## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

AMERICAN FREIGHT, LLC,

                Plaintiff,

    v.

SURPLUS FREIGHT, LLC,
SURPLUS FREIGHT, INC.,
STAGE CAPITAL, LLC,
ASAPH RINK, and
DAVID BELFORD

Civil Action No. 2:21-cv-1922

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff American Freight, LLC ("American Freight") files this Complaint seeking damages and preliminary and permanent injunctive relief against Defendants Surplus Freight LLC, Surplus Freight, Inc. (together with Surplus Freight LLC, "Surplus Freight"), Stage Capital LLC ("Stage Capital," and collectively with Surplus Freight, the "Defendant Entities"), Asaph Rink ("Rink"), and David Belford ("Belford," and together with Rink and the Defendant Entities, "Defendants").

## INTRODUCTION

1.    This case presents one of the more brazen violations of contractual non-compete and non-solicitation provisions by senior corporate executives seen by the Ohio courts in recent years.  Belford is a former director of American Freight, and Rink is the former President and Chief Executive Officer.  During their tenures at American Freight, both Belford and Rink were intimately involved in American Freight's business and competitive strategies, and were

compensated handsomely for this work.  As part of his buyout from American Freight in a corporate merger completed February 14, 2020, Belford received about $15 million in total payouts.  Rink received about $4.2 million in total compensation during his short tenure as CEO of American Freight (since August 2017), including a bonus in connection with the 2020 merger of American Freight of more than $1.8 million.

2.      Because of the competitively sensitive and confidential nature of the information to which they regularly had access at American Freight, both Rink and Belford contractually agreed to reasonable restrictions on their conduct after their ownership of shares and/or options in American Freight ended, including covenants that they would not compete with American Freight or solicit American Freight's employees, and would not use American Freight's confidential business information.

3.      As soon as the ink on their checks dried, however, Belford, Rink and others surreptitiously began to violate their non-compete and non-solicitation agreements in a coordinated and targeted attack on American Freight:  they set up a competing business, Surplus Freight, using American Freight's proprietary and confidential information, unabashedly misappropriated American Freight's distinctive designs, goodwill, trademark and trade dress, and embarked on a willful and malicious scheme to benefit themselves at the expense of their former employer, American Freight.

4.      Historically, Surplus Freight only operated stores in Canada and New York. However, after Rink resigned from American Freight and went to work for Belford, Surplus Freight began aggressively expanding into American Freight's U.S. markets, including in Maryland, Virginia, and North Carolina.  In recent months, Surplus Freight has opened competing stores near multiple American Freight locations and has announced on its Facebook

page that it is planning to open many more. Belford's and Rink's management of and participation in this expansion directly violates the terms of their non-competition agreements.

5.      Belford and Rink also have directed and coordinated an extensive campaign to poach employees from American Freight, using confidential information they misappropriated from American Freight, in violation of the terms of their non-solicitation and confidentiality agreements. Belford and Rink have directly or indirectly caused several employees, including key personnel, to leave American Freight and join Surplus Freight. Several additional employees report that they have been personally contacted by Surplus Freight employees and asked to join Surplus Freight. Even though Belford and Rink know that most of these employees also have their own non-competition and non-solicitation agreements, Belford and Rink have tortiously interfered with those contracts by instructing the defecting employees to breach those provisions and try to recruit their former colleagues for Surplus Freight.

6.      In addition to their knowing and willful contractual violations, Belford and Rink have violated the Defend Trade Secrets Acts ("DTSA") and Ohio Uniform Trade Secrets Act ("OUTSA"). Belford and Rink have misappropriated confidential and proprietary trade secret information, including information regarding American Freight's methods of operation, sales techniques, pricing models, suppliers, products, employee compensation models, and real estate strategy, and are using it to help Surplus Freight gain an unfair competitive advantage over American Freight.

7.      Besides stealing American Freight's employees and its confidential business information, Defendants have also misappropriated American Freight's goodwill and customer base. Surplus Freight's new U.S. stores blatantly copy the look and feel of American Freight's stores and Surplus Freight uses similar trademarks and trade dress to confuse American Freight's

customers into believing that Surplus Freight is, in fact, American Freight. This unlawfully converts American Freight's goodwill and misleads customers to believe they are still doing business with American Freight. Thus, Defendants have also violated trademark infringement laws.

8. Faced with evidence of this wrongful conduct, Belford has not denied that he is engaging in the prohibited conduct. Rather, he now claims that his non-compete **obligations** were terminated as part of the multi-million buyout of his stock and options. But the language he uses to support this position only relates to the termination of **his rights** under the relevant contracts, and did not waive, terminate, or otherwise affect American Freight's rights to enforce clear and unambiguous non-compete and non-solicitation agreements. Belford's position is meritless as a matter of contract, wrong as a matter of law, and inconsistent with economic rationality. It would make little economic sense for any company to pay millions of dollars in corporate executive buyouts only to have the executive compete on their front door moments after the buyout. Rink also did not deny that he is engaging in the conduct that American Freight alleges would violate his agreements. But Rink claimed that the scope of those agreements are overbroad, and thus, unenforceable against him. This position is meritless, as Rink explicitly agreed that the scope was reasonable and negotiated specific geographic exceptions in connection with his resignation. Rink also denied that he has had any involvement in soliciting American Freight employees, but wrongly claims that Surplus Freight has only hired employees who were terminated by American Freight. Rink also contends that even though the restrictive covenants are still in full force and effect, American Freight should not bother to enforce its rights because they are about to expire. But Rink is wrong about the expiration date of those

4

obligations, which run until at least February 2022, not counting additional time due to tolling while Rink was in breach.

9.      Defendants have already caused substantial and irreparable harm to American Freight through their improper actions. Because of their malfeasance, American Freight's ability to maintain and grow its business has been severely hindered while Defendants have been unjustly enriched. It is critical that Defendants, who are engaged in ongoing wrongful behavior, be stopped before they cause further damage to American Freight.

## PARTIES

10.     Plaintiff American Freight is a Delaware limited liability company with its principal place of business at 680 Sunbury Road, Delaware, Ohio.

11.     Defendant Surplus Freight LLC is an Ohio limited liability company with its principal place of business at 501 Morrison Road, Suite 100, Gahanna, Ohio 43230.

12.     Defendant Surplus Freight, Inc. is an Ohio corporation with its principal place of business at 501 Morrison Road, Suite 100, Gahanna, Ohio 43230.

13.     Defendant Stage Capital LLC is an Ohio limited liability company with its principal place of business at 501 Morrison Road, Suite 100, Gahanna, Ohio 43230.

14.     Defendant David Belford is an individual who, upon information and belief, is a citizen and resident of Naples, Florida 34102.

15.     Defendant Asaph Rink is an individual who, upon information and belief, is a citizen and resident of Bargersville, Indiana 46106.

5

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (trademark-related claims), 18 U.S.C. § 1836 (the DTSA), and 15 U.S.C. §§ 1114(1) and 1125(a) (the Lanham Act).

17.     This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367, because those claims are so related to American Freight's DTSA and Lanham Act claims that they form part of the same controversy.

18.     The Court has personal jurisdiction over all Defendants.  A substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District, as American Freight's principal place of business is located in this District.

19.     The Defendant Entities are registered to do business under the laws of the state of Ohio and have principal places of business in this District.

20.     Belford does business in Ohio, including owning and serving as the CEO of an Ohio company, his business activities in Ohio are among those giving rise to this dispute, and he caused harm to American Freight in Ohio.

21.     Rink does business in Ohio, including serving as an officer of an Ohio company, his business activities in Ohio are among those giving rise to this dispute, and he caused harm to American Freight in Ohio.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions underlying these claims occurred in this District.

## FACTS

**A.     American Freight**

23.     Belford's brother Steven Belford founded American Freight in Lima, Ohio in 1994 with the goal of providing working families with affordable furniture options.

24.     American Freight employs a "no frills, no fluff" business model, which includes storing and showing furniture in unvarnished warehouses, rather than high-end showrooms that use elaborate staging to entice customers.  Unlike other furniture retailers, including other "affordable" furniture retailers such as IKEA and Bob's Discount Furniture, American Freight does not invest significant resources into the interior decoration and design of its showrooms, or into the arrangement and staging of the furniture within the showroom.  Rather, American Freight displays its inventory simply and arranged by product (e.g., all couches will be displayed together, all recliners displayed together, etc.) and makes the bare-minimum investment into the interior of the store (e.g., no effort will be made to cover exposed ductwork or brick walls, floors will be unfinished, etc.).  By reducing or eliminating such non-essential decorating and staging, American Freight is able to reduce its overhead and passes those savings on to its customers. Furthermore, the distinctive look and feel of the American Freight stores leaves customers with the impression that they are receiving a bargain on their purchases.

25.     Since its founding, American Freight has devoted considerable time and resources toward its unique and proprietary sales techniques, operations, real estate strategy, market analysis, and pricing model.  This investment has contributed in large part to the success of American Freight and its employees in the highly competitive retail furniture market.

26.     Today, American Freight is a leading national retailer of quality furniture and mattresses, and it operates about 350 stores located throughout 40 states and Puerto Rico.

American Freight's retail stores provide working families with affordable options for purchasing mattresses and furniture.

**B.      Stage Capital and Surplus Freight**

27.      Stage Capital was founded in 2005 by Belford.  Upon information and belief, Stage Capital is the parent company of Surplus Freight, Inc.  Surplus Freight, Inc. is a retailer of furniture and mattresses.  For the fifteen years before May 2020, Surplus Freight, Inc.'s geographic market was limited to 33 stores in Canada (which were operated under the name Surplus Furniture and Mattress Warehouse), and 3 stores in New York.  Then, in or around May 2020, Belford founded Surplus Freight LLC, where he serves as president and CEO.

**C.      Rink Agreed To Confidentiality, Non-Solicitation, and Non-Competition Covenants In His Employment Agreement When He Joined American Freight**

28.      In 2006, Rink was hired to work at American Freight as a sales associate.  When he was hired, Rink signed a Confidentiality and Non-Competition Agreement (hereinafter, "Rink Employment Agreement," a true and accurate copy of which is attached hereto as **Exhibit 1**).

29.      Under the Rink Employment Agreement, Rink acknowledged and agreed that American Freight's "business and services are highly specialized, the identity and particular needs of [American Freight's] customers and suppliers are not generally known, and the documents and information regarding [American Freight's] customers, suppliers, services, products, methods of operation, sales, pricing and costs are highly confidential and constitute trade secrets."  (Rink Employment Agreement, Section 1.)  Rink further acknowledged that he had "access to trade secrets and confidential information belonging to [American Freight], the loss of which cannot adequately be compensated by damages."  (*Id*.)

30.      Rink further agreed to "hold in strict confidence any and all confidential and proprietary information concerning [American Freight's] services, processes, sales, business

systems, operations, and clients." (Rink Employment Agreement, Section 3.) Rink agreed not to "copy, take or remove" any of American Freight's "books, records, customer lists, leads, . . . or any other documents, materials or equipment. . . ." (Rink Employment Agreement, Section 4).

31. Under the Rink Employment Agreement, Rink also agreed to restrictive covenants governing his activities after leaving American Freight.

32. First, Rink agreed to a Covenant Against Competition, which provided that during the term of his employment and for a period of two years thereafter, he would not, "directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with in any manner the ownership, management, operation, or control of any business which competes directly or indirectly with [American Freight] in any existing market area of American Freight at the time of the termination" of his employment. (Rink Employment Agreement, Section 2.)

33. Second, Rink agreed to a Non-solicitation of Employees provision, which stated that during the term of his employment and for a period of two years thereafter, he would not, "directly or indirectly, absent the written consent of [American Freight]; (a) solicit, interfere with, or endeavor to cause any employee of [American Freight] to leave his or her employment; or (b) induce or attempt to induce any such employee to work for any other entity." (Rink Employment Agreement, Section 5.)

34. Rink agreed that if he breached or threatened to breach the restrictive covenants (Sections 2 through 6) of the Rink Employment Agreement, American Freight could "enjoin [Rink], together with all persons acting in concert with [Rink], from such breach or threatened breach." (Rink Employment Agreement, Section 7.) American Freight is also entitled "to

collect from [Rink] the court costs, actual attorneys and experts fees, and other expenses of enforcing [American Freight's] rights." (*Id*.)

35.     Before he was hired, Rink had no experience in the retail furniture business. American Freight spent considerable money, resources and time training Rink to perform in this field. As a result of American Freight's considerable investment, Rink gained expertise and became President of Sales for American Freight by 2015.

## C.     In 2015, Belford and Rink Agreed To Non-Solicitation, Non-Competition, and Confidentiality Covenants in Exchange for Stock Options

36.     In October 2014, American Freight was acquired by an affiliate of private equity firm The Jordan Company of New York. Founder and then-CEO Steven Belford continued to hold a significant stake in the company, and much of the senior management (including Steven Belford and Rink) retained their positions.

37.     Belford joined American Freight's board of directors after the transaction. As a member of the board, Belford was provided with confidential and proprietary information regarding every aspect of American Freight's business, including its business strategy, real estate and expansion strategy, profitability of particular stores, processes for serving customers, and vendor relationships.

38.     Belford also has an ongoing relationship with American Freight as the owner of several of American Freight's largest merchandise suppliers. For example, Belford is an owner of or has an interest in Solstice Sleep Products, Inc., United Furniture Industries, Inc., United Wood Products, Inc., NC Upholstery, LLC and Associated Bunk Bed Company, each of which is an American Freight vendor. In addition, several of American Freight's real estate leases are with Belford.

39.     On January 28, 2015, American Freight granted stock options to Belford, via the Separate Property Trust of David A. Belford, pursuant to a Non-Qualified Stock Option Agreement ("Belford 2015 Option Agreement," a true and accurate copy of which is attached hereto as **Exhibit 2**).  As a condition of this grant, Belford agreed to several restrictive covenants, including non-solicitation, non-competition, and confidentiality covenants.  (*See* Belford 2015 Option Agreement, Section 21(f) ("the obligations of the Separate Property Trust of David A. Belford . . . shall, *mutatis mutandis*, bind David A. Belford individually").)

40.     Under the Belford 2015 Option Agreement, Belford agreed to a non-solicitation covenant, which stated that he:

> shall not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, officer, director, partner, manager, employee, agent, contractor, consultant or otherwise):  (a) hire or engage, or recruit, solicit or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to [American Freight], (b) induce or attempt to induce any current or former employee of, or consultant to, [American Freight], to leave the employ of [American Freight], or in any way interfere with the relationship between [American Freight] and any [of its] employees or consultants, [or] (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to [American Freight] . . . .

(Belford 2015 Option Agreement, Section 17(f).)

41.     Belford further agreed to a non-competition covenant, which stated that he:

> shall not directly or indirectly, (a) own, operate, manage, control, participate in, provide support to (financial or otherwise), consult with, advise, permit his or her name to be used by, provide services for, lease, or in any manner engage in or knowingly facilitate (including, in association with any person, or through any person), any business that sells (i) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold or offered by [American Freight] . . . or (ii) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the Protected Territory (collectively, "Covered Activities"); or (b) acquire an ownership interest in, invest in or provide services to any person which engages in any Covered Activities (other than [American Freight]) as a partner, shareholder, principal, agent, consultant or in any other relationship or capacity; provided, however, that

no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(Belford 2015 Option Agreement, Section 17(g).)

42.     Although the "Protected Territory" is not defined in the Belford 2015 Option Agreement, later and related documents establish that the Protected Territory is defined as North America.  *See, e.g.*, Rink 2018 Option Agreement, Section 17(a).  However, the non-competition covenant was subject to certain exceptions, which were set forth in the Selling Equity Agreement, dated September 30, 2014.  Upon information and belief, those exceptions permitted Belford to continue owning and operating the Surplus Freight Inc. locations in Canada and New York, but did not permit him to expand those stores' geographical footprint.

43.     These covenants apply to Belford during the "Restricted Period," which is defined as "the period during which [the D. Belford Trust] or his permitted transferees holds any Options [in American Freight] or securities underlying such options, and for two years thereafter." (Belford 2015 Option Agreement, Section 17(a).)  In the event of an alleged breach or violation by Belford of the non-competition or non-solicitation covenants, the Restricted Period is tolled until such breach or violation is cured.  (Belford 2015 Option Agreement, Section 17(h).)

44.     With the negotiated carve outs, the scope and duration of the restrictive covenant provisions in the Belford 2015 Option Agreement are reasonable under Delaware law, which governs the contract.  (Belford 2015 Option Agreement, Section 21(e); see also Section 17(i).)

45.     Belford's options were cancelled by American Freight on or around February 14, 2020 (on the date of the closing of the merger of American Freight) pursuant to an Option Cancellation Agreement dated January 13, 2020.  Also on or around February 14, 2020, Belford's outstanding shares in American Freight were repurchased by American Freight, triggering the two-year Restricted Period.  As part of the merger of American Freight, Belford

was compensated handsomely with a cash payout of $15,549,084.97 in exchange for the cancellation of his option rights and for his outstanding shares in American Freight.

46.     As discussed below, the Option Cancellation Agreement did not terminate the Belford 2015 Option Agreement, and American Freight did not release, waive or terminate the restrictive covenants set forth therein.  As such, the restrictive covenants under the Belford 2015 Option Agreement, including the non-competition and non-solicitation covenants, survived the Option Cancellation Agreement and remain in full force and effect.

47.     Thus, not counting any applicable tolling period, Belford's non-solicitation and non-competition obligations remain in full force and effect until at least February 14, 2022.

48.     Belford also agreed to not disclose or use for his own account any of American Freight's confidential information, both during and after the Restricted Period:

> [Belford] recognizes and acknowledges that [Belford] has and may in the future receive certain confidential and proprietary information and trade secrets of [American Freight] (the "Confidential Information"), and that such Confidential Information constitutes valuable, special and unique property of [American Freight].  The term Confidential Information will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to [American Freight's] current or potential business (including information received by [American Freight] from third parties), and (b) not generally or publicly known. [Belford] agrees not to disclose or use for [Belford's] own account any Confidential Information without the Board's prior written consent, except [in certain situations, not applicable here].

(Belford 2015 Option Agreement, Section 17(b).)

49.     Belford specifically agreed that because he had access to proprietary and confidential information, money damages would not be an adequate remedy for any breach of Sections 17(b)-(g), and American Freight could seek injunctive relief.  (Belford 2015 Option Agreement, Section 17(h).)  Belford also agreed that if American Freight successfully brought an action against him for breach, he must reimburse American Freight for all reasonable litigation expenses, including attorneys' fees.  (*Id*.)

50. That same day, American Freight also granted stock options to Rink, pursuant to a Non-Qualified Stock Option Agreement. ("Rink 2015 Option Agreement," a true and accurate copy of which is attached hereto as **Exhibit 3**).

51. As a condition of this grant, Rink agreed to the same restrictive covenants as Belford, including non-solicitation (Rink 2015 Option Agreement, Section 17(f)) and non-competition (Rink 2015 Option Agreement, Section 17(g)) covenants.

52. These covenants apply to Rink during the "Restricted Period," which is defined as "the term of [Rink's] (i) employment by [American Freight] or (ii) membership on the Board of Directors of [American Freight], and, in each case, a period of two (2) years after" he left American Freight. (Rink 2015 Option Agreement, Section 17(a).) In the event of an alleged breach or violation by Rink of the non-competition or non-solicitation covenants, the Restricted Period is tolled until such breach or violation is cured. (*See* Rink 2015 Option Agreement, Section 17(h).)

53. As discussed below, Rink resigned from American Freight on June 6, 2019. Thus, not counting any applicable tolling period, Rink's non-solicitation and non-competition obligations under the Rink 2015 Option Agreement remain in full force and effect until at least June 6, 2021.

54. With the carve outs negotiated in connection with Rink's resignation, which are discussed below, the scope and duration of the restrictive covenants in the Rink 2015 Option Agreement are reasonable under Delaware law, which governs the contract. (*See* Rink 2015 Option Agreement, Section 21(e); *see also*, Section 17(i).).

55. Rink also agreed to the same confidentiality provision as Belford, which applies both during and after the Restricted Period. (Rink 2015 Option Agreement, Section 17(b).)

14

56. Rink also agreed to the same enforcement provisions as Belford, which provide that because he had access to proprietary and confidential information, money damages would not be an adequate remedy for any breach of Sections 17(b)-(g), and American Freight may seek injunctive relief.  (Rink 2015 Option Agreement, Section 17(h).)  Rink also agreed that if American Freight successfully brings an action against him for breach, he must reimburse American Freight for all reasonable litigation expenses, including attorneys' fees.  (*Id*.).

57. On November 3, 2016, the board voted to promote Rink from President of Sales to President of the Companies.

58. On August 23, 2017, Belford resigned from his position as a director of American Freight.  Pursuant to an Agreement and General Release between Belford and American Freight, Belford expressly agreed that the restrictive covenants set forth in the Belford 2015 Option Agreement survived the termination of his membership on the board of directors of American Freight.  ("Belford Agreement and General Release," a true and accurate copy of which is attached hereto as **Exhibit 4**, Section 9).  Thus, the non-solicitation and non-competition covenants in the Belford 2015 Option Agreement remained in full force and effect during the Restricted Period set forth therein.

**D.    In 2018, Rink Again Agreed to Non-Solicitation and Non-Competition Obligations**

59. Rink became CEO of American Freight in early 2018.  During his tenure as CEO, American Freight compensated Rink in excess of $4.2 million.

60. On February 14, 2018, American Freight granted additional stock options to Rink, pursuant to a Non-Qualified Stock Option Agreement ("Rink 2018 Option Agreement," a true and accurate copy of which is attached hereto as **Exhibit 5**).

15

61.     Under the Rink 2018 Option Agreement, Rink again agreed to non-solicitation and non-competition covenants, which contained the same language as under the Rink 2015 Option Agreement.  (Rink 2018 Option Agreement, Section 17(f) and 17(g).)

62.     The Rink 2018 Option Agreement expressly stated that these covenants were "in addition to, and not in lieu of, any non-competition, non-solicitation or other similar obligations contained in any other agreements between [Rink] and [American Freight]."  (Rink 2018 Option Agreement, Section 17(i).)

63.     The covenants in the Rink 2018 Option Agreement apply during the "Restricted Period," which is defined as "the period during which [Rink] holds any Securities and for two (2) years thereafter."  (Rink 2018 Option Agreement, Section 17(a).)  In addition, in the event of an alleged breach or violation by Rink of the non-competition or non-solicitation covenants, the Restricted Period is tolled until such breach or violation is cured.  (Rink 2018 Option Agreement, Section 17(h).)

64.     With the carve outs negotiated in connection with Rink's resignation, which are discussed below, the scope and duration of the restrictive covenant provisions in the Rink 2018 Option Agreement are reasonable under Delaware law, which governs the contract.  (*See* Rink 2018 Option Agreement, Section 21(e); *see also*, Section 17(i).).

65.     Rink's outstanding stock in American Freight was re-acquired on or around February 14, 2020 as part of American Freight's merger agreement, triggering the two-year Restricted Period.  Thus, not counting any applicable tolling period, Rink's non-solicitation and non-competition obligations remain in full force and effect.  Rink was paid $106,773.23 for his shares in American Freight as part of the merger, and also received a $1.8 million bonus in connection with that transaction.

16

66.     Rink also agreed to the same confidentiality provision as in the Rink 2015 Option Agreement, which applies both during and after the Restricted Period.  (Rink 2018 Option Agreement, Section 17(b).)

**E.     Rink Leaves American Freight On Bad Terms**

67.     On June 6, 2019, following an accusation of sexual harassment lodged against him by a subordinate, Rink resigned from his position as CEO of American Freight.  In connection with Rink's resignation, he acknowledged that American Freight had grounds to terminate him for cause, and entered into an Agreement and General Release ("Release Agreement," a true and accurate copy of which is attached hereto as **Exhibit 6**), which severed his employment with American Freight, including any board positions he held.

68.     In the Release Agreement, Rink expressly acknowledged and agreed that his obligations under the 2015 and 2018 Option Agreements, including the restrictive covenants therein, would survive termination of Rink's employment.  (Release Agreement, Section 10.)

69.     The Release Agreement provided an exception to the non-competition covenants of the 2015 and 2018 Rink Option Agreements, such that Rink would be permitted to be employed by Surplus Furniture and Mattress Warehouse, but only at its then current locations and any new locations within Canada:

> the Company agrees that [Rink] shall benefit from the Specific Exception relating to the Canadian Retail Company in the Selling Equityholder Agreement, dated September 30, 2014 between David A. Belford and American Freight, Inc., which for the avoidance of doubt, **would allow [Rink] to be employed in the business of Surplus Furniture and Mattress Warehouse ("Canadian Retail Company"), in its current locations, and any new location in Canada** (it being agreed by the Executive that the advertising by the Canadian Retail Company shall be targeted at retail customers within Canada and the Canadian Retail Company may not sell (including via the Internet, or otherwise) its products to retail customers in the United States or Mexico). [Rink] acknowledges and agrees that the benefit of the Specific Exception relating to the Canadian Retail Company shall not apply to, and shall not provide [Rink] with any exception from, any non-solicitation covenants

17

applicable to the [Rink] in connection with any potential employment by the Canadian Retail Company, or otherwise.

(*Id*., emphasis added.)

70.     On August 9, 2019, American Freight executed an Amendment to the Release Agreement ("Amended Release Agreement," a true and accurate copy of which is attached hereto as **Exhibit 7**) which permitted Rink to be employed by Surplus Freight, Inc., but only at its then current location and any new locations within New York City (hereinafter, the "Rink Specific Exception"):

> [T]he business of (a) **Surplus Freight, Inc. d/b/a Express Furniture Warehouse ("New York Retail Company"), in its current location (700 Grand Concourse, Bronx, NY), and any new location within the City of New York** (it being agreed by [Rink] that any advertising by the New York Retail Company shall be targeted at retail customers within the City of New York and the New York Retail Company may not sell (including via the Internet, or otherwise), its products outside of the City of New York) and (b) **Surplus Furniture and Mattress Warehouse ("Canadian Retail Company"), in its current locations, and any new location in Canada** (it being agreed by [Rink] that the advertising by the Canadian Retail Company shall be targeted at retail customers within Canada and the Canadian Retail Company may not sell (including via the Internet, or otherwise) its products to retail customers in the United States or Mexico).

(emphasis added.)  The fact that he specifically negotiated this amendment further emphasizes that Rink knew and understood the restrictions on his ability to work for or on behalf of Surplus Freight in the United States.

71.     Both the Release Agreement and the Amended Release Agreement make clear that the Rink Specific Exception did not provide any exception to the other restrictive covenants in the 2015 and 2018 Option Agreements, including the non-solicitation covenants.  Thus, the non-solicitation and non-competition covenants in the Rink 2015 and 2018 Option Agreements remain in full force and effect.

**F.      Rink and Belford Breach Their Obligations to American Freight**

72.     Upon information and belief, after Rink left American Freight, he began to work for Surplus Freight, Inc. in New York.  Rink's publicly available LinkedIn profile (a true and accurate copy of which is attached hereto as **Exhibit 8**) indicates that Rink joined "Surplus Furniture and Mattress" as President of Sales on or around September 2019, and then joined Stage Capital as President of Retail in January 2020.  Surplus Freight LLC was founded by Stage Capital in May 2020.

73.     Surplus Freight is a furniture retailer, and its stores are nearly carbon copies of American Freight's stores:  its stores have the same look and feel as American Freight's stores, it sells many of the same products from the same suppliers, and the inventory is arranged and priced in a similar way.  Stage Capital is the parent company of Surplus Freight Inc. and, therefore, Belford ultimately owns and controls Surplus Freight, Inc.  Upon information and belief, in his capacity as President of Retail at Stage Capital, Rink has managed, provided support to, consulted with, advised, and/or knowingly facilitated the business of Surplus Freight.

74.     Since May 2020, Surplus Freight has aggressively expanded into American Freight's U.S. market.  Specifically, Surplus Freight opened at least 19 stores in the states of North Carolina, Maryland, and Virginia, which are key markets for American Freight.  Some of these Surplus Freight stores opened in locations that are very close to American Freight stores.  Surplus Freight plans to open at least 20 stores throughout the United States in 2021.  According to Surplus Freight's Facebook page, Surplus Freight has opened at least eight new stores in Virginia and North Carolina since April 1, 2021, including opening stores in Norfolk and Newport News just days ago on April 16, 2021.

75.     Rink and Belford's participation in and assistance with this expansion of the Surplus Freight business into the United States constitutes a blatant violation of the non-competition covenants to which Rink and Belford agreed.

76.     Rink engaged American Freight employees to perform services for Surplus Freight while those employees were still employed by American Freight.  For example, on July 30, 2020, Rink used his personal email address to contact American Freight's Director of Real Estate at his personal email address, in order to ask for help with research on the real estate market.  This constitutes a further violation by Rink of the restrictive covenants that he agreed to.

77.     Surplus Freight also launched an extensive campaign to poach current American Freight employees.  Rink and Belford were aware of and directed this campaign, which constitutes a blatant violation of the non-solicitation covenants to which they agreed.

78.     On June 25, 2020, Haris Buljina left his position as a Store Manager for American Freight.  Buljina now works for Surplus Freight as Vice President of Sales.  Upon information and belief, Buljina was hired to work directly for Rink and is under Rink's and Belford's direction and/or control.

79.     At the direction and control of Rink and Belford, Buljina embarked upon a campaign to encourage American Freight's employees to defect to Surplus Freight, even though Rink and Belford knew or should have known that Buljina had signed an agreement with American Freight that contained a non-solicitation provision.  Buljina personally has contacted multiple American Freight employees and solicited them to leave American Freight in order to work for Surplus Freight.

80.     On November 30, 2020, Joel Cady left his position as a Regional Sales Manager for American Freight.  Cady now works for Surplus Freight.  Upon information and belief, Cady

was hired to work directly or indirectly for Rink and is under Rink's and Belford's direction and/or control.

81.     At the direction and control of Rink and Belford, Cady joined Buljina's campaign to encourage American Freight's employees to defect to Surplus Freight, even though Rink and Belford knew or should have known that Cady had signed an agreement with American Freight that contained a non-solicitation provision. Cady personally has contacted multiple American Freight employees and solicited them to leave American Freight in order to work for Surplus Freight.

82.     In or around the first week of March 2021, Eric Murray, the store manager for American Freight's Newport News, Virginia location, reported to a supervisor at American Freight that Buljina had contacted him to ask if Murray would join Surplus Freight.

83.     In or around the second week of March 2021, Kirill Koval, the store manager for American Freight's Norfolk, Virginia location, also reported to a supervisor at American Freight that Buljina had previously contacted to ask if Koval would join Surplus Freight.

84.     Murray and Koval did not accept these solicitations from Surplus Freight and are both still employed by American Freight. But several other American Freight employees have accepted these wrongful solicitations, often with little or no notice, leaving American Freight scrambling to fill those positions.

85.     On or around March 19, 2021, Kayla Hinson, the store manager for American Freight's Richmond, Virginia location, reported to a supervisor at American Freight that Buljina had contacted her and had asked her to join Surplus Freight. Hinson also reported speaking with Cady. On or around March 23, 2021, Hinson reported that she had accepted the offer from Surplus Freight, and her last day working for American Freight was on March 24, 2021. Hinson

21

is now the store manager at a new Surplus Freight store in Richmond.  Surplus Freight's Richmond store opened on or around April 2, 2021, and it is located within a mile of American Freight's Richmond store.  Hinson agreed to a non-competition and confidentiality agreement on December 3, 2015.

86.     Strangely, Hinson initially requested that she be fired.  When asked why, Hinson said that she had informed Surplus Freight about the non-compete agreement she had signed with American Freight, and had asked Surplus Freight about whether working there would violate it.  Hinson said that Surplus Freight instructed her that if she was fired from American Freight, that agreement would no longer apply.  This is incorrect, however, and it shows that Surplus Freight was on notice that the employees it was recruiting had non-compete agreements, and nonetheless willfully induced them to breach those agreements.

87.     Also on or around March 23, 2021, Shawn Brooks, the store manager for American Freight's store in Fredericksburg, Virginia, reported to a supervisor at American Freight that he had received and accepted an offer to join Surplus Freight.  In a subsequent conversation, he reported that Cady had recruited him to join Surplus Freight.  Brooks's last day working for American Freight was on March 24, 2021.  Brooks is now the store manager at a new Surplus Freight store in Fredericksburg.  Surplus Freight's Fredericksburg store opened on or around April 2, 2021, and it is located only one highway exit up from American Freight's Fredericksburg store.  Brooks agreed to American Freight's standard non-competition and confidentiality agreement on October 28, 2018 ("Form Confidentiality and Non-Competition Agreement," a true and accurate copy of which is attached hereto as **Exhibit 9**).

88.     But Surplus Freight is not only poaching American Freight's managers.  As part of this top-to-bottom attack on American Freight, several other American Freight employees in

the region, including key holders (who are responsible for keys to the stores), logistics coordinators, sales clerks and even warehouse associates, have resigned with little or no notice to join Surplus Freight.  American Freight's investigation is ongoing, and continues to discover new evidence regarding this scheme.

89.     Surplus Freight's new stores and Surplus Freight's poaching of American Freight employees has significantly harmed the American Freight business.  That harm will continue to grow if Surplus Freight continues to poach employees from American Freight stores.

90.     The high level of departures seen in the past month is quite unusual for the mid-Atlantic region of American Freight stores and has had a strong negative effect on the impacted stores.  For example, a lack of experienced store management can lead to a decline in sales, as well as a decline in the high level of customer service and satisfaction American Freight employees strive to achieve.  Once a store develops a reputation for poor customer service among consumers in an area, it is very difficult to change that impression and regain that lost goodwill.  If American Freight employees continue to leave, especially if they give little to no notice, the management and reputation of these stores will continue to suffer.

91.     Preliminary sales information shows that stores in the Virginia region have seen a marked decrease in sales.  Although this region was one of the top performing regions in 2020, it is now one of the worst performing regions in 2021.

92.     In addition, American Freight expended significant resources quickly re-staff stores where managers quit with little or no notice.  For example, in order to keep the Fredericksburg, VA store operating, American Freight had to fly in a manager from another region to help for a few weeks while another manager was hired and trained.  American also paid

$3,500 in relocation expenses to relocate a manager from Norfolk, VA to Richmond, VA to take over the position left open by Hinson.

93.     Furthermore, the large number of employees leaving has caused a great deal of stress on the remaining employees.  Because of American Freight's business model, stores are leanly staffed.  Losing employees with no notice leads to a strain on the remaining employees who have to cover for them until they can be replaced.  It also requires the managers to spend time hiring and training replacements, rather than focusing on running the stores.

94.     The harm to the stores in this region caused by Surplus Freight is ongoing, because Surplus Freight continues to poach employees.  For example, since March 24, 2021, an additional sales associate quit with no notice in order to join Surplus Freight, another sales associate had requested to be fired, and three warehouse associates have quit with no notice in order to join Surplus Freight.

95.     Given the extensive and highly coordinated nature of the outreach by Buljina and Cady, it is inconceivable that Rink and Belford are not aware of and involved in this scheme to poach American Freight's employees.

96.     On April 8, 2021, American Freight sent cease and desist letters to Belford, Rink, Buljina and Cady (true and accurate copies of which are attached hereto as **Exhibits 10, 11**, **12**, and **13**, respectively), reminding them of their non-competition and non-solicitation agreements and asking them to confirm by April 14, 2021 that they would adhere to them.  Buljina and Cady failed to respond.

97.     Belford responded on April 14, 2021 and asserted that the Option Cancellation Agreement terminated the Belford 2015 Option Agreement without preserving any of the restrictive covenants contained therein.  As discussed above, this is incorrect.  The Belford

24

Option Cancellation Agreement did not terminate the Belford 2015 Option Agreement, and American Freight did not release, waive or terminate the restrictive covenants set forth therein. As such, the restrictive covenants under the Belford 2015 Option Agreement, including the non-competition and non-solicitation covenants, survived the Belford Option Cancellation Agreement and remain in full force and effect. A response providing this information to Belford was sent on April 15, 2021. Belford's attorney responded on April 16, 2021 (a true and accurate copy of which is attached hereto as **Exhibit 14**), again incorrectly asserting that the Belford Option Cancellation Agreement terminated the Belford 2015 Option Agreement without preserving any of the restrictive covenants therein.

98. Rink's attorney responded April 16, 2021 (a true and accurate copy of which is attached hereto as **Exhibit 15**), admitting that Surplus Freight had hired "several" former employees of American Freight, but that these individuals had been hired after contacting Surplus Freight following the loss of their jobs with American Freight. Rink also claims to have instructed Buljina not to hire or communicate with American Freight employees. With respect to Rink's breach of his non-competition agreement, Rink did not deny breaching the agreement but instead argued that "[c]ertain aspects of the non-compete agreements are also unenforceable." As discussed above, this is incorrect.

**G.     Rink and Belford Had Access to American Freight's Trade Secrets**

99. Throughout Rink's tenure as CEO of American Freight, he had extensive access to and received confidential and proprietary information and trade secrets of American Freight.

100. For example, American Freight commissioned an industry leading strategy and consulting firm to provide American Freight with highly confidential and extensive research and analyses into its business, which American Freight developed into a "Store Opportunity Study." This study, conducted in March 2019, analyzed retail markets and real estate options across the

United States to determine the number of American Freight retail locations a region could support.  The Store Opportunity Study conferred a significant advantage, and it was kept highly confidential within American Freight and only shared among employees on a need-to-know basis and third parties subject to confidentiality and non-disclosure agreements.

101.    In addition, Rink had access to and knowledge of American Freight's other confidential and proprietary information and trade secrets, including (a) detailed market research and enhanced marketing strategies used to better understand American Freight's customers, more efficiently target American Freight's demographic at the local level, and improve American Freight's site selection strategy with new marketing and demographic data provided by location targeting support from analyzing local population demographics to ensure the market aligns with the American Freight customer; (b) American Freight's monthly financial statements and other financial information, including detailed information on sales, profits and losses, EBITDA for mature stores and new stores, cash flow, working capital, store four-wall EBITDA margins and performance metrics for stores, including data on new management; (c) American Freight real estate strategy, average location statistics, site selection criteria, and new neighborhoods of opportunity, including the Store Opportunity Study; (d) merchandise and supply chain information, including merchandise spend by supplier, methods to optimize supply chain efficiency, right sizing for inventory, inventory turnover rate and margin rate information; (e) advertising techniques and strategy, including digital optimization strategies for enhancing return on ad spend and other metrics (collectively, the "Confidential Information and Trade Secrets").  Gathering the required information for the Confidential Information and Trade Secrets involved store audits, consumer surveys, survey follow up calls, customer intercepts, website audits, store associate interviews, and store visits.

102.    Because of its Confidential Information and Trade Secrets, American Freight benefited from improved store performance and new store ramp, the ability to scale quickly and efficiently, increased margins, reduced warehousing and product-related costs, lower lease costs, and a larger new store pipeline.

103.    American Freight takes commercially reasonable measures to protect the confidentiality of the Confidential Information and Trade Secrets.  American Freight's employees are required to agree to the Form Non-competition and Confidentiality Agreement (see Exhibit 9), which, among other things, prohibits the disclosure of American Freight's confidential and proprietary information, including the Confidential Information and Trade Secrets, and provides that all such information is the property of American Freight and must be returned to American Freight upon termination of the agreement.  Other measures taken by American Freight include password-protected security, keeping the Confidential Information and Trade Secrets on the company's secure server, and strictly limiting such access to such information to a limited number of authorized personnel on a need-to-know basis.  American Freight also maintains and protects the Confidential Information and Trade Secrets by means which include, for example: (i) requiring user IDs and passwords to access American Freight's computer system; (ii) locking up confidential documents or shredding confidential documents upon disposal; (iii) requiring key or key card access to American Freight's facilities; and (iv) limiting visitors' access to American Freight's offices.

104.    Rink, during his employment with American Freight, consistently was given access to and interacted with the Confidential Information and Trade Secrets that drive American Freight's success.  For example, Rink often reviewed the performance of recently opened stores, highlighted financial results and key personnel assigned to each store, discussed American

27

Freight's current pipeline and potential future locations, and discussed supplier-focused initiatives involving regionalized buying strategies and evaluating trends in inventory. Rink received, reviewed and commented on the Store Opportunity Study.

105. Because of his position as a director, Belford also had access to and received the Confidential Information and Trade Secrets. Furthermore, after Belford left the board, he continued to receive Confidential Information and Trade Secrets at Rink's direction.

**H.    Rink and Belford Used Trade Secrets to Compete with American Freight**

106. Surplus Freight's selection of new store locations correlates with the locations identified as areas that can support multiple additional stores in the Store Opportunity Study commissioned by American Freight while Rink was CEO. Rink breached the confidentiality covenants within the Rink 2015 and 2018 Option Agreements by disclosing the Confidential Information and Trade Secrets to Surplus Freight to enable it to compete unfairly with American Freight in an effort to expand into geographic territories American Freight plans to expand into.

107. In addition, upon information and belief, Defendants are using their insider knowledge of American Freight's employees and compensation structure to lure employees away from American Freight. For example, upon information and belief, employees were offered compensation that was designed to be slightly higher than that offered by American Freight (e.g., American Freight employees were offered a 6% commission on sales if they joined Surplus Freight, where American Freight offers a 5% commission).

108. Because of the competitive advantage Defendants gained by using the Confidential Information and Trade Secrets, American Freight has lost a significant advantage in these prime markets. Indeed, if Defendants' new stores succeed in these markets, its will be difficult if not impossible for American Freight to achieve the full market potential of that

geographic area.  But even if Defendants' stores fail, Defendants will have created a negative association with discount furniture stores in these markets, again making it difficult for American Freight to do business in these markets.

109.    Surplus Freight's unfair expansion into the U.S. also has significantly curtailed American Freight's prospects of expanding into further markets throughout the country, which has severely limited and will continue to severely limit its ability to grow the business.

110.    American Freight has and will continue to lose sales as a result of Rink's use of the Confidential Information and Trade Secrets and Surplus Freight competing unfairly.

111.    Upon information and belief, the Defendant Entities and Belford know that Rink is using the Confidential Information and Trade Secrets, but they have not taken steps to prevent them from doing so.  As a result, they have benefited from the improper disclosure of Confidential Information and Trade Secrets.

## I.    Surplus Freight Copies the Trademarks and Trade Dress of American Freight

112.    American Freight has a distinctive and identifiable trade dress that is associated with its business.  American Freight's stores have a "no frills, no fluff" look and feel that leave customers with the impression that they are receiving a bargain on their purchases.  Elements of American Freight's trade dress include storing and showing furniture in warehouse-style stores with minimal interior decoration and muted color schemes, a lack of any sort of staging or the like of the furniture, displaying the inventory simply and arranged by product (e.g., all couches will be displayed together, all recliners displayed together, etc.), displaying unboxed furniture alongside warehouse boxes,  and simple store fronts with minimal decoration and muted color schemes (collectively, the "American Freight Trade Dress").

113.    Contemporaneously with its sudden expansion into the United States, Surplus Freight, at the direction of Belford and Rink, has engaged in a concerted effort to transplant and mimic the American Freight Trade Dress and business model.

114.    For example, Surplus Freight provides services that are highly similar to those offered by American Freight.  On the "About Us" page of Surplus Freight's website, surplusfreight.com (the "Surplus Freight Website"), the company describes itself as "a furniture retailer" that "carries brand name furniture purchased direct from the manufacturer at deeply discounted prices," including "sofas, loveseats, . . . sectionals[,] . . . recliners, mattresses, . . bedroom seats[,] . . . dining room tables, accent furniture, and home décor."  The similarity in the merchandise provided by Surplus Freight contributes to confusion by customers between American Freight and Surplus Freight.

115.    Surplus Freight also uses signs, print banners, print layouts, website banners, fonts, marketing offers and messaging, store layouts, sales practices, and price points, among other things, that are all highly similar or identical to those currently in use by American Freight. These similarities also contribute to confusion by consumers between American Freight and Surplus Freight.

116.    The American Freight and Surplus Freight logos are very similar, as depicted below.  Both have a large sign with the name of the company (i.e. either "American Freight" or "Surplus Freight") on the top row, with the words "furniture" and "mattress" beneath them.  The wording on both signs is in all block letters and in nearly the same font.




30

117.    Surplus Freight also uses highly similar or identical wording and design on its website banners and advertising, as well as highly similar or identical price points.

118.    For example, Surplus Freight has copied American Freight's program that allows customers to take furniture home that day with a small deposit, and it even advertises the program in similar wording with white letters on a red background.

Surplus Freight                    American Freight




119.    This program is also advertised in similar ways in the stores, with similar wording posted on temporary wall banners or signs.

Surplus Freight                    American Freight





120.    Surplus Freight has also copied American Freight's free layaway program, and has advertised the program in similar wording using similar fonts.

Surplus Freight                    American Freight



121.     In another example, both stores offer the same package of 18 pieces of furniture for the exact same price of $998.  Both stores also use similar fonts for these advertisements.

Surplus Freight



American Freight

122.     In another example, both stores offer the same package of 7 pieces of living room furniture for the exact same price of $398.  Both stores also use similar fonts for these advertisements, with the headline in all capital letters and the list of furniture in lower case, and they both list the price in red.

Surplus Freight



American Freight



123.     In another example, both stores use the exact same wording to offer a package of "2 mattress sets any size" that you can "Mix & Match" for the exact same price of $298.  Both stores also use similar fonts and capitalization, and they both list the price in red.

Surplus Freight



American Freight



124.     Surplus Freight has also copied the unique and distinctive American Freight Trade Dress, including by displaying its inventory by product, making limited effort to stage the

inventory within the showroom, using minimal decorations with a muted color scheme, and mimicking the warehouse-style interior.  As depicted in the photos below, the stores are so similar that it is difficult, if not impossible to tell them apart.  These pictures have multiple common features, including the arrangement of items on the showroom floor, as well as the presence of pricing signage on most items.

American Freight – Silver Spring, MD



American Freight – Hagerstown, MD



Surplus Freight – Germantown, MD



Surplus Freight – Essex, MD



125.    The bedroom furniture is also arranged in similar ways with the dressers and nightstands stacked behind or beside the bed display:

American Freight – Silver Spring, MD



American Freight – Hagerstown, MD



Surplus Freight – Germantown, MD



Surplus Freight – Essex, MD



126.     Adding to the similarities, the stores also both display wrapped and/or boxed

inventory on the showroom floor:

American Freight – Silver Spring, MD



American Freight – Hagerstown, MD



Surplus Freight – Germantown, MD







Surplus Freight - Glen Burnie, MD



127.    Further contributing to the similar look of the two stores, Surplus Freight carries a majority of the same vendors as American Freight, including Lane, North Carolina Upholstery, Washington Behold, Kith and CrownMark.

128.    Moreover, American Freight has the exclusive right to use or license its federally registered trademark "AMERICAN FREIGHT," Federal Registration No. 3,362,041, Class 35 (the "American Freight Mark").  A true and correct copy of the confirmation of registration for the American Freight Mark is attached hereto as **Exhibit 16**.  On March 10, 2021, the American Freight Mark was assigned to American Freight, LLC (a true and correct copy of the trademark assignment is attached hereto as **Exhibit 17**).  The American Freight Mark is registered on the Principal Register of the United States Patent and Trademark Office.  The registration of the American Freight Mark has always been and continues in full force and effect, and is incontestable under Section 15 of the Lanham Act, 15 U.S.C. §§ 1057(b), 1065, and 1115(a). American Freight has given notice to the public of the registration of its American Freight Mark as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that American Freight remains the exclusive user of the American Freight Mark.

129.    American Freight has continuously used the American Freight Mark in interstate commerce in connection with the promotion and operation of its business and the promotion of the services it offers since the date of its registration.

130.    The American Freight Mark and American Freight Trade Dress serve to identify the source, origin, and sponsorship of American Freight's business and the services it offers. Specifically, the American Freight Mark serves to distinguish American Freight's retail services featuring mattresses and furniture from those offered by others.

131.    As a result of its widespread, continuous, and exclusive use of the American Freight Mark and American Freight Trade Dress to identify American Freight's services and American Freight as their source, American Freight owns valid and existing federal statutory and common law rights to the American Freight Mark and American Freight Trade Dress.  The American Freight Mark and American Freight Trade Dress are distinctive to both the consuming public and American Freight's trade.  American Freight has expended substantial time, money, and resources marketing, advertising, and promoting the services sold under the American Freight Mark and American Freight Trade Dress.

132.    As a result of American Freight's expenditures and efforts, the American Freight Mark and American Freight Trade Dress have come to signify the quality of the services designated by the American Freight Mark and American Freight Trade Dress, and acquired incalculable distinction, reputation, and goodwill belonging exclusively to American Freight.

133.    Without American Freight's authorization and upon information and belief, beginning after American Freight acquired protectable exclusive rights in its American Freight Mark and American Freight Trade Dress, the Defendant Entities adopted and began using a mark confusingly similar to the American Freight Mark and trade dress in United States commerce.

134. Upon information and belief, the Defendant Entities have engaged in the provision of retail services featuring furniture and mattresses using their confusingly similar mark and trade dress, and have provided their retail services under the confusingly similar mark and trade dress through their retail stores in the United States.

135. The Defendant Entities provide their services under the confusingly similar mark and trade dress to working families looking for affordable options for purchasing furniture and mattresses. Upon information and belief, as a result of Surplus Freight's marks and trade dress being highly similar or identical to American Freight's marks and trade dress, consumers have begun to confuse the two competitors with one another and to think that the competitors are related or affiliated.

136. The Defendant Entities are unlawfully converting American Freight's goodwill by misleading consumers to believe they are doing business with American Freight, as American Freight has built the trust of its customers nationwide over the course of two and a half decades.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract – Non-Compete
### (Against Belford)

137. American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. The Belford 2015 Option Agreement constitutes a binding and enforceable contract between American Freight and Belford.

139. American Freight has fully performed its obligations under the Belford 2015 Option Agreement.

140. Under Section 17(g) of the Belford 2015 Option Agreement, Belford is prohibited from, directly or indirectly, owning, operating, controlling, providing support to, consulting with,

advising, providing services for, or in any manner engaging in or knowingly facilitating any business that sells furniture, carpet, mattresses, or other related goods to retail customers, with limited exceptions that are not applicable here.

141.    The non-competition covenant in the Belford 2015 Option Agreement applies for a two-year period after Belford ceases to hold any securities in American Freight.  This period has not run, and the covenant remains in full force and effect.

142.    Nonetheless, Belford has breached this non-compete covenant by owning, operating, controlling, providing support to, consulting with, advising, or otherwise engaging in business with (1) Surplus Freight as it expands into the U.S. market; and (2) Stage Capital, which provides support and services to Surplus Freight.

143.    As a result of Belford's breaches, American Freight has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists.

144.    American Freight has suffered and will suffer injury as a result of Belford's breaches and is entitled to an award of damages in an amount to be determined at trial.

### COUNT II
### Breach of Contract – Non-Compete
### (Against Rink)

145.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

146.    The Rink 2015 and 2018 Option Agreements constitute binding and enforceable contracts between American Freight and Rink.

147.    American Freight has fully performed its obligations under the Rink 2015 and 2018 Option Agreements.

148.    Under Section 17(g) of the Rink 2015 and 2018 Option Agreements, Rink is prohibited from, directly or indirectly, owning, operating, controlling, providing support to,

consulting with, advising, providing services for, or in any manner engaging in or knowingly facilitating any business that sells furniture, carpet, mattresses, or other related goods to retail customers, with limited exceptions that are not applicable here.

149. The non-competition covenant in the Rink 2015 Option Agreement applies for a two-year period after Rink ceases to be employed by American Freight. This period has not run, and the covenant remains in full force and effect.

150. The non-competition covenant in the Rink 2018 Option Agreement applies for a two-year period after Rink ceases to hold any security in American Freight. This period has not run, and the covenant remains in full force and effect.

151. Nonetheless, Rink has breached this non-compete covenant by owning, operating, controlling, providing support to, consulting with, advising, or otherwise engaging in business with (1) Surplus Freight as it expands into the U.S. market outside of New York City; and (2) Stage Capital, which provides support and services to Surplus Freight.

152. As a result of Rink's breaches, American Freight has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists.

153. American Freight has suffered and will suffer injury as a result of Rink's breaches and is entitled to an award of damages in an amount to be determined at trial.

## COUNT III
## Breach of Contract – Non-Solicit
### (Against Belford)

154. American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155. The Belford 2015 Option Agreement constitutes a binding and enforceable contract between American Freight and Belford.

156.     American Freight has fully performed its obligations under the Belford 2015 Option Agreement.

157.     Under Section 17(f) of the Belford 2015 Option Agreement, Belford is prohibited from hiring, recruiting, soliciting, or otherwise attempting to induce American Freight employees to leave their employment with American Freight.

158.     The non-solicitation covenant in the Belford 2015 Option Agreement applies for a two-year period after Belford ceases to hold any securities in American Freight.  This period has not run, and the covenant remains in full force and effect.

159.     Nonetheless, Belford has breached this non-solicitation covenant by directing and/or controlling a campaign in which Surplus Freight employees have recruited multiple American Freight employees to leave American Freight and to join Surplus Freight.

160.     As a result of Belford's breach, American Freight has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists.

161.     American Freight has suffered and will suffer injury as a result of Belford's breach and is entitled to an award of damages in an amount to be determined at trial.

**COUNT IV**
**Breach of Contract – Non-Solicit**
**(Against Rink)**

162.     American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

163.     The Rink 2015 and 2018 Option Agreements constitute binding and enforceable contracts between American Freight and Rink.

164.     American Freight has fully performed its obligations under the Rink 2015 and 2018 Option Agreements.

45

165.    Under Section 17(f) of the Rink 2015 and 2018 Option Agreements, Rink is prohibited from hiring, recruiting, soliciting, or otherwise attempting to induce American Freight employees to leave their employment with American Freight.

166.    The non-solicitation covenant in the Rink 2015 Option Agreement applies for a two-year period after Rink ceases to be employed by American Freight.  This period has not run, and the covenant remains in full force and effect.

167.    The non-solicitation covenant in the Rink 2018 Option Agreement applies for a two-year period after Rink ceases to hold any securities in American Freight.  This period has not run, and the covenant remains in full force and effect.

168.    Nonetheless, Rink has breached this non-solicitation covenant by directing and/or controlling a campaign in which other Surplus Freight employees have recruited multiple American Freight employees to leave American Freight and to join Surplus Freight.

169.    As a result of Rink's breach, American Freight has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists.

170.    American Freight has suffered and will suffer injury as a result of Rink's breach and is entitled to an award of damages in an amount to be determined at trial.

**COUNT V**
**Breach of Contract – Confidentiality**
**(Against Rink)**

171.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

172.    The Rink 2015 and 2018 Option Agreements constitute binding and enforceable contracts between American Freight and Rink.

173.    American Freight has fully performed its obligations under the Rink 2015 and 2018 Option Agreements.

46

174.     Under Section 17(b) of the Rink 2015 and 2018 Option Agreements, Rink is prohibited from disclosing and using American Freight's Confidential Information without American Freight's prior consent.

175.     The confidentiality covenant in the Rink 2015 and 2018 Option Agreements remains in full force and effect.

176.     By disclosing and/or using for his own account American Freight's Confidential Information as defined within the Rink 2015 and 2018 Option Agreements, including the Confidential Information and Trade Secrets, Rink breached the confidentiality covenants within the Rink 2015 and 2018 Option Agreements.

177.     As a result of Rink's breaches, American Freight has suffered, and will continue to suffer, irreparable harm for which no adequate remedy at law exists.

178.     American Freight has suffered and will suffer injury as a result of Rink's breaches and is entitled to an award of damages in an amount to be determined at trial.

## COUNT VI
## Trade Secret Misappropriation Under the DTSA, 18 U.S.C. § 1836 *et. seq.*
## (Against All Defendants)

179.     American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.     The Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

181.     American Freight takes and has taken reasonable measures to keep the Confidential Information and Trade Secrets secret by, among other things, requiring employees to sign confidentiality agreements, password protecting its electronic resources, maintaining

policies dictating strict information security, and training employees on the importance of information security.

182.    During his employment with American Freight, Rink had direct and intimate knowledge of the Confidential Information and Trade Secrets, as described herein.  This information is exclusive to American Freight and is not generally known in the industry.

183.    Rink has acquired, disclosed, and/or used the Confidential Information and Trade Secrets via improper means and without American Freight's permission and has done so willfully and maliciously.  Rink obtained the Confidential Information and Trade Secrets while employed by American Freight and is under a duty to maintain their secrecy, and American Freight did not grant Rink permission to use or disclose the Confidential Information and Trade Secrets in the course and scope of his work on behalf of the Defendant Entities or otherwise.

184.    The Defendant Entities and Belford knew or should have known that Rink had acquired the Confidential Information and Trade Secrets under a duty to maintain their secrecy.

185.    Upon information and belief, Defendants are using the Confidential Information and Trade Secrets to truncate the time needed to enter markets competitive with American Freight, compete unfairly in those markets, and target American Freight's customers.  These activities improperly capitalize on American Freight's investment of time, resources, and goodwill.

186.    Stage Capital is also liable under a theory of respondeat superior, knowing that Rink is prohibited from using and disclosing this information while working as an employee, officer, and agent of Stage Capital.

187.    As a result of Defendants' misappropriation, American Freight has suffered irreparable harm in the form of actual and threatened misappropriation of the Confidential

Information and Trade Secrets, injury, and harm to its goodwill and business reputation and loss of confidence and trust among its customers.

188.     American Freight has also suffered economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

189.     Unless restrained, Defendants will continue to misappropriate the Confidential Information and Trade Secrets, causing even further irreparable injury to American Freight for which there is no adequate remedy at law.

190.     Pursuant to 18 U.S.C. § 1836(b)(3), American Freight is entitled to preliminary and permanent injunctions barring Defendants' continued actual and threatened misappropriation of the Confidential Information and Trade Secrets as set forth herein.

191.     American Freight is entitled to an award of actual damages incurred as a result of Defendants' wrongful acts, as well as an award of damages equal to their unjust enrichment and/or the imposition of a reasonable royalty as provided by for by 18 U.S.C. § 1836(b)(3)(B).

192.     American Freight is also entitled to an award of exemplary damages, as well as its reasonable costs and attorneys' fees incurred hereby, pursuant to 18 U.S.C. § 1836(b)(3)(C)–(D).

## COUNT VII
**Trade Secret Misappropriation Under the OUTSA, Ohio Rev. Code § 1333.61 *et seq.***
**(Against All Defendants)**

193.     American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.     The Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

195.     American Freight takes and has taken reasonable measures to keep the Confidential Information and Trade Secrets secret by, among other things, requiring employees

49

to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

196.    Rink obtained the Confidential Information and Trade Secrets while employed by American Freight and is under a duty to maintain their secrecy, and American Freight did not grant Rink permission to use or disclose the Confidential Information and Trade Secrets in the course and scope of his work on behalf of the Defendant Entities or otherwise.

197.    The Defendant Entities and Belford knew or should have known that Rink had acquired the Confidential Information and Trade Secrets under a duty to maintain their secrecy.

198.    Upon information and belief, Defendants are using the Confidential Information and Trade Secrets to truncate the time needed to enter markets competitive with American Freight, compete unfairly in those markets, and target American Freight's customers.  All of these activities improperly capitalize on American Freight's investment of time, resources, and goodwill.

199.    Stage Capital is also liable under a theory of respondeat superior, knowing that Rink is prohibited from using and disclosing this information while working as an employee, officer, and agent of Stage Capital.

200.    As a result of Defendants' misappropriation, American Freight has suffered irreparable harm in the form of actual and threatened misappropriation of the Confidential Information and Trade Secrets, injury, and harm to its goodwill and business reputation and loss of confidence and trust among its customers.

201.    American Freight has also suffered economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

202.    Unless restrained, Defendants will continue to misappropriate the Confidential Information and Trade Secrets, causing even further irreparable injury to American Freight for which there is no adequate remedy at law.

203.    Pursuant to section 1333.62 of the Ohio Rev. Code, American Freight is entitled to preliminary and permanent injunctions barring Defendants' continued actual and threatened misappropriation of the Confidential Information and Trade Secrets as set forth herein.

204.    American Freight is entitled to an award of actual damages incurred as a result of Defendants' wrongful acts, as well as an award of damages equal to their unjust enrichment and/or the imposition of a reasonable royalty as provided by for by section 1333.63 of the Ohio Rev. Code.

205.    American Freight is also entitled to an award of exemplary damages, as well as their reasonable costs and attorneys' fees incurred hereby, pursuant to sections 1333.62–.63 of the Ohio Rev. Code.

## COUNT VIII
### Trademark Infringement Under the Lanham Act
### (Against Surplus Freight)

206.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

207.    American Freight is the owner of the American Freight Mark.

208.    Surplus Freight has been and continues to use in commerce, without authorization, a mark that is likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of the Surplus Freight services and have and are likely to deceive the relevant consuming public into believing, mistakenly, that the Surplus Freight services originate from, are associated or affiliated with, or otherwise authorized by

American Freight. Surplus Freight's conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

209.    Upon information and belief, the Surplus Freight's acts are willful with the deliberate intent to trade on the goodwill of the American Freight Mark, cause confusion and deception in the marketplace, and divert potential sales of American Freight's services to the Surplus Freight.

210.    Surplus Freight's acts are causing, and unless restrained, will continue to cause damage and immediate irreparable harm to American Freight and to its valuable reputation and goodwill with the consuming public for which American Freight has no adequate remedy.

211.    American Freight is entitled to, among other relief, injunctive relief and an award of actual damages, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116–1117, together with prejudgment and post-judgment interest.

### COUNT IX
### Trade Dress Infringement Under the Lanham Act
### (Against Surplus Freight)

212.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

213.    The American Freight Trade Dress is used in commerce, is distinctive and non-functional.

214.    Surplus Freight, without the consent of American Freight, has been using a trade dress that is highly similar or identical to the American Freight Trade Dress.

215.    Surplus Freight's unauthorized use in commerce of a trade dress that is the same or highly similar to the American Freight Trade Dress is likely to cause confusion or mistake, or

deceive consumers as to the origin, source, sponsorship, or affiliation of Surplus Freight's services and is likely to cause consumers to believe, contrary to fact, that Surplus Freight's services are sold, authorized, endorsed, or sponsored by American Freight, or that Surplus Freight is in some way affiliated with American Freight.

216.    Upon information and belief, Surplus Freight's conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Surplus Freight with American Freight.

217.    Surplus Freight's conduct as alleged herein constitutes trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

218.    Surplus Freight's conduct as alleged herein is causing immediate and irreparable harm and injury to American Freight, and to its goodwill and reputation, and will continue to both damage American Freight and confuse the public unless enjoined by this court.  American Freight has no adequate remedy at law.

219.    American Freight is entitled to, among other relief, injunctive relief and an award of actual damages, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116–1117, together with prejudgment and post-judgment interest.

### COUNT X
### Trade Dress Infringement Under the Ohio Deceptive Trade Practices Act
### (Against Surplus Freight)

220.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

221.    The American Freight Trade Dress is used in commerce, is distinctive and non-functional.

222.    Surplus Freight, without the consent of American Freight, has been using a trade dress that is highly similar or identical to the American Freight Trade Dress.

223.    Surplus Freight's unauthorized use in commerce of a trade dress that is the same or highly similar to the American Freight Trade Dress is likely to cause confusion or mistake, or deceive consumers as to the origin, source, sponsorship, or affiliation of Surplus Freight's services and is likely to cause consumers to believe, contrary to fact, that Surplus Freight's services are sold, authorized, endorsed, or sponsored by American Freight, or that Surplus Freight is in some way affiliated with American Freight.

224.    Upon information and belief, Surplus Freight's conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Surplus Freight with American Freight.

225.    Surplus Freight's conduct as alleged herein constitutes a deceptive trade practice in violation of Ohio Rev. Code § 4165.02.

226.    Surplus Freight's conduct as alleged herein is causing immediate and irreparable harm and injury to American Freight, and to its goodwill and reputation, and will continue to both damage American Freight and confuse the public unless enjoined by this court.  American Freight has no adequate remedy at law.

227.    American Freight is entitled to, among other relief, injunctive relief and an award of actual damages and reasonable attorneys' fees and costs of the action under Ohio Rev. Code § 4165.03, together with prejudgment and post-judgment interest.

**COUNT XI**
**Unjust Enrichment**
**(Against All Defendants)**

228.    American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

54

229.     Defendants have wrongfully taken American Freight's business opportunities and Confidential Information and Trade Secrets.

230.     Further, American Freight has conferred a benefit on the Rink and Belford through the granting of options.  Rink and Belford received a monetary payment in exchange for such options.  American Freight's conferral of this benefit was expressly conditioned on the Rink and Belford not competing with American Freight and not disclosing or using American Freight's Confidential Information during the Restricted Periods.  To allow Rink and Belford to retain the benefit under these circumstances would be unjust.  Rink and Belford cannot take the benefit of the options without accepting the obligations.

231.     Permitting Defendants to be unjustly enriched by their unlawful use of these opportunities, contractual benefits and valuable information without American Freight's authorization would be inequitable.

232.     Defendants should be divested of their unjustly gained enrichment and should pay restitution so that American Freight is returned to the status quo.

### COUNT XII
### Tortious Interference With Contract
### (Against All Defendants)

233.     American Freight re-alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

234.     Many of the former American Freight employees who were poached by Surplus Freight, including Shawn Brooks, have valid and enforceable contracts that contained non-competition obligations, pursuant to which Brooks agreed that during the two years following his employment with American Freight, he would not work for any business that competes directly or indirectly with American Freight in any existing market area of American Freight at the time of the employee's termination.

235. Rink and Belford know of the existence and terms of these contractual obligations because of their previous positions at American Freight, and because they had signed similar agreements themselves.

236. Nonetheless, Rink and Belford intentionally and with malice induced at least Brooks to breach their contractual obligations by directing and/or controlling a campaign in which other Surplus Freight employees recruited Brooks to leave American Freight and to join Surplus Freight.

237. Surplus Freight is liable under a theory of respondeat superior, because the interference with the non-competition agreement of Brooks was undertaken by Belford and other Surplus Freight employees (including Cady and Buljina) while working as an employee, officer, and agent of Surplus Freight. Stage Capital is also liable under a theory of respondeat superior, because the interference with the non-competition agreement of Brooks was undertaken by Rink and others acting under Rink's direction or control (including Cady and Buljina) while working as an employee, officer, and agent of Stage Capital.

238. American Freight has suffered and will suffer injury as a result of Defendants' actions and is entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff American Freight respectfully requests that this Court:

a) Issue an Order preliminarily and permanently enjoining Rink and Belford, until the expiration of the Restricted Period, from breaching of their non-competition, non-solicitation, and confidentiality agreements.

b)      Issue an Order preliminarily and permanently enjoining Defendants, and all those acting in concert with them, from misappropriating, using or disclosing American Freight's Confidential Information and Trade Secrets.

c)      Issue an Order preliminarily and permanently enjoining Defendants from tortiously interfering with American Freight's contracts with its employees.

d)      Issue an Order preliminarily and permanently enjoining Defendants from infringing upon American Freight's trademark or trade dress.

e)      Issue an Order directing the Defendant Entities to cancel with prejudice any and all of its registrations and/or withdraw any applications for registration for any mark consisting of, incorporating, or containing the American Freight Mark or trade dress or any counterfeit, copy, confusingly similar variation, or colorable imitation thereof on any state or federal trademark registry.

f)      Award American Freight monetary damages against Defendants, jointly and severally, awarding all available relief, including actual damages, compensatory damages, expectancy damages, punitive or exemplary damages, and disgorgement of profits.

g)      Issue an Order requiring Defendants to compensate American Freight for their reasonable attorneys' fees and costs incurred in this action, in an amount to be proven at trial.

h)      Award American Freight interest, including pre-judgment and post-judgment interest, on the foregoing sums.

i)      Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all issues triable to a jury.

Dated:  April 19, 2021                    TAFT STETTINIUS & HOLLISTER LLP

By:  */s/ David J. Butler*        
    David J. Butler (0068455) (Trial Attorney)
    David C. Roper (0099782) (*Motion for
     admission pro hac vice forthcoming*)
    65 East State Street, Suite 1000
    Columbus, Ohio 43215
    Telephone:  (614) 221-2838
    Facsimile:   (614) 221-2007
    dbutler@taftlaw.com
    droper@taftlaw.com

    *Attorneys for Plaintiff American Freight, LLC*

    WILLKIE FARR & GALLAGHER LLP

    Tariq Mundiya
    Thomas J. Meloro
    James C. Dugan
    Tara L. Thieme
    Vanessa C. Richardson
    787 Seventh Avenue
    New York, New York 10019
    Phone:  (212) 728-8000
    tmundiya@willkie.com
    tmeloro@willkie.com
    jdugan@willkie.com
    tthieme@willkie.com
    vrichardson@willkie.com

    *Attorneys for Plaintiff American Freight, LLC
    Motions for admission pro hac vice pending*

29254386v1