# EXHIBIT 1

## Confidentiality and Non-Competition Agreement

THIS AGREEMENT (AAgreement@) is made this _____ day of _____,
2006, by and between AMERICAN FREIGHT MANAGEMENT COMPANY, an Ohio
corporation     (hereinafter      referred     to     as     the     Company)     and
_Joseph____ _Kirk__ (hereinafter referred to as the Employee).

### Recitals

WHEREAS, the Company currently employs Employee in the position of
_____Sales_____; and

WHEREAS, the Company wishes to assure itself that Employee will keep in
confidence and not disclose any information disclosed to Employee by the Company
during the term of Employee's employment; and

WHEREAS, the Company further wishes to assure itself that Employee will not
compete with the Company after the termination of Employee's employment; and

WHEREAS, Employee is willing to agree not to so compete with Company.

NOW THEREFORE, the premises set forth herein and intending to be legally
bound, the parties hereto agree as follows:

**Section 1.  Acknowledgments.**  The Company is engaged in the business of the sale
of furniture, carpet, mattresses and other related goods. The Employee acknowledges
that the Company=s sales techniques, operating systems, client lists, and leads are unique
and legitimate interests of the Company which contribute in large part to the success of
the Company and its employees in the competitive field in which they are engaged. The
Employee acknowledges that the Company=s business and services are highly
specialized, the identity and particular needs of the Company=s customers and suppliers
are not generally known, and the documents and information regarding the Company=s
customers, suppliers, services, products, methods of operation, sales, pricing and costs
are highly confidential and constitute trade secrets. The Employee further acknowledges
that the services rendered to the Company by the Employee have been or will be of a
special and unusual character which have a unique value to the Company such that: (a)
the frequent contact with customers or customer information will result in close
relationships and the association of the Company=s goodwill with the Employee and/or
specialized knowledge about the customer; and (b) the Employee has had or will have
access to trade secrets and confidential information belonging to the Company, the loss of
which cannot adequately be compensated by damages in an action of law.

**Section 2.   Covenant Against Competition.**   During the term of the Employee=s employment with the Company and for a period of two (2) years from either the voluntary termination of the Employee=s employment with the Company or the termination of the Employee=s employment with the Company for Cause, the Employee will not, directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with in any manner the ownership, management, operation, or control of any business which competes directly or indirectly with the Company in any existing market area of the Company at the time of the termination (voluntary or involuntary) of employment of the Employee. For purposes of this Agreement, ACause@ shall include but shall not be limited to competing against the Company and/or criminal activity for which charges are brought against Employee.

**Section 3.   Covenant Against Disclosure of Confidential and Proprietary Information.**   The Employee shall, in accordance with the restrictions set forth in Section 2 above, hold in strict confidence any and all confidential and proprietary information concerning the Company=s services, processes, sales, business systems, operations, and clients of the Company. Confidential and proprietary information shall include, but shall not be limited to, information related to the Company=s products, processing, manufacturing, selling, storage, application techniques, including customer lists, call lists, other confidential technical data, sketches, plans, drawings, chemical formulae, composition of the Company=s products, and other research and development data. Confidential and proprietary information shall also include, in addition to those materials described above, sources of supply and material, operating and other cost data, information contained in manuals or memoranda and other records of the Company identified as Confidential or Proprietary Information or Trade Secrets. Such other information will sometimes be identified as Aconfidential,@ Aproprietary@ or as a Atrade secret,@ either by written or verbal designation, but shall also include that which is a trade secret under the Ohio Uniform Trade Secrets Act. However, nothing herein shall be construed to limit the Company=s protections under the Ohio Uniform Trade Secrets Act.

**Section 4.   Records to be Returned.**   The Employee also shall not without permission, directly or indirectly, copy, take, or remove from the Company=s premises, any of the Company=s books, records, customer lists, leads, computer disks, software, or any other documents, materials or equipment paid for by the Company or to which the Employee has devoted efforts for its development while employed by the Company. Any such information, and any copies thereof, in the possession of the Employee at the end of employment shall be returned, along with any of the Company=s equipment. The Employee shall also disclose, if applicable, computer passwords for any and all of the Company=s computers the Employee used while employed by the Company.

2

**Section 5. Nonsolicitation of Employees.** During the term of the Employee=s employment with the Company and for a period of two (2) years from the voluntary or involuntary termination of the Employee=s employment with the Company for any reason whatsoever, the Employee shall not, either directly or indirectly, absent the written consent of the Company; (a) solicit, interfere with, or endeavor to cause any employee of the Company to leave his or her employment; or (b) induce or attempt to induce any such employee to work for any other entity.

**Section 6. Nonsolicitation or Service of Customers.** During the term of the Employee=s employment with the Company and for a period of two (2) years from the voluntary or involuntary termination of the Employee=s employment with the Company for any reason whatsoever, the Employee shall not solicit, suggest, induce, or attempt to induce any past or current customer of the Company; (a) to cease doing business in whole or in part with or through the Company; or (b) to do business with or purchase from any other person or business entity, goods or services, the nature of which are materially similar to those supplied by the Company.

**Section 7. Remedies.** Employee acknowledges that Company would be greatly injured by, and have no adequate remedy at law for, Employee=s breach of Section 2-6 of this Agreement. Employee therefore consents that if such breach occurs or is threatened, whether before or after the termination of his/her relationship with Company, Company may, as appropriate and in addition to all other then available remedies, enjoin Employee, together with all persons acting in concert with Employee, from such breach or threatened breach. If it prevails, Company shall also be entitled to collect from Employee the court costs, actual attorneys= and experts= fees, and other expenses of enforcing Company=s rights under this Agreement. Employee submits to entry of a temporary restraining order to prevent such breach, and waives the right to require Company to post bond as a condition of injunctive relief. If such waiver is not then permitted, Employee agrees that a bond of $1,000.00 or less will be sufficient. The periods provided in Sections 2-6 shall, in the event that Company is granted an injunction, be extended so as to commence upon the date of entry of any such injunction. All of the Company=s remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy shall not be deemed to exclude any other remedies. In the event total actual damages are not possible to determine, it is agreed that the Company may recover, in addition to those damages which are determined, liquidated damages in the amount of $50,000.00 for a material breach of this Agreement in addition to other remedies provided by this Agreement.

**Section 8. Choice of Law and Forum.** It is understood and agreed that the construction and interpretation of this Agreement shall be in accordance with and governed by the laws of the State of Ohio, and any action related to this Agreement shall

3

be brought and maintained in the courts of the State of Ohio, in the County of Richland, unless otherwise agree to by both parties.

**Section 9. Reasonableness of Restrictions.** The Employee has carefully read and considered the provisions hereof and, having done so and in consultation with a lawyer of his/her own choosing, agrees that the restrictions set forth in this Agreement (including, but not limited to, the time periods of restriction in each of such paragraphs and the geographical area of restrictions set forth in this Agreement) are fair, reasonable, and needed to protect the Company=s interests. The Employee also agrees, having read and considered the provisions hereof, that the covenants set forth in this Agreement will not create an unreasonable restraint on the Employee=s ability to earn a living.

**Section 10. Burden and Benefit.** This Agreement shall be binding upon, and shall inure to the benefit of, the Company and Employee, and their respective successors and assigns. The Company shall have the right to assign its rights hereunder to any successor in interest, whether by merger, consolidation, sale of assets, or otherwise.

**Section 11. Whole Agreement.** Notwithstanding the existence of any other Company pronouncement, writing, or policy to the contrary or conflicting herewith, the conditions of this Agreement shall predominate and prevail. No change or modification hereof shall be valid or binding unless the same is in writing and signed by the party against whom such waiver is sought to be enforced.

**Section 12. Interpretation.** The parties acknowledge their mutual participation in the drafting of this Agreement and its terms shall not be construed more strictly against one party or the other as the author of the document.

IN WITNESS WHEREOF, the Company and the Employee have duly executed this Agreement as of the day and year first written above.

The Employee                    The Company

AMERICAN FREIGHT OF OHIO, INC.,
an Ohio corporation

Asaph Rink

By: _____
STEVE BELFORD, President

dianne\jason\corp\American Freight\Conf.NonCompAgree

4

# EXHIBIT 2

AMERICAN FREIGHT GROUP, INC.

_____

Non-Qualified Stock Option Agreement

Option Agreement No. 2

_____

Subject to the terms and conditions set forth herein and the terms and conditions of the American Freight Group, Inc. 2015 Non-Qualified Stock Option Plan (the "Plan") (with capitalized terms used but not defined herein having the meanings given to them in the Plan), American Freight Group, Inc., a Delaware corporation (the "Company" which term shall include, unless the context otherwise clearly requires, all Subsidiaries (as defined in the Plan) of the Company), hereby grants the following option to purchase shares of common stock, par value of $0.001 per share, of the Company (the "Stock") to the Optionee, and the Optionee hereby accepts such grant and agrees to be bound by the terms and conditions hereinafter set forth:

1.  Name of Person to Whom the Option is Granted (the "Optionee"): Separate Property Trust of David A. Belford, dated November 13, 2007

2.  Date of Grant of Option: January 28, 2015

3.  An Option to acquire 396.8750 shares of Stock.

4.  Option Exercise Price (per share of Stock): $1,000 (the "Exercise Price").

5.  Term of Option:   Subject to earlier termination under Section 9 below, this Option expires at 5:00 p.m. local New York, New York time on January 28, 2025.

6.  Vesting/Exercise Schedule:   Subject to the provisions of Section 9 below, this Option shall vest and become exercisable with respect to the number of shares of Stock upon the passage of certain time, as shown on Schedule I attached hereto and incorporated herein.

713338790

7.     Grant.  The Company hereby grants to the Optionee a stock option (the "Option") to purchase from the Company the number of shares of Stock set forth in Section 3 on the first page of this Option, upon the terms and conditions set forth in the Plan and upon the additional terms and conditions contained herein.  This Option is a non-qualified stock option and is not intended to qualify as an "incentive stock option" pursuant to Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

8.     Option Price.  To the extent vested, this Option may be exercised at the exercise price per share of Stock set forth in Section 4 on the first page hereof, subject to adjustment as provided herein and in the Plan.

9.     Term and Exercisability of Option.

(a)     This Option shall expire on the earlier of (a) the date determined pursuant to Section 5 on the first page of this Option and (b) the date determined pursuant to Sections 11 and 15(d) of the Plan, and shall be exercisable in accordance with and subject to the terms and conditions set forth in the Plan (including but not limited to Section 11 of the Plan) and those terms and conditions, if any, set forth in Section 6 on the first page of this Option. Notwithstanding anything to the contrary contained herein, vesting shall cease immediately upon termination of employment or other engagement for any reason, and any portion of this Option that has not vested on or prior to the date of such termination is forfeited on such date.  If the Optionee dies before this Option has been exercised in full, the personal representative of the Optionee may exercise this Option in accordance with the Plan.

(b)     Notwithstanding anything contained in the Plan or this Option Agreement to the contrary (i) to the extent that any of the payments and benefits provided for under the Plan, this Option Agreement or any other agreement or arrangement (including payments contingent upon the occurrence of a Change in Control) between the Company or any of its Subsidiaries and Optionee (collectively, the "Payments") would constitute a "parachute payment" within the meaning of Section 280G of the Code, then the Company and its Subsidiaries shall each use commercially reasonable efforts to obtain the stockholder consent required to approve of such Payment to preclude such Payment from being subject to the excise tax imposed pursuant to Section 4999 of the Code (the "Excise Tax"); provided, however, that in such event the Optionee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments as shall be reasonably necessary to accomplish such preclusion of the Excise Tax.  In the event that (a) the stockholder consent is not obtained or (b) the Optionee does not take the actions set forth in the proviso to the foregoing sentence, the amount of the Payments shall be reduced to the amount that would result in no portion of the Payments being subject to the Excise Tax.

10.     Method of Exercise.  To the extent that the right to purchase shares of Stock has vested hereunder, this Option may be exercised from time to time by written notice to the Company substantially in the form attached hereto as Exhibit A, stating the number of shares of Stock with respect to which this Option is being exercised, and accompanied by (a) payment in full of the Exercise Payment for the number of shares of Stock to be delivered, by means of payment acceptable to the Company in accordance with Section 9 of the Plan and (b) an executed joinder agreement and a Spousal Consent, if applicable, pursuant to Section 16 of this Option.

Notwithstanding the foregoing, Optionee may elect to purchase shares of Stock vested hereunder by cashless exercise, whereby Optionee shall receive upon exercise such number of shares of Stock equal to (x) the number of Options being exercised <u>less</u> (y) the number of shares of Stock with a Fair Market Value equal to the sum of the Exercise Price and the necessary withholding obligation with respect to such exercise. Subject to the Plan and to <u>Section 13</u> hereof, as soon as practicable after its receipt of such items, the Company shall deliver to the Optionee (or other person entitled to receive the shares of Stock issuable upon exercise of this Option), at the principal executive offices of the Company or such other place as may be mutually acceptable, a certificate or certificates for such shares out of theretofore authorized but unissued shares or reacquired shares of Stock (if certificated) or a certified copy of the stockholders' registry, as the Company may elect; <u>provided</u>, <u>however</u>, that the time of such delivery may be postponed by the Company for such period as may be required for it with reasonable diligence to comply with any applicable requirements of law. If the Optionee (or other person entitled to exercise this Option) fails to pay for and accept delivery of all of the shares specified in such notice upon tender of delivery thereof, his or her right to exercise this Option with respect to such shares not paid for may be terminated by the Company.

11. <u>Forfeiture; Restrictions on Exercise; Right of Repurchase</u>.

(a)    In addition to the restrictions set forth herein, this Option is subject to forfeiture upon the occurrence of the events specified in <u>Sections 11</u> and <u>15</u> of the Plan. The stock issued upon the exercise of this Option and other Securities held by the Optionee will be subject to further restrictions set forth in the Stockholders' Agreement, any subscription agreement entered into between the Optionee and the Company and this Section 11.

(b)    <u>General</u>. Upon the termination of Optionee's employment with, or membership on the Board of Directors of, the Company or its Subsidiaries, in each case, for any reason (whether by the Optionee or the Company or one of its Subsidiaries and whether with or without Cause) (a "<u>Termination</u>"), the Company and Resolute will have the option to repurchase all or any portion of the Securities (including Optionee Securities) held by Optionee (whether held by the Optionee or one or more of his or her affiliates or Permitted Transferees (as defined in the Stockholders Agreement) other than those Securities purchased by Optionee pursuant to a Subscription Agreement, dated October 31, 2014 ("<u>Repurchasable Securities</u>") pursuant to the terms and conditions set forth in this <u>Section 11</u>.

(c)    <u>Company's Option</u>. The Company may elect in its sole discretion to purchase all or any portion of the Repurchaseable Securities by giving written notice to the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement) within 90 days following the Termination. Such notice will set forth the number and type of Repurchaseable Securities to be acquired by the Company from Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase. If Optionee is a member of the Board at the time of such election, then Optionee will not have the right to vote with respect to such election or any other matter relating to this <u>Section 11</u>.

(d)    <u>Resolute's Option</u>. If for any reason the Company does not elect to purchase all of the Repurchaseable Securities pursuant to <u>Section 11(c)</u>, then Resolute may at any time within 180 days following the Termination elect in its sole discretion to purchase all or any portion of

3

the Repurchaseable Securities which the Company has not elected to purchase by giving written notice to the Company and the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement). Such notice will set forth the number and type of Repurchaseable Securities to be acquired by Resolute from the Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase.

(e) <u>Purchase Price</u>. The purchase price for the Repurchaseable Securities (the "<u>Repurchase Price</u>") will be calculated as follows:

(i) If the Termination occurs by reason of (A) termination of such Optionee's employment by, membership on the Board of, or engagement with, the Company or any of its Subsidiaries without Cause or (B) such Optionee's death or disability, then the Repurchase Price will be a price per share equal to the Fair Market Value of the Repurchaseable Securities on the date of Termination.

(ii) If (A) the Termination occurs by reason of such Optionee's termination by the Company or any of its Subsidiaries for Cause, (B) termination of such Optionee's employment or membership on the Board, in each case, by reason of such Optionee's resignation, or if (C) in the Committee's reasonable determination, such Optionee has breached any agreement between the Optionee and the Company or any of its Subsidiaries, then the Repurchase Price will be the lesser of a price per share equal to the Original Cost and a price per share equal to the Fair Market Value, in each case, of the Repurchaseable Securities.

(f) <u>Repurchase Closing</u>. If the Company or Resolute has elected to purchase any of the Repurchaseable Securities, then the purchase of Repurchaseable Securities pursuant to this <u>Section 11</u> will be completed (the "<u>Repurchase Closing</u>") at the Company's principal office, at 10:00 a.m., on the 30th day following the date the Company or Resolute provides notice to the Optionee that the Company or Resolute, as the case may be, are purchasing any of the Repurchaseable Securities or on such earlier day as designated by the Company, in its sole discretion, upon not less than ten days prior notice to Resolute and the Optionee. If such date is not a Business Day, then the Repurchase Closing will occur at the same time and place on the next succeeding Business Day. The Company and/or Resolute will pay for the Repurchaseable Securities, at their respective options, by (i) delivery of a cashier's check or wire transfer of immediately available funds, (ii) delivery of a Three Year Junior Note, (iii) setoff against any and all obligations (to the extent of such obligations) owed to the Company, its Subsidiaries, Resolute or any of their respective Affiliates by the Optionee or (iv) any combination of the foregoing. The Company and/or Resolute may rescind any exercise of their repurchase rights under this <u>Section 11</u> at any time prior to the Repurchase Closing. At the Repurchase Closing, the Optionee shall deliver any certificate or certificates (if certificated) representing the Repurchaseable Securities to be purchased, with stock powers or instruments of transfer duly executed, for transfer, and such other documents as the Company or Resolute may reasonably request. The Company and Resolute will be entitled to receive customary representations and warranties as to ownership, title, authority to sell and the like from the Optionees regarding such sale, and to receive such other evidence, including applicable inheritance and estate tax waivers, as may reasonably be necessary to effect the purchase of the Repurchaseable Securities to be purchased pursuant to <u>Section 11</u>.

713338790

(g)    <u>Failure To Deliver Securities</u>.  If Optionee or any other Stockholder whose Repurchaseable Securities are to be purchased pursuant to this <u>Section 11</u> fails to deliver certificates representing the Repurchaseable Securities (if certificated) and such other documents as the Company or Resolute may reasonably request on the scheduled closing date of such purchase, then the Company or Resolute may elect to deposit the consideration representing the purchase price of the Repurchaseable Securities with a third party (which may be the Company's attorney, a bank or a financial institution), as escrow agent and exercise its rights pursuant to (g) below.  In the event of the foregoing election: (i) such Repurchaseable Securities will be deemed for all purposes (including the right to vote and receive payment for dividends) to have been transferred to the Company or Resolute, as applicable; (ii) to the extent that such Repurchaseable Securities are evidenced by certificates or other instruments, such certificates or other instruments will be deemed canceled and the Company will issue new certificates or other instruments in the name of Resolute, if applicable; (iii) the Company will make an appropriate notation in its stock ledger to reflect the transfer of such Repurchaseable Securities to the Company or Resolute, as applicable; and (iv) the Person obligated to sell such Repurchaseable Securities will merely be a creditor with respect to such Repurchaseable Securities, with the right only to receive payment of the purchase price, without interest, from the deposited funds.  If, prior to the third anniversary of the scheduled closing date as determined pursuant to this <u>Section 11</u>, the proceeds of sale have not been claimed by such Optionee or other seller of the Repurchaseable Securities, then the deposited funds (and any interest earned thereon) will be returned to the Person originally depositing the same, and the transferors whose Repurchaseable Securities were so purchased will look solely to the purchasers thereof for payment of the purchase price, without interest.  The escrow agent will not be liable for any action or inaction taken by it in good faith.

(h)    <u>Power of Attorney</u>.  Optionee in order more fully to secure the performance of his or her obligations hereunder, hereby irrevocably appoints the Company and Resolute and the persons deriving title under them jointly and also severally to be his or her attorney to execute and complete in favor of the Company or Resolute any documents, including but not limited to a stock power or instrument of transfer, which the Company or Resolute may from time to time require pursuant to <u>Section 11</u> for perfecting its title to or for vesting the Repurchaseable Securities in the Company or Resolute as applicable.  The power hereby conferred shall be a general power of attorney and each Optionee hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.

(i)    <u>Repurchase Disability</u>.

(i)    Notwithstanding anything to the contrary herein, the Company shall not be permitted to repurchase any Optionee Securities pursuant to <u>Section 11</u> if the Board determines that:

(A)    The repurchase of the Repurchaseable Securities would render the Company or the Subsidiaries unable to meet their business plan or obligations in the ordinary course of business taking into account any pending or proposed transactions, capital expenditures or other budgeted cash outlays by the Company, including, without limitation, any proposed acquisition of any other entity by the Company or any of the Subsidiaries;

713338790

(B)     The Company is prohibited from repurchasing the Repurchaseable Securities by applicable law restricting the purchase by a corporation of its own shares; or

(C)     The repurchase of Repurchaseable Securities would constitute a breach of, default, or event of default under, or is otherwise prohibited by, the terms of any loan agreement or other agreement or instrument to which the Company or any of the Subsidiaries is a party or the Company is not able to obtain the requisite consent of any of its senior lenders to the repurchase of the Repurchaseable Securities.  The events described in (A) through (C) above each constitute a "Repurchase Disability."

(ii)     In the event of a Repurchase Disability, the Company shall notify in writing any Optionee whose Repurchaseable Securities are to be repurchased pursuant to Section 11 (a "Disability Notice").  The Disability Notice shall specify the nature of the Repurchase Disability.  The Company shall thereafter repurchase the Repurchaseable Securities as soon as reasonably practicable after all Repurchase Disabilities cease to exist (or the Company may elect, but shall have no obligation, to cause its nominee to repurchase the Repurchaseable Securities while any Repurchase Disabilities continue to exist).  In the event the Company suspends its obligations to repurchase the Repurchaseable Securities pursuant to a Repurchase Disability, (A) the Company shall provide written notice to each applicable Optionee as soon as practicable after all Repurchase Disabilities cease to exist (the "Reinstatement Notice"); (B) the Fair Market Value of the Repurchaseable Securities shall be determined as of the date the Reinstatement Notice is delivered to the Optionee, which Fair Market Value shall be used to determine the Repurchase Price in the manner described above; and (C) the repurchase shall occur on a date specified by the Company within 10 days following the determination of the Fair Market Value of the Repurchaseable Securities as provided in clause (B) above.

(j)     If the Company or Resolute does not deliver to the Optionee a written notice of its intention to exercise the repurchase rights set forth in this Section 11 within 180 days following a Termination, such repurchase rights will expire.  This Section 11 shall terminate upon (i) the effectiveness of an initial bona fide, firm commitment underwritten public offering of any securities of the Company for which the aggregate purchase price of the securities sold is in excess of $100 million or (ii) the consummation of a Change in Control.

(k)     Certain Definitions.  For purposes of this Section 11, the following terms shall have the following meanings unless the context indicates otherwise:

(i)     "Business Day" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

(ii)     "Common Stock" shall mean shares of the Company's common stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of

recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(iii)    "Common Stock FMV" shall mean, as of any date of determination, the quotient obtained by dividing (i) an amount equal to (A) the Company Stock FMV, less (B) the Preferred Stock FMV by (ii) the aggregate number of shares of Common Stock issued and outstanding on a Fully-Diluted Basis as of the applicable date of determination.

(iv)    "Company Stock FMV" shall mean, as of any date of determination, an amount equal to (i) the Enterprise Value, less (ii) the aggregate amount of Indebtedness of the Company and the Subsidiaries, including, but not limited to, indebtedness for borrowed money and capitalized leases of the Company and the Subsidiaries as of the end of the Determination Period (including, without limitation, interest accrued but unpaid as of the end of the Determination Period), less (iii) the aggregate amount to be paid pursuant to any earnout, deferred purchase price or similar amounts in respect of acquisitions outstanding as of the end of the Determination Period, less (iv) the aggregate amount that would have been payable by the Company in respect of any stock appreciation rights or similar obligation of the Company or its Subsidiaries outstanding as of the end of the Determination Period (whether or not restricted as of such date), less (v) any other long-term obligations or liabilities of the type reflected on the face of a balance sheet of the Company, as determined in accordance with GAAP.

(v)    "Contract" shall mean any binding contract, lease, agreement, indenture, mortgage, note, bond or instrument, whether written or oral.

(vi)    "Determination Period" shall mean the last four (4) consecutive completed fiscal quarters as set forth on the unaudited financial statements of the Company immediately preceding the applicable date of determination of the Enterprise Value.

(vii)    "EBITDA" shall mean, for any period, the consolidated net income (or loss) of the Company (after eliminating all extraordinary or non-recurring items of income (or loss)), as reflected in the Company's financial statements for such period, further adjusted by (i) without duplication, the addition of (A) interest and other expense in respect of indebtedness for borrowed money and similar expense in respect of capitalized leases, charged, accrued or otherwise allocated against such net income (or loss), (B) expenses for income taxes (whether paid, accrued or deferred) charged or otherwise allocated against such net income, (C) depreciation and amortization of any assets or other non-cash charges (including, without limitation, any depreciation, amortization and other non-cash charges relating to purchase accounting adjustments, and any amortization or write-off of intangible assets, transaction costs or goodwill) charged, allocated or otherwise accrued against such net income (or loss) and (D) non-cash expenses attributable to the issuance of stock, options, warrants, stock appreciation rights or similar rights by the Company to any of its directors, officer, employees, dealers or others or the exercise thereof, charged, accrued or allocated against such net income (or loss) and (ii) without duplication, the subtraction of interest income, non-cash gains and other income, in each case, excluding any such interest, depreciation, amortization costs

and expenses and income previously taken into account in determining EBITDA during any period preceding such period, all as determined in accordance with U.S. generally accepted accounting principles, consistently applied.

(viii)     "Enterprise Value" shall mean, as of any date of determination, an amount equal to (i) seven (7) multiplied by the average annual EBITDA for the Determination Period, plus (ii) the aggregate amount of Unrestricted Cash of the Company and the Subsidiaries plus (iii) the aggregate exercise or conversion price of all options or warrants exercisable for, or securities convertible into, Common Stock outstanding (whether vested or not) as of the applicable date of determination.

(ix)     "Equity Interest" means, with respect to any Person, (i) any capital stock, shares, partnership interests, membership interests, limited liability company interests, stock appreciation rights, phantom equity interests or other ownership or equity interests of such Person, including any securities exercisable, exchangeable or convertible into any of the foregoing, (ii) any other interest or participation that confers on the holder thereof the right to receive a share of the profits and losses or, or distributions of assets of, such Person, and (iii) any warrants, options or other rights to acquire any of the foregoing.

(x)     "Fair Market Value" shall mean, (i) with respect to Common Stock, the Common Stock FMV and (ii) with respect to Preferred Stock, the quotient obtained by dividing (A) the Preferred Stock FMV by (B) the aggregate number of shares of Preferred Stock issued and outstanding as of the applicable date of determination.

(xi)     "Fully-Diluted Basis" shall mean the number of shares of Common Stock which would be outstanding, as of the date of computation, if all vested and outstanding Stock Equivalents had been converted, exercised or exchanged.

(xii)     "GAAP" shall mean generally accepted accounting principles in the United States as in effect on the date hereof and from time to time.

(xiii)     "Income Tax" means (i) all Taxes based on income determined under provisions of the Code and (ii) foreign, state and other taxes (including franchise taxes) based on income or gross receipts, including a Tax assessed on a corporation by reference to its income, gains, or profits, and shall include for the avoidance of doubt, any withholding taxes, and in each instance any interest, penalties or additions to tax attributable to such Tax.

(xiv)     "Indebtedness" shall mean, with respect to the Company and its Subsidiaries, and without duplication: (i) any indebtedness for borrowed money, (ii) indebtedness evidenced by notes, bonds, debentures, mortgages or other debt instruments or debt securities, (iii) to the extent drawn, all obligations of the Company and its Subsidiaries in respect of letters of credit, performance bonds, bankers acceptances or similar obligations of the Company and its Subsidiaries or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation), (iv) all obligations of the Company and its Subsidiaries as lessee or lessees under leases that have been

recorded as capital leases in accordance with GAAP, (v) all payment obligations under any interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or agreement to which the Company or any Subsidiary is a party (valued at the termination value thereof), (vi) whether or not so included as Liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (v) of the Company or any Subsidiary secured by any Lien on any assets owned or purchased by the Company or any of its Subsidiaries (including indebtedness arising under conditional sales or other title retention agreements), even though (A) such Person has not assumed or otherwise become liable for the payment thereof or (B) such indebtedness is limited in recourse, (vii) all obligations of the Company or any of its Subsidiaries issued or assumed as the deferred purchase price of businesses, assets, property, Equity Interests or services, including potential earn-outs, purchase price adjustments, post-closing payments in respect of transaction tax benefits, non-competition payments or similar payments, in each case in respect of past acquisitions, as well as the deferred purchase price for security cameras and systems, (viii) all Liabilities or underfunding of the Company or any of its Subsidiaries in relation to pension plans, retiree medical and any other long-term obligations under Laws or pension, welfare or benefit plans for the Company or any of its Subsidiaries, (ix) all Off-Balance Sheet Financings of the Company or any of its Subsidiaries, (x) the amount of any guarantees made by the Company or any of its Subsidiaries of indebtedness of the type described in clauses (i) through (ix) above of any Person, (xi) any unpaid interest, fees, prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts, owing on or in respect of any such indebtedness described in clauses (i) through (x) above, (xii) all obligations of the Company or any of its Subsidiaries arising from deferred compensation or severance and similar arrangements (including payroll, employment and other Taxes thereon), (xiii) all deferred or unearned revenue of the Company and its Subsidiaries, amounts refundable by the Company and its Subsidiaries under Contracts with their customers (including all advanced payments, contingent refunds, and amounts refundable by the Company and its Subsidiaries) and any Liabilities to customers for inventory assumed by such Person, (xiv) any Net Tax Liabilities and (xv) any Lay-Away Obligations; provided, however, that none of the following shall constitute Indebtedness hereunder: (A) to the extent undrawn, any obligation with respect to any letter of credit (or reimbursement agreement in respect thereof), (B) any operating lease, (C) any guarantee by the Company or any of its Subsidiaries of the obligations of any other Subsidiary and (D) any indebtedness of any Subsidiary owed to any other Subsidiary. For all purposes of this Agreement, Indebtedness shall include the indebtedness of any partnership or joint venture in which Subsidiary is a general partner or joint venturer (to the extent that such Subsidiary is liable for such indebtedness).

(xv)       "Laws" means all applicable federal, state, local and foreign laws, statutes, constitutions, rules, regulations, ordinances, common law and similar provisions having the force of law and all judgments, rulings, orders, decrees, administrative determinations, injunctions, guidance and guidelines of governmental authorities.

(xvi)      "Lay-Away Obligations" shall mean those deposits or monies received from a Person representing part or all of the price of goods that was payable in one or

more payments subsequent to the making of a layaway agreement and for which the Company or any Subsidiary retains possession of such goods and bears the risk of their loss or damage until such goods are paid in full and delivered according to the layaway agreement, the dollar amount of inventory purchased by a customer but not yet received by such customer, and escheatment, unclaimed property and similar liabilities.

(xvii)    "Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any Liability for Taxes.

(xviii)    "Lien" shall mean any security interest, lien, charge, mortgage, deed, assignment, pledge, hypothecation, encumbrance, servitude, easement, restriction (including any repatriation restrictions), judgment, option, right of first offer, right of first refusal or interest of another Person of any kind or nature.

(xix)    "Net Tax Liabilities" means an amount, which may be positive or negative, equal to the sum of any amounts that would be properly accrued as current liabilities for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries in accordance with GAAP reduced by any amounts that would be properly accrued as a current asset for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries.

(xx)    "Off-Balance Sheet Financing" means (a) any liability of the Company or any Subsidiary under any sale leaseback transactions which does not create a liability on the consolidated balance sheet of the Company and its Subsidiaries and (b) any liability of the Company or any Subsidiary under any synthetic lease, Tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product where the transaction is considered indebtedness for borrowed money for federal income Tax purposes but is classified as an operating lease in accordance with GAAP for financial reporting purposes.

(xxi)    "Original Cost" shall mean the original purchase or exercise price actually paid for a Repurchaseable Security.

(xxii)    "Preferred Stock" shall mean the shares of the Company's preferred stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(xxiii)    "Preferred Stock FMV" shall mean, as of any date of determination, the lesser of (i) the liquidation value of the outstanding shares of Preferred Stock as calculated in accordance with the Certificate of Incorporation or (ii) the Company Stock FMV.

(xxiv)    "Securities" shall mean all (A) shares of Common Stock, (B) shares of Preferred Stock, (C) Stock Equivalents and D) securities of the Company issued or issuable with respect to the securities referred to in clauses (A) through (C) above, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise.

(xxv)    "Stock Equivalents" shall mean any (i) warrants, options or other right to subscribe for, purchase or otherwise acquire any shares of Common Stock or (ii) any securities convertible into or exchangeable for shares of Common Stock.

(xxvi)    "Tax" or "Taxes" shall mean all federal, state, county, local, franchise or foreign income, payroll, employment, excise, environmental, customs, franchise, windfall profits, withholding, social security (or similar), unemployment, real property, personal property (tangible or intangible), escheat, unclaimed property, sales, use, transfer, registration, value added, gross receipts, net proceeds, turnover, license, ad valorem, capital stock, disability, stamp, leasing, lease, excess profits, occupational and interest equalization, fuel, severance, alternative or add-on minimum or estimated tax, charge, fee, levy, duty or other assessment, and other obligations of the same or of a similar nature to any of the foregoing due or claimed to be due by or to any Taxing authority, including any interest, penalty or addition thereto, whether disputed or not.

(xxvii)    "Three Year Junior Notes" shall mean a promissory note of the Company in the form attached hereto as Exhibit C.

(xxviii)    "Unrestricted Cash" shall mean, as of any date of determination, the aggregate amount of immediately available cash and cash equivalents of the Company and the Subsidiaries after any applicable withholding taxes, excluding (i) credit card receivables, (ii) register cash and (iii) cash or cash equivalents (A) subject to any Lien and (B) that may not be legally distributed on such date of determination by means of one or more direct or indirect dividends or distributions to the Company.

12.    Nonassignability of Option Rights.  This Option shall not be assignable or transferable by the Optionee except by will or by the laws of descent and distribution.  During the life of the Optionee, this Option shall be exercisable only by Optionee or, in the event of Optionee's legal incapacity, by Optionee's legal representative.

13.    Compliance with Securities Act.  The Company shall not be obligated to sell or issue any shares of Stock or other securities pursuant to the exercise of this Option unless the shares of Stock or other securities with respect to which this Option is being exercised are at that time effectively registered or exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws.  In the event shares or other securities shall be issued which shall not be so registered, the Optionee hereby represents, warrants and agrees that he or she will receive such shares or other securities for investment and not with a view to their resale or distribution, and will execute an appropriate investment letter satisfactory to the Company and its counsel as a condition precedent to any exercise of this Option in whole or in part.

713338790

14.     <u>Legends</u>.  The Optionee hereby acknowledges that, if certificated, the stock certificate or certificates evidencing shares of Stock or other securities issued pursuant to any exercise of this Option will bear a legend setting forth the restrictions on their transferability described in <u>Section 13</u> hereof, in <u>Section 12</u> of the Plan, and under any applicable agreements between the Optionee and the Company or any of its stockholders.

15.     <u>Rights as Stockholder</u>.  The Optionee shall have no rights as a stockholder with respect to any shares of Stock or other securities covered by this Option until the date of issuance of a certificate to him or her for such shares or other securities (if certificated) or the date on which the Company updates the stockholders' registry reflecting such issuance.  No adjustment shall be made for dividends or other rights for which the record date is prior to the date such certificate is issued (if certificated) or the date on which the Company updates the stockholders' registry.

16.     <u>Certain Agreements</u>.   The Optionee hereby agrees to be bound by the terms and conditions of the Stockholders' Agreement dated October 31, 2014 as amended or modified from time to time, among the Company and the other persons named therein (the "<u>Stockholders' Agreement</u>").  The Optionee hereby further acknowledges and agrees that the Option and the shares of Stock issuable upon exercise of the Option are and shall be subject to the terms and provisions of the Stockholders' Agreement; <u>provided</u>, <u>however</u>, that, in case of any conflict between this Option Agreement and the Stockholders' Agreement, this Option Agreement shall control.  Upon the Optionee's exercise of the Option in accordance with <u>Section 10</u> hereof, the Optionee agrees to execute a joinder agreement to the Stockholders' Agreement in the form as determined by the Committee in its sole discretion and agrees to have his or her spouse, if applicable, execute a spousal consent by which Optionee's spouse acknowledges and consents to the restrictions set forth in such Stockholders' Agreement (the "<u>Spousal Consent</u>").

17.     <u>Restrictions</u>.

        (a)     <u>Definitions</u>.  For purposes of this <u>Section 17</u>, the following terms shall have the following meanings unless the context indicates otherwise:

                "<u>Business</u>" shall mean any business of the Company or any of its Subsidiaries, as conducted by or engaged in on the date hereof, and as proposed to be conducted by or engaged in on the date hereof, by the Company or any of its Subsidiaries, including, without limitation, the business of selling furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers.

                "<u>Restricted Period</u>" means the period during which Optionee or his permitted transferees holds any Options or securities underlying such options, and for two years thereafter.

                "<u>Specific Exceptions</u>" shall have the meaning set forth in the Selling Equityholder Agreement, dated September 30, 2014 by and between American Freight, Inc. and Optionee.

                "<u>Termination Date</u>" shall mean, as applicable, the date of termination of Optionee's employment with the Company or any of its Subsidiaries or membership on the Board of Directors of the Company.

(b)      Confidentiality.  During and after the Restricted Period, Optionee recognizes and acknowledges that Optionee has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (the "Confidential Information"), and that such Confidential Information constitutes valuable, special and unique property of the Company.  The term Confidential Information will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the Company's and its Subsidiaries' current or potential business (including information received by the Company or any of its Subsidiaries from third parties), and (b) is not generally or publicly known.  Optionee agrees not to disclose or use for Optionee's own account any Confidential Information without the Board's prior written consent, except (i) to the extent that any Confidential Information becomes generally known to and available for use by the public other than as a result of Optionee's acts or omissions; (ii) to the extent that any Confidential Information is required to be disclosed pursuant to any applicable law or court order; or (iii) to Optionee's attorneys and accountants; provided that, in the case of subsection (iii) hereof, Optionee shall cause each Person receiving such Confidential Information to be informed that such Confidential Information is strictly confidential and subject to this Agreement and to agree not to disclose or use such information except as provided herein.  Optionee acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by Optionee concerning any information relating to the Company's and its Subsidiaries' business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of Optionee's ownership of Optionee Securities

(c)      Books and Records.  All books, records, reports, writings, notes, notebooks, computer programs, sketches, drawings, blueprints, prototypes, formulas, photographs, negatives, models, equipment, reproductions, proposals, flow sheets, supplier lists, supply terms or contracts, customer lists and other documents and/or things relating in any manner to the business of the Company or any of its Subsidiaries or affiliates (including but not limited to any of the same embodying or relating to any Confidential Information), whether prepared by Optionee or otherwise coming into Optionee's possession, shall be the exclusive property of the Company and shall not be copied, duplicated, replicated, transformed, modified or removed from the premises of the Company except pursuant to and in furtherance of the business of the Company and shall be returned immediately to the Company on the Termination Date or on the Company's request at any time.

(d)      Inventions and Patents.

(i)        Optionee agrees that any and all writings, documents, inventions, discoveries, processes, methods, designs, mask works, compositions of matter, formulations, computer programs or instructions (whether in source code, object code, or any other form), algorithms, formulae, plans, customer lists, vendor lists, memoranda, tests, research, designs, specifications, models, data, diagrams, flow charts, and/or techniques (whether reduced to written form or otherwise) that Optionee makes, conceives, discovers, or develops, either solely or jointly with any other person, at any time during the period during which Optionee or its permitted transferees holds any Optionee Securities, whether during working hours or at the Company's facility or at any other time or location, whether patentable or not, and whether upon the request or

13

suggestion of the Company or otherwise, that relate to or are useful in any way in connection with the Business (collectively, the "Intellectual Work Product") shall be the sole and exclusive property of the Company. Optionee agrees to promptly and fully disclose all the Intellectual Work Product to the Company, and Optionee shall not have any claim for compensation for the Intellectual Work Product.

(ii)     Optionee agrees that all Intellectual Work Product that is copyrightable shall be considered a work made for hire under the United States Copyright Act. To the extent that any copyrightable Intellectual Work Product may not be considered a work made for hire under the applicable provisions of copyright law, or to the extent that, notwithstanding the foregoing provisions, Optionee may retain an interest in any Intellectual Work Product, Optionee hereby irrevocably assigns and transfers to the Company any and all right, title, or interest that Optionee may have in the Intellectual Work Product under copyright, patent, trade secret, trademark and other law protecting proprietary or intellectual property rights, in perpetuity or for the longest period otherwise permitted by law, without the necessity of further consideration. The Company shall be entitled to obtain and hold in its own name all registrations of copyrights, patents, trade secrets, trademarks and other proprietary or intellectual property rights with respect thereto.

(iii)     At the sole request and expense of the Company, either before or after the Restricted Period, Optionee shall assist the Company in acquiring and maintaining registrations under copyright, patent, trade secret, trademark and other laws protecting proprietary or intellectual property rights in, and confirming its title to, all Intellectual Work Product. Optionee's assistance shall include signing all applications for copyrights, patents and other proprietary or intellectual property rights and other documents, cooperating in legal proceedings and taking any other steps considered desirable by the Company.

(e)     Non-Disparagement. During and after the Restricted Period, Optionee shall not, and shall ensure that its agents, representatives and affiliates do not, directly or indirectly, disparage or make negative, derogatory or defamatory statements about the Company or any of its Subsidiaries, their respective business activities, or any of their respective Stockholders, directors, officers or employees.

(f)     Nonsolicitation. During the Restricted Period, Optionee shall not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, officer, director, partner, manager, employee, agent, contractor, consultant or otherwise): (a) hire or engage, or recruit, solicit or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to the Company or any of its Subsidiaries, (b) induce or attempt to induce any current or former employee of, or consultant to, the Company or any of its Subsidiaries, to leave the employ of the Company or any such Subsidiary, or in any way interfere with the relationship between the Company or any of its Subsidiaries and any their employees or consultants, (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to the Company or any of its Subsidiaries or (d) in any way interfere with the relationship between the Company or any of its Subsidiaries and any supplier, licensee, lessor or other business relation (or any prospective supplier, licensee, lessor

713338790

or other business relationship) of the Company or any of its Subsidiaries (including, without limitation, by making any negative or disparaging statements or communications regarding the Company, any of its Subsidiaries or any of their operations, officers, directors or investors)

(g)     Noncompetition.  During the Restricted Period, subject to the Specific Exceptions set forth in a Selling Equityholder Agreement executed by American Freight, Inc. and Optionee, Optionee shall not directly or indirectly, (a) own, operate, manage, control, participate in, provide support to (financial or otherwise), consult with, advise, permit his or her name to be used by, provide services for, lease, or in any manner engage in or knowingly facilitate (including, in association with any person, or through any person), any business that sells (i) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold or offered by the Company or its Subsidiaries or reasonably would be expected to be sold or offered by a Competing Business or (ii) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the Protected Territory (collectively, "Covered Activities"); or (b) acquire an ownership interest in, invest in or provide services to any person which engages in any Covered Activities (other than the Company or its Subsidiaries) as a partner, shareholder, principal, agent, consultant or in any other relationship or capacity; provided, however, that no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(h)     Enforcement.  If, at the time of enforcement of any provision of Section 17(f) or Section 17(g), a court shall hold that the duration, scope or area restrictions stated therein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained therein to cover the maximum period, scope and area permitted by law.  Because Optionee has access to proprietary information and Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of Sections 17(b) through 17(g). Therefore, in the event of a breach or threatened breach of the foregoing sections of this Section 17, the Company or any of its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security and without proving actual damages).  In addition, in the event of an alleged breach or violation by Optionee of any provision of Section 17(f) or Section 17(g), the Restricted Period shall be tolled until such breach or violation has been duly cured.  The existence of any claim or cause of action by Optionee against the Company or any of its affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of Sections 17(b) through 17(g) which Sections will be enforceable notwithstanding the existence of any breach by the Company.  If the Company (i) brings any action or proceeding to enforce any provision of this Agreement or to obtain damages as a result of a breach of this Agreement or to enjoin any breach of this Agreement and (ii) prevails in such action or proceeding, then Optionee will, in addition to any other rights and remedies available to the Company, reimburse the Company for any and all reasonable costs and expenses (including attorneys' fees) incurred by the Company in connection with such action or proceeding.

(i)     Further Acknowledgments.  Optionee expressly agrees and acknowledges that the restrictions contained in Section 17(f) or Section 17(g) do not preclude Optionee from earning a livelihood, nor do they unreasonably impose limitations on Optionee's ability to earn a living.  In addition, Optionee agrees and acknowledges that the potential harm to the Company of the non-enforcement of Section 17(f) or Section 17(g) outweighs any harm to Optionee of his or her enforcement by injunction or otherwise.  Optionee acknowledges that Optionee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Optionee, and is in full accord as to their necessity for the reasonable and proper protection of the Confidential Information.  Optionee expressly acknowledges and agrees that each and every restriction imposed by this Agreement is reasonable with respect to subject matter and time period and such restrictions are necessary to protect the Company's interest in, and value of, the Company (including, without limitation, the goodwill inherent therein).  Optionee understands and agrees that the restrictions and covenants contained in Section 17(f) or Section 17(g) are in addition to, and not in lieu of, any non-competition, non-solicitation or other similar obligations contained in any other agreements between Optionee and the Company.

18.     Withholding Taxes.  The Optionee hereby agrees, as a condition to the exercise of any portion of this Option, to provide to the Company an amount sufficient to satisfy its obligation to withhold any federal, state and local taxes arising by reason of such exercise (the "Withholding Amount") by (a) authorizing the Company to withhold the Withholding Amount from his or her cash compensation, or (b) remitting the Withholding Amount to the Company in cash; provided, however, that to the extent that the Withholding Amount is not provided by one or a combination of such methods, the Company in its sole and absolute discretion may refuse to issue such shares of Stock.

19.     Effect Upon Employment.  Nothing in this Option or the Plan shall be construed to impose any obligation upon the Company or any Subsidiary to employ or retain in its employ, or continue its involvement with, the Optionee or interfere in any way with any right of the Company or any of its Subsidiaries or affiliates to terminate such employment at any time for any reason whatsoever (whether for cause or without cause) without liability to the Company or any of its Subsidiaries or affiliates.

20.     Time for Acceptance.  This Option shall be effective as of the date an executed copy is delivered by the Company to the Optionee, provided, however, that unless the Optionee shall return to the Company an executed copy of this Option Agreement, and, if applicable, an executed spousal consent in the form attached hereto as Exhibit B, within fourteen (14) days after its delivery to him or her, the Option and this Option Agreement shall be null and void.

21.     General Provisions.

(a)     Amendment.  This Option Agreement, including the Plan, contains the full and complete understanding and agreement of the parties hereto as to the subject matter hereof, and except as permitted under the terms of the Plan, this Option Agreement may not be modified or amended, nor may any provision hereof be waived, except by a further written agreement duly signed by the Company and Optionee.  The waiver by either of the parties hereto of any provision hereof in any instance shall not operate as a waiver or any other provision hereof or in any other instance.

713338790

(b)  <u>Binding Effect</u>.  This Option Agreement shall inure to the benefit of and be binding upon the parties hereto and, to the extent provided herein and in the Plan, their respective heirs, executors, administrators, representatives, successors and assigns.

(c)  <u>Option Plan; Construction</u>.  The Optionee hereby acknowledges receipt of a copy of the Plan.  Except as otherwise provided in this Option Agreement, all of the terms and conditions of the Plan are incorporated herein by reference and this Option is subject to such terms and conditions in all respects.  In case of any conflict between the Plan and this Option Agreement, this Option Agreement shall control.  The titles of the sections of this Option Agreement and of the Plan are included for convenience only and shall not be construed as modifying or affecting their provisions.  The masculine gender shall include both sexes; the singular shall include the plural and the plural the singular unless the context otherwise requires.

(d)  <u>Exclusive Agreement</u>.  The Optionee hereby acknowledges and agrees that by signing this Option Agreement, the Optionee voluntarily and irrevocably forfeits any and all rights, title, and interests the Optionee has or may have had in, to and under (a) any option agreement, option letter, or other similar document pursuant to which the Company (or any Subsidiary or affiliate thereof) may have previously granted, or offered to grant, options in the Company (or any Subsidiary or affiliate thereof) to the Optionee and (b) any oral or written commitment or promise regarding options that the Company (or any Subsidiary or affiliate thereof) may have made to the Optionee, except as to any options that have been previously exercised and paid for by the Optionee.

(e)  <u>Governing Law</u>.  This Option Agreement shall be governed by and construed and enforced in accordance with the applicable laws of the State of Delaware (other than the law governing conflict of law questions) except to the extent the laws of any other jurisdiction are mandatorily applicable.

(f)  <u>Miscellaneous</u>.  For purposes of this Option Agreement, references herein, including <u>Section 11</u> hereof, to the employment or the membership on the Board of Directors of the Company or its Subsidiaries to the Separate Property Trust of David A. Belford, dated November 13, 2007, shall, *mutatis mutandis*, be deemed to refer to the membership on the Board of Directors of the Company or its Subsidiaries or Termination of David A. Belford. Additionally, the obligations of the Separate Property Trust of David A. Belford, dated November 13, 2007 pursuant to <u>Section 17</u> or otherwise under this Option Agreement, shall, *mutatis mutandis*, bind David A. Belford individually.

(g)  <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by electronic mail (with confirmation of receipt) or (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

> To the Optionee:  To his or her address as listed on the books of the Company.
>
> To the Company:  American Freight Group, Inc.
> c/o The Jordan Company III, L.P.

399 Park Avenue
30th Floor
New York, New York 10022
Attention:     M. Brad Wilford
                 Daniel S. Williams
Email:         bwilford@thejordancompany.com
Email:         dwilliams@thejordancompany.com

with a copy to:     Mayer Brown LLP
1675 Broadway
New York, New York  10019
Attention:  Philip O. Brandes
Email:  pbrandes@mayerbrown.com

(h)     <u>Amendment to the Definition of Cause</u>.  Subpart (f) of the definition of Cause, as defined in the Option Plan, is hereby amended by inserting the words "other than in connection with the Specific Exceptions," immediately prior to the words "obtaining any personal profit…".

\*       \*       \*       \*       \*

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement as of the date first written above.

OPTIONEE:

_____

Separate Property Trust of David A. Belford,
dated November 13, 2007

Name: David A. Belford

Title: Trustee
Address: 2950 E BROAD ST
COLUMBUS OH 43209

_____
David A. Belford

Address: 2950 E BROAD ST
COLUMBUS OH 43209
_____

AMERICAN FREIGHT GROUP, INC.

By: _____

Name: Steven J. Belford

Title: President

713338790

**AMERICAN FREIGHT GROUP, INC.**

**SCHEDULE I**

**<u>Vesting Schedule</u>**

396.8750 shares of Stock subject to this Option (the "<u>Option Shares</u>") shall vest and be exercisable according to the following vesting schedule:

    (a) Forty percent (40%) of the Option Shares shall vest and be exercisable on the second (2nd) anniversary of January 28, 2015;

    (b) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the third (3rd) anniversary of January 28, 2015;

    (c) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the fourth (4th) anniversary of January 28, 2015; and

    (d) the remaining twenty percent (20%) of the Option Shares shall vest and be exercisable on the fifth (5th) anniversary of January 28, 2015.

Notwithstanding the foregoing, upon a Change in Control, 100% of any then-unvested Option Shares shall vest and be exercisable upon such Change in Control.

EXHIBIT A
(to Stock Option Agreement)

**FORM FOR EXERCISE OF STOCK OPTION**

American Freight Group, Inc.
c/o The Jordan Company III, L.P.
399 Park Avenue
30th Floor
New York, New York 10022
Attention:     M. Brad Wilford
                        Daniel S. Williams

> RE:     Exercise of Option under American Freight Group, Inc.
>               2015 Non-Qualified Stock Option Plan (the "Plan")

Ladies and Gentlemen:

Please take notice that the undersigned hereby elects to exercise the stock option granted to _____ on _____ by and to the extent of purchasing _____ shares of common stock, par value of $0.001 per share (the "Stock"), of American Freight Group, Inc. (the "Company") for the option price of $_____ per share, subject to the terms and conditions of the Stock Option Agreement between _____ and the Company dated as of _____ (the "Option Agreement"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan.

The undersigned encloses herewith payment, in cash or in such other property as is permitted under the Plan, of the Exercise Payment for said shares and has made a provision with the Company for the Withholding Amount.

In connection with the exercise of the Option, the undersigned represents to the Company as follows:

(a)     The undersigned is acquiring the Stock solely for investment purposes, with no present intention of distributing or reselling any of the shares of Stock or any interest therein. The undersigned acknowledges that the Stock has not been registered under the Securities Act of 1933, as amended (the "Securities Act").

(b)     The undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.

(c)     The undersigned understands that the Stock is a "restricted security" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the undersigned must hold the Stock indefinitely unless it is registered with the Securities and Exchange Commission and qualified by state authorities, or unless an exemption from such registration and qualification requirements is available. The undersigned acknowledges that the Company has no obligation to register or qualify the Stock for resale. The undersigned further acknowledges that

if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner or sale, the holding period for the Stock, and requirements relating to the Company which are outside of the undersigned's control, and which the Company is under no obligation to and may not be able to satisfy.

(d)    The undersigned understands that there is no public market for the Stock, that no market may ever develop for the Stock, and that the Stock has not been approved or disapproved by the Securities and Exchange Commission or any other federal, state or other governmental agency.

(e)    The undersigned understands that the Stock is subject to certain restrictions on transfer set forth in the Plan.  Both the Plan and the Option Agreement are incorporated herein by reference.

(f)    The undersigned understands that any Stock purchased hereunder shall be subject to the Stockholders' Agreement of the Company as it may be amended from time to time ("Stockholders' Agreement"), a copy of which has been provided to the undersigned, and that it is a condition to the exercise of my Option that the undersigned executes a signature page of the Stockholders' Agreement, agreeing to be bound thereby and that the undersigned's spouse, if applicable, must sign the Spousal Consent.  The undersigned and his or her spouse has had a full and fair opportunity to review the Stockholders' Agreement prior to exercising the Option.

(g)    The undersigned understands that any Stock purchased hereunder shall be subject to certain repurchase rights that may cause the Stock to be considered unvested at the time of purchase for purposes of Section 83 of the Internal Revenue Code of 1986, as amended (the "Code").  If the Stock is considered to be unvested upon purchase under Section 83, the fair market value of the Stock generally would be reportable to the Participant on the applicable vesting date as ordinary income and subject to tax withholding at that time.  Instead, the Participant may elect to be taxed on the fair market value of the Stock (less the exercise price) at the time of purchase by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after purchase.  The undersigned acknowledges and agrees that it is his or her personal responsibility to determine whether or not to make a Section 83(b) election and if such election is filed, the undersigned shall provide the Company with a copy of the election form filed with the Internal Revenue Service.

Very truly yours,

Date _____

_____
(Signed by _____ or other party duly exercising option)

Note:  If Options are being exercised on behalf of a deceased Optionee, then this Notice must be signed by such Optionee's personal representative and must be accompanied by a certificate issued by an appropriate authority evidencing that the individual signing this Notice has been

duly appointed and is currently serving as the Optionee's personal representative under applicable local law governing decedents' estates.

EXHIBIT B
(to Stock Option Agreement)

## FORM OF SPOUSAL CONSENT

I acknowledge that I have read the foregoing Stock Option Agreement and that I know its contents. I acknowledge and agree that capitalized terms used and not defined in this spousal consent shall have the meanings ascribed to such terms in the Stock Option Agreement. I am aware that by the provisions of the Stock Option Agreement, my spouse agrees, among other things, to the granting of rights to purchase and to the imposition of certain restrictions on the transfer of Optionee Securities, including my community interest therein (if any), which rights and restrictions may survive my spouse's death. I hereby consent to such rights and restrictions, approve of the provisions of the Stock Option Agreement, and agree that I will bequeath any interest which I may have in said Optionee Securities or any of them, including my community interest, if any, or permit any such interest to be purchased, in a manner consistent with the provisions of the Stock Option Agreement. I direct that any residuary clause in my will not be deemed to apply to my community interest (if any) in such Optionee Securities except to the extent consistent with the provisions of the Stock Option Agreement.

I further agree that in the event of a dissolution of the marriage between myself and my spouse, in connection with which I secure or am awarded any Optionee Securities or any interest therein through property settlement agreement or otherwise, (a) I will receive and hold said Optionee Securities subject to all the provisions and restrictions contained in the Stock Option Agreement, including any option of the Company, Resolute or other stockholder or optionholder to purchase such shares or interest from me, and (b) I hereby irrevocably constitute and appoint my spouse, as true and lawful attorney and proxy (the "Proxy") of my Optionee Securities with full power of substitution, to vote (at any annual or special meeting or by written consent) such Optionee Securities which I would be entitled to vote as a stockholder, together with any and all Optionee Securities issued in replacement or in respect of such Optionee Securities by dividend, distribution, stock split, reorganization, recapitalization or otherwise.

I also acknowledge that I have been advised to obtain independent counsel to represent my interests with respect to this spousal consent.

Date: _____

_____

Name of Spouse: _____

Name of Optionee: _____

713338790

## <u>EXHIBIT C</u>

**FORM OF THREE YEAR JUNIOR NOTE**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND ACCORDINGLY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR LAWS OR PURSUANT TO AN EXEMPTION THEREFROM. THE PRINCIPAL AMOUNT OF THIS NOTE, AND INTEREST IN RESPECT THEREOF, IS SUBORDINATED TO THE PAYMENT IN FULL OF ALL SENIOR INDEBTEDNESS AND IS SUBJECT TO SET-OFF, AS DESCRIBED IN THIS NOTE.

AMERICAN FREIGHT GROUP, INC.

NON-NEGOTIABLE THREE YEAR JUNIOR SUBORDINATED NOTE
DUE _____, _____

New York, New York

[$ _____]                                         ____ ___, ___

      FOR VALUE RECEIVED, the undersigned, American Freight Group, Inc., a Delaware corporation (together with its successors, the "<u>Company</u>"), hereby promises to pay to _____ (together with its successors and permitted assigns, the "<u>Holder</u>"), at the Holder's residence at _____, the principal amount of _____ ($_____) on the Maturity Date. Certain capitalized terms are used in this Note are as defined in <u>Section 6</u>.

      Section 1. <u>Payment; Interest</u>.

      1.1    The outstanding principal amount of this Note shall bear interest (computed on the basis of a 365 day year, as the case may be) accruing daily at a rate equal to five percent (5%) per annum from (but excluding) the date hereof to (and including) the date on which the principal amount of this Note is paid in full, regardless of the commencement of any bankruptcy or insolvency proceedings against the Company. Subject to <u>Section 5</u> of this Note, such interest shall be payable on the Maturity Date.

      1.2    Whenever payment of principal of, or interest on, this Note shall be due on a date that is not a Business Day, the date for payment thereof shall be the next succeeding Business Day and interest due on the unpaid principal and any other Amounts Payable hereunder shall accrue during such extension and shall be payable on such succeeding Business Day.

713338790

Section 2.  <u>Optional Prepayment</u>.  The Company shall have the right to prepay the principal amount of this Note in whole or in part at any time, or from time to time, without payment of any premium or penalty whatsoever, together with interest thereon accrued to the date of prepayment; <u>provided</u>, <u>however</u>, that so long as (a) any Senior Indebtedness remains outstanding and unpaid, (b) any commitment to provide Senior Indebtedness is outstanding, or (c) any other amount is owing to the holders of Senior Indebtedness, this Note may not be prepaid, in whole or in part, without the consent of, or written waiver of, any relevant prohibitions by the holders of Senior Indebtedness.

Section 3.  <u>Set-off</u>.  The Company shall be entitled to set-off and reduce any Amounts Payable hereunder for (a) any obligations or liabilities of the Holder to the Company or its Subsidiaries or (b) any claims by the Company or its Subsidiaries against the Holder under the Stockholders Agreement, or any other agreement, written or oral, between the Company or its Subsidiaries and the Holder.  The Holder, by accepting this Note, hereby acknowledges and agrees to the foregoing provisions, and any subsequent transferee or successor shall be bound by the foregoing.

Section 4.  <u>Defaults</u>.

4.1     <u>Events of Default</u>.  If one or more of the following events ("<u>Events of Default</u>") shall have occurred and be continuing:

(a)     the Company shall fail to pay within ten (10) Business Days of the due date thereof any principal of this Note or shall fail to pay within ten Business Days of the due date thereof any interest or any other amount payable hereunder and the same shall not have been cured within forty-five (45) days after written notice thereof has been given by the Holder to the Company;

(b)     the Company shall fail to observe or perform any covenant or agreement contained in this Note (other than those covered by <u>clause (a)</u> above) and the same shall not have been cured within sixty (60) days after written notice thereof has been given by the Holder to the Company;

(c)     the Company shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors; or

(d)     an involuntary case or other proceeding shall be commenced against the Company seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days; or an

C-2-

order for relief shall be entered against the Company under the Federal bankruptcy laws as now or hereafter in effect;

then, and in every such event, subject to the provisions of Section 5, the Holder may, by notice to the Company and to the holders of Senior Indebtedness, declare the unpaid principal amount of this Note together with accrued interest thereon, to be, and such portions of this Note (and accrued interest thereon) shall thereupon become, due and payable immediately following delivery of such notice to the Company and to the holders of Senior Indebtedness without presentment, demand, protest or further notice of any kind, all of which are hereby waived by the Company; provided, however, that in the case of any of the Events of Default specified in clause (c) or (d) above, such portions of this Note (together with accrued interest thereon) shall, subject to the provisions of Section 5, immediately (and without notice) become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Company.

Section 5.  Subordination.

5.1  Amounts Payable Subordinated to Senior Indebtedness.  Notwithstanding any provision of this Note to the contrary, the Company covenants and agrees, and the Holder by acceptance of this Note likewise covenants and agrees, that all Amounts Payable shall be subordinated to the extent set forth in this Section 5 to the prior payment in full in cash of all Senior Indebtedness.  This Section 5 shall constitute a continuing offer to and covenant with all persons who become holders of, or continue to hold, Senior Indebtedness (irrespective of whether such Senior Indebtedness was created or acquired before or after the issuance of this Note).  The provisions of this Section 5 are made for the benefit of all present and future holders of Senior Indebtedness (and their successors and assigns), and shall be enforceable by them directly against the Holder.

5.2  Priority Over and Payment of Proceeds in Certain Events.

(a)  Upon any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, in the event of any dissolution, winding up or total or partial liquidation, reorganization, arrangement, adjustment, protection, relief or composition, or assignment for the benefit of creditors of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, reorganization, relief or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of all or part of the assets and liabilities of the Company (the foregoing events herein collectively referred to as an "Insolvency Event"), all Senior Indebtedness shall first be paid in full in cash before the Holder shall be entitled to receive any payment by or on behalf of the Company or distribution of assets of the Company relating to any Amounts Payable.  Upon any Insolvency Event, any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, to which the Holder would be entitled relating to any Amounts Payable, except for the provisions of this Section 5, shall, until payment in full in cash of all Senior Indebtedness (including from any concurrent payment or distribution to the holders of such Senior Indebtedness), be made by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution,

directly to the holders of the Senior Indebtedness or their representatives for application to the payment or prepayment of all such Senior Indebtedness.

If the Senior Indebtedness has not been paid in full in cash at a time in which the Company is subject to an Insolvency Event, (i) the holders of the Senior Indebtedness are hereby irrevocably authorized, but shall have no obligation, to demand, sue for, collect and receive every payment or distribution received on or after the Insolvency Event or to be received in respect of this Note (regardless of when originally due) in any insolvency proceeding and give acquittance therefor and to file claims and proofs of claim, as their interests may appear, and (ii) the Holder shall duly and promptly take, for the account of the holders of the Senior Indebtedness, as their interests may appear, such actions as the holders of the Senior Indebtedness may request to collect and receive all Amounts Payable by the Company in respect of this Note and to file appropriate claims or proofs of claim in respect of this Note.

(b)    No payment shall be made by or on behalf of the Company with respect to any Amounts Payable or to acquire this Note (or any portion hereof) for cash, property, securities or otherwise, and, by virtue of accepting this Note and the benefits hereof, the Holder shall not be entitled, and will not take any action, including any judicial process, to accelerate, demand payment or enforce any Indebtedness in respect of this Note or any other claim with regard to any Amounts Payable if (i) such payment is prohibited by the terms of any Senior Indebtedness, (ii) there has occurred and is continuing a default in the payment of all or any portion of any Senior Indebtedness, it being understood that for purposes of this clause (ii), any payment of interest accrued on any Senior Indebtedness which is paid, in lieu of cash, with the issuance of a payment-in-kind obligation, shall be deemed to continue to be unpaid until such payment-in-kind obligation (and all interest accrued thereon) shall have been paid in full or (iii) any other default (not involving the non-payment of any Senior Indebtedness) shall have occurred which, including after giving any notice or the passage of time, or both, would allow holders of any Senior Indebtedness to accelerate or otherwise demand the payment thereof, and in the case of a default described in clause (iii), the holders of the Senior Indebtedness have, to the extent required under the documents evidencing the Senior Indebtedness given notice of such default to the Company (the date that such notice is received by the Company is the "Notice Date"); provided that such restrictions on actions, including judicial process, to accelerate, demand payment or enforce any such Indebtedness on claim will cease to be applicable twenty-four (24) months after the occurrence and continuation of an Event of Default of the types referred to in Section 4.1(a) or (b). The Company shall promptly give written notice to the Holder of any written notice of default under the Senior Indebtedness.

(c)    In the event of all or any portion of the principal amount of this Note becoming due before the Maturity Date (whether by declaration or otherwise), no payment shall be made by or on behalf of the Company on or with respect to any Amounts Payable or to acquire this Note (or any portion thereof) for cash, property, securities or otherwise until all Senior Indebtedness shall first have been paid in full in cash.

(d)    If, notwithstanding the foregoing provisions of clauses (a) through (c) prohibiting payments or distributions, the Holder shall, on or after the Notice Date or the occurrence of any Insolvency Event, have received, directly or indirectly, by setoff, redemption, purchase or in any other manner, any payment of, or on account of, any Amounts Payable that was prohibited by

C-4-

this Section 5, before all Senior Indebtedness shall have been paid in full in cash, then and in such event such payments or distributions shall be received and held in trust for the holders of the Senior Indebtedness and promptly paid over or delivered to the holders of the Senior Indebtedness remaining unpaid to the extent necessary to pay in full in cash such Senior Indebtedness in accordance with its terms after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness, provided that any such payment which is, for any reason, not so paid over or delivered shall be held in trust by the Holder for the holders of Senior Indebtedness.

(e) So long as any Senior Indebtedness remains outstanding, or the commitment to make credit extensions of any Senior Indebtedness shall not have been terminated, the Holder will not be entitled to take, demand or receive, directly or indirectly, by setoff, redemption, purchase or in any other manner, any voluntary prepayment or other payment of any Amounts Payable in amounts or in a manner which are in violation of the provisions of this Section 5.

(f) Upon any payment or distribution of assets referred to in clause (a) above, the Holder shall be entitled to rely upon any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, and upon a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making any such payment or distribution of assets, delivered to the Holder for the purpose of ascertaining the persons entitled to participate in such distribution of assets, the holders of Senior Indebtedness and other Indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Section 5.

5.3   Rights of Holders of Senior Indebtedness Not To Be Impaired, etc.

(a) No right of any present or future holder of any Senior Indebtedness to enforce the subordination and other terms and conditions provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act by any such holder, or by any noncompliance by the Company with the terms and provisions and covenants herein regardless of any knowledge thereof any such holder may have or otherwise be charged with.

(b) This Section 5 may not be amended without the written consent of each holder of the Senior Indebtedness and of the Holder, and any purported amendment without such consent shall be void.  No holder of Senior Indebtedness shall be prejudiced in such holder's right to enforce the subordination and other terms and conditions of this Note by any act or failure to act by the Company or anyone in custody of its assets or property.

5.4   Subrogation.  Subject to and upon the payment in full in cash of all Senior Indebtedness, the Holder shall be subrogated, to the extent of payments or distributions made to the holders of Senior Indebtedness pursuant to or by reason of this Section 5, to the rights of the holders of such Senior Indebtedness to receive payments or distributions of assets of the Company made on such Senior Indebtedness until all amounts due under this Note shall be paid in full; and for the purposes of such subrogation, no payments or distributions to holders of such Senior Indebtedness of any cash, property or securities to which the Holder would be entitled except for the provisions of this Section 5, and no payment over pursuant to the provisions of this

C-5-

Section 5 to holders of such Senior Indebtedness by the Holder, shall, as among the Company, its creditors (other than holders of such Senior Indebtedness) and the Holder be deemed to be a payment by the Company to or on account of such Senior Indebtedness, it being understood that the provisions of this Section 5 are solely for the purpose of defining the relative rights of the holders of such Senior Indebtedness, on the one hand, and the Holder, on the other hand.

5.5     Obligations of the Company Unconditional.  Nothing contained in this Note is intended to or shall impair, as between the Company and the Holder, the obligation of the Company, which is absolute and unconditional, to pay to the Holder all Amounts Payable, as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holder and other creditors of the Company (other than the holders of Senior Indebtedness), except as provided in Section 5.2(b).

5.6     Section 5 Not To Prevent Events of Default.  The failure to make a payment of any Amounts Payable by reason of any provision of this Section 5 shall not be construed as preventing the occurrence or consequences of an Event of Default under Section 4.1 hereof, except as provided in Section 5.2(b).

5.7     Additional Rights of Holders of Senior Indebtedness.  Upon request by the Company, the Holder of this Note shall deliver to the holders of Senior Indebtedness or parties contemplating becoming holders of Senior Indebtedness a written statement confirming that (a) the provisions (including those of this Section 5) of this Note are in full force and effect; and (b) such party is or will be entitled to rely upon and enjoy the benefits of the provisions (including those of this Section 5) of this Note as a holder of Senior Indebtedness.

5.8     Senior Indebtedness Changes.  By virtue of accepting this Note and the benefits hereof, the Holder hereby waives any and all notice of renewal, extension or accrual of any of the Senior Indebtedness, present or future, and agrees and consents that without notice to or consent of the Holder:

(a)     the obligations and liabilities of the Company or any other party or parties under the Senior Indebtedness may, from time to time, in whole or in part, be renewed, refinanced, replaced, extended, refunded, modified, amended, accelerated, compromised, supplemented, terminated, increased, decreased, sold, exchanged, waived or released;

(b)     the holders of Senior Indebtedness and their representatives may exercise or refrain from exercising any right, remedy or power granted by any document creating, evidencing or otherwise related to the Senior Indebtedness or granted at law, in equity, or otherwise, with respect to the Senior Indebtedness or in connection with any collateral security or lien (legal or equitable) held, given or intended to be given therefor (including, without limitation, the right to perfect any lien or security interest created in connection therewith);

(c)     any and all collateral security and/or liens (legal or equitable) at any time, present or future, held, given or intended to be given for the Senior Indebtedness, and any rights or remedies of the holders of Senior Indebtedness and their representatives in respect thereof, may, from time to time, in whole or in part, be exchanged, sold, surrendered, released, modified, perfected, unperfected, waived or extended by the Holders and their representatives;

C-6-

(d)     any balance or balances of funds with any holder of Senior Indebtedness at any time standing to the credit of the Company or any guarantor of any of the Senior Indebtedness may, from time to time, in whole or in part, be surrendered or released; all as the holders of Senior Indebtedness, their representatives or any of them may deem advisable and all without impairing, abridging, diminishing, releasing or affecting the subordination to the Senior Indebtedness provided for herein; and

(e)     the Company may incur any amount or type of Senior Indebtedness (including Senior Indebtedness owed to Affiliates), or modify, restate, refinance, replace or amend any Senior Indebtedness from time to time, on terms and conditions acceptable to the Company, without notice to or approval by the Holder. The Company shall deliver written notice to the Holder of all actions by the holders of Senior Indebtedness to accelerate payment of, or to exercise any other rights, remedies or powers under, the Senior Indebtedness.

5.9     Waivers.  In the event the holders of Senior Indebtedness elect to exercise their remedies to liquidate any collateral given to secure the Senior Indebtedness, the Holder hereby waives any right it may have to contest the validity of or the value obtained as a result of the holders of Senior Indebtedness exercise of their remedies, including, but not limited to, a foreclosure, a sale pursuant to the Uniform Commercial Code or the acceptance by the holders of Senior Indebtedness in lieu of foreclosure.  The Holder further waives any right it may have either in or out of any bankruptcy or similar proceeding to challenge any action taken by the holders of Senior Indebtedness as either a preference or fraudulent conveyance and further agrees not to take any active role in such a proceeding other than the filing of a claim in any such proceeding, which claim shall be subordinate (to the extent set forth above) to the claims of the holders of Senior Indebtedness.

Section 6.  Definitions.  For purposes of this Note, the following terms have the meanings set forth below.

"Affiliates" means the Company, The Resolute Fund III, L.P., and any other person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with any of them.

"Amounts Payable" means all principal of, interest on, premium, if any, fees, costs, expenses, indemnities or any other amounts due from the Company under this Note, and all claims against or liabilities of the Company in respect of this Note.

"Business Day" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

"Default" means any condition or event that constitutes an Event of Default or that with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Indebtedness" means with respect to any Person, and without duplication: (i) any obligation of such Person for borrowed money; (ii) all capitalized lease obligations of such Person; (iii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security; (iv) any payment obligation under any existing interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or

agreement entered into by such Person, unless extended by mutual agreement; (v) to the extent drawn or called upon and not reimbursed, all letters of credit, performance bonds, bankers acceptances or similar obligations of such Person or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation); (vi) whether or not so included as liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (vi) of any other Person secured by any Lien on any assets owned or purchased by such Person (including Indebtedness arising under conditional sales or other title retention agreements), even though (x) such Person has not assumed or otherwise become liable for the payment thereof or (y) such Indebtedness is limited in recourse; (vii) all asset financing obligations of such Person, to the extent capitalized on the balance sheet of such Person; (viii) all amounts owing for the deferred purchase price of acquisitions, whether or not reflected on the face of the audited balance sheet of the Company, including all amounts owing for earnouts, purchase price adjustments, non-competition payments and similar obligations in respect of past acquisitions; (ix) the amount of any guarantees of Indebtedness of the type described in clauses (i) through (viii) above of any other Person; and (x) any unpaid interest, fees (whether accrued or otherwise), prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts owing on or in respect of any such indebtedness described in clauses (a) through (ix) above. Indebtedness owed to Affiliates will be Indebtedness for purposes of this Note.

"<u>Maturity Date</u>" means the third anniversary of the issuance of this Note.

"<u>Note</u>" means this Non-Negotiable Three Year Junior Subordinated Note.

"<u>Senior Indebtedness</u>" means the principal, interest (including interest accruing subsequent to the commencement of a proceeding specified in <u>Sections 4.1(c)</u> and <u>4.1(d)</u>, whether or not enforceable in such proceeding) on, premium, if any, fees (including, without limitation, any attorneys', commitment, agency, facility, structuring, restructuring or other fee), costs, expenses, indemnities, and other amounts due on or in connection with any Indebtedness of the Company and its Subsidiaries, and any refinancings, extensions or replacements of the foregoing Indebtedness, now or hereafter incurred, any documents executed under or in connection therewith, and any amendments, modifications, deferrals, renewals or extensions of such Indebtedness, and any amounts owed in respect of any Indebtedness incurred in refinancing, replacing or refunding the foregoing (including any refinancing, replacing or refunding with new lenders), unless the terms of such Indebtedness expressly provide that such Indebtedness is not Senior Indebtedness with respect to this Note. Nothing in this Note shall restrict an Affiliate of the Company from being a holder of Senior Indebtedness.

"<u>Stockholders' Agreement</u>" means the Stockholders' Agreement, dated as of October 31, 2014, among the Company, the Holder and the other Stockholders listed on the signature pages thereto.

"<u>Subsidiary</u>" of a person means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors or other persons performing similar functions are at the time directly or indirectly owned by such person.

713338790

Section 7. <u>Miscellaneous</u>.

7.1 <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, sent by PDF attachment to email (in such cases by PDF attachment, with hard copy to follow) or mailed by first class mail, return receipt requested, to the following address (or at any other address as any party shall have specified by notice in writing to the other party):

If to the Company:

> American Freight Group, Inc.
> c/o The Jordan Company III, L.P.
> 399 Park Avenue, 30th floor
> New York, New York 10022
> Attention: M. Brad Wilford
> Daniel S. Williams
> Email: bwilford@thejordancompany.com
> dwilliams@thejordancompany.com

with a copy to:

> Mayer Brown LLP
> 1675 Broadway
> New York, New York 10019
> Attention: Philip O. Brandes
> Email: pbrandes@mayerbrown.com

If to the Holder, to:

> _____
> _____
> _____

Each party may, by notice given in accordance with this Section to the other party, designate another address or person for receipt of notices hereunder.

The date of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after the date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by email.

7.2 <u>No Waivers</u>. No failure or delay by the Holder in exercising any right, power or privilege hereunder or under this Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law. No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in related or similar circumstances requiring such notice.

7.3     Amendments and Waivers.  Except as expressly set forth in this Note (including Section 5.3(b)), any provision of this Note may be amended or waived if, but only if, such amendment or waiver is in writing, signed by the Company and the Holder.

7.4     Rights of Parties.  This Note is delivered pursuant to the terms and conditions of the Stockholders Agreement and is subject to the terms thereof.

7.5     Restrictions on Transfer.  This Note may not be sold, pledged, distributed, offered for sale, or otherwise transferred by the Holder to any transferee other than to a Permitted Transferee (as defined in the Stockholders Agreement).

7.6     Binding Effect.  The provisions of this Note shall be binding upon and inure to the benefit of the Holder and its respective successors and permitted assigns.

7.7     Replacement Note.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and of a letter of indemnity reasonably satisfactory to the Company from the Holder and upon reimbursement to the Company of all reasonable expenses incident thereto, and upon surrender or cancellation of this Note, if mutilated, the Company will make and deliver a new Note of like tenor in lieu of such lost, stolen, destroyed or mutilated Note.

7.8     Company Obligations.  The Holder agrees and acknowledges that this Note and the Company's obligations hereunder and for all Amounts Payable are solely obligations and liabilities of the Company.  None of the Company's directors, officers, employees, stockholders, advisors, consultants and affiliates or any other persons shall be obligated or liable in respect of this Note or any Amounts Payable, and the Holder hereby releases them from any such obligation or liability.

7.9     Cross-References; Headings.  Unless otherwise specified, references in this Note to any Section are references to such Section of this Note, and unless otherwise specified, references in any Section to any clause are references to such clause of such Section.  The various headings of this Note are inserted for convenience only and shall not affect the meaning or interpretation of this Note or any provisions hereof.

7.10    CHOICE OF LAW; LITIGATION.  (a) THIS NOTE SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION 7.10 SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OF A DELAWARE FEDERAL OR STATE COURT, OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SUCH A JUDGMENT, IN ANY OTHER APPROPRIATE JURISDICTION.

(b)  IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS NOTE,  THE HOLDER AND THE COMPANY HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO INSTITUTE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE STATE OF DELAWARE,

WHETHER A STATE OR FEDERAL COURT; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, THE HOLDER AND THE COMPANY WILL CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS (IT BEING UNDERSTOOD THAT NOTHING IN THIS SECTION SHALL BE DEEMED TO PREVENT THE HOLDER OR THE COMPANY FROM SEEKING TO REMOVE ANY ACTION TO A FEDERAL COURT IN THE STATE OF DELAWARE; (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN ANY INCONVENIENT FORUM; (4) AGREE, AFTER CONSULTATION WITH COUNSEL, TO WAIVE ANY RIGHTS TO A JURY TRIAL TO RESOLVE ANY DISPUTES OR CLAIMS RELATING TO THIS NOTE; (5) AGREE TO DESIGNATE, APPOINT AND DIRECT AN AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS AND DOCUMENTS IN ANY LEGAL PROCEEDING IN THE STATE OF DELAWARE; (6) AGREE TO PROVIDE EACH OTHER WITH THE NAME, THE MAILING ADDRESS AND EMAIL ADDRESS OF SUCH AGENT; (7) AGREE AS AN ALTERNATIVE METHOD OF SERVICE TO SERVICE OF PROCESS IN ANY LEGAL PROCEEDING BY MAILING OF COPIES THEREOF TO IT AT ITS ADDRESS SET FORTH HEREIN FOR COMMUNICATIONS TO IT; (8) AGREE THAT ANY SERVICE MADE AS PROVIDED HEREIN SHALL BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (9) AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHTS OF THE HOLDER OR THE COMPANY TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

713338790

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the date first above written.

AMERICAN FREIGHT GROUP, INC.

By:_____

Name:

Title:

# EXHIBIT 3

AMERICAN FREIGHT GROUP, INC.

_____

Non-Qualified Stock Option Agreement

Option Agreement No. 4

_____

Subject to the terms and conditions set forth herein and the terms and conditions of the American Freight Group, Inc. 2015 Non-Qualified Stock Option Plan (the "Plan") (with capitalized terms used but not defined herein having the meanings given to them in the Plan), American Freight Group, Inc., a Delaware corporation (the "Company" which term shall include, unless the context otherwise clearly requires, all Subsidiaries (as defined in the Plan) of the Company), hereby grants the following option to purchase shares of common stock, par value of $0.001 per share, of the Company (the "Stock") to the Optionee, and the Optionee hereby accepts such grant and agrees to be bound by the terms and conditions hereinafter set forth:

1.  Name of Person to Whom the Option is Granted (the "Optionee"): Asaph Rink

2.  Date of Grant of Option: January 28, 2015

3.  An Option to acquire 476.2500 shares of Stock.

4.  Option Exercise Price (per share of Stock): $1,000 (the "Exercise Price").

5.  Term of Option:             Subject to earlier termination under Section 9 below, this Option expires at 5:00 p.m. local New York, New York time on January 28, 2025.

6.  Vesting/Exercise Schedule:             Subject to the provisions of Section 9 below, this Option shall vest and become exercisable with respect to the number of shares of Stock upon the passage of certain time, as shown on Schedule I attached hereto and incorporated herein.

713331390

1

7.    Grant.  The Company hereby grants to the Optionee a stock option (the "Option") to purchase from the Company the number of shares of Stock set forth in Section 3 on the first page of this Option, upon the terms and conditions set forth in the Plan and upon the additional terms and conditions contained herein.  This Option is a non-qualified stock option and is not intended to qualify as an "incentive stock option" pursuant to Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

8.    Option Price.  To the extent vested, this Option may be exercised at the exercise price per share of Stock set forth in Section 4 on the first page hereof, subject to adjustment as provided herein and in the Plan.

9.    Term and Exercisability of Option.

       (a)    This Option shall expire on the earlier of (a) the date determined pursuant to Section 5 on the first page of this Option and (b) the date determined pursuant to Sections 11 and 15(d) of the Plan, and shall be exercisable in accordance with and subject to the terms and conditions set forth in the Plan (including but not limited to Section 11 of the Plan) and those terms and conditions, if any, set forth in Section 6 on the first page of this Option. Notwithstanding anything to the contrary contained herein, vesting shall cease immediately upon termination of employment or other engagement for any reason, and any portion of this Option that has not vested on or prior to the date of such termination is forfeited on such date.  If the Optionee dies before this Option has been exercised in full, the personal representative of the Optionee may exercise this Option in accordance with the Plan.

       (b)    Notwithstanding anything contained in the Plan or this Option Agreement to the contrary (i) to the extent that any of the payments and benefits provided for under the Plan, this Option Agreement or any other agreement or arrangement (including payments contingent upon the occurrence of a Change in Control) between the Company or any of its Subsidiaries and Optionee (collectively, the "Payments") would constitute a "parachute payment" within the meaning of Section 280G of the Code, then the Company and its Subsidiaries shall each use commercially reasonable efforts to obtain the stockholder consent required to approve of such Payment to preclude such Payment from being subject to the excise tax imposed pursuant to Section 4999 of the Code (the "Excise Tax"); provided, however, that in such event the Optionee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments as shall be reasonably necessary to accomplish such preclusion of the Excise Tax.  In the event that (a) the stockholder consent is not obtained or (b) the Optionee does not take the actions set forth in the proviso to the foregoing sentence, the amount of the Payments shall be reduced to the amount that would result in no portion of the Payments being subject to the Excise Tax.

10.    Method of Exercise.  To the extent that the right to purchase shares of Stock has vested hereunder, this Option may be exercised from time to time by written notice to the Company substantially in the form attached hereto as Exhibit A, stating the number of shares of Stock with respect to which this Option is being exercised, and accompanied by (a) payment in full of the Exercise Payment for the number of shares of Stock to be delivered, by means of payment acceptable to the Company in accordance with Section 9 of the Plan and (b) an executed joinder agreement and a Spousal Consent, if applicable, pursuant to Section 16 of this Option.

2

713331390

Notwithstanding the foregoing, Optionee may elect to purchase shares of Stock vested hereunder by cashless exercise, whereby Optionee shall receive upon exercise such number of shares of Stock equal to (x) the number of Options being exercised <u>less</u> (y) the number of shares of Stock with a Fair Market Value equal to the sum of the Exercise Price and the necessary withholding obligation with respect to such exercise. Subject to the Plan and to <u>Section 13</u> hereof, as soon as practicable after its receipt of such items, the Company shall deliver to the Optionee (or other person entitled to receive the shares of Stock issuable upon exercise of this Option), at the principal executive offices of the Company or such other place as may be mutually acceptable, a certificate or certificates for such shares out of theretofore authorized but unissued shares or reacquired shares of Stock (if certificated) or a certified copy of the stockholders' registry, as the Company may elect; <u>provided</u>, <u>however</u>, that the time of such delivery may be postponed by the Company for such period as may be required for it with reasonable diligence to comply with any applicable requirements of law. If the Optionee (or other person entitled to exercise this Option) fails to pay for and accept delivery of all of the shares specified in such notice upon tender of delivery thereof, his or her right to exercise this Option with respect to such shares not paid for may be terminated by the Company.

11. <u>Forfeiture; Restrictions on Exercise; Right of Repurchase</u>.

(a)    In addition to the restrictions set forth herein, this Option is subject to forfeiture upon the occurrence of the events specified in <u>Sections 11</u> and <u>15</u> of the Plan. The stock issued upon the exercise of this Option and other Securities held by the Optionee will be subject to further restrictions set forth in the Stockholders' Agreement, any subscription agreement entered into between the Optionee and the Company and this Section 11.

(b)    <u>General</u>.  Upon the termination of Optionee's employment with, or membership on the Board of Directors of, the Company or its Subsidiaries, in each case, for any reason (whether by the Optionee or the Company or one of its Subsidiaries and whether with or without Cause) (a "<u>Termination</u>"), the Company and Resolute will have the option to repurchase all or any portion of the Securities (including Optionee Securities) held by Optionee (whether held by the Optionee or one or more of his or her affiliates or Permitted Transferees (as defined in the Stockholders Agreement) ("<u>Repurchasable Securities</u>") pursuant to the terms and conditions set forth in this <u>Section 11</u>.

(c)    <u>Company's Option</u>.  The Company may elect in its sole discretion to purchase all or any portion of the Repurchaseable Securities by giving written notice to the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement) within 90 days following the Termination. Such notice will set forth the number and type of Repurchaseable Securities to be acquired by the Company from Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase. If Optionee is a member of the Board at the time of such election, then Optionee will not have the right to vote with respect to such election or any other matter relating to this <u>Section 11</u>.

(d)    <u>Resolute's Option</u>.  If for any reason the Company does not elect to purchase all of the Repurchaseable Securities pursuant to <u>Section 11(c)</u>, then Resolute may at any time within 180 days following the Termination elect in its sole discretion to purchase all or any portion of the Repurchaseable Securities which the Company has not elected to purchase by giving written

3

notice to the Company and the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement).  Such notice will set forth the number and type of Repurchaseable Securities to be acquired by Resolute from the Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase.

(e)     Purchase Price.  The purchase price for the Repurchaseable Securities (the "Repurchase Price") will be calculated as follows:

(i)     If the Termination occurs by reason of (A) termination of such Optionee's employment by, membership on the Board of, or engagement with, the Company or any of its Subsidiaries without Cause or (B) such Optionee's death or disability, then the Repurchase Price will be a price per share equal to the Fair Market Value of the Repurchaseable Securities on the date of Termination.

(ii)     If (A) the Termination occurs by reason of such Optionee's termination by the Company or any of its Subsidiaries for Cause, (B) termination of such Optionee's employment or membership on the Board, in each case, by reason of such Optionee's resignation, or if (C) in the Committee's determination, such Optionee has breached any agreement between the Optionee and the Company or any of its Subsidiaries, then the Repurchase Price will be the lesser of a price per share equal to the Original Cost and a price per share equal to the Fair Market Value, in each case, of the Repurchaseable Securities.

(f)     Repurchase Closing.  If the Company or Resolute has elected to purchase any of the Repurchaseable Securities, then the purchase of Repurchaseable Securities pursuant to this Section 11 will be completed (the "Repurchase Closing") at the Company's principal office, at 10:00 a.m., on the 30th day following the date the Company or Resolute provides notice to the Optionee that the Company or Resolute, as the case may be, are purchasing any of the Repurchaseable Securities or on such earlier day as designated by the Company, in its sole discretion, upon not less than ten days prior notice to Resolute and the Optionee.  If such date is not a Business Day, then the Repurchase Closing will occur at the same time and place on the next succeeding Business Day.  The Company and/or Resolute will pay for the Repurchaseable Securities, at their respective options, by (i) delivery of a cashier's check or wire transfer of immediately available funds, (ii) delivery of a Three Year Junior Note, (iii) setoff against any and all obligations (to the extent of such obligations) owed to the Company, its Subsidiaries, Resolute or any of their respective Affiliates by the Optionee or (iv) any combination of the foregoing.  The Company and/or Resolute may rescind any exercise of their repurchase rights under this Section 11 at any time prior to the Repurchase Closing.  At the Repurchase Closing, the Optionee shall deliver any certificate or certificates (if certificated) representing the Repurchaseable Securities to be purchased, with stock powers or instruments of transfer duly executed, for transfer, and such other documents as the Company or Resolute may reasonably request.  The Company and Resolute will be entitled to receive customary representations and warranties as to ownership, title, authority to sell and the like from the Optionees regarding such sale, and to receive such other evidence, including applicable inheritance and estate tax waivers, as may reasonably be necessary to effect the purchase of the Repurchaseable Securities to be purchased pursuant to Section 11.

713331390

(g)     <u>Failure To Deliver Securities</u>.  If Optionee or any other Stockholder whose Repurchaseable Securities are to be purchased pursuant to this <u>Section 11</u> fails to deliver certificates representing the Repurchaseable Securities (if certificated) and such other documents as the Company or Resolute may reasonably request on the scheduled closing date of such purchase, then the Company or Resolute may elect to deposit the consideration representing the purchase price of the Repurchaseable Securities with a third party (which may be the Company's attorney, a bank or a financial institution), as escrow agent and exercise its rights pursuant to (g) below.  In the event of the foregoing election: (i) such Repurchaseable Securities will be deemed for all purposes (including the right to vote and receive payment for dividends) to have been transferred to the Company or Resolute, as applicable; (ii) to the extent that such Repurchaseable Securities are evidenced by certificates or other instruments, such certificates or other instruments will be deemed canceled and the Company will issue new certificates or other instruments in the name of Resolute, if applicable; (iii) the Company will make an appropriate notation in its stock ledger to reflect the transfer of such Repurchaseable Securities to the Company or Resolute, as applicable; and (iv) the Person obligated to sell such Repurchaseable Securities will merely be a creditor with respect to such Repurchaseable Securities, with the right only to receive payment of the purchase price, without interest, from the deposited funds.  If, prior to the third anniversary of the scheduled closing date as determined pursuant to this <u>Section 11</u>, the proceeds of sale have not been claimed by such Optionee or other seller of the Repurchaseable Securities, then the deposited funds (and any interest earned thereon) will be returned to the Person originally depositing the same, and the transferors whose Repurchaseable Securities were so purchased will look solely to the purchasers thereof for payment of the purchase price, without interest.  The escrow agent will not be liable for any action or inaction taken by it in good faith.

(h)     <u>Power of Attorney</u>.  Optionee in order more fully to secure the performance of his or her obligations hereunder, hereby irrevocably appoints the Company and Resolute and the persons deriving title under them jointly and also severally to be his or her attorney to execute and complete in favor of the Company or Resolute any documents, including but not limited to a stock power or instrument of transfer, which the Company or Resolute may from time to time require pursuant to <u>Section 11</u> for perfecting its title to or for vesting the Repurchaseable Securities in the Company or Resolute as applicable.  The power hereby conferred shall be a general power of attorney and each Optionee hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.

(i)     <u>Repurchase Disability</u>.

(i)     Notwithstanding anything to the contrary herein, the Company shall not be permitted to repurchase any Optionee Securities pursuant to <u>Section 11</u> if the Board determines that:

(A)     The repurchase of the Repurchaseable Securities would render the Company or the Subsidiaries unable to meet their business plan or obligations in the ordinary course of business taking into account any pending or proposed transactions, capital expenditures or other budgeted cash outlays by the Company, including, without limitation, any proposed acquisition of any other entity by the Company or any of the Subsidiaries;

(B)     The Company is prohibited from repurchasing the Repurchaseable Securities by applicable law restricting the purchase by a corporation of its own shares; or

(C)     The repurchase of Repurchaseable Securities would constitute a breach of, default, or event of default under, or is otherwise prohibited by, the terms of any loan agreement or other agreement or instrument to which the Company or any of the Subsidiaries is a party or the Company is not able to obtain the requisite consent of any of its senior lenders to the repurchase of the Repurchaseable Securities.  The events described in (A) through (C) above each constitute a "Repurchase Disability."

(ii)     In the event of a Repurchase Disability, the Company shall notify in writing any Optionee whose Repurchaseable Securities are to be repurchased pursuant to Section 11 (a "Disability Notice").  The Disability Notice shall specify the nature of the Repurchase Disability.  The Company shall thereafter repurchase the Repurchaseable Securities as soon as reasonably practicable after all Repurchase Disabilities cease to exist (or the Company may elect, but shall have no obligation, to cause its nominee to repurchase the Repurchaseable Securities while any Repurchase Disabilities continue to exist).  In the event the Company suspends its obligations to repurchase the Repurchaseable Securities pursuant to a Repurchase Disability, (A) the Company shall provide written notice to each applicable Optionee as soon as practicable after all Repurchase Disabilities cease to exist (the "Reinstatement Notice"); (B) the Fair Market Value of the Repurchaseable Securities shall be determined as of the date the Reinstatement Notice is delivered to the Optionee, which Fair Market Value shall be used to determine the Repurchase Price in the manner described above; and (C) the repurchase shall occur on a date specified by the Company within 10 days following the determination of the Fair Market Value of the Repurchaseable Securities as provided in clause (B) above.

(j)     If the Company or Resolute does not deliver to the Optionee a written notice of its intention to exercise the repurchase rights set forth in this Section 11 within 180 days following a Termination, such repurchase rights will expire.  This Section 11 shall terminate upon (i) the effectiveness of an initial bona fide, firm commitment underwritten public offering of any securities of the Company for which the aggregate purchase price of the securities sold is in excess of $100 million or (ii) the consummation of a Change in Control.

(k)     Certain Definitions.  For purposes of this Section 11, the following terms shall have the following meanings unless the context indicates otherwise:

(i)     "Business Day" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

(ii)     "Common Stock" shall mean shares of the Company's common stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of

713331390

recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(iii)    "Common Stock FMV" shall mean, as of any date of determination, the quotient obtained by dividing (i) an amount equal to (A) the Company Stock FMV, less (B) the Preferred Stock FMV by (ii) the aggregate number of shares of Common Stock issued and outstanding on a Fully-Diluted Basis as of the applicable date of determination.

(iv)    "Company Stock FMV" shall mean, as of any date of determination, an amount equal to (i) the Enterprise Value, less (ii) the aggregate amount of Indebtedness of the Company and the Subsidiaries, including, but not limited to, indebtedness for borrowed money and capitalized leases of the Company and the Subsidiaries as of the end of the Determination Period (including, without limitation, interest accrued but unpaid as of the end of the Determination Period), less (iii) the aggregate amount to be paid pursuant to any earnout, deferred purchase price or similar amounts in respect of acquisitions outstanding as of the end of the Determination Period, less (iv) the aggregate amount that would have been payable by the Company in respect of any stock appreciation rights or similar obligation of the Company or its Subsidiaries outstanding as of the end of the Determination Period (whether or not restricted as of such date), less (v) any other long-term obligations or liabilities of the type reflected on the face of a balance sheet of the Company, as determined in accordance with GAAP.

(v)    "Contract" shall mean any binding contract, lease, agreement, indenture, mortgage, note, bond or instrument, whether written or oral.

(vi)    "Determination Period" shall mean the last four (4) consecutive completed fiscal quarters as set forth on the unaudited financial statements of the Company immediately preceding the applicable date of determination of the Enterprise Value.

(vii)    "EBITDA" shall mean, for any period, the consolidated net income (or loss) of the Company (after eliminating all extraordinary or non-recurring items of income (or loss)), as reflected in the Company's financial statements for such period, further adjusted by (i) without duplication, the addition of (A) interest and other expense in respect of indebtedness for borrowed money and similar expense in respect of capitalized leases, charged, accrued or otherwise allocated against such net income (or loss), (B) expenses for income taxes (whether paid, accrued or deferred) charged or otherwise allocated against such net income, (C) depreciation and amortization of any assets or other non-cash charges (including, without limitation, any depreciation, amortization and other non-cash charges relating to purchase accounting adjustments, and any amortization or write-off of intangible assets, transaction costs or goodwill) charged, allocated or otherwise accrued against such net income (or loss) and (D) non-cash expenses attributable to the issuance of stock, options, warrants, stock appreciation rights or similar rights by the Company to any of its directors, officer, employees, dealers or others or the exercise thereof, charged, accrued or allocated against such net income (or loss) and (ii) without duplication, the subtraction of interest income, non-cash gains and other income, in each case, excluding any such interest, depreciation, amortization costs

7

713331390

and expenses and income previously taken into account in determining EBITDA during any period preceding such period, all as determined in accordance with U.S. generally accepted accounting principles, consistently applied.

(viii)      "Enterprise Value" shall mean, as of any date of determination, an amount equal to (i) seven (7) multiplied by the average annual EBITDA for the Determination Period, plus (ii) the aggregate amount of Unrestricted Cash of the Company and the Subsidiaries plus (iii) the aggregate exercise or conversion price of all options or warrants exercisable for, or securities convertible into, Common Stock outstanding (whether vested or not) as of the applicable date of determination.

(ix)      "Equity Interest" means, with respect to any Person, (i) any capital stock, shares, partnership interests, membership interests, limited liability company interests, stock appreciation rights, phantom equity interests or other ownership or equity interests of such Person, including any securities exercisable, exchangeable or convertible into any of the foregoing, (ii) any other interest or participation that confers on the holder thereof the right to receive a share of the profits and losses or, or distributions of assets of, such Person, and (iii) any warrants, options or other rights to acquire any of the foregoing.

(x)      "Fair Market Value" shall mean, (i) with respect to Common Stock, the Common Stock FMV and (ii) with respect to Preferred Stock, the quotient obtained by dividing (A) the Preferred Stock FMV by (B) the aggregate number of shares of Preferred Stock issued and outstanding as of the applicable date of determination.

(xi)      "Fully-Diluted Basis" shall mean the number of shares of Common Stock which would be outstanding, as of the date of computation, if all vested and outstanding Stock Equivalents had been converted, exercised or exchanged.

(xii)      "GAAP" shall mean generally accepted accounting principles in the United States as in effect on the date hereof and from time to time.

(xiii)      "Income Tax" means (i) all Taxes based on income determined under provisions of the Code and (ii) foreign, state and other taxes (including franchise taxes) based on income or gross receipts, including a Tax assessed on a corporation by reference to its income, gains, or profits, and shall include for the avoidance of doubt, any withholding taxes, and in each instance any interest, penalties or additions to tax attributable to such Tax.

(xiv)      "Indebtedness" shall mean, with respect to the Company and its Subsidiaries, and without duplication: (i) any indebtedness for borrowed money, (ii) indebtedness evidenced by notes, bonds, debentures, mortgages or other debt instruments or debt securities, (iii) to the extent drawn, all obligations of the Company and its Subsidiaries in respect of letters of credit, performance bonds, bankers acceptances or similar obligations of the Company and its Subsidiaries or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation), (iv) all obligations of the Company and its Subsidiaries as lessee or lessees under leases that have been

8

recorded as capital leases in accordance with GAAP, (v) all payment obligations under any interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or agreement to which the Company or any Subsidiary is a party (valued at the termination value thereof), (vi) whether or not so included as Liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (v) of the Company or any Subsidiary secured by any Lien on any assets owned or purchased by the Company or any of its Subsidiaries (including indebtedness arising under conditional sales or other title retention agreements), even though (A) such Person has not assumed or otherwise become liable for the payment thereof or (B) such indebtedness is limited in recourse, (vii) all obligations of the Company or any of its Subsidiaries issued or assumed as the deferred purchase price of businesses, assets, property, Equity Interests or services, including potential earn-outs, purchase price adjustments, post-closing payments in respect of transaction tax benefits, non-competition payments or similar payments, in each case in respect of past acquisitions, as well as the deferred purchase price for security cameras and systems, (viii) all Liabilities or underfunding of the Company or any of its Subsidiaries in relation to pension plans, retiree medical and any other long-term obligations under Laws or pension, welfare or benefit plans for the Company or any of its Subsidiaries, (ix) all Off-Balance Sheet Financings of the Company or any of its Subsidiaries, (x) the amount of any guarantees made by the Company or any of its Subsidiaries of indebtedness of the type described in clauses (i) through (ix) above of any Person, (xi) any unpaid interest, fees, prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts, owing on or in respect of any such indebtedness described in clauses (i) through (x) above, (xii) all obligations of the Company or any of its Subsidiaries arising from deferred compensation or severance and similar arrangements (including payroll, employment and other Taxes thereon), (xiii) all deferred or unearned revenue of the Company and its Subsidiaries, amounts refundable by the Company and its Subsidiaries under Contracts with their customers (including all advanced payments, contingent refunds, and amounts refundable by the Company and its Subsidiaries) and any Liabilities to customers for inventory assumed by such Person, (xiv) any Net Tax Liabilities and (xv) any Lay-Away Obligations; provided, however, that none of the following shall constitute Indebtedness hereunder: (A) to the extent undrawn, any obligation with respect to any letter of credit (or reimbursement agreement in respect thereof), (B) any operating lease, (C) any guarantee by the Company or any of its Subsidiaries of the obligations of any other Subsidiary and (D) any indebtedness of any Subsidiary owed to any other Subsidiary.  For all purposes of this Agreement, Indebtedness shall include the indebtedness of any partnership or joint venture in which Subsidiary is a general partner or joint venturer (to the extent that such Subsidiary is liable for such indebtedness).

(xv)  "Laws" means all applicable federal, state, local and foreign laws, statutes, constitutions, rules, regulations, ordinances, common law and similar provisions having the force of law and all judgments, rulings, orders, decrees, administrative determinations, injunctions, guidance and guidelines of governmental authorities.

(xvi)  "Lay-Away Obligations" shall mean those deposits or monies received from a Person representing part or all of the price of goods that was payable in one or

more payments subsequent to the making of a layaway agreement and for which the Company or any Subsidiary retains possession of such goods and bears the risk of their loss or damage until such goods are paid in full and delivered according to the layaway agreement, the dollar amount of inventory purchased by a customer but not yet received by such customer, and escheatment, unclaimed property and similar liabilities.

(xvii)     "Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any Liability for Taxes.

(xviii)     "Lien" shall mean any security interest, lien, charge, mortgage, deed, assignment, pledge, hypothecation, encumbrance, servitude, easement, restriction (including any repatriation restrictions), judgment, option, right of first offer, right of first refusal or interest of another Person of any kind or nature.

(xix)     "Net Tax Liabilities" means an amount, which may be positive or negative, equal to the sum of any amounts that would be properly accrued as current liabilities for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries in accordance with GAAP reduced by any amounts that would be properly accrued as a current asset for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries.

(xx)     "Off-Balance Sheet Financing" means (a) any liability of the Company or any Subsidiary under any sale leaseback transactions which does not create a liability on the consolidated balance sheet of the Company and its Subsidiaries and (b) any liability of the Company or any Subsidiary under any synthetic lease, Tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product where the transaction is considered indebtedness for borrowed money for federal income Tax purposes but is classified as an operating lease in accordance with GAAP for financial reporting purposes.

(xxi)     "Original Cost" shall mean the original purchase or exercise price actually paid for a Repurchaseable Security.

(xxii)     "Preferred Stock" shall mean the shares of the Company's preferred stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(xxiii)     "Preferred Stock FMV" shall mean, as of any date of determination, the lesser of (i) the liquidation value of the outstanding shares of Preferred Stock as calculated in accordance with the Certificate of Incorporation or (ii) the Company Stock FMV.

(xxiv)      "Securities" shall mean all (A) shares of Common Stock, (B) shares of Preferred Stock, (C) Stock Equivalents and D) securities of the Company issued or issuable with respect to the securities referred to in clauses (A) through (C) above, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise.

(xxv)      "Stock Equivalents" shall mean any (i) warrants, options or other right to subscribe for, purchase or otherwise acquire any shares of Common Stock or (ii) any securities convertible into or exchangeable for shares of Common Stock.

(xxvi)      "Tax" or "Taxes" shall mean all federal, state, county, local, franchise or foreign income, payroll, employment, excise, environmental, customs, franchise, windfall profits, withholding, social security (or similar), unemployment, real property, personal property (tangible or intangible), escheat, unclaimed property, sales, use, transfer, registration, value added, gross receipts, net proceeds, turnover, license, ad valorem, capital stock, disability, stamp, leasing, lease, excess profits, occupational and interest equalization, fuel, severance, alternative or add-on minimum or estimated tax, charge, fee, levy, duty or other assessment, and other obligations of the same or of a similar nature to any of the foregoing due or claimed to be due by or to any Taxing authority, including any interest, penalty or addition thereto, whether disputed or not.

(xxvii)      "Three Year Junior Notes" shall mean a promissory note of the Company in the form attached hereto as Exhibit C.

(xxviii)      "Unrestricted Cash" shall mean, as of any date of determination, the aggregate amount of immediately available cash and cash equivalents of the Company and the Subsidiaries after any applicable withholding taxes, excluding (i) credit card receivables, (ii) register cash and (iii) cash or cash equivalents (A) subject to any Lien and (B) that may not be legally distributed on such date of determination by means of one or more direct or indirect dividends or distributions to the Company.

12.      Nonassignability of Option Rights.  This Option shall not be assignable or transferable by the Optionee except by will or by the laws of descent and distribution.  During the life of the Optionee, this Option shall be exercisable only by Optionee or, in the event of Optionee's legal incapacity, by Optionee's legal representative.

13.      Compliance with Securities Act.  The Company shall not be obligated to sell or issue any shares of Stock or other securities pursuant to the exercise of this Option unless the shares of Stock or other securities with respect to which this Option is being exercised are at that time effectively registered or exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws.  In the event shares or other securities shall be issued which shall not be so registered, the Optionee hereby represents, warrants and agrees that he or she will receive such shares or other securities for investment and not with a view to their resale or distribution, and will execute an appropriate investment letter satisfactory to the Company and its counsel as a condition precedent to any exercise of this Option in whole or in part.

14.    Legends.  The Optionee hereby acknowledges that, if certificated, the stock certificate or certificates evidencing shares of Stock or other securities issued pursuant to any exercise of this Option will bear a legend setting forth the restrictions on their transferability described in Section 13 hereof, in Section 12 of the Plan, and under any applicable agreements between the Optionee and the Company or any of its stockholders.

15.    Rights as Stockholder.  The Optionee shall have no rights as a stockholder with respect to any shares of Stock or other securities covered by this Option until the date of issuance of a certificate to him or her for such shares or other securities (if certificated) or the date on which the Company updates the stockholders' registry reflecting such issuance.  No adjustment shall be made for dividends or other rights for which the record date is prior to the date such certificate is issued (if certificated) or the date on which the Company updates the stockholders' registry.

16.    Certain Agreements.  The Optionee hereby agrees to be bound by the terms and conditions of the Stockholders' Agreement dated October 31, 2014 as amended or modified from time to time, among the Company and the other persons named therein (the "Stockholders' Agreement").  The Optionee hereby further acknowledges and agrees that the Option and the shares of Stock issuable upon exercise of the Option are and shall be subject to the terms and provisions of the Stockholders' Agreement; provided, however, that, in case of any conflict between this Option Agreement and the Stockholders' Agreement, this Option Agreement shall control.  Upon the Optionee's exercise of the Option in accordance with Section 10 hereof, the Optionee agrees to execute a joinder agreement to the Stockholders' Agreement in the form as determined by the Committee in its sole discretion and agrees to have his or her spouse, if applicable, execute a spousal consent by which Optionee's spouse acknowledges and consents to the restrictions set forth in such Stockholders' Agreement (the "Spousal Consent").

17.    Restrictions.

        (a)    Definitions.  For purposes of this Section 17, the following terms shall have the following meanings unless the context indicates otherwise:

                "Business" shall mean any business of the Company or any of its Subsidiaries, as conducted by or engaged in on the date hereof, and as proposed to be conducted by or engaged in on the date hereof, by the Company or any of its Subsidiaries, including, without limitation, the business of selling furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers.

                "Restricted Period" means, as applicable, the term of Optionees's (i) employment by the Company or any of its Subsidiaries or (ii) membership on the Board of Directors of the Company and, in each case, a period of two (2) years after the Termination Date.

                "Termination Date" shall mean, as applicable, the date of termination of Optionee's employment with the Company or any of its Subsidiaries or membership on the Board of Directors of the Company.

        (b)    Confidentiality.  During and after the Restricted Period, Optionee recognizes and acknowledges that Optionee has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (the "Confidential

12

Information"), and that such Confidential Information constitutes valuable, special and unique property of the Company. The term Confidential Information will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the Company's and its Subsidiaries' current or potential business (including information received by the Company or any of its Subsidiaries from third parties), and (b) is not generally or publicly known. Optionee agrees not to disclose or use for Optionee's own account any Confidential Information without the Board's prior written consent, except (i) to the extent that any Confidential Information becomes generally known to and available for use by the public other than as a result of Optionee's acts or omissions; (ii) to the extent that any Confidential Information is required to be disclosed pursuant to any applicable law or court order; or (iii) to Optionee's attorneys and accountants, provided that, in the case of subsection (iii) hereof, Optionee shall cause each Person receiving such Confidential Information to be informed that such Confidential Information is strictly confidential and subject to this Agreement and to agree not to disclose or use such information except as provided herein. Optionee acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by Optionee concerning any information relating to the Company's and its Subsidiaries' business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of Optionee's ownership of Optionee Securities

(c)     Books and Records. All books, records, reports, writings, notes, notebooks, computer programs, sketches, drawings, blueprints, prototypes, formulas, photographs, negatives, models, equipment, reproductions, proposals, flow sheets, supplier lists, supply terms or contracts, customer lists and other documents and/or things relating in any manner to the business of the Company or any of its Subsidiaries or affiliates (including but not limited to any of the same embodying or relating to any Confidential Information), whether prepared by Optionee or otherwise coming into Optionee's possession, shall be the exclusive property of the Company and shall not be copied, duplicated, replicated, transformed, modified or removed from the premises of the Company except pursuant to and in furtherance of the business of the Company and shall be returned immediately to the Company on the Termination Date or on the Company's request at any time.

(d)     Inventions and Patents.

(i)     Optionee agrees that any and all writings, documents, inventions, discoveries, processes, methods, designs, mask works, compositions of matter, formulations, computer programs or instructions (whether in source code, object code, or any other form), algorithms, formulae, plans, customer lists, vendor lists, memoranda, tests, research, designs, specifications, models, data, diagrams, flow charts, and/or techniques (whether reduced to written form or otherwise) that Optionee makes, conceives, discovers, or develops, either solely or jointly with any other person, at any time during the period during which Optionee or its permitted transferees holds any Optionee Securities, whether during working hours or at the Company's facility or at any other time or location, whether patentable or not, and whether upon the request or suggestion of the Company or otherwise, that relate to or are useful in any way in connection with the Business (collectively, the "Intellectual Work Product") shall be the sole and exclusive property of the Company. Optionee agrees to promptly and fully

13

disclose all the Intellectual Work Product to the Company, and Optionee shall not have any claim for compensation for the Intellectual Work Product.

(ii)     Optionee agrees that all Intellectual Work Product that is copyrightable shall be considered a work made for hire under the United States Copyright Act. To the extent that any copyrightable Intellectual Work Product may not be considered a work made for hire under the applicable provisions of copyright law, or to the extent that, notwithstanding the foregoing provisions, Optionee may retain an interest in any Intellectual Work Product, Optionee hereby irrevocably assigns and transfers to the Company any and all right, title, or interest that Optionee may have in the Intellectual Work Product under copyright, patent, trade secret, trademark and other law protecting proprietary or intellectual property rights, in perpetuity or for the longest period otherwise permitted by law, without the necessity of further consideration. The Company shall be entitled to obtain and hold in its own name all registrations of copyrights, patents, trade secrets, trademarks and other proprietary or intellectual property rights with respect thereto.

(iii)     At the sole request and expense of the Company, either before or after the Restricted Period, Optionee shall assist the Company in acquiring and maintaining registrations under copyright, patent, trade secret, trademark and other laws protecting proprietary or intellectual property rights in, and confirming its title to, all Intellectual Work Product. Optionee's assistance shall include signing all applications for copyrights, patents and other proprietary or intellectual property rights and other documents, cooperating in legal proceedings and taking any other steps considered desirable by the Company.

(e)     <u>Non-Disparagement</u>. During and after the Restricted Period, Optionee shall not, and shall ensure that its agents, representatives and affiliates do not, directly or indirectly, disparage or make negative, derogatory or defamatory statements about the Company or any of its Subsidiaries, their respective business activities, or any of their respective Stockholders, directors, officers or employees.

(f)     <u>Nonsolicitation</u>. During the Restricted Period, Optionee shall not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, officer, director, partner, manager, employee, agent, contractor, consultant or otherwise): (a) hire or engage, or recruit, solicit or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to the Company or any of its Subsidiaries, (b) induce or attempt to induce any current or former employee of, or consultant to, the Company or any of its Subsidiaries, to leave the employ of the Company or any such Subsidiary, or in any way interfere with the relationship between the Company or any of its Subsidiaries and any their employees or consultants, (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to the Company or any of its Subsidiaries or (d) in any way interfere with the relationship between the Company or any of its Subsidiaries and any supplier, licensee, lessor or other business relation (or any prospective supplier, licensee, lessor or other business relationship) of the Company or any of its Subsidiaries (including, without limitation, by making any negative or disparaging statements or communications regarding the Company, any of its Subsidiaries or any of their operations, officers, directors or investors)

14

(g)     Noncompetition.  During the Restricted Period, Optionee shall not directly or indirectly, (a) own, operate, manage, control, participate in, provide support to (financial or otherwise), consult with, advise, permit his or her name to be used by, provide services for, lease, or in any manner engage in or knowingly facilitate (including, in association with any person, or through any person), any business that sells (i) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold or offered by the Company or its Subsidiaries or reasonably would be expected to be sold or offered by a Competing Business or (ii) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the Protected Territory (collectively, "Covered Activities"); or (b) acquire an ownership interest in, invest in or provide services to any person which engages in any Covered Activities (other than the Company or its Subsidiaries) as a partner, shareholder, principal, agent, consultant or in any other relationship or capacity; provided, however, that no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(h)     Enforcement.  If, at the time of enforcement of any provision of Section 17(f) or Section 17(g), a court shall hold that the duration, scope or area restrictions stated therein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained therein to cover the maximum period, scope and area permitted by law.  Because Optionee has access to proprietary information and Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of Sections 17(b) through 17(g). Therefore, in the event of a breach or threatened breach of the foregoing sections of this Section 17, the Company or any of its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security and without proving actual damages).  In addition, in the event of an alleged breach or violation by Optionee of any provision of Section 17(f) or Section 17(g), the Restricted Period shall be tolled until such breach or violation has been duly cured.  The existence of any claim or cause of action by Optionee against the Company or any of its affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of Sections 17(b) through 17(g) which Sections will be enforceable notwithstanding the existence of any breach by the Company.  If the Company (i) brings any action or proceeding to enforce any provision of this Agreement or to obtain damages as a result of a breach of this Agreement or to enjoin any breach of this Agreement and (ii) prevails in such action or proceeding, then Optionee will, in addition to any other rights and remedies available to the Company, reimburse the Company for any and all reasonable costs and expenses (including attorneys' fees) incurred by the Company in connection with such action or proceeding.

(i)     Further Acknowledgments.  Optionee expressly agrees and acknowledges that the restrictions contained in Section 17(f) or Section 17(g) do not preclude Optionee from earning a livelihood, nor do they unreasonably impose limitations on Optionee's ability to earn a living.  In addition, Optionee agrees and acknowledges that the potential harm to the Company of the non-enforcement of Section 17(f) or Section 17(g) outweighs any harm to Optionee of his or her

713331390

enforcement by injunction or otherwise. Optionee acknowledges that Optionee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Optionee, and is in full accord as to their necessity for the reasonable and proper protection of the Confidential Information. Optionee expressly acknowledges and agrees that each and every restriction imposed by this Agreement is reasonable with respect to subject matter and time period and such restrictions are necessary to protect the Company's interest in, and value of, the Company (including, without limitation, the goodwill inherent therein). Optionee understands and agrees that the restrictions and covenants contained in Section 17(f) or Section 17(g) are in addition to, and not in lieu of, any non-competition, non-solicitation or other similar obligations contained in any other agreements between Optionee and the Company.

18.     Withholding Taxes.  The Optionee hereby agrees, as a condition to the exercise of any portion of this Option, to provide to the Company an amount sufficient to satisfy its obligation to withhold any federal, state and local taxes arising by reason of such exercise (the "Withholding Amount") by (a) authorizing the Company to withhold the Withholding Amount from his or her cash compensation, or (b) remitting the Withholding Amount to the Company in cash; provided, however, that to the extent that the Withholding Amount is not provided by one or a combination of such methods, the Company in its sole and absolute discretion may refuse to issue such shares of Stock.

19.     Effect Upon Employment.  Nothing in this Option or the Plan shall be construed to impose any obligation upon the Company or any Subsidiary to employ or retain in its employ, or continue its involvement with, the Optionee or interfere in any way with any right of the Company or any of its Subsidiaries or affiliates to terminate such employment at any time for any reason whatsoever (whether for cause or without cause) without liability to the Company or any of its Subsidiaries or affiliates.

20.     Time for Acceptance.  This Option shall be effective as of the date an executed copy is delivered by the Company to the Optionee, provided, however, that unless the Optionee shall return to the Company an executed copy of this Option Agreement, and, if applicable, an executed spousal consent in the form attached hereto as Exhibit B, within fourteen (14) days after its delivery to him or her, the Option and this Option Agreement shall be null and void.

21.     General Provisions.

        (a)     Amendment.  This Option Agreement, including the Plan, contains the full and complete understanding and agreement of the parties hereto as to the subject matter hereof, and except as permitted under the terms of the Plan, this Option Agreement may not be modified or amended, nor may any provision hereof be waived, except by a further written agreement duly signed by the Company and Optionee.  The waiver by either of the parties hereto of any provision hereof in any instance shall not operate as a waiver or any other provision hereof or in any other instance.

        (b)     Binding Effect.  This Option Agreement shall inure to the benefit of and be binding upon the parties hereto and, to the extent provided herein and in the Plan, their respective heirs, executors, administrators, representatives, successors and assigns.

(c)    <u>Option Plan; Construction</u>.  The Optionee hereby acknowledges receipt of a copy of the Plan.  Except as otherwise provided in this Option Agreement, all of the terms and conditions of the Plan are incorporated herein by reference and this Option is subject to such terms and conditions in all respects.  In case of any conflict between the Plan and this Option Agreement, this Option Agreement shall control.  The titles of the sections of this Option Agreement and of the Plan are included for convenience only and shall not be construed as modifying or affecting their provisions.  The masculine gender shall include both sexes; the singular shall include the plural and the plural the singular unless the context otherwise requires.

(d)    <u>Exclusive Agreement</u>.  The Optionee hereby acknowledges and agrees that by signing this Option Agreement, the Optionee voluntarily and irrevocably forfeits any and all rights, title, and interests the Optionee has or may have had in, to and under (a) any option agreement, option letter, or other similar document pursuant to which the Company (or any Subsidiary or affiliate thereof) may have previously granted, or offered to grant, options in the Company (or any Subsidiary or affiliate thereof) to the Optionee and (b) any oral or written commitment or promise regarding options that the Company (or any Subsidiary or affiliate thereof) may have made to the Optionee, except as to any options that have been previously exercised and paid for by the Optionee.

(e)    <u>Governing Law</u>.  This Option Agreement shall be governed by and construed and enforced in accordance with the applicable laws of the State of Delaware (other than the law governing conflict of law questions) except to the extent the laws of any other jurisdiction are mandatorily applicable.

(f)    <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by electronic mail (with confirmation of receipt) or (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

|                  |                                              |
|------------------|----------------------------------------------|
| To the Optionee: | To his or her address as listed on the books of the Company. |
| To the Company:  | American Freight Group, Inc.                 |
|                  | c/o The Jordan Company III, L.P.             |
|                  | 399 Park Avenue                              |
|                  | 30th Floor                                   |
|                  | New York, New York 10022                     |
|                  | Attention:    M. Brad Wilford                |
|                  |               Daniel S. Williams            |
|                  | Email:        bwilford@thejordancompany.com  |
|                  | Email:        dwilliams@thejordancompany.com |
| with a copy to:  | Mayer Brown LLP                              |
|                  | 1675 Broadway                                |
|                  | New York, New York  10019                    |
|                  | Attention:  Philip O. Brandes                |
|                  | Email:  pbrandes@mayerbrown.com              |

713331390

\*       \*       \*       \*       \*

713331390

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement as of the date first written above.

OPTIONEE:

_____

Asaph Rink


AMERICAN FREIGHT GROUP, INC.

By: _____

Name: Steven J. Belford

Title:  President


Address:  3485  W Rd 100N

Bargersville IN 46106

713331390

**AMERICAN FREIGHT GROUP, INC.**

**SCHEDULE I**

**<u>Vesting Schedule</u>**

476.2500 shares of Stock subject to this Option (the "<u>Option Shares</u>") shall vest and be exercisable according to the following vesting schedule:

(a) Forty percent (40%) of the Option Shares shall vest and be exercisable on the second (2nd) anniversary of January 28, 2015;

(b) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the third (3rd) anniversary of January 28, 2015;

(c) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the fourth (4th) anniversary of January 28, 2015; and

(d) the remaining twenty percent (20%) of the Option Shares shall vest and be exercisable on the fifth (5th) anniversary of January 28, 2015.

Notwithstanding the foregoing, upon a Change in Control, 100% of any then-unvested Option Shares shall vest and be exercisable upon such Change in Control.

713331390

EXHIBIT A
(to Stock Option Agreement)

**FORM FOR EXERCISE OF STOCK OPTION**

American Freight Group, Inc.
c/o The Jordan Company III, L.P.
399 Park Avenue
30th Floor
New York, New York 10022
Attention:    M. Brad Wilford
               Daniel S. Williams

          RE:    Exercise of Option under American Freight Group, Inc.
                   2015 Non-Qualified Stock Option Plan (the "Plan")

Ladies and Gentlemen:

      Please take notice that the undersigned hereby elects to exercise the stock option granted to _____ on _____ by and to the extent of purchasing _____ shares of common stock, par value of $0.001 per share (the "Stock"), of American Freight Group, Inc. (the "Company") for the option price of $_____ per share, subject to the terms and conditions of the Stock Option Agreement between _____ and the Company dated as of _____ (the "Option Agreement"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan.

      The undersigned encloses herewith payment, in cash or in such other property as is permitted under the Plan, of the Exercise Payment for said shares and has made a provision with the Company for the Withholding Amount.

      In connection with the exercise of the Option, the undersigned represents to the Company as follows:

      (a)    The undersigned is acquiring the Stock solely for investment purposes, with no present intention of distributing or reselling any of the shares of Stock or any interest therein. The undersigned acknowledges that the Stock has not been registered under the Securities Act of 1933, as amended (the "Securities Act").

      (b)    The undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.

      (c)    The undersigned understands that the Stock is a "restricted security" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the undersigned must hold the Stock indefinitely unless it is registered with the Securities and Exchange Commission and qualified by state authorities, or unless an exemption from such registration and qualification requirements is available. The undersigned acknowledges that the Company has no obligation to register or qualify the Stock for resale. The undersigned further acknowledges that

713331390

if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner or sale, the holding period for the Stock, and requirements relating to the Company which are outside of the undersigned's control, and which the Company is under no obligation to and may not be able to satisfy.

(d)     The undersigned understands that there is no public market for the Stock, that no market may ever develop for the Stock, and that the Stock has not been approved or disapproved by the Securities and Exchange Commission or any other federal, state or other governmental agency.

(e)     The undersigned understands that the Stock is subject to certain restrictions on transfer set forth in the Plan.  Both the Plan and the Option Agreement are incorporated herein by reference.

(f)     The undersigned understands that any Stock purchased hereunder shall be subject to the Stockholders' Agreement of the Company as it may be amended from time to time ("Stockholders' Agreement"), a copy of which has been provided to the undersigned, and that it is a condition to the exercise of my Option that the undersigned executes a signature page of the Stockholders' Agreement, agreeing to be bound thereby and that the undersigned's spouse, if applicable, must sign the Spousal Consent.  The undersigned and his or her spouse has had a full and fair opportunity to review the Stockholders' Agreement prior to exercising the Option.

(g)     The undersigned understands that any Stock purchased hereunder shall be subject to certain repurchase rights that may cause the Stock to be considered unvested at the time of purchase for purposes of Section 83 of the Internal Revenue Code of 1986, as amended (the "Code").  If the Stock is considered to be unvested upon purchase under Section 83, the fair market value of the Stock generally would be reportable to the Participant on the applicable vesting date as ordinary income and subject to tax withholding at that time.  Instead, the Participant may elect to be taxed on the fair market value of the Stock (less the exercise price) at the time of purchase by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after purchase.  The undersigned acknowledges and agrees that it is his or her personal responsibility to determine whether or not to make a Section 83(b) election and if such election is filed, the undersigned shall provide the Company with a copy of the election form filed with the Internal Revenue Service.

Very truly yours,

Date _____

_____
(Signed   by   _____   or   other   party   duly exercising option)

Note:  If Options are being exercised on behalf of a deceased Optionee, then this Notice must be signed by such Optionee's personal representative and must be accompanied by a certificate issued by an appropriate authority evidencing that the individual signing this Notice has been

duly appointed and is currently serving as the Optionee's personal representative under applicable local law governing decedents' estates.

EXHIBIT B
(to Stock Option Agreement)

## FORM OF SPOUSAL CONSENT

I acknowledge that I have read the foregoing Stock Option Agreement and that I know its contents.  I acknowledge and agree that capitalized terms used and not defined in this spousal consent shall have the meanings ascribed to such terms in the Stock Option Agreement.  I am aware that by the provisions of the Stock Option Agreement, my spouse agrees, among other things, to the granting of rights to purchase and to the imposition of certain restrictions on the transfer of Optionee Securities, including my community interest therein (if any), which rights and restrictions may survive my spouse's death.  I hereby consent to such rights and restrictions, approve of the provisions of the Stock Option Agreement, and agree that I will bequeath any interest which I may have in said Optionee Securities or any of them, including my community interest, if any, or permit any such interest to be purchased, in a manner consistent with the provisions of the Stock Option Agreement.  I direct that any residuary clause in my will not be deemed to apply to my community interest (if any) in such Optionee Securities except to the extent consistent with the provisions of the Stock Option Agreement.

I further agree that in the event of a dissolution of the marriage between myself and my spouse, in connection with which I secure or am awarded any Optionee Securities or any interest therein through property settlement agreement or otherwise, (a) I will receive and hold said Optionee Securities subject to all the provisions and restrictions contained in the Stock Option Agreement, including any option of the Company, Resolute or other stockholder or optionholder to purchase such shares or interest from me, and (b) I hereby irrevocably constitute and appoint my spouse, as true and lawful attorney and proxy (the "Proxy") of my Optionee Securities with full power of substitution, to vote (at any annual or special meeting or by written consent) such Optionee Securities which I would be entitled to vote as a stockholder, together with any and all Optionee Securities issued in replacement or in respect of such Optionee Securities by dividend, distribution, stock split, reorganization, recapitalization or otherwise.

I also acknowledge that I have been advised to obtain independent counsel to represent my interests with respect to this spousal consent.

Date:  _____

_____

Name of Spouse:      _____

Name of Optionee:    _____

713331390

## EXHIBIT C

**FORM OF THREE YEAR JUNIOR NOTE**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND ACCORDINGLY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR LAWS OR PURSUANT TO AN EXEMPTION THEREFROM. THE PRINCIPAL AMOUNT OF THIS NOTE, AND INTEREST IN RESPECT THEREOF, IS SUBORDINATED TO THE PAYMENT IN FULL OF ALL SENIOR INDEBTEDNESS AND IS SUBJECT TO SET-OFF, AS DESCRIBED IN THIS NOTE.

AMERICAN FREIGHT GROUP, INC.

NON-NEGOTIABLE THREE YEAR JUNIOR SUBORDINATED NOTE
DUE _____, _____

New York, New York

[$ _____]                                                              ____ ___, ___

FOR VALUE RECEIVED, the undersigned, American Freight Group, Inc., a Delaware corporation (together with its successors, the "<u>Company</u>"), hereby promises to pay to _____ (together with its successors and permitted assigns, the "<u>Holder</u>"), at the Holder's residence at _____, the principal amount of _____ ($_____) on the Maturity Date. Certain capitalized terms are used in this Note are as defined in <u>Section 6</u>.

Section 1. <u>Payment; Interest</u>.

1.1     The outstanding principal amount of this Note shall bear interest (computed on the basis of a 365 day year, as the case may be) accruing daily at a rate equal to five percent (5%) per annum from (but excluding) the date hereof to (and including) the date on which the principal amount of this Note is paid in full, regardless of the commencement of any bankruptcy or insolvency proceedings against the Company. Subject to <u>Section 5</u> of this Note, such interest shall be payable on the Maturity Date.

1.2     Whenever payment of principal of, or interest on, this Note shall be due on a date that is not a Business Day, the date for payment thereof shall be the next succeeding Business Day and interest due on the unpaid principal and any other Amounts Payable hereunder shall accrue during such extension and shall be payable on such succeeding Business Day.

713331390

Section 2. <u>Optional Prepayment</u>. The Company shall have the right to prepay the principal amount of this Note in whole or in part at any time, or from time to time, without payment of any premium or penalty whatsoever, together with interest thereon accrued to the date of prepayment; <u>provided</u>, <u>however</u>, that so long as (a) any Senior Indebtedness remains outstanding and unpaid, (b) any commitment to provide Senior Indebtedness is outstanding, or (c) any other amount is owing to the holders of Senior Indebtedness, this Note may not be prepaid, in whole or in part, without the consent of, or written waiver of, any relevant prohibitions by the holders of Senior Indebtedness.

Section 3. <u>Set-off</u>. The Company shall be entitled to set-off and reduce any Amounts Payable hereunder for (a) any obligations or liabilities of the Holder to the Company or its Subsidiaries or (b) any claims by the Company or its Subsidiaries against the Holder under the Stockholders Agreement, or any other agreement, written or oral, between the Company or its Subsidiaries and the Holder. The Holder, by accepting this Note, hereby acknowledges and agrees to the foregoing provisions, and any subsequent transferee or successor shall be bound by the foregoing.

Section 4. <u>Defaults</u>.

4.1     <u>Events of Default</u>. If one or more of the following events ("<u>Events of Default</u>") shall have occurred and be continuing:

(a)     the Company shall fail to pay within ten (10) Business Days of the due date thereof any principal of this Note or shall fail to pay within ten Business Days of the due date thereof any interest or any other amount payable hereunder and the same shall not have been cured within forty-five (45) days after written notice thereof has been given by the Holder to the Company;

(b)     the Company shall fail to observe or perform any covenant or agreement contained in this Note (other than those covered by <u>clause (a)</u> above) and the same shall not have been cured within sixty (60) days after written notice thereof has been given by the Holder to the Company;

(c)     the Company shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors; or

(d)     an involuntary case or other proceeding shall be commenced against the Company seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days; or an

C-2-

order for relief shall be entered against the Company under the Federal bankruptcy laws as now or hereafter in effect;

then, and in every such event, subject to the provisions of Section 5, the Holder may, by notice to the Company and to the holders of Senior Indebtedness, declare the unpaid principal amount of this Note together with accrued interest thereon, to be, and such portions of this Note (and accrued interest thereon) shall thereupon become, due and payable immediately following delivery of such notice to the Company and to the holders of Senior Indebtedness without presentment, demand, protest or further notice of any kind, all of which are hereby waived by the Company; provided, however, that in the case of any of the Events of Default specified in clause (c) or (d) above, such portions of this Note (together with accrued interest thereon) shall, subject to the provisions of Section 5, immediately (and without notice) become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Company.

Section 5.  Subordination.

5.1  <u>Amounts Payable Subordinated to Senior Indebtedness</u>.  Notwithstanding any provision of this Note to the contrary, the Company covenants and agrees, and the Holder by acceptance of this Note likewise covenants and agrees, that all Amounts Payable shall be subordinated to the extent set forth in this Section 5 to the prior payment in full in cash of all Senior Indebtedness.  This Section 5 shall constitute a continuing offer to and covenant with all persons who become holders of, or continue to hold, Senior Indebtedness (irrespective of whether such Senior Indebtedness was created or acquired before or after the issuance of this Note).  The provisions of this Section 5 are made for the benefit of all present and future holders of Senior Indebtedness (and their successors and assigns), and shall be enforceable by them directly against the Holder.

5.2  <u>Priority Over and Payment of Proceeds in Certain Events</u>.

(a)  Upon any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, in the event of any dissolution, winding up or total or partial liquidation, reorganization, arrangement, adjustment, protection, relief or composition, or assignment for the benefit of creditors of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, reorganization, relief or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of all or part of the assets and liabilities of the Company (the foregoing events herein collectively referred to as an "Insolvency Event"), all Senior Indebtedness shall first be paid in full in cash before the Holder shall be entitled to receive any payment by or on behalf of the Company or distribution of assets of the Company relating to any Amounts Payable.  Upon any Insolvency Event, any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, to which the Holder would be entitled relating to any Amounts Payable, except for the provisions of this Section 5, shall, until payment in full in cash of all Senior Indebtedness (including from any concurrent payment or distribution to the holders of such Senior Indebtedness), be made by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution,

C-3-

directly to the holders of the Senior Indebtedness or their representatives for application to the payment or prepayment of all such Senior Indebtedness.

If the Senior Indebtedness has not been paid in full in cash at a time in which the Company is subject to an Insolvency Event, (i) the holders of the Senior Indebtedness are hereby irrevocably authorized, but shall have no obligation, to demand, sue for, collect and receive every payment or distribution received on or after the Insolvency Event or to be received in respect of this Note (regardless of when originally due) in any insolvency proceeding and give acquittance therefor and to file claims and proofs of claim, as their interests may appear, and (ii) the Holder shall duly and promptly take, for the account of the holders of the Senior Indebtedness, as their interests may appear, such actions as the holders of the Senior Indebtedness may request to collect and receive all Amounts Payable by the Company in respect of this Note and to file appropriate claims or proofs of claim in respect of this Note.

(b)     No payment shall be made by or on behalf of the Company with respect to any Amounts Payable or to acquire this Note (or any portion hereof) for cash, property, securities or otherwise, and, by virtue of accepting this Note and the benefits hereof, the Holder shall not be entitled, and will not take any action, including any judicial process, to accelerate, demand payment or enforce any Indebtedness in respect of this Note or any other claim with regard to any Amounts Payable if (i) such payment is prohibited by the terms of any Senior Indebtedness, (ii) there has occurred and is continuing a default in the payment of all or any portion of any Senior Indebtedness, it being understood that for purposes of this clause (ii), any payment of interest accrued on any Senior Indebtedness which is paid, in lieu of cash, with the issuance of a payment-in-kind obligation, shall be deemed to continue to be unpaid until such payment-in-kind obligation (and all interest accrued thereon) shall have been paid in full or (iii) any other default (not involving the non-payment of any Senior Indebtedness) shall have occurred which, including after giving any notice or the passage of time, or both, would allow holders of any Senior Indebtedness to accelerate or otherwise demand the payment thereof, and in the case of a default described in clause (iii), the holders of the Senior Indebtedness have, to the extent required under the documents evidencing the Senior Indebtedness given notice of such default to the Company (the date that such notice is received by the Company is the "Notice Date"); provided that such restrictions on actions, including judicial process, to accelerate, demand payment or enforce any such Indebtedness on claim will cease to be applicable twenty-four (24) months after the occurrence and continuation of an Event of Default of the types referred to in Section 4.1(a) or (b). The Company shall promptly give written notice to the Holder of any written notice of default under the Senior Indebtedness.

(c)     In the event of all or any portion of the principal amount of this Note becoming due before the Maturity Date (whether by declaration or otherwise), no payment shall be made by or on behalf of the Company on or with respect to any Amounts Payable or to acquire this Note (or any portion thereof) for cash, property, securities or otherwise until all Senior Indebtedness shall first have been paid in full in cash.

(d)     If, notwithstanding the foregoing provisions of clauses (a) through (c) prohibiting payments or distributions, the Holder shall, on or after the Notice Date or the occurrence of any Insolvency Event, have received, directly or indirectly, by setoff, redemption, purchase or in any other manner, any payment of, or on account of, any Amounts Payable that was prohibited by

C-4-

this Section 5, before all Senior Indebtedness shall have been paid in full in cash, then and in such event such payments or distributions shall be received and held in trust for the holders of the Senior Indebtedness and promptly paid over or delivered to the holders of the Senior Indebtedness remaining unpaid to the extent necessary to pay in full in cash such Senior Indebtedness in accordance with its terms after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness, provided that any such payment which is, for any reason, not so paid over or delivered shall be held in trust by the Holder for the holders of Senior Indebtedness.

(e)    So long as any Senior Indebtedness remains outstanding, or the commitment to make credit extensions of any Senior Indebtedness shall not have been terminated, the Holder will not be entitled to take, demand or receive, directly or indirectly, by setoff, redemption, purchase or in any other manner, any voluntary prepayment or other payment of any Amounts Payable in amounts or in a manner which are in violation of the provisions of this Section 5.

(f)    Upon any payment or distribution of assets referred to in clause (a) above, the Holder shall be entitled to rely upon any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, and upon a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making any such payment or distribution of assets, delivered to the Holder for the purpose of ascertaining the persons entitled to participate in such distribution of assets, the holders of Senior Indebtedness and other Indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Section 5.

5.3    Rights of Holders of Senior Indebtedness Not To Be Impaired, etc.

(a)    No right of any present or future holder of any Senior Indebtedness to enforce the subordination and other terms and conditions provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act by any such holder, or by any noncompliance by the Company with the terms and provisions and covenants herein regardless of any knowledge thereof any such holder may have or otherwise be charged with.

(b)    This Section 5 may not be amended without the written consent of each holder of the Senior Indebtedness and of the Holder, and any purported amendment without such consent shall be void.  No holder of Senior Indebtedness shall be prejudiced in such holder's right to enforce the subordination and other terms and conditions of this Note by any act or failure to act by the Company or anyone in custody of its assets or property.

5.4    Subrogation.  Subject to and upon the payment in full in cash of all Senior Indebtedness, the Holder shall be subrogated, to the extent of payments or distributions made to the holders of Senior Indebtedness pursuant to or by reason of this Section 5, to the rights of the holders of such Senior Indebtedness to receive payments or distributions of assets of the Company made on such Senior Indebtedness until all amounts due under this Note shall be paid in full; and for the purposes of such subrogation, no payments or distributions to holders of such Senior Indebtedness of any cash, property or securities to which the Holder would be entitled except for the provisions of this Section 5, and no payment over pursuant to the provisions of this

C-5-

Section 5 to holders of such Senior Indebtedness by the Holder, shall, as among the Company, its creditors (other than holders of such Senior Indebtedness) and the Holder be deemed to be a payment by the Company to or on account of such Senior Indebtedness, it being understood that the provisions of this Section 5 are solely for the purpose of defining the relative rights of the holders of such Senior Indebtedness, on the one hand, and the Holder, on the other hand.

5.5     Obligations of the Company Unconditional.  Nothing contained in this Note is intended to or shall impair, as between the Company and the Holder, the obligation of the Company, which is absolute and unconditional, to pay to the Holder all Amounts Payable, as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holder and other creditors of the Company (other than the holders of Senior Indebtedness), except as provided in Section 5.2(b).

5.6     Section 5 Not To Prevent Events of Default.  The failure to make a payment of any Amounts Payable by reason of any provision of this Section 5 shall not be construed as preventing the occurrence or consequences of an Event of Default under Section 4.1 hereof, except as provided in Section 5.2(b).

5.7     Additional Rights of Holders of Senior Indebtedness.  Upon request by the Company, the Holder of this Note shall deliver to the holders of Senior Indebtedness or parties contemplating becoming holders of Senior Indebtedness a written statement confirming that (a) the provisions (including those of this Section 5) of this Note are in full force and effect; and (b) such party is or will be entitled to rely upon and enjoy the benefits of the provisions (including those of this Section 5) of this Note as a holder of Senior Indebtedness.

5.8     Senior Indebtedness Changes.  By virtue of accepting this Note and the benefits hereof, the Holder hereby waives any and all notice of renewal, extension or accrual of any of the Senior Indebtedness, present or future, and agrees and consents that without notice to or consent of the Holder:

(a)     the obligations and liabilities of the Company or any other party or parties under the Senior Indebtedness may, from time to time, in whole or in part, be renewed, refinanced, replaced, extended, refunded, modified, amended, accelerated, compromised, supplemented, terminated, increased, decreased, sold, exchanged, waived or released;

(b)     the holders of Senior Indebtedness and their representatives may exercise or refrain from exercising any right, remedy or power granted by any document creating, evidencing or otherwise related to the Senior Indebtedness or granted at law, in equity, or otherwise, with respect to the Senior Indebtedness or in connection with any collateral security or lien (legal or equitable) held, given or intended to be given therefor (including, without limitation, the right to perfect any lien or security interest created in connection therewith);

(c)     any and all collateral security and/or liens (legal or equitable) at any time, present or future, held, given or intended to be given for the Senior Indebtedness, and any rights or remedies of the holders of Senior Indebtedness and their representatives in respect thereof, may, from time to time, in whole or in part, be exchanged, sold, surrendered, released, modified, perfected, unperfected, waived or extended by the Holders and their representatives;

(d)     any balance or balances of funds with any holder of Senior Indebtedness at any time standing to the credit of the Company or any guarantor of any of the Senior Indebtedness may, from time to time, in whole or in part, be surrendered or released; all as the holders of Senior Indebtedness, their representatives or any of them may deem advisable and all without impairing, abridging, diminishing, releasing or affecting the subordination to the Senior Indebtedness provided for herein; and

(e)     the Company may incur any amount or type of Senior Indebtedness (including Senior Indebtedness owed to Affiliates), or modify, restate, refinance, replace or amend any Senior Indebtedness from time to time, on terms and conditions acceptable to the Company, without notice to or approval by the Holder. The Company shall deliver written notice to the Holder of all actions by the holders of Senior Indebtedness to accelerate payment of, or to exercise any other rights, remedies or powers under, the Senior Indebtedness.

5.9     Waivers. In the event the holders of Senior Indebtedness elect to exercise their remedies to liquidate any collateral given to secure the Senior Indebtedness, the Holder hereby waives any right it may have to contest the validity of or the value obtained as a result of the holders of Senior Indebtedness exercise of their remedies, including, but not limited to, a foreclosure, a sale pursuant to the Uniform Commercial Code or the acceptance by the holders of Senior Indebtedness in lieu of foreclosure. The Holder further waives any right it may have either in or out of any bankruptcy or similar proceeding to challenge any action taken by the holders of Senior Indebtedness as either a preference or fraudulent conveyance and further agrees not to take any active role in such a proceeding other than the filing of a claim in any such proceeding, which claim shall be subordinate (to the extent set forth above) to the claims of the holders of Senior Indebtedness.

Section 6. Definitions. For purposes of this Note, the following terms have the meanings set forth below.

"Affiliates" means the Company, The Resolute Fund III, L.P., and any other person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with any of them.

"Amounts Payable" means all principal of, interest on, premium, if any, fees, costs, expenses, indemnities or any other amounts due from the Company under this Note, and all claims against or liabilities of the Company in respect of this Note.

"Business Day" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

"Default" means any condition or event that constitutes an Event of Default or that with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Indebtedness" means with respect to any Person, and without duplication: (i) any obligation of such Person for borrowed money; (ii) all capitalized lease obligations of such Person; (iii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security; (iv) any payment obligation under any existing interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or

agreement entered into by such Person, unless extended by mutual agreement; (v) to the extent drawn or called upon and not reimbursed, all letters of credit, performance bonds, bankers acceptances or similar obligations of such Person or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation); (vi) whether or not so included as liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (vi) of any other Person secured by any Lien on any assets owned or purchased by such Person (including Indebtedness arising under conditional sales or other title retention agreements), even though (x) such Person has not assumed or otherwise become liable for the payment thereof or (y) such Indebtedness is limited in recourse; (vii) all asset financing obligations of such Person, to the extent capitalized on the balance sheet of such Person; (viii) all amounts owing for the deferred purchase price of acquisitions, whether or not reflected on the face of the audited balance sheet of the Company, including all amounts owing for earnouts, purchase price adjustments, non-competition payments and similar obligations in respect of past acquisitions; (ix) the amount of any guarantees of Indebtedness of the type described in clauses (i) through (viii) above of any other Person; and (x) any unpaid interest, fees (whether accrued or otherwise), prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts owing on or in respect of any such indebtedness described in clauses (a) through (ix) above. Indebtedness owed to Affiliates will be Indebtedness for purposes of this Note.

"<u>Maturity Date</u>" means the third anniversary of the issuance of this Note.

"<u>Note</u>" means this Non-Negotiable Three Year Junior Subordinated Note.

"<u>Senior Indebtedness</u>" means the principal, interest (including interest accruing subsequent to the commencement of a proceeding specified in <u>Sections 4.1(c)</u> and <u>4.1(d)</u>, whether or not enforceable in such proceeding) on, premium, if any, fees (including, without limitation, any attorneys', commitment, agency, facility, structuring, restructuring or other fee), costs, expenses, indemnities, and other amounts due on or in connection with any Indebtedness of the Company and its Subsidiaries, and any refinancings, extensions or replacements of the foregoing Indebtedness, now or hereafter incurred, any documents executed under or in connection therewith, and any amendments, modifications, deferrals, renewals or extensions of such Indebtedness, and any amounts owed in respect of any Indebtedness incurred in refinancing, replacing or refunding the foregoing (including any refinancing, replacing or refunding with new lenders), unless the terms of such Indebtedness expressly provide that such Indebtedness is not Senior Indebtedness with respect to this Note. Nothing in this Note shall restrict an Affiliate of the Company from being a holder of Senior Indebtedness.

"<u>Stockholders' Agreement</u>" means the Stockholders' Agreement, dated as of October 31, 2014, among the Company, the Holder and the other Stockholders listed on the signature pages thereto.

"<u>Subsidiary</u>" of a person means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors or other persons performing similar functions are at the time directly or indirectly owned by such person.

C-8-

Section 7.  Miscellaneous.

7.1    Notices.  All notices, requests and other communications to any party hereunder shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, sent by PDF attachment to email (in such cases by PDF attachment, with hard copy to follow) or mailed by first class mail, return receipt requested, to the following address (or at any other address as any party shall have specified by notice in writing to the other party):

If to the Company:

> American Freight Group, Inc.
> c/o The Jordan Company III, L.P.
> 399 Park Avenue, 30th floor
> New York, New York 10022
> Attention:    M. Brad Wilford
>                      Daniel S. Williams
> Email:         bwilford@thejordancompany.com
>                      dwilliams@thejordancompany.com

with a copy to:

> Mayer Brown LLP
> 1675 Broadway
> New York, New York 10019
> Attention:    Philip O. Brandes
> Email:         pbrandes@mayerbrown.com

If to the Holder, to:

> _____
> _____
> _____

Each party may, by notice given in accordance with this Section to the other party, designate another address or person for receipt of notices hereunder.

The date of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after the date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by email.

7.2    No Waivers.  No failure or delay by the Holder in exercising any right, power or privilege hereunder or under this Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in related or similar circumstances requiring such notice.

713331390

7.3   <u>Amendments and Waivers</u>.  Except as expressly set forth in this Note (including <u>Section 5.3(b)</u>), any provision of this Note may be amended or waived if, but only if, such amendment or waiver is in writing, signed by the Company and the Holder.

7.4   <u>Rights of Parties</u>.  This Note is delivered pursuant to the terms and conditions of the Stockholders Agreement and is subject to the terms thereof.

7.5   <u>Restrictions on Transfer</u>.  This Note may not be sold, pledged, distributed, offered for sale, or otherwise transferred by the Holder to any transferee other than to a Permitted Transferee (as defined in the Stockholders Agreement).

7.6   <u>Binding Effect</u>.  The provisions of this Note shall be binding upon and inure to the benefit of the Holder and its respective successors and permitted assigns.

7.7   <u>Replacement Note</u>.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and of a letter of indemnity reasonably satisfactory to the Company from the Holder and upon reimbursement to the Company of all reasonable expenses incident thereto, and upon surrender or cancellation of this Note, if mutilated, the Company will make and deliver a new Note of like tenor in lieu of such lost, stolen, destroyed or mutilated Note.

7.8   <u>Company Obligations</u>.  The Holder agrees and acknowledges that this Note and the Company's obligations hereunder and for all Amounts Payable are solely obligations and liabilities of the Company.  None of the Company's directors, officers, employees, stockholders, advisors, consultants and affiliates or any other persons shall be obligated or liable in respect of this Note or any Amounts Payable, and the Holder hereby releases them from any such obligation or liability.

7.9   <u>Cross-References; Headings</u>.  Unless otherwise specified, references in this Note to any Section are references to such Section of this Note, and unless otherwise specified, references in any Section to any clause are references to such clause of such Section.  The various headings of this Note are inserted for convenience only and shall not affect the meaning or interpretation of this Note or any provisions hereof.

7.10   <u>CHOICE OF LAW; LITIGATION</u>.  (a) THIS NOTE SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE.  THE CHOICE OF FORUM SET FORTH IN THIS <u>SECTION 7.10</u> SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OF A DELAWARE FEDERAL OR STATE COURT, OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SUCH A JUDGMENT, IN ANY OTHER APPROPRIATE JURISDICTION.

(b)  IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS NOTE,  THE HOLDER AND THE COMPANY HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO INSTITUTE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE STATE OF DELAWARE,

713331390

WHETHER A STATE OR FEDERAL COURT; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, THE HOLDER AND THE COMPANY WILL CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS (IT BEING UNDERSTOOD THAT NOTHING IN THIS SECTION SHALL BE DEEMED TO PREVENT THE HOLDER OR THE COMPANY FROM SEEKING TO REMOVE ANY ACTION TO A FEDERAL COURT IN THE STATE OF DELAWARE; (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN ANY INCONVENIENT FORUM; (4) AGREE, AFTER CONSULTATION WITH COUNSEL, TO WAIVE ANY RIGHTS TO A JURY TRIAL TO RESOLVE ANY DISPUTES OR CLAIMS RELATING TO THIS NOTE; (5) AGREE TO DESIGNATE, APPOINT AND DIRECT AN AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS AND DOCUMENTS IN ANY LEGAL PROCEEDING IN THE STATE OF DELAWARE; (6) AGREE TO PROVIDE EACH OTHER WITH THE NAME, THE MAILING ADDRESS AND EMAIL ADDRESS OF SUCH AGENT; (7) AGREE AS AN ALTERNATIVE METHOD OF SERVICE TO SERVICE OF PROCESS IN ANY LEGAL PROCEEDING BY MAILING OF COPIES THEREOF TO IT AT ITS ADDRESS SET FORTH HEREIN FOR COMMUNICATIONS TO IT; (8) AGREE THAT ANY SERVICE MADE AS PROVIDED HEREIN SHALL BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (9) AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHTS OF THE HOLDER OR THE COMPANY TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the date first above written.

AMERICAN FREIGHT GROUP, INC.

By:_____

    Name:

    Title:

# EXHIBIT 4

## AGREEMENT AND GENERAL RELEASE

THIS AGREEMENT AND GENERAL RELEASE (this "Agreement") is made and entered into as of November 30, 2017, by and between American Freight Group, Inc., a Delaware corporation ("Holdings" and, together with its subsidiaries, the "Company"), and David A. Belford (the "Director").

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Resignation of Directorship. The Company and the Director agree that Director resigned from his position as a director of Holdings and each of its subsidiaries on August 23, 2017, which shall be referred to herein as the "Resignation Date." Effective as of the Resignation Date, Director hereby resigns and shall be terminated from all positions and offices he holds with Holdings and each of Holdings' subsidiaries, including but not limited to his membership on the Board of Directors of Holdings and each of its subsidiaries, as applicable. To the extent applicable, Director's participation in all of the Company's benefit plans, except as otherwise stated herein, shall cease on the Resignation Date. The Director further agrees that he will not hereafter seek reinstatement, recall or employment with the Company or its affiliates.

2.    Equity.

(a)    Pursuant to a subscription agreement, dated October 31, 2014 between the Director and Holdings (the "Subscription Agreement"), the Director purchased (i) 1,297.7867 shares of common stock, par value $0.001 per share ("Common Stock") of Holdings and (ii) 5,191.1469 shares of Series A Preferred Stock, par value $0.001 per share, of Holdings (the "Preferred Stock" and, together with the Common Stock, the "Stock"), which Stock is subject to the terms of the Stockholders' Agreement, dated October 31, 2014, among Holdings, the Director and the other stockholders party thereto (the "Stockholders' Agreement"). In addition, pursuant to those certain warrants, dated October 31, 2014 (the "Warrants"), the Separate Property Trust of David A. Belford, dated November 13, 2007 (the "Trust") was issued warrants to purchase 325.3004 shares of Common Stock of Holdings, which Warrants, and the shares of Common Stock issuable upon exercise of the Warrants, remains subject to the terms of the Warrants and the Stockholders' Agreement.

(b)    On January 28, 2015, pursuant to a Non-Qualified Stock Option Agreement (the "Option Agreement"), the Trust was granted an option (the "Option") to purchase 396.8750 shares of Common Stock of Holdings pursuant to the American Freight Group, Inc. 2015 Non-Qualified Stock Option Plan (the "Plan") at an exercise price of $1,000 per share. The Option Agreement in respect of the Option provides that 40% of the shares subject to the Option vest and become exercisable on the second anniversary of the grant date and, thereafter, an additional 20% of the shares subject to the Option vest and become exercisable on each subsequent anniversary of the grant date. As of the Resignation Date, 158.75 of Director's Options have vested and may be purchased by him at an exercise price of $1,000 per share (the "Vested Options"), and

Director, on behalf of himself and the Trust, acknowledges that all of the Trust's unvested Options have expired and agrees that such unvested Options are hereby terminated and cancelled and shall have no further force or effect from and after the Resignation Date. The Director, on behalf of himself and the Trust, further acknowledges and agrees that, in accordance with the Plan, all of Director's Vested Options were set to expire on the day before the Resignation Date, however, Holdings has determined to allow such Vested Options to remain outstanding in accordance with the Option Agreement and the Plan.

3.     General Release. In consideration of Holdings permitting the Vested Options to remain outstanding, the Director, with full understanding of the contents and legal effect of this release and having the right and opportunity to consult with his counsel, releases and discharges Holdings, its officers, directors, board members, supervisors, managers, executives, agents, representatives, attorneys, divisions, subsidiaries and affiliates, and all related entities of any kind or nature, and its and their predecessors, successors, heirs, executors, administrators, and assigns (collectively, the "Company Released Parties") from any and all claims, actions, causes of action, grievances, suits, charges, or complaints of any kind or nature whatsoever, that he ever had or now has, whether fixed or contingent, liquidated or unliquidated, known or unknown, suspected or unsuspected, and whether arising in tort, contract, statute, or equity, before any federal, state, local, or private court, agency, arbitrator, mediator, or other entity, regardless of the relief or remedy. Without limiting the generality of the foregoing, it being the intention of the parties to make this release as broad and as general as the law permits, this release specifically includes any and all subject matters and claims arising from any alleged violation by the Released Parties under the Age Discrimination in Employment Act of 1967, as amended; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991 (42 U.S.C. § 1981); the Rehabilitation Act of 1973, as amended and any similar state or local laws; the Employee Retirement Income Security Act of 1974, as amended; the Americans with Disabilities Act; the Worker Adjustment and Retraining Notification Act; the Equal Pay Act; Executive Order 11246; Executive Order 11141; and any other statutory claim, employment or other contract or implied contract claim or common law claim for wrongful discharge, breach of an implied covenant of good faith and fair dealing, defamation, or invasion of privacy arising out of or involving his membership on the board of directors of the Company, the termination of his membership on the board of director of the Company, or involving any continuing effects of his membership on the board of directors of the Company or termination of his membership on the board of directors of the Company. The Director further acknowledges that he is aware that statutes exist that render null and void releases and discharges of any claims, rights, demands, liabilities, action and causes of action which are unknown to the releasing or discharging part at the time of execution of the release and discharge. The Director hereby expressly waives, surrenders and agrees to forego any protection to which he would otherwise be entitled by virtue of the existence of any such statute in any jurisdiction including, but not limited to, the State of Delaware. Director does not waive or release claims or causes of action arising under or relating to: (i) this Agreement or (ii) indemnification or contribution under Company bylaws or common law, including coverage for directors or former directors under any directors and officers policy.

725509963

4.    <u>Covenant Not to Sue</u>.  The Director agrees not to bring, file, charge, claim, sue or cause, assist, or permit to be brought, filed, charged or claimed any action, cause of action, or proceeding regarding or in any way related to any of the claims described in Paragraph 3 hereof, and further agrees that his release is, will constitute and may be pleaded as, a bar to any such claim, action, cause of action or proceeding.  If any government agency or court assumes jurisdiction of any charge, complaint, or cause of action covered by this release, the Director will not seek and will not accept any personal equitable or monetary relief in connection with such investigation, civil action, suit or legal proceeding.

5.    <u>Severability</u>.  If any provision of this Agreement shall be found by a court to be invalid or unenforceable, in whole or in part, then such provision shall be construed and/or modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.  The parties further agree to seek a lawful substitute for any provision found to be unlawful; provided, that, if the parties are unable to agree upon a lawful substitute, the parties desire and request that a court or other authority called upon to decide the enforceability of this Agreement modify the Agreement so that, once modified, the Agreement will be enforceable to the maximum extent permitted by the law in existence at the time of the requested enforcement.

6.    <u>Waiver</u>.  A waiver by the Company of a breach of any provision of this Agreement by the Director shall not operate or be construed as a waiver or estoppel of any subsequent breach by the Director.  No waiver shall be valid unless in writing and signed by an authorized officer of the Company. A waiver by Director of a breach of any provision of this Agreement by the Company shall not operate or be construed as a waiver or estoppel of any subsequent breach by the Company.  No waiver shall be valid unless in writing and signed by Director.

7.    <u>Non-Disclosure</u>.  The Director agrees that he will keep the terms and amounts set forth in this Agreement completely confidential and will not disclose any information concerning this Agreement's terms to any person other than his attorney, accountant, tax advisor, or immediate family.

8.    <u>No Disparaging, Untrue Or Misleading Statements</u>.  The Director represents that he has not made, and agrees that he will not make, to any third party any disparaging, untrue, or misleading written or oral statements about or relating to, respectively, the Company, its products or services, or about or relating to any officer, director, agent, employee, or other person acting on the Company's behalf.    The Company  represents that it has not made, and agrees that it will not make, to any third party any disparaging, untrue, or misleading written or oral statements about or relating to Director.

725509963

9. <u>Survival of Certain Provisions</u>. Each of the Director and the Trust agrees that the provisions of the Option Agreement, including Section 17 through 21 thereof, together with any applicable definitions used in such Sections and contained in the Option Agreement survive the termination of Director's membership on the board of directors of the Company. Each of the Director and the Trust further agrees that he and it remains subject to all of the terms of the (i) Stockholders' Agreement, including the provisions of Articles III, IV and V thereof and (ii) Warrants. The Director further acknowledges that he remains subject to that certain Selling Equityholder Agreement, dated September 30, 2014 between the Director and American Freight, Inc.

10. **<u>Representation</u>. Director hereby agrees that this Agreement (including the release set forth herein) is given knowingly and voluntarily and acknowledges that:**

**(a)     this Agreement is written in a manner understood by Director;**

**(b)     the release in this Agreement refers to and waives any and all rights or claims that he may have arising under the Age Discrimination in Employment Act, as amended;**

**(c)     Director has not waived any rights arising after the date of this Agreement;**

**(d)     Director has received valuable consideration in exchange for the release in addition to amounts Director is already entitled to receive; and**

**(e)     Director has been advised to consult with an attorney prior to executing this Agreement.**

11. **<u>Consideration and Revocation</u>. Director is receiving this Agreement on November 30, 2017, and Director shall be given twenty one (21) days from receipt of this Agreement to consider whether to sign the Agreement. Director agrees that changes or modifications to this Agreement do not restart or otherwise extend the above twenty one (21) day period. Moreover, Director shall have seven (7) days following execution to revoke this Agreement in writing to the Company and the Agreement shall not take effect until those seven (7) days have ended.**

12. <u>Amendment</u>. This Agreement may not be altered, amended, or modified except in writing signed by both the Director and the Company.

13. <u>Joint Participation</u>. The parties hereto participated jointly in the negotiation and preparation of this Agreement, and each party has had the opportunity to obtain the advice of legal counsel and to review and comment upon this Agreement. Accordingly, it is agreed that no rule of construction shall apply against any party or in favor of any party. This Agreement shall be construed as if the parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not be interpreted against one party and in favor of the other.

14.     Binding Effect; Assignment.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the parties and their respective successors, heirs, representatives and permitted assigns.  Neither party may assign its respective interests hereunder without the express written consent of the other party, except that the Company will honor any written instructions about the direction of severance payments included in Director's will or other estate planning documents.

15.     Applicable Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

16.     Future Cooperation. In connection with any and all claims, disputes, negotiations, investigations, lawsuits or administrative proceedings involving the Company or its affiliates, the Director agrees to make himself available, upon reasonable notice from the Company and without the necessity of subpoena, to provide information or documents, provide declarations or statements to the Company, meet with attorneys or other representatives of the Company, prepare for and give depositions or testimony, and/or otherwise cooperate in the investigation, defense or prosecution of any or all such matters.  The Company will reimburse Director for any reasonable and documented out of pocket expenses, approved by the Company in advance and incurred as a result of actions taken pursuant to this Paragraph 16.

17.     Execution of Agreement.  This Agreement may be executed in several counterparts, each of which shall be considered an original, but which when taken together, shall constitute one Agreement.

PLEASE READ THIS AGREEMENT AND CAREFULLY CONSIDER ALL OF ITS PROVISIONS BEFORE SIGNING IT.  THIS AGREEMENT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS, INCLUDING THOSE UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT, AND OTHER FEDERAL, STATE AND LOCAL LAWS PROHIBITING DISCRIMINATION IN EMPLOYMENT.

**If Director signs this Agreement less than 21 days after he receives it from the Company, he confirms that he does so voluntarily and without any pressure or coercion from anyone at the Company.**

IN WITNESS WHEREOF, Director, the Trust and Holdings have voluntarily signed this Agreement and General Release on the date set forth above.

American Freight Group, Inc.

By: _____

Its: V.P. and Asst. Secretary

Date: 12/28/2017

David A. Belford

_____

David A. Belford

Date: 12/16/17

Separate Property Trust of David A. Belford, dated November 13, 2007

By: _____

Its: Trustee

Date: 12/11/17

Formatted: Font: 8 pt

# EXHIBIT 5

**EXECUTION VERSION**

AMERICAN FREIGHT GROUP, INC.

_____

Non-Qualified Stock Option Agreement

Option Agreement No. 13

_____

Subject to the terms and conditions set forth herein and the terms and conditions of the American Freight Group, Inc. 2015 Non-Qualified Stock Option Plan (the "Plan") (with capitalized terms used but not defined herein having the meanings given to them in the Plan), American Freight Group, Inc., a Delaware corporation (the "Company" which term shall include, unless the context otherwise clearly requires, all Subsidiaries (as defined in the Plan) of the Company), hereby grants the following option to purchase shares of common stock, par value of $0.001 per share, of the Company (the "Stock") to the Optionee, and the Optionee hereby accepts such grant and agrees to be bound by the terms and conditions hereinafter set forth:

1. Name of Person to Whom the Option is Granted (the "Optionee"): Asaph Rink

2. Date of Grant of Option: February 14, 2018

3. An Option to acquire 175.0000 shares of Stock.

4. Option Exercise Price (per share of Stock): $3,935 (the "Exercise Price").

5. Term of Option: Subject to earlier termination under Section 9 below, this Option expires at 5:00 p.m. local New York, New York time on February 14, 2028.

6. Vesting/Exercise Schedule: Subject to the provisions of Section 9 below, this Option shall vest and become exercisable with respect to the number of shares of Stock upon the passage of certain time, as shown on Schedule I attached hereto and incorporated herein.

726831442

7.      Grant.  The Company hereby grants to the Optionee a stock option (the "Option") to purchase from the Company the number of shares of Stock set forth in Section 3 on the first page of this Option, upon the terms and conditions set forth in the Plan and upon the additional terms and conditions contained herein.  This Option is a non-qualified stock option and is not intended to qualify as an "incentive stock option" pursuant to Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

8.      Option Price.  To the extent vested, this Option may be exercised at the exercise price per share of Stock set forth in Section 4 on the first page hereof, subject to adjustment as provided herein and in the Plan.

9.      Term and Exercisability of Option.

        (a)     This Option shall expire on the earlier of (a) the date determined pursuant to Section 5 on the first page of this Option and (b) the date determined pursuant to Sections 11 and 15(d) of the Plan, and shall be exercisable in accordance with and subject to the terms and conditions set forth in the Plan (including but not limited to Section 11 of the Plan) and those terms and conditions, if any, set forth in Section 6 on the first page of this Option. Notwithstanding anything to the contrary contained herein, vesting shall cease immediately upon termination of employment or other engagement for any reason, and any portion of this Option that has not vested on or prior to the date of such termination is forfeited on such date.  If the Optionee dies before this Option has been exercised in full, the personal representative of the Optionee may exercise this Option in accordance with the Plan.

        (b)     Notwithstanding anything contained in the Plan or this Option Agreement to the contrary (i) to the extent that any of the payments and benefits provided for under the Plan, this Option Agreement or any other agreement or arrangement (including payments contingent upon the occurrence of a Change in Control) between the Company or any of its Subsidiaries and Optionee (collectively, the "Payments") would constitute a "parachute payment" within the meaning of Section 280G of the Code, then the Company and its Subsidiaries shall each use commercially reasonable efforts to obtain the stockholder consent required to approve of such Payment to preclude such Payment from being subject to the excise tax imposed pursuant to Section 4999 of the Code (the "Excise Tax"); provided, however, that in such event the Optionee shall reasonably cooperate with the Company and shall take all actions and execute such documents and instruments as shall be reasonably necessary to accomplish such preclusion of the Excise Tax.  In the event that (a) the stockholder consent is not obtained or (b) the Optionee does not take the actions set forth in the proviso to the foregoing sentence, the amount of the Payments shall be reduced to the amount that would result in no portion of the Payments being subject to the Excise Tax.

10.     Method of Exercise.  To the extent that the right to purchase shares of Stock has vested hereunder, this Option may be exercised from time to time by written notice to the Company substantially in the form attached hereto as Exhibit A, stating the number of shares of Stock with respect to which this Option is being exercised, and accompanied by (a) payment in full of the Exercise Payment for the number of shares of Stock to be delivered, by means of payment acceptable to the Company in accordance with Section 9 of the Plan and (b) an executed joinder agreement and a Spousal Consent, if applicable, pursuant to Section 16 of this Option.

726831442

Notwithstanding the foregoing, Optionee may elect to purchase shares of Stock vested hereunder by cashless exercise, whereby Optionee shall receive upon exercise such number of shares of Stock equal to (x) the number of Options being exercised less (y) the number of shares of Stock with a Fair Market Value equal to the sum of the Exercise Price and the necessary withholding obligation with respect to such exercise. Subject to the Plan and to Section 13 hereof, as soon as practicable after its receipt of such items, the Company shall deliver to the Optionee (or other person entitled to receive the shares of Stock issuable upon exercise of this Option), at the principal executive offices of the Company or such other place as may be mutually acceptable, a certificate or certificates for such shares out of theretofore authorized but unissued shares or reacquired shares of Stock (if certificated) or a certified copy of the stockholders' registry, as the Company may elect; provided, however, that the time of such delivery may be postponed by the Company for such period as may be required for it with reasonable diligence to comply with any applicable requirements of law. If the Optionee (or other person entitled to exercise this Option) fails to pay for and accept delivery of all of the shares specified in such notice upon tender of delivery thereof, his or her right to exercise this Option with respect to such shares not paid for may be terminated by the Company.

11. <u>Forfeiture; Restrictions on Exercise; Right of Repurchase</u>.

(a) In addition to the restrictions set forth herein, this Option is subject to forfeiture upon the occurrence of the events specified in Sections 11 and 15 of the Plan. The stock issued upon the exercise of this Option and other Securities held by the Optionee will be subject to further restrictions set forth in the Stockholders' Agreement, any subscription agreement entered into between the Optionee and the Company and this Section 11.

(b) <u>General</u>. Upon the termination of Optionee's employment with, or membership on the Board of Directors of, the Company or its Subsidiaries, in each case, for any reason (whether by the Optionee or the Company or one of its Subsidiaries and whether with or without Cause) (a "Termination"), the Company and Resolute will have the option to repurchase all or any portion of the Securities (including Optionee Securities) held by Optionee (whether held by the Optionee or one or more of his or her affiliates or Permitted Transferees (as defined in the Stockholders Agreement) ("Repurchasable Securities") pursuant to the terms and conditions set forth in this Section 11.

(c) <u>Company's Option</u>. The Company may elect in its sole discretion to purchase all or any portion of the Repurchaseable Securities by giving written notice to the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement) within 90 days following the last date on which Optionee may exercise his Options under Section 11 of the Plan. Such notice will set forth the number and type of Repurchaseable Securities to be acquired by the Company from Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase. If Optionee is a member of the Board at the time of such election, then Optionee will not have the right to vote with respect to such election or any other matter relating to this Section 11.

(d) <u>Resolute's Option</u>. If for any reason the Company does not elect to purchase all of the Repurchaseable Securities pursuant to Section 11(c), then Resolute may at any time within 180 days following the last date on which Optionee may exercise his Options under Section 11

726831442

of the Plan elect in its sole discretion to purchase all or any portion of the Repurchaseable Securities which the Company has not elected to purchase by giving written notice to the Company and the Optionee or his or her Permitted Transferees (as defined in the Stockholders Agreement). Such notice will set forth the number and type of Repurchaseable Securities to be acquired by Resolute from the Optionee, the aggregate consideration to be paid for such Repurchaseable Securities, and the time and place for the closing of such purchase.

(e) <u>Purchase Price</u>. The purchase price for the Repurchaseable Securities (the "<u>Repurchase Price</u>") will be calculated as follows:

(i) If the Termination occurs by reason of (A) termination by the Company of such Optionee's employment with the Company or any of its Subsidiaries without Cause or by the Optionee for Good Reason or (B) such Optionee's death or disability, then the Repurchase Price will be a price per share equal to the Fair Market Value of the Repurchaseable Securities on the date of Termination.

(ii) If (A) the Termination occurs by reason of such Optionee's termination by the Company or any of its Subsidiaries for Cause or (B) termination of such Optionee's employment by reason of such Optionee's resignation other than for Good Reason, then the Repurchase Price will be the lesser of a price per share equal to the Original Cost and a price per share equal to the Fair Market Value, in each case, of the Repurchaseable Securities.

(f) <u>Repurchase Closing</u>. If the Company or Resolute has elected to purchase any of the Repurchaseable Securities, then the purchase of Repurchaseable Securities pursuant to this <u>Section 11</u> will be completed (the "<u>Repurchase Closing</u>") at the Company's principal office, at 10:00 a.m., on the 30th day following the date the Company or Resolute provides notice to the Optionee that the Company or Resolute, as the case may be, are purchasing any of the Repurchaseable Securities or on such earlier day as designated by the Company, in its sole discretion, upon not less than ten days prior notice to Resolute and the Optionee. If such date is not a Business Day, then the Repurchase Closing will occur at the same time and place on the next succeeding Business Day. The Company and/or Resolute will pay for the Repurchaseable Securities, at their respective options, by (i) delivery of a cashier's check or wire transfer of immediately available funds, (ii) delivery of a Three Year Junior Note, (iii) setoff against any and all obligations (to the extent of such obligations) owed to the Company, its Subsidiaries, Resolute or any of their respective Affiliates by the Optionee or (iv) any combination of the foregoing. The Company and/or Resolute may rescind any exercise of their repurchase rights under this <u>Section 11</u> at any time prior to the Repurchase Closing. At the Repurchase Closing, the Optionee shall deliver any certificate or certificates (if certificated) representing the Repurchaseable Securities to be purchased, with stock powers or instruments of transfer duly executed, for transfer, and such other documents as the Company or Resolute may reasonably request. The Company and Resolute will be entitled to receive customary representations and warranties as to ownership, title, authority to sell and the like from the Optionees regarding such sale, and to receive such other evidence, including applicable inheritance and estate tax waivers, as may reasonably be necessary to effect the purchase of the Repurchaseable Securities to be purchased pursuant to <u>Section 11</u>.

4

(g)     Failure To Deliver Securities.  If Optionee or any other Stockholder whose Repurchaseable Securities are to be purchased pursuant to this Section 11 fails to deliver certificates representing the Repurchaseable Securities (if certificated) and such other documents as the Company or Resolute may reasonably request on the scheduled closing date of such purchase, then the Company or Resolute may elect to deposit the consideration representing the purchase price of the Repurchaseable Securities with a third party (which may be the Company's attorney, a bank or a financial institution), as escrow agent and exercise its rights pursuant to (h) below.  In the event of the foregoing election: (i) such Repurchaseable Securities will be deemed for all purposes (including the right to vote and receive payment for dividends) to have been transferred to the Company or Resolute, as applicable; (ii) to the extent that such Repurchaseable Securities are evidenced by certificates or other instruments, such certificates or other instruments will be deemed canceled and the Company will issue new certificates or other instruments in the name of Resolute, if applicable; (iii) the Company will make an appropriate notation in its stock ledger to reflect the transfer of such Repurchaseable Securities to the Company or Resolute, as applicable; and (iv) the Person obligated to sell such Repurchaseable Securities will merely be a creditor with respect to such Repurchaseable Securities, with the right only to receive payment of the purchase price, without interest, from the deposited funds.  The escrow agent shall release the consideration representing the purchase price of the Repurchaseable Securities (excluding any interest earned thereon) to the Optionee upon Optionee's and the Company's or Resolute's joint written instructions, which shall be delivered to the escrow agent following legal transfer of the Repurchaseable Securities to the Company or Resolute, as applicable.  If, prior to the third anniversary of the scheduled closing date as determined pursuant to this Section 11, the proceeds of sale have not been claimed by such Optionee or other seller of the Repurchaseable Securities, then the deposited funds (and any interest earned thereon) will be returned to the Person originally depositing the same, and the transferors whose Repurchaseable Securities were so purchased will look solely to the purchasers thereof for payment of the purchase price, without interest.  The escrow agent will not be liable for any action or inaction taken by it in good faith.

(h)     Power of Attorney.  Optionee in order more fully to secure the performance of his or her obligations hereunder, hereby irrevocably appoints the Company and Resolute and the persons deriving title under them jointly and also severally to be his or her attorney to execute and complete in favor of the Company or Resolute any documents, including but not limited to a stock power or instrument of transfer, which the Company or Resolute may from time to time require pursuant to Section 11 for perfecting its title to or for vesting the Repurchaseable Securities in the Company or Resolute as applicable.  The power hereby conferred shall be a general power of attorney and each Optionee hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.

(i)     Repurchase Disability.

(i)     Notwithstanding anything to the contrary herein, the Company shall not be permitted to repurchase any Optionee Securities pursuant to Section 11 if the Board determines that:

(A)     The repurchase of the Repurchaseable Securities would render the Company or the Subsidiaries unable to meet their business plan or obligations in

the ordinary course of business taking into account any pending or proposed transactions, capital expenditures or other budgeted cash outlays by the Company, including, without limitation, any proposed acquisition of any other entity by the Company or any of the Subsidiaries;

(B)     The Company is prohibited from repurchasing the Repurchaseable Securities by applicable law restricting the purchase by a corporation of its own shares; or

(C)     The repurchase of Repurchaseable Securities would constitute a breach of, default, or event of default under, or is otherwise prohibited by, the terms of any loan agreement or other agreement or instrument to which the Company or any of the Subsidiaries is a party or the Company is not able to obtain the requisite consent of any of its senior lenders to the repurchase of the Repurchaseable Securities. The events described in (A) through (C) above each constitute a "Repurchase Disability."

(ii)     In the event of a Repurchase Disability, the Company shall notify in writing any Optionee whose Repurchaseable Securities are to be repurchased pursuant to Section 11 (a "Disability Notice"). The Disability Notice shall specify the nature of the Repurchase Disability. The Company shall thereafter repurchase the Repurchaseable Securities as soon as reasonably practicable, but in any event within thirty (30) days after all Repurchase Disabilities cease to exist (or the Company may elect, but shall have no obligation, to cause its nominee to repurchase the Repurchaseable Securities while any Repurchase Disabilities continue to exist). In the event the Company suspends its obligations to repurchase the Repurchaseable Securities pursuant to a Repurchase Disability, (A) the Company shall provide written notice to each applicable Optionee as soon as practicable after all Repurchase Disabilities cease to exist (the "Reinstatement Notice"); (B) the Fair Market Value of the Repurchaseable Securities shall be determined as of the date the Reinstatement Notice is delivered to the Optionee, which Fair Market Value shall be used to determine the Repurchase Price in the manner described above; and (C) the repurchase shall occur on a date specified by the Company within 10 days following the determination of the Fair Market Value of the Repurchaseable Securities as provided in clause (B) above.

(j)     If the Company or Resolute does not deliver to the Optionee a written notice of its intention to exercise the repurchase rights set forth in this Section 11 within 180 days following a Termination, such repurchase rights will expire. This Section 11 shall terminate upon (i) the effectiveness of an initial bona fide, firm commitment underwritten public offering of any securities of the Company for which the aggregate purchase price of the securities sold is in excess of $100 million or (ii) the consummation of a Change in Control.

(k)     Certain Definitions. For purposes of this Section 11, the following terms shall have the following meanings unless the context indicates otherwise:

(i)     "Business Day" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

726831442

(ii) "<u>Common Stock</u>" shall mean shares of the Company's common stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(iii) "<u>Common Stock FMV</u>" shall mean, as of any date of determination, the quotient obtained by dividing (i) an amount equal to (A) the Company Stock FMV, <u>less</u> (B) the Preferred Stock FMV by (ii) the aggregate number of shares of Common Stock issued and outstanding on a Fully-Diluted Basis as of the applicable date of determination.

(iv) "<u>Company Stock FMV</u>" shall mean, as of any date of determination, an amount equal to (i) the Enterprise Value, <u>less</u> (ii) the aggregate amount of Indebtedness of the Company and the Subsidiaries, including, but not limited to, indebtedness for borrowed money and capitalized leases of the Company and the Subsidiaries as of the end of the Determination Period (including, without limitation, interest accrued but unpaid as of the end of the Determination Period), <u>less</u> (iii) the aggregate amount to be paid pursuant to any earnout, deferred purchase price or similar amounts in respect of acquisitions outstanding as of the end of the Determination Period, <u>less</u> (iv) the aggregate amount that would have been payable by the Company in respect of any stock appreciation rights or similar obligation of the Company or its Subsidiaries outstanding as of the end of the Determination Period (whether or not restricted as of such date), <u>less</u> (v) any other long-term obligations or liabilities of the type reflected on the face of a balance sheet of the Company, as determined in accordance with GAAP.

(v) "<u>Contract</u>" shall mean any binding contract, lease, agreement, indenture, mortgage, note, bond or instrument, whether written or oral.

(vi) "<u>Determination Period</u>" shall mean the last four (4) consecutive completed fiscal quarters as set forth on the unaudited financial statements of the Company immediately preceding the applicable date of determination of the Enterprise Value.

(vii) "<u>EBITDA</u>" shall mean, for any period, the consolidated net income (or loss) of the Company (after eliminating all extraordinary or non-recurring items of income (or loss)), as reflected in the Company's financial statements for such period, further adjusted by (i) without duplication, <u>the addition of</u> (A) interest and other expense in respect of indebtedness for borrowed money and similar expense in respect of capitalized leases, charged, accrued or otherwise allocated against such net income (or loss), (B) expenses for income taxes (whether paid, accrued or deferred) charged or otherwise allocated against such net income, (C) depreciation and amortization of any assets or other non-cash charges (including, without limitation, any depreciation, amortization and other non-cash charges relating to purchase accounting adjustments, and any amortization or write-off of intangible assets, transaction costs or goodwill) charged, allocated or otherwise accrued against such net income (or loss) and (D) non-cash expenses attributable to the issuance of stock, options, warrants, stock appreciation rights

or similar rights by the Company to any of its directors, officer, employees, dealers or others or the exercise thereof, charged, accrued or allocated against such net income (or loss) and (ii) without duplication, the subtraction of interest income, non-cash gains and other income, in each case, excluding any such interest, depreciation, amortization costs and expenses and income previously taken into account in determining EBITDA during any period preceding such period, all as determined in accordance with U.S. generally accepted accounting principles, consistently applied.

(viii)    "Enterprise Value" shall mean, as of any date of determination, an amount equal to (i) seven (7) multiplied by the average annual EBITDA for the Determination Period, plus (ii) the aggregate amount of Unrestricted Cash of the Company and the Subsidiaries plus (iii) the aggregate exercise or conversion price of all options or warrants exercisable for, or securities convertible into, Common Stock outstanding (whether vested or not) as of the applicable date of determination.

(ix)    "Equity Interest" means, with respect to any Person, (i) any capital stock, shares, partnership interests, membership interests, limited liability company interests, stock appreciation rights, phantom equity interests or other ownership or equity interests of such Person, including any securities exercisable, exchangeable or convertible into any of the foregoing, (ii) any other interest or participation that confers on the holder thereof the right to receive a share of the profits and losses or, or distributions of assets of, such Person, and (iii) any warrants, options or other rights to acquire any of the foregoing.

(x)    "Fair Market Value" shall mean, (i) with respect to Common Stock, the Common Stock FMV and (ii) with respect to Preferred Stock, the quotient obtained by dividing (A) the Preferred Stock FMV by (B) the aggregate number of shares of Preferred Stock issued and outstanding as of the applicable date of determination.

(xi)    "Fully-Diluted Basis" shall mean the number of shares of Common Stock which would be outstanding, as of the date of computation, if all vested and outstanding Stock Equivalents had been converted, exercised or exchanged.

(xii)    "GAAP" shall mean generally accepted accounting principles in the United States as in effect on the date hereof and from time to time.

(xiii)    "Income Tax" means (i) all Taxes based on income determined under provisions of the Code and (ii) foreign, state and other taxes (including franchise taxes) based on income or gross receipts, including a Tax assessed on a corporation by reference to its income, gains, or profits, and shall include for the avoidance of doubt, any withholding taxes, and in each instance any interest, penalties or additions to tax attributable to such Tax.

(xiv)    "Indebtedness" shall mean, with respect to the Company and its Subsidiaries, and without duplication: (i) any indebtedness for borrowed money, (ii) indebtedness evidenced by notes, bonds, debentures, mortgages or other debt instruments or debt securities, (iii) to the extent drawn, all obligations of the Company and its Subsidiaries in respect of letters of credit, performance bonds, bankers

acceptances or similar obligations of the Company and its Subsidiaries or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation), (iv) all obligations of the Company and its Subsidiaries as lessee or lessees under leases that have been recorded as capital leases in accordance with GAAP, (v) all payment obligations under any interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or agreement to which the Company or any Subsidiary is a party (valued at the termination value thereof), (vi) whether or not so included as Liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (v) of the Company or any Subsidiary secured by any Lien on any assets owned or purchased by the Company or any of its Subsidiaries (including indebtedness arising under conditional sales or other title retention agreements), even though (A) such Person has not assumed or otherwise become liable for the payment thereof or (B) such indebtedness is limited in recourse, (vii) all obligations of the Company or any of its Subsidiaries issued or assumed as the deferred purchase price of businesses, assets, property, Equity Interests or services, including potential earn-outs, purchase price adjustments, post-closing payments in respect of transaction tax benefits, non-competition payments or similar payments, in each case in respect of past acquisitions, as well as the deferred purchase price for security cameras and systems, (viii) all Liabilities or underfunding of the Company or any of its Subsidiaries in relation to pension plans, retiree medical and any other long-term obligations under Laws or pension, welfare or benefit plans for the Company or any of its Subsidiaries, (ix) all Off-Balance Sheet Financings of the Company or any of its Subsidiaries, (x) the amount of any guarantees made by the Company or any of its Subsidiaries of indebtedness of the type described in clauses (i) through (ix) above of any Person, (xi) any unpaid interest, fees, prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts, owing on or in respect of any such indebtedness described in clauses (i) through (x) above, (xii) all obligations of the Company or any of its Subsidiaries arising from deferred compensation or severance and similar arrangements (including payroll, employment and other Taxes thereon), (xiii) all deferred or unearned revenue of the Company and its Subsidiaries, amounts refundable by the Company and its Subsidiaries under Contracts with their customers (including all advanced payments, contingent refunds, and amounts refundable by the Company and its Subsidiaries) and any Liabilities to customers for inventory assumed by such Person, (xiv) any Net Tax Liabilities and (xv) any Lay-Away Obligations; provided, however, that none of the following shall constitute Indebtedness hereunder: (A) to the extent undrawn, any obligation with respect to any letter of credit (or reimbursement agreement in respect thereof), (B) any operating lease, (C) any guarantee by the Company or any of its Subsidiaries of the obligations of any other Subsidiary and (D) any indebtedness of any Subsidiary owed to any other Subsidiary. For all purposes of this Agreement, Indebtedness shall include the indebtedness of any partnership or joint venture in which Subsidiary is a general partner or joint venturer (to the extent that such Subsidiary is liable for such indebtedness).

(xv)     "Laws" means all applicable federal, state, local and foreign laws, statutes, constitutions, rules, regulations, ordinances, common law and similar provisions having

the force of law and all judgments, rulings, orders, decrees, administrative determinations, injunctions, guidance and guidelines of governmental authorities.

(xvi) "Lay-Away Obligations" shall mean those deposits or monies received from a Person representing part or all of the price of goods that was payable in one or more payments subsequent to the making of a layaway agreement and for which the Company or any Subsidiary retains possession of such goods and bears the risk of their loss or damage until such goods are paid in full and delivered according to the layaway agreement, the dollar amount of inventory purchased by a customer but not yet received by such customer, and escheatment, unclaimed property and similar liabilities.

(xvii) "Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any Liability for Taxes.

(xviii) "Lien" shall mean any security interest, lien, charge, mortgage, deed, assignment, pledge, hypothecation, encumbrance, servitude, easement, restriction (including any repatriation restrictions), judgment, option, right of first offer, right of first refusal or interest of another Person of any kind or nature.

(xix) "Net Tax Liabilities" means an amount, which may be positive or negative, equal to the sum of any amounts that would be properly accrued as current liabilities for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries in accordance with GAAP reduced by any amounts that would be properly accrued as a current asset for Income Taxes on the consolidated balance sheet of the Company and its Subsidiaries.

(xx) "Off-Balance Sheet Financing" means (a) any liability of the Company or any Subsidiary under any sale leaseback transactions which does not create a liability on the consolidated balance sheet of the Company and its Subsidiaries and (b) any liability of the Company or any Subsidiary under any synthetic lease, Tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product where the transaction is considered indebtedness for borrowed money for federal income Tax purposes but is classified as an operating lease in accordance with GAAP for financial reporting purposes.

(xxi) "Original Cost" shall mean the original purchase or exercise price actually paid for a Repurchaseable Security.

(xxii) "Preferred Stock" shall mean the shares of the Company's preferred stock, par value $0.001 per share, that the Company may be authorized to issue from time to time and any stock or other securities issued or issuable with respect to such shares, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, reclassification, exchange, merger, sale of assets or otherwise.

(xxiii)    "Preferred Stock FMV" shall mean, as of any date of determination, the lesser of (i) the liquidation value of the outstanding shares of Preferred Stock as calculated in accordance with the Certificate of Incorporation or (ii) the Company Stock FMV.

(xxiv)    "Securities" shall mean all (A) shares of Common Stock, (B) shares of Preferred Stock, (C) Stock Equivalents and D) securities of the Company issued or issuable with respect to the securities referred to in clauses (A) through (C) above, including pursuant to a stock dividend, stock split, or like action, or pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise.

(xxv)    "Stock Equivalents" shall mean any (i) warrants, options or other right to subscribe for, purchase or otherwise acquire any shares of Common Stock or (ii) any securities convertible into or exchangeable for shares of Common Stock.

(xxvi)    "Tax" or "Taxes" shall mean all federal, state, county, local, franchise or foreign income, payroll, employment, excise, environmental, customs, franchise, windfall profits, withholding, social security (or similar), unemployment, real property, personal property (tangible or intangible), escheat, unclaimed property, sales, use, transfer, registration, value added, gross receipts, net proceeds, turnover, license, ad valorem, capital stock, disability, stamp, leasing, lease, excess profits, occupational and interest equalization, fuel, severance, alternative or add-on minimum or estimated tax, charge, fee, levy, duty or other assessment, and other obligations of the same or of a similar nature to any of the foregoing due or claimed to be due by or to any Taxing authority, including any interest, penalty or addition thereto, whether disputed or not.

(xxvii)    "Three Year Junior Notes" shall mean a promissory note of the Company in the form attached hereto as Exhibit C.

(xxviii)    "Unrestricted Cash" shall mean, as of any date of determination, the aggregate amount of immediately available cash and cash equivalents of the Company and the Subsidiaries after any applicable withholding taxes, excluding (i) credit card receivables, (ii) register cash and (iii) cash or cash equivalents (A) subject to any Lien and (B) that may not be legally distributed on such date of determination by means of one or more direct or indirect dividends or distributions to the Company.

12.    Nonassignability of Option Rights.  This Option shall not be assignable or transferable by the Optionee except by will or by the laws of descent and distribution.  During the life of the Optionee, this Option shall be exercisable only by Optionee or, in the event of Optionee's legal incapacity, by Optionee's legal representative.

13.    Compliance with Securities Act.  The Company shall not be obligated to sell or issue any shares of Stock or other securities pursuant to the exercise of this Option unless the shares of Stock or other securities with respect to which this Option is being exercised are at that time effectively registered or exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws.  In the event shares or other securities shall be issued which shall not be so registered, the Optionee hereby represents, warrants and agrees that he or she will

726831442

receive such shares or other securities for investment and not with a view to their resale or distribution, and will execute an appropriate investment letter satisfactory to the Company and its counsel as a condition precedent to any exercise of this Option in whole or in part.

14.     Legends.  The Optionee hereby acknowledges that, if certificated, the stock certificate or certificates evidencing shares of Stock or other securities issued pursuant to any exercise of this Option will bear a legend setting forth the restrictions on their transferability described in Section 13 hereof, in Section 12 of the Plan, and under any applicable agreements between the Optionee and the Company or any of its stockholders.

15.     Rights as Stockholder.  The Optionee shall have no rights as a stockholder with respect to any shares of Stock or other securities covered by this Option until the date of issuance of a certificate to him or her for such shares or other securities (if certificated) or the date on which the Company updates the stockholders' registry reflecting such issuance.  No adjustment shall be made for dividends or other rights for which the record date is prior to the date such certificate is issued (if certificated) or the date on which the Company updates the stockholders' registry.

16.     Certain Agreements.   The Optionee hereby agrees to be bound by the terms and conditions of the Stockholders' Agreement dated October 31, 2014 as amended or modified from time to time, among the Company and the other persons named therein (the "Stockholders' Agreement").  The Optionee hereby further acknowledges and agrees that the Option and the shares of Stock issuable upon exercise of the Option are and shall be subject to the terms and provisions of the Stockholders' Agreement; provided, however, that, in case of any conflict between this Option Agreement and the Stockholders' Agreement, this Option Agreement shall control.  Upon the Optionee's exercise of the Option in accordance with Section 10 hereof, the Optionee agrees to execute a joinder agreement to the Stockholders' Agreement in the form as determined by the Committee in its sole discretion and agrees to have his or her spouse, if applicable, execute a spousal consent by which Optionee's spouse acknowledges and consents to the restrictions set forth in such Stockholders' Agreement (the "Spousal Consent").

17.     Restrictions.

        (a)     Definitions.  For purposes of this Section 17, the following terms shall have the following meanings unless the context indicates otherwise:

                "Business" shall mean any business of the Company or any of its Subsidiaries, as conducted by or engaged in on the date hereof, and as proposed to be conducted by or engaged in on the date hereof, by the Company or any of its Subsidiaries, including, without limitation, the business of selling furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers.

                "Competing Business" shall mean any business of the Company or any of its Subsidiaries, as conducted by or engaged in on the date hereof, and as proposed to be conducted by or engaged in on the date hereof, including, without limitation, the business of selling furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers.  The term "Competing

12

Business" shall also include training and sales techniques provided to employees of the Company or any of its Subsidiaries.

"<u>Protected Territory</u>" shall mean North America.

"<u>Restricted Period</u>" shall mean the period during which an Optionee holds any Securities and for two (2) years thereafter.

"<u>Termination Date</u>" shall mean, as applicable, the date of termination of Optionee's employment with the Company or any of its Subsidiaries or membership on the Board of Directors of the Company.

(b)    <u>Confidentiality</u>.  During and after the Restricted Period, Optionee recognizes and acknowledges that Optionee has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (the "<u>Confidential Information</u>"), and that such Confidential Information constitutes valuable, special and unique property of the Company.  The term Confidential Information will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the Company's and its Subsidiaries' current or potential business (including information received by the Company or any of its Subsidiaries from third parties), and (b)  not generally or publicly known.  Optionee agrees not to disclose or use for Optionee's own account any Confidential Information without the Board's prior written consent, except (i) to the extent that any Confidential Information becomes generally known to and available for use by the public other than as a result of Optionee's acts or omissions; (ii) to the extent that any Confidential Information is required to be disclosed pursuant to any applicable law or court order; or (iii) to Optionee's attorneys and accountants; <u>provided</u> <u>that</u>, in the case of subsection (iii) hereof, Optionee shall cause each Person receiving such Confidential Information to be informed that such Confidential Information is strictly confidential and subject to this Agreement and to agree not to disclose or use such information except as provided herein.  Optionee acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by Optionee concerning any information relating to the Company's and its Subsidiaries' business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of Optionee's ownership of Optionee Securities.

(c)    <u>Books and Records</u>.  All books, records, reports, writings, notes, notebooks, computer programs, sketches, drawings, blueprints, prototypes, formulas, photographs, negatives, models, equipment, reproductions, proposals, flow sheets, supplier lists, supply terms or contracts, customer lists and other documents and/or things relating in any manner to the business of the Company or any of its Subsidiaries or affiliates (including but not limited to any of the same embodying or relating to any Confidential Information), whether prepared by Optionee or otherwise coming into Optionee's possession, shall be the exclusive property of the Company and shall not be copied, duplicated, replicated, transformed, modified or removed from the premises of the Company except pursuant to and in furtherance of the business of the Company and shall be returned immediately to the Company on the Termination Date or on the Company's request at any time.

726831442

(d)    Inventions and Patents.

(i)      Optionee agrees that any and all writings, documents, inventions, discoveries, processes, methods, designs, mask works, compositions of matter, formulations, computer programs or instructions (whether in source code, object code, or any other form), algorithms, formulae, plans, customer lists, vendor lists, memoranda, tests, research, designs, specifications, models, data, diagrams, flow charts, and/or techniques (whether reduced to written form or otherwise) that Optionee makes, conceives, discovers, or develops, either solely or jointly with any other person, at any time during the period during which Optionee or its permitted transferees holds any Optionee Securities, whether during working hours or at the Company's facility or at any other time or location, whether patentable or not, and whether upon the request or suggestion of the Company or otherwise, that relate to or are useful in any way in connection with the Business (collectively, the "Intellectual Work Product") shall be the sole and exclusive property of the Company.  Optionee agrees to promptly and fully disclose all the Intellectual Work Product to the Company, and Optionee shall not have any claim for compensation for the Intellectual Work Product.

(ii)     Optionee agrees that all Intellectual Work Product that is copyrightable shall be considered a work made for hire under the United States Copyright Act.  To the extent that any copyrightable Intellectual Work Product may not be considered a work made for hire under the applicable provisions of copyright law, or to the extent that, notwithstanding the foregoing provisions, Optionee may retain an interest in any Intellectual Work Product, Optionee hereby irrevocably assigns and transfers to the Company any and all right, title, or interest that Optionee may have in the Intellectual Work Product under copyright, patent, trade secret, trademark and other law protecting proprietary or intellectual property rights, in perpetuity or for the longest period otherwise permitted by law, without the necessity of further consideration.  The Company shall be entitled to obtain and hold in its own name all registrations of copyrights, patents, trade secrets, trademarks and other proprietary or intellectual property rights with respect thereto.

(iii)    At the sole request and expense of the Company, either before or after the Restricted Period, Optionee shall assist the Company in acquiring and maintaining registrations under copyright, patent, trade secret, trademark and other laws protecting proprietary or intellectual property rights in, and confirming its title to, all Intellectual Work Product.   Optionee's assistance shall include signing all applications for copyrights, patents and other proprietary or intellectual property rights and other documents, cooperating in legal proceedings and taking any other steps considered desirable by the Company.

(e)    Non-Disparagement.  During and after the Restricted Period, Optionee shall not, and shall ensure that its agents, representatives and affiliates do not, directly or indirectly, disparage or make negative, derogatory or defamatory statements about the Company or any of its Subsidiaries, their respective business activities, or any of their respective Stockholders, directors, officers or employees.

726831442

(f)    Nonsolicitation.  During the Restricted Period, Optionee shall not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, officer, director, partner, manager, employee, agent, contractor, consultant or otherwise):  (a) hire or engage, or recruit, solicit or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to the Company or any of its Subsidiaries, (b) induce or attempt to induce any current or former employee of, or consultant to, the Company or any of its Subsidiaries, to leave the employ of the Company or any such Subsidiary, or in any way interfere with the relationship between the Company or any of its Subsidiaries and any their employees or consultants, (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to the Company or any of its Subsidiaries or (d) in any way interfere with the relationship between the Company or any of its Subsidiaries and any supplier, licensee, lessor or other business relation (or any prospective supplier, licensee, lessor or other business relationship) of the Company or any of its Subsidiaries (including, without limitation, by making any negative or disparaging statements or communications regarding the Company, any of its Subsidiaries or any of their operations, officers, directors or investors).

(g)    Noncompetition.  During the Restricted Period, Optionee shall not directly or indirectly, (a) own, operate, manage, control, participate in, provide support to (financial or otherwise), consult with, advise, permit his or her name to be used by, provide services for, lease, or in any manner engage in or knowingly facilitate (including, in association with any person, or through any person), any business that sells (i) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold or offered by the Company or its Subsidiaries or reasonably would be expected to be sold or offered by a Competing Business or (ii) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the Protected Territory (collectively, "Covered Activities"); or (b) acquire an ownership interest in, invest in or provide services to any person which engages in any Covered Activities (other than the Company or its Subsidiaries) as a partner, shareholder, principal, agent, consultant or in any other relationship or capacity; provided, however, that no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(h)    Enforcement.  If, at the time of enforcement of any provision of Section 17(f) or Section 17(g), a court shall hold that the duration, scope or area restrictions stated therein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained therein to cover the maximum period, scope and area permitted by law.  Because Optionee has access to proprietary information and Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of Sections 17(b) through 17(g). Therefore, in the event of a breach or threatened breach of the foregoing sections of this Section 17, the Company or any of its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security and without proving actual damages).  In addition, in the event of an alleged breach or violation by Optionee of any provision of Section 17(f) or Section 17(g), the Restricted Period shall be tolled until such breach or violation has

726831442

been duly cured. The existence of any claim or cause of action by Optionee against the Company or any of its affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of Sections 17(b) through 17(g) which Sections will be enforceable notwithstanding the existence of any breach by the Company. If the Company (i) brings any action or proceeding to enforce any provision of this Agreement or to obtain damages as a result of a breach of this Agreement or to enjoin any breach of this Agreement and (ii) prevails in such action or proceeding, then Optionee will, in addition to any other rights and remedies available to the Company, reimburse the Company for any and all reasonable costs and expenses (including attorneys' fees) incurred by the Company in connection with such action or proceeding.

(i) Further Acknowledgments. Optionee expressly agrees and acknowledges that the restrictions contained in Section 17(f) or Section 17(g) do not preclude Optionee from earning a livelihood, nor do they unreasonably impose limitations on Optionee's ability to earn a living. In addition, Optionee agrees and acknowledges that the potential harm to the Company of the non-enforcement of Section 17(f) or Section 17(g) outweighs any harm to Optionee of his or her enforcement by injunction or otherwise. Optionee acknowledges that Optionee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Optionee, and is in full accord as to their necessity for the reasonable and proper protection of the Confidential Information. Optionee expressly acknowledges and agrees that each and every restriction imposed by this Agreement is reasonable with respect to subject matter and time period and such restrictions are necessary to protect the Company's interest in, and value of, the Company (including, without limitation, the goodwill inherent therein). Optionee understands and agrees that the restrictions and covenants contained in Section 17(f) or Section 17(g) are in addition to, and not in lieu of, any non-competition, non-solicitation or other similar obligations contained in any other agreements between Optionee and the Company.

18.     Withholding Taxes. The Optionee hereby agrees, as a condition to the exercise of any portion of this Option, to provide to the Company an amount sufficient to satisfy its obligation to withhold any federal, state and local taxes arising by reason of such exercise (the "Withholding Amount") by (a) authorizing the Company to withhold the Withholding Amount from his or her cash compensation, or (b) remitting the Withholding Amount to the Company in cash; provided, however, that to the extent that the Withholding Amount is not provided by one or a combination of such methods, the Company in its sole and absolute discretion may refuse to issue such shares of Stock.

19.     Effect Upon Employment. Nothing in this Option or the Plan shall be construed to impose any obligation upon the Company or any Subsidiary to employ or retain in its employ, or continue its involvement with, the Optionee or interfere in any way with any right of the Company or any of its Subsidiaries or affiliates to terminate such employment at any time for any reason whatsoever (whether for cause or without cause) without liability to the Company or any of its Subsidiaries or affiliates.

20.     Time for Acceptance. This Option shall be effective as of the date an executed copy is delivered by the Company to the Optionee, provided, however, that unless the Optionee shall return to the Company an executed copy of this Option Agreement, and, if applicable, an

executed spousal consent in the form attached hereto as <u>Exhibit B</u>, within fourteen (14) days after its delivery to him or her, the Option and this Option Agreement shall be null and void.

21.     <u>General Provisions</u>.

(a)     <u>Amendment</u>.  This Option Agreement, including the Plan, contains the full and complete understanding and agreement of the parties hereto as to the subject matter hereof, and except as permitted under the terms of the Plan, this Option Agreement may not be modified or amended, nor may any provision hereof be waived, except by a further written agreement duly signed by the Company and Optionee.  The waiver by either of the parties hereto of any provision hereof in any instance shall not operate as a waiver or any other provision hereof or in any other instance.

(b)     <u>Binding Effect</u>.  This Option Agreement shall inure to the benefit of and be binding upon the parties hereto and, to the extent provided herein and in the Plan, their respective heirs, executors, administrators, representatives, successors and assigns.

(c)     <u>Option Plan; Construction</u>.  The Optionee hereby acknowledges receipt of a copy of the Plan.  Except as otherwise provided in this Option Agreement, all of the terms and conditions of the Plan are incorporated herein by reference and this Option is subject to such terms and conditions in all respects.  In case of any conflict between the Plan and this Option Agreement, this Option Agreement shall control.  The titles of the sections of this Option Agreement and of the Plan are included for convenience only and shall not be construed as modifying or affecting their provisions.  The masculine gender shall include both sexes; the singular shall include the plural and the plural the singular unless the context otherwise requires.

(d)     <u>Exclusive Agreement</u>.  The Optionee hereby acknowledges and agrees that by signing this Option Agreement, the Optionee voluntarily and irrevocably forfeits any and all rights, title, and interests the Optionee has or may have had in, to and under (a) any option agreement, option letter, or other similar document pursuant to which the Company (or any Subsidiary or affiliate thereof) may have previously granted, or offered to grant, options in the Company (or any Subsidiary or affiliate thereof) to the Optionee and (b) any oral or written commitment or promise regarding options that the Company (or any Subsidiary or affiliate thereof) may have made to the Optionee, except as to any options that have been previously exercised and paid for by the Optionee.

(e)     <u>Governing Law</u>.  This Option Agreement shall be governed by and construed and enforced in accordance with the applicable laws of the State of Delaware (other than the law governing conflict of law questions) except to the extent the laws of any other jurisdiction are mandatorily applicable.

(f)     <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by electronic mail (with confirmation of receipt) or (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

726831442

To the Optionee:    To his or her address as listed on the books of the Company.

To the Company:    American Freight Group, Inc.
c/o The Jordan Company, L.P.
399 Park Avenue
30th Floor
New York, New York 10022
Attention:    M. Brad Wilford
                Daniel S. Williams
Email:    bwilford@thejordancompany.com
Email:    dwilliams@thejordancompany.com

with a copy to:    Mayer Brown LLP
1221 Avenue of the Americas
New York, New York  10020
Attention:  Philip O. Brandes
Email:  pbrandes@mayerbrown.com

\*      \*      \*      \*      \*

726831442

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement as of the date first written above.

OPTIONEE:

_____
Asaph Rink

Address: 3485 W 100N
Bargersville IN, 46106

AMERICAN FREIGHT GROUP, INC.

By: _____
Name: M. Brad Wilford
Title: Vice President and Assistant Secretary

726831842

## AMERICAN FREIGHT GROUP, INC.

### SCHEDULE I

### <u>Vesting Schedule</u>

175.0000 shares of Stock subject to this Option (the "<u>Option Shares</u>") shall vest and be exercisable according to the following vesting schedule:

(a) Forty percent (40%) of the Option Shares shall vest and be exercisable on the second (2nd) anniversary of <u>February 14, 2018</u>;

(b) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the third (3rd) anniversary of <u>February 14, 2018</u>;

(c) an additional twenty percent (20%) of the Option Shares shall vest and be exercisable on the fourth (4th) anniversary of <u>February 14, 2018</u>; and

(d) the remaining twenty percent (20%) of the Option Shares shall vest and be exercisable on the fifth (5th) anniversary of <u>February 14, 2018</u>.

Notwithstanding the foregoing, upon a Change in Control, 100% of any then-unvested Option Shares shall vest and be exercisable upon such Change in Control.

EXHIBIT A
(to Stock Option Agreement)

**FORM FOR EXERCISE OF STOCK OPTION**

American Freight Group, Inc.
c/o The Jordan Company, L.P.
399 Park Avenue
30th Floor
New York, New York 10022
Attention:      M. Brad Wilford
                 Daniel S. Williams

>        RE:      Exercise of Option under American Freight Group, Inc.
>                 2015 Non-Qualified Stock Option Plan (the "Plan")

Ladies and Gentlemen:

Please take notice that the undersigned hereby elects to exercise the stock option granted to _____ on _____ by and to the extent of purchasing _____ shares of common stock, par value of $0.001 per share (the "Stock"), of American Freight Group, Inc. (the "Company") for the option price of $_____ per share, subject to the terms and conditions of the Stock Option Agreement between _____ and the Company dated as of _____ (the "Option Agreement").  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan.

The undersigned encloses herewith payment, in cash or in such other property as is permitted under the Plan, of the Exercise Payment for said shares and has made a provision with the Company for the Withholding Amount.

In connection with the exercise of the Option, the undersigned represents to the Company as follows:

(a)      The undersigned is acquiring the Stock solely for investment purposes, with no present intention of distributing or reselling any of the shares of Stock or any interest therein. The undersigned acknowledges that the Stock has not been registered under the Securities Act of 1933, as amended (the "Securities Act").

(b)      The undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.

(c)      The undersigned understands that the Stock is a "restricted security" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the undersigned must hold the Stock indefinitely unless it is registered with the Securities and Exchange Commission and qualified by state authorities, or unless an exemption from such registration and qualification requirements is available.  The undersigned acknowledges that the Company has no obligation to register or qualify the Stock for resale.  The undersigned further acknowledges that

726831442

if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner or sale, the holding period for the Stock, and requirements relating to the Company which are outside of the undersigned's control, and which the Company is under no obligation to and may not be able to satisfy.

(d)     The undersigned understands that there is no public market for the Stock, that no market may ever develop for the Stock, and that the Stock has not been approved or disapproved by the Securities and Exchange Commission or any other federal, state or other governmental agency.

(e)     The undersigned understands that the Stock is subject to certain restrictions on transfer set forth in the Plan.  Both the Plan and the Option Agreement are incorporated herein by reference.

(f)     The undersigned understands that any Stock purchased hereunder shall be subject to the Stockholders' Agreement of the Company as it may be amended from time to time ("Stockholders' Agreement"), a copy of which has been provided to the undersigned, and that it is a condition to the exercise of my Option that the undersigned executes a signature page of the Stockholders' Agreement, agreeing to be bound thereby and that the undersigned's spouse, if applicable, must sign the Spousal Consent.  The undersigned and his or her spouse has had a full and fair opportunity to review the Stockholders' Agreement prior to exercising the Option.

(g)     The undersigned understands that any Stock purchased hereunder shall be subject to certain repurchase rights that may cause the Stock to be considered unvested at the time of purchase for purposes of Section 83 of the Internal Revenue Code of 1986, as amended (the "Code").  If the Stock is considered to be unvested upon purchase under Section 83, the fair market value of the Stock generally would be reportable to the Participant on the applicable vesting date as ordinary income and subject to tax withholding at that time.  Instead, the Participant may elect to be taxed on the fair market value of the Stock (less the exercise price) at the time of purchase by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after purchase.  The undersigned acknowledges and agrees that it is his or her personal responsibility to determine whether or not to make a Section 83(b) election and if such election is filed, the undersigned shall provide the Company with a copy of the election form filed with the Internal Revenue Service.

Very truly yours,

Date _____

_____
(Signed by _____ or other party duly exercising option)

Note:  If Options are being exercised on behalf of a deceased Optionee, then this Notice must be signed by such Optionee's personal representative and must be accompanied by a certificate issued by an appropriate authority evidencing that the individual signing this Notice has been

duly appointed and is currently serving as the Optionee's personal representative under applicable local law governing decedents' estates.

EXHIBIT B
(to Stock Option Agreement)

## FORM OF SPOUSAL CONSENT

I acknowledge that I have read the foregoing Stock Option Agreement and that I know its contents. I acknowledge and agree that capitalized terms used and not defined in this spousal consent shall have the meanings ascribed to such terms in the Stock Option Agreement. I am aware that by the provisions of the Stock Option Agreement, my spouse agrees, among other things, to the granting of rights to purchase and to the imposition of certain restrictions on the transfer of Optionee Securities, including my community interest therein (if any), which rights and restrictions may survive my spouse's death. I hereby consent to such rights and restrictions, approve of the provisions of the Stock Option Agreement, and agree that I will bequeath any interest which I may have in said Optionee Securities or any of them, including my community interest, if any, or permit any such interest to be purchased, in a manner consistent with the provisions of the Stock Option Agreement. I direct that any residuary clause in my will not be deemed to apply to my community interest (if any) in such Optionee Securities except to the extent consistent with the provisions of the Stock Option Agreement.

I further agree that in the event of a dissolution of the marriage between myself and my spouse, in connection with which I secure or am awarded any Optionee Securities or any interest therein through property settlement agreement or otherwise, (a) I will receive and hold said Optionee Securities subject to all the provisions and restrictions contained in the Stock Option Agreement, including any option of the Company, Resolute or other stockholder or optionholder to purchase such shares or interest from me, and (b) I hereby irrevocably constitute and appoint my spouse, as true and lawful attorney and proxy (the "Proxy") of my Optionee Securities with full power of substitution, to vote (at any annual or special meeting or by written consent) such Optionee Securities which I would be entitled to vote as a stockholder, together with any and all Optionee Securities issued in replacement or in respect of such Optionee Securities by dividend, distribution, stock split, reorganization, recapitalization or otherwise.

I also acknowledge that I have been advised to obtain independent counsel to represent my interests with respect to this spousal consent.

Date:  2/14/2018

Name of Spouse:  Sara Rink

Name of Optionee:  Aseph Rink

726831442

## <u>EXHIBIT C</u>

**FORM OF THREE YEAR JUNIOR NOTE**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND ACCORDINGLY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR LAWS OR PURSUANT TO AN EXEMPTION THEREFROM.  THE PRINCIPAL AMOUNT OF THIS NOTE, AND INTEREST IN RESPECT THEREOF, IS SUBORDINATED TO THE PAYMENT IN FULL OF ALL SENIOR INDEBTEDNESS AND IS SUBJECT TO SET-OFF, AS DESCRIBED IN THIS NOTE.

AMERICAN FREIGHT GROUP, INC.

NON-NEGOTIABLE THREE YEAR JUNIOR SUBORDINATED NOTE
DUE _____, _____

New York, New York

[$ _____]                                                              ____ ___, ___

FOR VALUE RECEIVED, the undersigned, American Freight Group, Inc., a Delaware corporation (together with its successors, the "<u>Company</u>"), hereby promises to pay to _____ (together with its successors and permitted assigns, the "<u>Holder</u>"), at the Holder's residence at _____, the principal amount of _____ ($_____) on the Maturity Date.  Certain capitalized terms are used in this Note are as defined in <u>Section 6</u>.

Section 1.  <u>Payment; Interest</u>.

1.1     The outstanding principal amount of this Note shall bear interest (computed on the basis of a 365 day year, as the case may be) accruing daily at a rate equal to five percent (5%) per annum from (but excluding) the date hereof to (and including) the date on which the principal amount of this Note is paid in full, regardless of the commencement of any bankruptcy or insolvency proceedings against the Company.  Subject to <u>Section 5</u> of this Note, such interest shall be payable on the Maturity Date.

1.2     Whenever payment of principal of, or interest on, this Note shall be due on a date that is not a Business Day, the date for payment thereof shall be the next succeeding Business Day and interest due on the unpaid principal and any other Amounts Payable hereunder shall accrue during such extension and shall be payable on such succeeding Business Day.

Section 2.  Optional Prepayment.  The Company shall have the right to prepay the principal amount of this Note in whole or in part at any time, or from time to time, without payment of any premium or penalty whatsoever, together with interest thereon accrued to the date of prepayment; provided, however, that so long as (a) any Senior Indebtedness remains outstanding and unpaid, (b) any commitment to provide Senior Indebtedness is outstanding, or (c) any other amount is owing to the holders of Senior Indebtedness, this Note may not be prepaid, in whole or in part, without the consent of, or written waiver of, any relevant prohibitions by the holders of Senior Indebtedness.

Section 3.  Set-off.  The Company shall be entitled to set-off and reduce any Amounts Payable hereunder for (a) any obligations or liabilities of the Holder to the Company or its Subsidiaries or (b) any claims by the Company or its Subsidiaries against the Holder under the Stockholders Agreement, or any other agreement, written or oral, between the Company or its Subsidiaries and the Holder.  The Holder, by accepting this Note, hereby acknowledges and agrees to the foregoing provisions, and any subsequent transferee or successor shall be bound by the foregoing.

Section 4.  Defaults.

4.1    Events of Default.  If one or more of the following events ("Events of Default") shall have occurred and be continuing:

(a)    the Company shall fail to pay within ten (10) Business Days of the due date thereof any principal of this Note or shall fail to pay within ten Business Days of the due date thereof any interest or any other amount payable hereunder and the same shall not have been cured within forty-five (45) days after written notice thereof has been given by the Holder to the Company;

(b)    the Company shall fail to observe or perform any covenant or agreement contained in this Note (other than those covered by clause (a) above) and the same shall not have been cured within sixty (60) days after written notice thereof has been given by the Holder to the Company;

(c)    the Company shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors; or

(d)    an involuntary case or other proceeding shall be commenced against the Company seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days; or an

C-2-

order for relief shall be entered against the Company under the Federal bankruptcy laws as now or hereafter in effect;

then, and in every such event, subject to the provisions of Section 5, the Holder may, by notice to the Company and to the holders of Senior Indebtedness, declare the unpaid principal amount of this Note together with accrued interest thereon, to be, and such portions of this Note (and accrued interest thereon) shall thereupon become, due and payable immediately following delivery of such notice to the Company and to the holders of Senior Indebtedness without presentment, demand, protest or further notice of any kind, all of which are hereby waived by the Company; provided, however, that in the case of any of the Events of Default specified in clause (c) or (d) above, such portions of this Note (together with accrued interest thereon) shall, subject to the provisions of Section 5, immediately (and without notice) become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Company.

Section 5.  Subordination.

5.1     Amounts Payable Subordinated to Senior Indebtedness.  Notwithstanding any provision of this Note to the contrary, the Company covenants and agrees, and the Holder by acceptance of this Note likewise covenants and agrees, that all Amounts Payable shall be subordinated to the extent set forth in this Section 5 to the prior payment in full in cash of all Senior Indebtedness.  This Section 5 shall constitute a continuing offer to and covenant with all persons who become holders of, or continue to hold, Senior Indebtedness (irrespective of whether such Senior Indebtedness was created or acquired before or after the issuance of this Note).  The provisions of this Section 5 are made for the benefit of all present and future holders of Senior Indebtedness (and their successors and assigns), and shall be enforceable by them directly against the Holder.

5.2     Priority Over and Payment of Proceeds in Certain Events.

(a)     Upon any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, in the event of any dissolution, winding up or total or partial liquidation, reorganization, arrangement, adjustment, protection, relief or composition, or assignment for the benefit of creditors of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, reorganization, relief or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of all or part of the assets and liabilities of the Company (the foregoing events herein collectively referred to as an "Insolvency Event"), all Senior Indebtedness shall first be paid in full in cash before the Holder shall be entitled to receive any payment by or on behalf of the Company or distribution of assets of the Company relating to any Amounts Payable.  Upon any Insolvency Event, any payment by or on behalf of the Company or distribution of assets of the Company, whether in cash, property, securities or otherwise, to which the Holder would be entitled relating to any Amounts Payable, except for the provisions of this Section 5, shall, until payment in full in cash of all Senior Indebtedness (including from any concurrent payment or distribution to the holders of such Senior Indebtedness), be made by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution,

C-3-

directly to the holders of the Senior Indebtedness or their representatives for application to the payment or prepayment of all such Senior Indebtedness.

If the Senior Indebtedness has not been paid in full in cash at a time in which the Company is subject to an Insolvency Event, (i) the holders of the Senior Indebtedness are hereby irrevocably authorized, but shall have no obligation, to demand, sue for, collect and receive every payment or distribution received on or after the Insolvency Event or to be received in respect of this Note (regardless of when originally due) in any insolvency proceeding and give acquittance therefor and to file claims and proofs of claim, as their interests may appear, and (ii) the Holder shall duly and promptly take, for the account of the holders of the Senior Indebtedness, as their interests may appear, such actions as the holders of the Senior Indebtedness may request to collect and receive all Amounts Payable by the Company in respect of this Note and to file appropriate claims or proofs of claim in respect of this Note.

(b)     No payment shall be made by or on behalf of the Company with respect to any Amounts Payable or to acquire this Note (or any portion hereof) for cash, property, securities or otherwise, and, by virtue of accepting this Note and the benefits hereof, the Holder shall not be entitled, and will not take any action, including any judicial process, to accelerate, demand payment or enforce any Indebtedness in respect of this Note or any other claim with regard to any Amounts Payable if (i) such payment is prohibited by the terms of any Senior Indebtedness, (ii) there has occurred and is continuing a default in the payment of all or any portion of any Senior Indebtedness, it being understood that for purposes of this clause (ii), any payment of interest accrued on any Senior Indebtedness which is paid, in lieu of cash, with the issuance of a payment-in-kind obligation, shall be deemed to continue to be unpaid until such payment-in-kind obligation (and all interest accrued thereon) shall have been paid in full or (iii) any other default (not involving the non-payment of any Senior Indebtedness) shall have occurred which, including after giving any notice or the passage of time, or both, would allow holders of any Senior Indebtedness to accelerate or otherwise demand the payment thereof, and in the case of a default described in clause (iii), the holders of the Senior Indebtedness have, to the extent required under the documents evidencing the Senior Indebtedness given notice of such default to the Company (the date that such notice is received by the Company is the "Notice Date"); provided that such restrictions on actions, including judicial process, to accelerate, demand payment or enforce any such Indebtedness on claim will cease to be applicable twenty-four (24) months after the occurrence and continuation of an Event of Default of the types referred to in Section 4.1(a) or (b). The Company shall promptly give written notice to the Holder of any written notice of default under the Senior Indebtedness.

(c)     In the event of all or any portion of the principal amount of this Note becoming due before the Maturity Date (whether by declaration or otherwise), no payment shall be made by or on behalf of the Company on or with respect to any Amounts Payable or to acquire this Note (or any portion thereof) for cash, property, securities or otherwise until all Senior Indebtedness shall first have been paid in full in cash.

(d)     If, notwithstanding the foregoing provisions of clauses (a) through (c) prohibiting payments or distributions, the Holder shall, on or after the Notice Date or the occurrence of any Insolvency Event, have received, directly or indirectly, by setoff, redemption, purchase or in any other manner, any payment of, or on account of, any Amounts Payable that was prohibited by

C-4-

this Section 5, before all Senior Indebtedness shall have been paid in full in cash, then and in such event such payments or distributions shall be received and held in trust for the holders of the Senior Indebtedness and promptly paid over or delivered to the holders of the Senior Indebtedness remaining unpaid to the extent necessary to pay in full in cash such Senior Indebtedness in accordance with its terms after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness, provided that any such payment which is, for any reason, not so paid over or delivered shall be held in trust by the Holder for the holders of Senior Indebtedness.

(e)     So long as any Senior Indebtedness remains outstanding, or the commitment to make credit extensions of any Senior Indebtedness shall not have been terminated, the Holder will not be entitled to take, demand or receive, directly or indirectly, by setoff, redemption, purchase or in any other manner, any voluntary prepayment or other payment of any Amounts Payable in amounts or in a manner which are in violation of the provisions of this Section 5.

(f)     Upon any payment or distribution of assets referred to in clause (a) above, the Holder shall be entitled to rely upon any order or decree of a court of competent jurisdiction in which such dissolution, winding up, liquidation or reorganization proceedings are pending, or upon a certificate of the receiver, trustee in bankruptcy, liquidating trustee, agent or other person making any such payment or distribution of assets, delivered to the Holder for the purpose of ascertaining the persons entitled to participate in such distribution of assets, the holders of Senior Indebtedness and other Indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Section 5.

5.3     Rights of Holders of Senior Indebtedness Not To Be Impaired, etc.

(a)     No right of any present or future holder of any Senior Indebtedness to enforce the subordination and other terms and conditions provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act by any such holder, or by any noncompliance by the Company with the terms and provisions and covenants herein regardless of any knowledge thereof any such holder may have or otherwise be charged with.

(b)     This Section 5 may not be amended without the written consent of each holder of the Senior Indebtedness and of the Holder, and any purported amendment without such consent shall be void. No holder of Senior Indebtedness shall be prejudiced in such holder's right to enforce the subordination and other terms and conditions of this Note by any act or failure to act by the Company or anyone in custody of its assets or property.

5.4     Subrogation.  Subject to and upon the payment in full in cash of all Senior Indebtedness, the Holder shall be subrogated, to the extent of payments or distributions made to the holders of Senior Indebtedness pursuant to or by reason of this Section 5, to the rights of the holders of such Senior Indebtedness to receive payments or distributions of assets of the Company made on such Senior Indebtedness until all amounts due under this Note shall be paid in full; and for the purposes of such subrogation, no payments or distributions to holders of such Senior Indebtedness of any cash, property or securities to which the Holder would be entitled except for the provisions of this Section 5, and no payment over pursuant to the provisions of this

C-5-

Section 5 to holders of such Senior Indebtedness by the Holder, shall, as among the Company, its creditors (other than holders of such Senior Indebtedness) and the Holder be deemed to be a payment by the Company to or on account of such Senior Indebtedness, it being understood that the provisions of this Section 5 are solely for the purpose of defining the relative rights of the holders of such Senior Indebtedness, on the one hand, and the Holder, on the other hand.

5.5     Obligations of the Company Unconditional.  Nothing contained in this Note is intended to or shall impair, as between the Company and the Holder, the obligation of the Company, which is absolute and unconditional, to pay to the Holder all Amounts Payable, as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holder and other creditors of the Company (other than the holders of Senior Indebtedness), except as provided in Section 5.2(b).

5.6     Section 5 Not To Prevent Events of Default.  The failure to make a payment of any Amounts Payable by reason of any provision of this Section 5 shall not be construed as preventing the occurrence or consequences of an Event of Default under Section 4.1 hereof, except as provided in Section 5.2(b).

5.7     Additional Rights of Holders of Senior Indebtedness.  Upon request by the Company, the Holder of this Note shall deliver to the holders of Senior Indebtedness or parties contemplating becoming holders of Senior Indebtedness a written statement confirming that (a) the provisions (including those of this Section 5) of this Note are in full force and effect; and (b) such party is or will be entitled to rely upon and enjoy the benefits of the provisions (including those of this Section 5) of this Note as a holder of Senior Indebtedness.

5.8     Senior Indebtedness Changes.  By virtue of accepting this Note and the benefits hereof, the Holder hereby waives any and all notice of renewal, extension or accrual of any of the Senior Indebtedness, present or future, and agrees and consents that without notice to or consent of the Holder:

(a)     the obligations and liabilities of the Company or any other party or parties under the Senior Indebtedness may, from time to time, in whole or in part, be renewed, refinanced, replaced, extended, refunded, modified, amended, accelerated, compromised, supplemented, terminated, increased, decreased, sold, exchanged, waived or released;

(b)     the holders of Senior Indebtedness and their representatives may exercise or refrain from exercising any right, remedy or power granted by any document creating, evidencing or otherwise related to the Senior Indebtedness or granted at law, in equity, or otherwise, with respect to the Senior Indebtedness or in connection with any collateral security or lien (legal or equitable) held, given or intended to be given therefor (including, without limitation, the right to perfect any lien or security interest created in connection therewith);

(c)     any and all collateral security and/or liens (legal or equitable) at any time, present or future, held, given or intended to be given for the Senior Indebtedness, and any rights or remedies of the holders of Senior Indebtedness and their representatives in respect thereof, may, from time to time, in whole or in part, be exchanged, sold, surrendered, released, modified, perfected, unperfected, waived or extended by the Holders and their representatives;

C-6-

726831442

(d)     any balance or balances of funds with any holder of Senior Indebtedness at any time standing to the credit of the Company or any guarantor of any of the Senior Indebtedness may, from time to time, in whole or in part, be surrendered or released; all as the holders of Senior Indebtedness, their representatives or any of them may deem advisable and all without impairing, abridging, diminishing, releasing or affecting the subordination to the Senior Indebtedness provided for herein; and

(e)     the Company may incur any amount or type of Senior Indebtedness (including Senior Indebtedness owed to Affiliates), or modify, restate, refinance, replace or amend any Senior Indebtedness from time to time, on terms and conditions acceptable to the Company, without notice to or approval by the Holder.  The Company shall deliver written notice to the Holder of all actions by the holders of Senior Indebtedness to accelerate payment of, or to exercise any other rights, remedies or powers under, the Senior Indebtedness.

5.9     <u>Waivers</u>.  In the event the holders of Senior Indebtedness elect to exercise their remedies to liquidate any collateral given to secure the Senior Indebtedness, the Holder hereby waives any right it may have to contest the validity of or the value obtained as a result of the holders of Senior Indebtedness exercise of their remedies, including, but not limited to, a foreclosure, a sale pursuant to the Uniform Commercial Code or the acceptance by the holders of Senior Indebtedness in lieu of foreclosure.  The Holder further waives any right it may have either in or out of any bankruptcy or similar proceeding to challenge any action taken by the holders of Senior Indebtedness as either a preference or fraudulent conveyance and further agrees not to take any active role in such a proceeding other than the filing of a claim in any such proceeding, which claim shall be subordinate (to the extent set forth above) to the claims of the holders of Senior Indebtedness.

Section 6.  <u>Definitions</u>.  For purposes of this Note, the following terms have the meanings set forth below.

"<u>Affiliates</u>" means the Company, The Resolute Fund III, L.P., and any other person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with any of them.

"<u>Amounts Payable</u>" means all principal of, interest on, premium, if any, fees, costs, expenses, indemnities or any other amounts due from the Company under this Note, and all claims against or liabilities of the Company in respect of this Note.

"<u>Business Day</u>" means any day except a Saturday, Sunday or other days on which commercial banks in New York City are required or authorized by law to close.

"<u>Default</u>" means any condition or event that constitutes an Event of Default or that with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Indebtedness</u>" means with respect to any Person, and without duplication: (i) any obligation of such Person for borrowed money; (ii) all capitalized lease obligations of such Person; (iii) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security; (iv) any payment obligation under any existing interest rate, foreign exchange, commodity or other swap, hedge, or other financial derivative instruments or

726831442

agreement entered into by such Person, unless extended by mutual agreement; (v) to the extent drawn or called upon and not reimbursed, all letters of credit, performance bonds, bankers acceptances or similar obligations of such Person or incurred in connection with performance guaranties related to insurance obligations (including letters of credit supporting insurance policies for worker's compensation); (vi) whether or not so included as liabilities in accordance with GAAP, all indebtedness or obligations of the types referred to in the preceding clauses (i) through (vi) of any other Person secured by any Lien on any assets owned or purchased by such Person (including Indebtedness arising under conditional sales or other title retention agreements), even though (x) such Person has not assumed or otherwise become liable for the payment thereof or (y) such Indebtedness is limited in recourse; (vii) all asset financing obligations of such Person, to the extent capitalized on the balance sheet of such Person; (viii) all amounts owing for the deferred purchase price of acquisitions, whether or not reflected on the face of the audited balance sheet of the Company, including all amounts owing for earnouts, purchase price adjustments, non-competition payments and similar obligations in respect of past acquisitions; (ix) the amount of any guarantees of Indebtedness of the type described in clauses (i) through (viii) above of any other Person; and (x) any unpaid interest, fees (whether accrued or otherwise), prepayment premiums or penalties, make-whole payments, breakage costs, indemnities, expenses and other obligations or amounts owing on or in respect of any such indebtedness described in clauses (a) through (ix) above.  Indebtedness owed to Affiliates will be Indebtedness for purposes of this Note.

"Maturity Date" means the third anniversary of the issuance of this Note.

"Note" means this Non-Negotiable Three Year Junior Subordinated Note.

"Senior Indebtedness" means the principal, interest (including interest accruing subsequent to the commencement of a proceeding specified in Sections 4.1(c) and 4.1(d), whether or not enforceable in such proceeding) on, premium, if any, fees (including, without limitation, any attorneys', commitment, agency, facility, structuring, restructuring or other fee), costs, expenses, indemnities, and other amounts due on or in connection with any Indebtedness of the Company and its Subsidiaries, and any refinancings, extensions or replacements of the foregoing Indebtedness, now or hereafter incurred, any documents executed under or in connection therewith, and any amendments, modifications, deferrals, renewals or extensions of such Indebtedness, and any amounts owed in respect of any Indebtedness incurred in refinancing, replacing or refunding the foregoing (including any refinancing, replacing or refunding with new lenders), unless the terms of such Indebtedness expressly provide that such Indebtedness is not Senior Indebtedness with respect to this Note.  Nothing in this Note shall restrict an Affiliate of the Company from being a holder of Senior Indebtedness.

"Stockholders' Agreement" means the Stockholders' Agreement, dated as of October 31, 2014, among the Company, the Holder and the other Stockholders listed on the signature pages thereto.

"Subsidiary" of a person means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors or other persons performing similar functions are at the time directly or indirectly owned by such person.

Section 7.  <u>Miscellaneous</u>.

7.1    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, sent by PDF attachment to email (in such cases by PDF attachment, with hard copy to follow) or mailed by first class mail, return receipt requested, to the following address (or at any other address as any party shall have specified by notice in writing to the other party):

If to the Company:

> American Freight Group, Inc.
> c/o The Jordan Company, L.P.
> 399 Park Avenue, 30th floor
> New York, New York 10022
> Attention:    M. Brad Wilford
>                      Daniel S. Williams
> Email:          bwilford@thejordancompany.com
>                      dwilliams@thejordancompany.com

with a copy to:

> Mayer Brown LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attention:    Philip O. Brandes
> Email:          pbrandes@mayerbrown.com

If to the Holder, to:

> _____
> _____
> _____

Each party may, by notice given in accordance with this Section to the other party, designate another address or person for receipt of notices hereunder.

The date of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after the date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by email.

7.2    <u>No Waivers</u>.  No failure or delay by the Holder in exercising any right, power or privilege hereunder or under this Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  No notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in related or similar circumstances requiring such notice.

726831442

7.3     Amendments and Waivers.  Except as expressly set forth in this Note (including Section 5.3(b)), any provision of this Note may be amended or waived if, but only if, such amendment or waiver is in writing, signed by the Company and the Holder.

7.4     Rights of Parties.  This Note is delivered pursuant to the terms and conditions of the Stockholders Agreement and is subject to the terms thereof.

7.5     Restrictions on Transfer.  This Note may not be sold, pledged, distributed, offered for sale, or otherwise transferred by the Holder to any transferee other than to a Permitted Transferee (as defined in the Stockholders Agreement).

7.6     Binding Effect.  The provisions of this Note shall be binding upon and inure to the benefit of the Holder and its respective successors and permitted assigns.

7.7     Replacement Note.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and of a letter of indemnity reasonably satisfactory to the Company from the Holder and upon reimbursement to the Company of all reasonable expenses incident thereto, and upon surrender or cancellation of this Note, if mutilated, the Company will make and deliver a new Note of like tenor in lieu of such lost, stolen, destroyed or mutilated Note.

7.8     Company Obligations.  The Holder agrees and acknowledges that this Note and the Company's obligations hereunder and for all Amounts Payable are solely obligations and liabilities of the Company.  None of the Company's directors, officers, employees, stockholders, advisors, consultants and affiliates or any other persons shall be obligated or liable in respect of this Note or any Amounts Payable, and the Holder hereby releases them from any such obligation or liability.

7.9     Cross-References; Headings.  Unless otherwise specified, references in this Note to any Section are references to such Section of this Note, and unless otherwise specified, references in any Section to any clause are references to such clause of such Section.  The various headings of this Note are inserted for convenience only and shall not affect the meaning or interpretation of this Note or any provisions hereof.

7.10     CHOICE OF LAW; LITIGATION.  (a) THIS NOTE SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION 7.10 SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OF A DELAWARE FEDERAL OR STATE COURT, OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SUCH A JUDGMENT, IN ANY OTHER APPROPRIATE JURISDICTION.

(b)  IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS NOTE,  THE HOLDER AND THE COMPANY HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO INSTITUTE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE STATE OF DELAWARE,

726831442

WHETHER A STATE OR FEDERAL COURT; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, THE HOLDER AND THE COMPANY WILL CONSENT AND SUBMIT TO THE  PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS (IT BEING UNDERSTOOD THAT NOTHING IN THIS SECTION SHALL BE DEEMED TO PREVENT THE HOLDER OR THE COMPANY FROM SEEKING TO REMOVE ANY ACTION TO A FEDERAL COURT IN THE STATE OF DELAWARE; (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN ANY INCONVENIENT FORUM; (4) AGREE, AFTER CONSULTATION WITH COUNSEL, TO WAIVE ANY RIGHTS TO A JURY TRIAL TO RESOLVE ANY DISPUTES OR CLAIMS RELATING TO THIS NOTE; (5) AGREE TO DESIGNATE, APPOINT AND DIRECT AN AUTHORIZED AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS AND DOCUMENTS IN ANY LEGAL PROCEEDING IN THE STATE OF DELAWARE; (6) AGREE TO PROVIDE EACH OTHER WITH THE NAME, THE MAILING ADDRESS AND EMAIL ADDRESS OF SUCH AGENT; (7) AGREE AS AN ALTERNATIVE METHOD OF SERVICE TO SERVICE OF PROCESS IN ANY LEGAL PROCEEDING BY MAILING OF COPIES THEREOF TO IT AT ITS ADDRESS SET FORTH HEREIN FOR COMMUNICATIONS TO IT; (8) AGREE THAT ANY SERVICE MADE AS PROVIDED HEREIN SHALL BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (9) AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHTS OF THE HOLDER OR THE COMPANY TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

C-11-

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the date first above written.

AMERICAN FREIGHT GROUP, INC.

By:_____
    Name:
    Title:

# EXHIBIT 6

EXECUTION VERSION

**AGREEMENT AND GENERAL RELEASE**

THIS AGREEMENT AND GENERAL RELEASE (this "Agreement") is made and entered into as of June 13, 2019, by and between American Freight Group, Inc., a Delaware corporation ("Holdings" and, together with its subsidiaries, the "Company"), and Asaph Rink (the "Executive").

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:



3.    Equity.

(a)    Pursuant to a management subscription agreement, dated January 28, 2015 between the Executive and Holdings (the "Subscription Agreement"), the Executive purchased (i) 10 shares of common stock, par value $0.001 per share ("Common Stock") of Holdings and (ii) 40 shares of Series A Preferred Stock, par value

$0.001 per share, of Holdings (the "Preferred Stock" and, together with the Common Stock, the "Stock"), which Stock is subject to repurchase rights of Holdings and The Resolute Fund III, L.P. ("Resolute") pursuant to Section 8 of the Subscription Agreement. Executive, the Company and Resolute hereby agree that, except as set forth below, each of the Company and Resolute hereby waives its repurchase rights set forth therein on account of the Executive's termination of employment with the Company; provided, however, that if Executive breaches any term of this Agreement, the Subscription Agreement, the Stockholders' Agreement (as defined below) or the Option Agreements (as defined below), or violates any of the restrictive covenants set forth therein, including Section 17 of the Option Agreements (as defined below) and Article IV of the Stockholders' Agreement (as defined below), the Executive agrees that the Company shall be permitted to repurchase the Stock for a purchase price equal to the lesser of Cost and Fair Market Value (each as defined in the Subscription Agreement) for such Stock. Section 8(e) through (j) of the Subscription Agreement shall apply to this Agreement *mutatis mutandis.*

       (b)     On January 28, 2015, pursuant to a Non-Qualified Stock Option Agreement (the "2015 Option Agreement") the Executive was granted an option (the "2015 Option") to purchase 476.2500 shares of Common Stock of Holdings pursuant to the American Freight Group, Inc. 2015 Non-Qualified Stock Option Plan (the "Plan") at an exercise price of $1,000 per share. On February 14, 2018, pursuant to a Non-Qualified Stock Option Agreement (the "2018 Option Agreement" and, together with the 2015 Option Agreement, the "Option Agreements") the Executive was granted an option (the "2018 Option" and, together with the 2015 Option, the "Options") to purchase 175.0000 shares of Common Stock of Holdings pursuant to the Plan at an exercise price of $3,935 per share. The Option Agreements in respect of the Options provide that 40% of the shares subject to such Option vest and become exercisable on the second anniversary of such grant date and, thereafter, an additional 20% of the shares subject to such Option vest and become exercisable on each subsequent anniversary of such grant date. As of the Termination Date, 80% of Executive's 2015 Options (381.0000 shares of Common Stock of Holdings) have vested and may be purchased by him at an exercise price of $1,000 per share (the "Vested Options"), 20% of such 2015 Options are unvested and none of Executive's 2018 Options have vested. Executive acknowledges that all of his unvested Options have expired and agrees that such unvested Options are hereby terminated, forfeited and cancelled and shall have no further force or effect from and after the Termination Date. Executive further acknowledges and agrees that, except as noted in Paragraph 10, the 2018 Option Agreement is hereby terminated. The Executive further acknowledges and agrees that all of Executive's Vested Options must be exercised, if at all, prior to September 4, 2019, or such Vested Options shall automatically terminate on September 4, 2019.







      10.   <u>Survival of Certain Agreements</u>.  Executive acknowledges and agrees that the Subscription Agreement, the 2015 Option Agreement and the Stockholders' Agreement remain in effect, and the Executive further reaffirms and agrees to the restrictive covenants therein, including the provisions of Section 17 of the Option Agreements and Article IV of the Stockholders' Agreement, dated October 31, 2014, among Holdings, the Executive and the other stockholders party thereto (the "<u>Stockholders' Agreement</u>"), which relate to, among other things, you not competing with the business of the Company or hiring or soliciting employees of the Company.

Executive further acknowledges and agrees that the provisions of Sections 17 through 21 of the 2018 Option Agreement together with any applicable definitions used in such Sections and contained in the 2018 Option Agreement survive the termination of Executive's employment. Notwithstanding the foregoing, the Company agrees that Executive shall benefit from the Specific Exception relating to the Canadian Retail Company in the Selling Equityholder Agreement, dated September 30, 2014 between David A. Belford and American Freight, Inc., which for the avoidance of doubt, would allow Executive to be employed in the business of Surplus Furniture and Mattress Warehouse ("Canadian Retail Company"), in its current locations, and any new location in Canada (it being agreed by the Executive that the advertising by the Canadian Retail Company shall be targeted at retail customers within Canada and the Canadian Retail Company may not sell (including via the Internet, or otherwise) its products to retail customers in the United States or Mexico). The Executive acknowledges and agrees that the benefit of the Specific Exception relating to the Canadian Retail Company shall not apply to, and shall not provide Executive with any exception from, any non-solicitation covenants applicable to the Executive in connection with any potential employment by the Canadian Retail Company, or otherwise.







IN WITNESS WHEREOF, Executive and Holdings have voluntarily signed this Agreement and General Release on the date set forth above.

American Freight Group, Inc.    Asaph Rink

By: _____

Its: __AUTHORIZED SIGNATORY__

_____
Asaph Rink

9

# EXHIBIT 7

**EXECUTION VERSION**

**AMENDMENT TO
AGREEMENT AND GENERAL RELEASE**

THIS AMENDMENT TO AGREEMENT AND GENERAL RELEASE (this "Amendment") is made and entered into as of August 9, 2019, by and between American Freight Group, Inc., a Delaware corporation ("Holdings" and, together with its subsidiaries, the "Company"), and Asaph Rink (the "Executive").

RECITALS

WHEREAS, effective as of June 13, 2019, the Company and the Executive entered an Agreement and General Release (as amended, modified, supplemented or restated, the "Agreement and Release"); and

WHEREAS, the Company and the Executive desire to effect certain amendments to the Agreement and Release as more fully set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree that the Agreement and Release be, and hereby is, amended as set forth herein:

Section 1.1.    Amendment to Section 10 of the Agreement and Release.  Section 10 of the Agreement and Release is hereby amended and restated as follows:

10.    Survival of Certain Agreements.    Executive acknowledges and agrees that the Subscription Agreement, the 2015 Option Agreement and the Stockholders' Agreement remain in effect, and the Executive further reaffirms and agrees to the restrictive covenants therein, including the provisions of Section 17 of the Option Agreements and Article IV of the Stockholders' Agreement, dated October 31, 2014, among Holdings, the Executive and the other stockholders party thereto (the "Stockholders' Agreement"), which relate to, among other things, you not competing with the business of the Company or hiring or soliciting employees of the Company.  Executive further acknowledges and agrees that the provisions of Sections 17 through 21 of the 2018 Option Agreement together with any applicable definitions used in such Sections and contained in the 2018 Option Agreement survive the termination of Executive's employment. Notwithstanding the foregoing, the Company agrees that Executive shall benefit from the Specific Exception relating to the **New York Retail Company and** Canadian Retail Company in the Selling Equityholder Agreement, dated September 30, 2014 between David A. Belford and American Freight, Inc., which for the avoidance of doubt, would allow Executive to be employed in the business of **(a) Surplus Freight, Inc. d/b/a Express Furniture Warehouse ("New York Retail Company"), in its current location (700 Grand Concourse, Bronx, NY), and any new location within the City of New York (it being agreed by the Executive that any advertising by the New York Retail Company shall**

**be targeted at retail customers within the City of New York and the New York Retail Company may not sell (including via the Internet, or otherwise), its products outside of the City of New York) and (b)** Surplus Furniture and Mattress Warehouse ("Canadian Retail Company"), in its current locations, and any new location in Canada (it being agreed by the Executive that the advertising by the Canadian Retail Company shall be targeted at retail customers within Canada and the Canadian Retail Company may not sell (including via the Internet, or otherwise) its products to retail customers in the United States or Mexico). The Executive acknowledges and agrees that the benefit of the Specific Exception relating to the **New York Retail Company and** Canadian Retail Company shall not apply to, and shall not provide Executive with any exception from, any **other restrictive covenants, including, but not limited to, any** non-solicitation covenants applicable to the Executive in connection with any potential employment by **the New York Retail Company,** the Canadian Retail Company, or otherwise.

Section 1.2.   <u>Miscellaneous</u>.   Sections 6, 7, 8, 13, 14, 15, 16 and 19 of the Agreement and Release shall apply to this Amendment *mutatis mutandis*.

[*Remainder of page intentionally left blank*]

**TABLE OF CONTENTS**
(continued)

Page

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first above written.

American Freight Group, Inc.

By:

Name:   M. Brad Wilford
Title:   Authorized Signatory

Asaph Rink

17521045
733193039

# EXHIBIT 8



Ace R.



# Ace R.

President of retail at Stage Capital

Columbus, Ohio, United States · 100 connections

Sign in to Connect

**Stage Capital**

🔒 When signing in, you can choose to view the profile in private mode.

## About

☑️Career Summary ☑️

Executive Leader with 15+ years of experience driving revenue growth and client retention/engagement within a variety of organizations. Excel in reviewing current market trends and opportunities and devising appropriate strategies with a focus on optimizing the organization's product offerings. Experienced in training and promoting internal team members, consistently exceeding operational sales goals, and creating initiatives focused on market growth/expansion.

☑️Key Skills ☑️

Operations Management • Manufacturing/Production • Identifying Client Requirements • Business Development • Strategy Tracking & Correction • Market Research & Analysis • Change Management P&L Management • Contract Negotiation • Client Retention & Engagement • Operational Process Improvement • Market Expansion

☑️Highlights ☑️

➤Demonstrated success in strategic sales roles with an ability to identify market opportunities/risks, define go-to-market strategy, and identify target markets

➤Equipped with an ability to improve sales success by growing funnels, closing opportunities, and facilitating growth into new, larger markets


Ace R.

## Activity

 **Lane is investing heavy for future growth! #lane #home #brand #furniture #value #investing**

Liked by **Ace R.**

 **Date: Sun, 7 Feb 2016 A Marine stands guard while a brave young child dies. This is honor! "Every now and then, in the middle of the constant...**

Liked by **Ace R.**

 **Lane continues to invest in growth and supporting our dealers!**

Liked by **Ace R.**

Sign in to see all activity

## Experience

 **President of retail**
Stage Capital
Jan 2020 - Present · 1 year 4 months
Columbus, Ohio Metropolitan Area

 **President Of Sales**
Surplus Furniture and Mattress
Sep 2019 - Jan 2020 · 5 months

 **CEO**
American Freight Furniture and Mattress
May 2007 - Jun 2019 · 12 years 2 months


Consistently built positive relationships with both internal stakeholders and vendors, resulting in improved contract terms and a more encouraging working environment.
➢Created, planned, and executed a complex data-driven model used for market expansion which highlighted dollars per zip code near each store location and resulted in a 30% increase to topline sales and double-digit EBITDA increases
➢Using the data-driven model, expanded the organization by opening 100 new locations while simultaneously reducing the advertising budget by 1.3% and ensuring no negative impact to existing locations
➢Developed an innovative customer financing program which was rolled-out to over 150 locations (in a period of 30 days) which achieved double-digit growth in every location and improved EBITDA
➢Identified a gap in the current training system and devised an updated training program which increased employee engagement and decreased turnover by 25%
➢Implemented a comprehensive point of sale system within all stores which allowed for real-time inventory tracking and resulted in a reduced excess inventory, a 16% increase in cash flow, and increased yearly inventory turns to 6 (above the industry average)
➢Utilized a new sourcing strategy during vendor negotiations that achieved a zero impact on consumer price points and zero loss to organizational revenue while maintaining gross margin
➢During tenure, increased the number of retail locations from 24 to 171 across 25 states

Show less ⌃



### Production Manager, Shelling Department

Heartland RV

Jul 2006 - May 2007 · 11 months

Elkhart, Indiana Area

Hired into a leadership role within a manufacturing environment which centered on managing day to day manufacturing logistics. Quickly identified areas of risk and created innovative solutions along with monitoring product quality levels at all times.
➢Worked closely with the internal engineering department in the design of jigs and identification of production requirements for new product models
➢Consistently increased employee morale and engagement by developing training programs, recognizing top-performers, and encouraging open lines of communication
➢Coordinated with the Slide Out department prior to product completion to ensure the product was functioning properly and met established quality levels

Show less ⌃


Led production and manufacturing operations within a busy facility which required supervising internal team members and monitoring daily production goals. Provided training and mentoring to new staff members along with acting as a subject matter expert regarding new model changes and designs.

➤Chosen as a member of an R&D Installer Team for a new Toy Hauler division which required leading the whole process from concept through production



### Assistant Plant Manager
FlexCo Products Inc.

Apr 2004 - Aug 2005 · 1 year 5 months

Elkhart, Indiana Area

Member of leadership within a manufacturing environment focused on supporting production efforts and supervising internal team members. Coached others on both quality and safety standards, managed the ordering of raw materials, and monitored production schedules.

➤Played a lead role in setting up die-casts on rotary presses along with completed in-depth maintenance and safety checks for all machinery

➤Created the organization's flagship Hazard Awareness Program along with spearheading several performance management initiatives

➤Reduced scrap and trash by 10% by implementing a daily inventory log and utilizing scrap materials for other production runs in the facility

Show less ⌃



### 0311
United States Marine Corps

2000 - 2004 · 4 years

## View Ace's full profile

⊙  See who you know in common

⊡  Get introduced

⧐  Contact Ace directly


Ace R.

## People also viewed



**Mike Watson**

Stage Capital

Columbus, Ohio Metropolitan Area

CPPR: 3:52:FF:03923:4NHR:6bD:DXY:6:3D:3:6JRE:G82FJ37:OJA:QJA:NH:Q37:XJEF:G32F:J37XC:2QG



**Cana Workman**

Vice president of Sales at American Freight Furniture and Mattress

Columbus, Ohio Metropolitan Area



**Kevin O'Keefe**

Vice President at American Freight Furniture and Mattress

Scottsdale, AZ



**Jonathan Waters**

Division Vice President of Store Operations at American Freight Furniture, Mattress, Appliance

Schaumburg, IL



**Haris Buljina**

Vice President of Sales

Ormond Beach, FL



**Mike Schweitzer**

Director of Store Support at American Freight Furniture, Mattress, Appliance

Columbus, Ohio Metropolitan Area



**Joe Kaminski**

President of Stores at American Freight Furniture and Mattress

North Hero, VT



**Heather Mundy**

Human Resources Manager at American Freight Appliance, Furniture and Mattress

Mansfield, OH



**Gordon Bond III**

Regional Sales Manager at American Freight Furniture, Mattress, Appliance

Pensacola, FL



**John Rausch**

Corporate Real Estate Management / Martial Arts Instructor

Newark, OH



Ace R.


**ace r**
cfo
New York, NY


**Ace R**
--
Malaysia


**Ace R.**
Student at Basa Air Base National High School
Central Luzon, Philippines


**Ace R**
Walmart Associate at Walmart
Raynham, MA


**ace r**
Student at Pamantasan ng Lungsod ng Pasig
Metro Manila

6 others named Ace R. are on LinkedIn

**See others named Ace R.**

## Add new skills with these courses


**A Manager's Toolkit for Supporting Change**


**Pitching to Investors**


**Leveraging Your Relationship Capital**

**See all courses**



Ace R.

 President of retail at Stage Capital

 President of retail at Stage Capital

View profile



View profile badges

 © 2021

Accessibility

Privacy Policy

Copyright Policy

Guest Controls

Language ⌄

About

User Agreement

Cookie Policy

Brand Policy

Community Guidelines

# EXHIBIT 9

## Confidentiality and Non-Competition Agreement

THIS AGREEMENT ("Agreement") is made this _____ day of _____, in of _____, by and between AMERICAN FREIGHT MANAGEMENT COMPANY, LLC., an Ohio corporation (hereinafter referred to as the Company) and _____ (hereinafter referred to as the Employee).

### Recitals

WHEREAS, the Company currently employs Employee in the position of _____; and

WHEREAS, the Company wishes to assure itself that Employee will keep in confidence and not disclose any information disclosed to Employee by the Company during the term of Employee's employment; and

WHEREAS, the Company further wishes to assure itself that Employee will not compete with the Company after the termination of Employee's employment; and

WHEREAS, Employee is willing to agree not to so compete with Company.

NOW THEREFORE, the premises set forth herein and intending to be legally bound, the parties here to agree as follows:

**Section 1. Acknowledgments.** The Company is engaged in the business of the sale of furniture, carpet, mattresses and other related goods. The Employee acknowledges that the Company's sales techniques, operating systems, client lists, and leads are unique and legitimate interests of the Company which contribute in large part to the success of the Company and its employees in the competitive field in which they are engaged. The Employee acknowledges that the Company's business and services are highly specialized, the identity and particular needs of the Company's customers and suppliers are not generally known, and the documents and information regarding the Company's customers, suppliers, services, products, methods of operation, sales, pricing and costs are highly confidential and constitute trade secrets. The Employee further acknowledges that the services rendered to the Company by the Employee have been or will be of a special and unusual character which have a unique value to the Company such that: (a) the frequent contact with customers or customer information will result in close relationships and the association of the Company's goodwill with the Employee and/or specialized knowledge about the customer; and (b) the Employee has had or will have access to trade secrets and confidential information belonging to the Company, the loss of which cannot adequately be compensated by damages in an action of law.

**Section 2. Covenant Against Competition.** During the term of the Employee's

employment with the Company and for a period of two (2) years from either the voluntary termination of the Employee's employment with the Company or the termination of the Employee's employment with the Company for Cause, the Employee will not, directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with in any manner the ownership, management, operation, or control of any business which competes directly or indirectly with the Company in any existing market area of the Company at the time of the termination (voluntary or involuntary) of employment of the Employee. For purposes of this Agreement, ACause@ shall include but shall not be limited to competing against the Company and/or criminal activity for which charges are brought against Employee.

**Section 3.    Covenant Against Disclosure of Confidential and Proprietary Information.**  The Employee shall, in accordance with the restrictions set forth in Section 2 above, hold in strict confidence any and all confidential and proprietary information concerning the Company's services, processes, sales, business systems, operations, and clients of the Company.  Confidential and proprietary information shall include, but shall not be limited to, information related to the Company's products, processing, manufacturing, selling, storage, application techniques, including customer lists, call lists, other confidential technical data, sketches, plans, drawings, chemical formulae, composition of the Company's products, and other research and development data.  Confidential and proprietary information shall also include, in addition to those materials described above, sources of supply and material, operating and other cost data, information contained in manuals or memoranda and other records of the Company identified as Confidential or Proprietary Information or Trade Secrets.  Such other information will sometimes be identified as "confidential", "proprietary",or as a "trade secret," either by written or verbal designation, but shall also include that which is a trade secret under the Ohio Uniform Trade Secrets Act.  However, nothing herein shall be construed to limit the Company's protections under the Ohio Uniform Trade Secrets Act.

**Section 4.    Records to be Returned.**    The Employee also shall not without permission, directly or indirectly, copy, take, or remove from the Company's premises, any of the Company's books, records, customer lists, leads, computer disks, software, or any other documents, materials or equipment paid for by the Company or to which the Employee has devoted efforts for its development while employed by the Company.  Any such information, and any copies thereof, in the possession of the Employee at the end of employment shall be returned, along with any of the Company's equipment.  The Employee shall also disclose, if applicable, computer passwords for any and all of the Company's computers the Employee used while employed by the Company.

**Section 5.    Nonsolicitation of Employees.**  During the term of the Employee's

2

employment with the Company and for a period of two (2) years from the voluntary or involuntary termination of the Employee's employment with the Company for any reason whatsoever, the Employee shall not, either directly or indirectly, absent the written consent of the Company; (a) solicit, interfere with, or endeavor to cause any employee of the Company to leave his or her employment; or (b) induce or attempt to induce any such employee to work for any other entity.

**Section 6.     Nonsolicitation or Service of Customers.**     During the term of the Employee's employment with the Company and for a period of two (2) years from the voluntary or involuntary termination of the Employee's employment with the Company for any reason whatsoever, the Employee shall not solicit, suggest, induce, or attempt to induce any past or current customer of the Company; (a) to cease doing business in whole or in part with or through the Company; or (b) to do business with or purchase from any other person or business entity, goods or services, the nature of which are materially similar to those supplied by the Company.

**Section 7.     Remedies.**     Employee acknowledges that Company would be greatly injured by, and have no adequate remedy at law for, Employee's breach of Section 2-6 of this Agreement.  Employee therefore consents that if such breach occurs or is threatened, whether before or after the termination of his/her relationship with Company, Company may, as appropriate and in addition to all other then available remedies, enjoin Employee, together with all persons acting in concert with Employee, from such breach or threatened breach.  If it prevails, Company shall also be entitled to collect from Employee the court costs, actual attorneys and experts fees, and other expenses of enforcing Company's rights under this Agreement.  Employee submits to entry of a temporary restraining order to prevent such breach, and waives the right to require Company to post bond as a condition of injunctive relief. If such waiver is not then permitted, Employee agrees that a bond of $1,000.00 or less will be sufficient.  The periods provided in Sections 2-6 shall, in the event that Company is granted an injunction, be extended so as to commence upon the date of entry of any such injunction.  All of the Company's remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy shall not be deemed to exclude any other remedies.  In the event total actual damages are not possible to determine, it is agreed that the Company may recover, in addition to those damages which are determined, liquidated damages in the amount of $50,000.00 for a material breach of this Agreement in addition to other remedies provided by this Agreement.

**Section 8.     Choice of Law and Forum.**     It is understood and agreed that the construction and interpretation of this Agreement shall be in accordance with and governed by the laws of the State of Ohio, and any action related to this Agreement shall be brought and maintained in the courts of the State of Ohio, in the County of Delaware, unless otherwise agree to by both parties.

**Section 9.     Reasonableness of Restrictions.**     The Employee has carefully read and

considered the provisions hereof and, having done so and in consultation with a lawyer of his/her own choosing, agrees that the restrictions set forth in this Agreement (including, but not limited to, the time periods of restriction in each of such paragraphs and the geographical area of restrictions set forth in this Agreement) are fair, reasonable, and needed to protect the Company's interests. The Employee also agrees, having read and considered the provisions hereof, that the covenants set forth in this Agreement will not create an unreasonable restraint on the Employee's ability to earn a living.

**Section 10.   Burden and Benefit.**      This Agreement shall be binding upon, and shall inure to the benefit of, the Company and Employee, and their respective successors and assigns. The Company shall have the right to assign its rights hereunder to any successor in interest, whether by merger, consolidation, sale of assets, or otherwise.

**Section 11.   Whole Agreement.**   Notwithstanding the existence of any other Company pronouncement, writing, or policy to the contrary or conflicting herewith, the conditions of this Agreement shall predominate and prevail. No change or modification hereof shall be valid or binding unless the same is in writing and signed by the party against whom such waiver is sought to be enforced.

**Section 12.   Interpretation.**      The parties acknowledge their mutual participation in the drafting of this Agreement and its terms shall not be construed more strictly against one party or the other as the author of the document.

   IN WITNESS WHEREOF, the Company and the Employee have duly executed this Agreement as of the day and year first written above.

The Employee                                      The Company

                                                  AMERICAN FREIGHT MANAGEMENT CO, LLC.

_____       By: _____
                                           James Brownell, COO

dianne\jason\corp\American Freight\Conf.NonCompAgree

4

# EXHIBIT 10

# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

April 8, 2021

**<u>VIA EMAIL AND FEDEX</u>**

David Belford
626 Gulf Shore Blvd.
S. Naples, FL 34102
Dab361@gmail.com

Dear Mr. Belford:

This firm represents American Freight, LLC ("<u>American</u>"). As you know, during the course of your involvement with American, you entered into a Non-Qualified Stock Option Agreement dated January 28, 2015 (the "Option Agreement") pursuant to which you agreed not to directly or indirectly own, operate, manage, control, participate in, provide support to, consult with, advise, permit your name to be used by, provide services for, lease or in any manner engage in or knowingly facilitate any business that sells: (1) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold by or offered by American; or (2) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the United States (collectively, the "Protected Activities"). As part of your termination from American, you also entered into an Agreement and General Release on November 30, 2017 (the "<u>Termination Agreement</u>") pursuant to which you acknowledged and agreed that the restrictive covenants in the Option Agreement survived your resignation from American.

Following your resignation, we understand that you are currently an owner of Stage Capital LLC ("<u>Stage Capital</u>"), and may be the president, owner and CEO of Surplus Freight LLC ("<u>Surplus</u>"). Starting on or around July 2020, Surplus started expanding into American's geographic market by opening stores in North Carolina, Maryland, and Virginia. These stores are in direct competition with American's stores in those states. As such, your participation in and management of Surplus and possibly Stage Capital breach the non-competition covenant of the Option Agreement (§ 17(g)).

In addition to your non-compete obligations of which you are in breach, the Option Agreement, among other things, requires you not to directly or indirectly (a) hire or engage, or recruit, solicit, or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to American, (b) induce or attempt to induce any current or former

April 8, 2021
Page 2

employee of, or consultant to, American to leave the employ of American, or in any way interfere with the relationship between American and any of its employees or consultants, (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to American, or (d) in any way interfere with the relationship between American and any supplier, licensee, lessor, or other business relation (or any prospective supplier, licensee, lessor, or other business relationship) of American. Despite your clear obligations not to solicit American employees, we understand that several current Surplus employees acting under your direction or control, including but not limited to Joel Cady and Haris Buljina, have solicited several American employees to leave their employment with American in order to join Surplus. This solicitation is a direct breach of the non-competition covenants of your 2015 and 2018 Option Agreements (§ 17(f)).

American takes your non-competition and non-solicitation obligations very seriously and expects that you will abide by the agreements you entered into with American. We urge you to review the Option Agreement's and the Termination Agreement's non-competition and non-solicitation provisions in their entirety and to discuss with a lawyer how you can ensure that you do not violate those provisions, inadvertently or otherwise. Please confirm no later than April 14, 2021 that you have ceased all involvement with any competing business and any other Protected Activities and that you will adhere to the obligations set forth in the Option Agreement until the Restricted Period ends February 14, 2022. Should you continue to violate your Agreements, American will take legal action to hold you accountable for all breaches of the Option Agreement, the Termination Agreement and any other legal obligations you owe to American.

Finally, this letter is intended to place you on notice that litigation is likely to be commenced, and you must preserve and not destroy any documents, including electronically stored documents, concerning any communications with former or current employees of American and anything related to American or competition with American.

Nothing herein should be construed as a waiver by American of any of its rights, all of which are expressly reserved.

Sincerely,

/s/ *Thomas J. Meloro*

# EXHIBIT 11

# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

April 8, 2021

**VIA EMAIL AND FEDEX**

Asaph Rink
3485 W. 100 Rd. N.,
Bargersville, IN 46106
acerink2092@gmail.com

Dear Mr. Rink:

This firm represents American Freight, LLC ("American"), your former employer. As you know, during the course of your employment, you entered into Non-Qualified Stock Option Agreements, dated January 28, 2015 and February 14, 2018, respectively (the "2015 Option Agreement" and the "2018 Option Agreement," respectively) pursuant to which you agreed not to directly or indirectly own, operate, manage, control, participate in, provide support to, consult with, advise, permit your name to be used by, provide services for, lease or in any manner engage in or knowingly facilitate any business that sells: (1) any products or provides any services which may be used as substitutes for or are otherwise in competition with any products or services sold by or offered by American; or (2) any other furniture, carpet, upholstery, bedding, fabric protection products, case goods, mattresses and other furniture accessories and related goods directly to retail customers in the United States (collectively, the "Protected Activities"). As part of your termination from American, you also entered into an Agreement and General Release on June 13, 2019, as amended on August 9, 2019 (together, the "Termination Agreement") pursuant to which you acknowledged and agreed that the restrictive covenants in the 2015 and 2018 Option Agreements survived your termination from American.

Following your termination, we understand that you served as the President of Sales at Surplus Furniture and Mattress from September 2019 to January 2020, and are currently the President of Retail at Stage Capital LLC ("Stage Capital"), a related entity of Surplus Freight LLC ("Surplus"). Starting on or around July 2020, Surplus started expanding into American's geographic market by opening stores in North Carolina, Maryland, and Virginia. These stores are in direct competition with American's stores in those states. As such, your participation in and management of Surplus and possibly Stage Capital breach the non-competition covenants of your 2015 and 2018 Option Agreements (§ 17(g)). Further, this violation does not fall within any of the Specific Exceptions (as that term is defined in the Termination Agreement).

NEW YORK   WASHINGTON   HOUSTON   PALO ALTO   SAN FRANCISCO   CHICAGO   PARIS   LONDON   FRANKFURT   BRUSSELS   MILAN   ROME

April 8, 2021
Page 2

In addition to your non-compete obligations of which you are in breach, the 2015 and 2018 Option Agreements, among other things, require you not to directly or indirectly (a) hire or engage, or recruit, solicit, or otherwise attempt to employ or retain or enter into any business relationship with, any current or former employee of or consultant to American, (b) induce or attempt to induce any current or former employee of, or consultant to, American to leave the employ of American, or in any way interfere with the relationship between American and any of its employees or consultants, (c) employ or retain or enter into any business relationship with any person who was an employee of or consultant to American, or (d) in any way interfere with the relationship between American and any supplier, licensee, lessor, or other business relation (or any prospective supplier, licensee, lessor, or other business relationship) of American.  Despite your clear obligations not to solicit American employees, we understand that several current Surplus employees possibly acting under your direction or control, including but not limited to Joel Cady and Haris Buljina, have solicited several American employees to leave their employment with American in order to join Surplus.  This solicitation is a direct breach of the non-competition covenants of your 2015 and 2018 Option Agreements (§ 17(f)).

American takes your post-employment obligations very seriously and expects that you will abide by the agreements you entered into as an employee of American.  We urge you to review the 2015 and 2018 Option Agreements' and the Termination Agreement's non-competition and non-solicitation provisions in their entirety and to discuss with a lawyer how you can ensure that you do not violate those provisions, inadvertently or otherwise.  Please confirm no later than April 14, 2021 that you have ceased all involvement with any competing businesses and any other Protected Activities and that you will adhere to the obligations set forth in the 2015 and 2018 Option Agreements until the Restricted Period ends.  Should you continue to violate your Agreements, American will take legal action to hold you accountable for all breaches of the 2015 and 2018 Option Agreements, the Termination Agreement and any other legal obligations you owe to American as your former employer.

Finally, this letter is intended to place you on notice that litigation is likely to be commenced, and you must preserve and not destroy any documents, including electronically stored documents, concerning any communications with former or current employees of American and your involvement with Surplus.

Nothing herein should be construed as a waiver by American of any of its rights, all of which are expressly reserved.

Sincerely,

/s/ *Thomas J. Meloro*

# EXHIBIT 12

# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel:  212 728 8000
Fax: 212 728 8111

April 8, 2021

**VIA EMAIL AND FEDEX**

Haris Buljina
145 Nautical Dr.
South Daytona FL, 32119
hblawns@yahoo.com

Dear Mr. Buljina:

This firm represents American Freight, LLC ("American" or the "Company"), your former employer. As you know, your employment with American was terminated on June 25, 2020.  Following your termination, we understand that you accepted employment as the Vice President of Sales at Surplus Freight LLC ("Surplus"), a direct competitor of American.

As one of the terms for your employment with American, you entered into a Confidentiality and Non-Competition Agreement with American on August 29, 2016 (the "Agreement").  The Agreement requires that, "for a period of two (2) years from the voluntary or involuntary termination of [your] employment with the Company for any reason whatsoever, [you] shall not, either directly or indirectly, absent the written consent of the Company; (a) solicit, interfere with, or endeavor to cause any employee of the Company to leave his or her employment; or (b) induce or attempt to induce any such employee to work for any other entity."  Nevertheless, American has uncovered evidence that you are actively soliciting American employees, including American store managers, assistant managers and warehouse personnel in Virginia, to leave their employment with American in order to work for Surplus.  Egregiously, at least one American employee has reported that you instructed that individual to get fired from their position at American in order to work at Surplus.  This is a willful violation of your non-solicitation obligations.

The Agreement also requires that, "for a period of two (2) years from either the voluntary termination of [your] employment with the Company or the termination of [your] employment with the Company for Cause, [you] will not, directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with in any manner the ownership, management, operation, or control of any business which competes directly or indirectly with the Company in any existing market area of the Company at the time of termination

NEW YORK   WASHINGTON   HOUSTON   PALO ALTO   SAN FRANCISCO   CHICAGO   PARIS   LONDON   FRANKFURT   BRUSSELS   MILAN   ROME

April 8, 2021
Page 2

(voluntary or involuntary) of [your] employment." Your employment with Surplus is a direct violation of this non-competition obligation.

As such, we demand that you cease your employment with Surplus immediately, refrain from any further solicitation of American employees and confirm such compliance in writing no later than April 14, 2021. If you do not, American intends to seek all available legal and equitable remedies against, including but not limited to a restraining order, an injunction, court costs, attorneys' fees, monetary damages and punitive damages.

Finally, this letter is intended to place you on notice that litigation is likely to be commenced, and you must preserve and not destroy any documents, including electronically stored documents, phone call logs, text messages and the like, concerning the subject matter set forth in this letter, including any communications with former or current employees of American and your involvement with Surplus.

Nothing herein should be construed as a waiver by American of any of its rights, all of which are expressly reserved.

Sincerely,

/s/ *Thomas J. Meloro*

# EXHIBIT 13

# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

April 8, 2021

**<u>VIA EMAIL AND FEDEX</u>**

Joel Cady
254 Miller Rd.
Getzville, NY 14068
joelcady18@gmail.com

Dear Mr. Cady:

This firm represents American Freight, LLC ("<u>American</u>" or the "<u>Company</u>"), your former employer. As you know, your employment with American was terminated on November 30, 2020. Following your termination, we are informed that you may have accepted employment at Surplus Freight LLC ("<u>Surplus</u>"), a direct competitor of American.

As one of the terms for your employment with American, you entered into a Confidentiality and Non-Competition Agreement with American on August 22, 2017 (the "<u>Agreement</u>"). The Agreement requires that, "for a period of two (2) years from the voluntary or involuntary termination of [your] employment with the Company for any reason whatsoever, [you] shall not, either directly or indirectly, absent the written consent of the Company; (a) solicit, interfere with, or endeavor to cause any employee of the Company to leave his or her employment; or (b) induce or attempt to induce any such employee to work for any other entity." Nevertheless, American has uncovered evidence that you are actively soliciting American employees, including American store managers, assistant managers and warehouse personnel in Virginia, to leave their employment with American in order to work for Surplus. This is a willful violation of your non-solicitation obligations.

The Agreement also requires that, "for a period of two (2) years from either the voluntary termination of [your] employment with the Company or the termination of [your] employment with the Company for Cause, [you] will not, directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for, participate in, or be connected with in any manner the ownership, management, operation, or control of any business which competes directly or indirectly with the Company in any existing market area of the Company at the time of termination (voluntary or involuntary) of [your] employment." Your employment with Surplus is a direct violation of this non-competition obligation.

April 8, 2021
Page 2

As such, we demand that you cease your employment with Surplus immediately, refrain from any further solicitation of American employees and confirm such compliance in writing no later than April 14, 2021.  If you do not, American intends to seek all available legal and equitable remedies against, including but not limited to a restraining order, an injunction, court costs, attorneys' fees, monetary damages and punitive damages.

Finally, this letter is intended to place you on notice that litigation is likely to be commenced, and you must preserve and not destroy any documents, including electronically stored documents, phone call logs, text messages and the like, concerning the subject matter set forth in this letter, including any communications with former or current employees of American and your involvement with Surplus.

Nothing herein should be construed as a waiver by American of any of its rights, all of which are expressly reserved.


Sincerely,

/s/ *Thomas J. Meloro*

# EXHIBIT 14



Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
United States of America

T: +1 212 506 2500
F: +1 212 262 1910

mayerbrown.com

April 16, 2021

**Philip O. Brandes**
T: +1 212 506 2558
PBrandes@mayerbrown.com

BY E-MAIL

Thomas J. Meloro
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

Re:  David Belford

Dear Mr. Meloro:

I write on behalf of David Belford in response to your letters dated April 15, 2021. Contrary to the assertions in your letters, the Option Cancellation Agreement between American Freight Group, Inc. ("American Freight") and Mr. Belford, dated January 13, 2020 (the "Option Cancellation Agreement") expressly terminated the Non-Qualified Stock Option Agreement between American Freight and Mr. Belford, dated January 28, 2015 (the "Option Agreement"). Specifically, the relevant provision of the Option Cancellation Agreement is crystal clear: "At the Effective Time, your In-the-Money Options, whether vested or unvested, will automatically be cancelled and converted into the right to receive the Per Option Merger Consideration *and your Option agreement shall be terminated*, in full satisfaction of your rights as an Option holder." Option Cancellation Agreement § 1 (emphasis added).  Accordingly, Mr. Belford's obligations under the Option Agreement, including the restrictive covenants, were terminated at the Effective Time[1] and have no legal force.

As you are well aware, at the time that the Option Cancellation Agreement was negotiated, Franchise Group, Inc. ("Franchise Group") was represented by sophisticated counsel.  If Franchise Group had wanted the restrictive covenants set out in the Option Agreement to remain in force after the Effective Time, it could have proposed language to that effect.  But it did not.  It cannot now rewrite the Option Cancellation Agreement to obtain that for which it did not bargain.  *See Ashwood Capital, Inc. v. OTG Management, Inc.,* 99 A.D.3d 1, 7 (1st Dep't 2012) (in cases concerning "commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople . . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include") (citations and internal quotation marks omitted).  Moreover, in the unlikely event that a court concludes that there is any ambiguity in the Option Cancellation Agreement, it will be resolved against American Freight, since your firm drafted and proposed the provision at issue.  *See* Ex. 1 at § 1; *see also 151 W. Assoc. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (1984) ("It has long been the rule that

---

[1] Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Option Cancellation Agreement.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Mayer Brown LLP

Thomas J. Meloro
April 16, 2021
Page 2

ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it.").

Accordingly, Mr. Belford will not hesitate to defend his rights in court, should it come to that. Mr. Belford reserves all of his rights and remedies under the Option Cancellation Agreement, applicable law, or otherwise.

Sincerely,

*/s/ Philip O. Brandes*

Philip O. Brandes

# EXHIBIT 1

**AMERICAN FREIGHT GROUP, INC.**
c/o The Jordan Company, L.P.
399 Park Avenue, 30th Floor
New York, New York 10022

[●], 2019

«FirstName» «LastName»
American Freight Group, Inc.
c/o The Jordan Company, L.P.
399 Park Avenue, 30th Floor
New York, New York 10022

**Option Cancellation Agreement**

Dear «Salutation»:

As you know, on [●], 2019, American Freight Group, Inc., a Delaware corporation (the "Company") entered into an Agreement and Plan of Merger, dated as of [●], 2019 (as amended, restated or otherwise modified from time to time, the "Merger Agreement"), by and among the Company, **The Jordan Company, L.P., a Delaware limited partnership, solely in its capacity as the Representative,** [BUYER], a [●] ("Parent") and [BUYER MERGER SUB], a [●] and wholly-owned subsidiary of Parent ("Merger Sub"), pursuant to which the Company will be acquired in a merger (the "Merger") by Parent**, with the Company surviving the Merger**.

You are receiving this letter because you currently hold one or more options to purchase shares of common stock of the Company (the "Options") granted to you under the 2015 Non-Qualified Stock Option Plan of the Company (the "Plan"). Your current Option holdings **(including your In-the-Money Options)** are set forth on Exhibit A to this Option Cancellation Agreement (this "Agreement"). The purpose of this Agreement is to explain how the Merger will affect your Options and to memorialize certain agreements and commitments on your part in connection with the Merger and in consideration of the payments you will receive in respect of the Options pursuant to the Merger. A copy of the Merger Agreement is enclosed with this Agreement. Capitalized terms that are used and not otherwise defined in this Agreement have the meanings given to them in the Merger Agreement.

1. Treatment of the Options in the Merger.

~~The~~**Subject to the provisions of the Merger Agreement, the** Merger will have the following effect on the Options you hold ~~at~~**:**

- **Immediately prior to** the time the Merger becomes effective **pursuant to the Merger Agreement** (the "Effective Time")~~,~~**, your Options that are**

~~32335139.1~~32335139.2

**not In-the-Money Options will be automatically cancelled and terminated with no right to receive any consideration or payment therefor and be of no further force or effect.**

- ~~All of your Options will be canceled in exchange for~~**At the Effective Time, your In-the-Money Options, whether vested or unvested, will automatically be cancelled and converted into** the right to receive ~~cash. The amount of cash you will receive for your~~**the Per Option Merger Consideration and your Option agreement shall be terminated, in full satisfaction of your rights as an Option holder. The amount of the Per Option Merger Consideration that you would be entitled to receive in respect of your In-the-Money** Options is based on ~~a formula contained~~**the provisions set forth** in the Merger Agreement. Pursuant to the terms of the Merger Agreement, the amounts paid by **or on behalf of** Parent in connection with the Merger will be applied **by the Company or the Representative, as applicable,** to retire outstanding debt and the Company's preferred stock and to pay certain expenses in connection with the Merger, and the remainder will be available for payments to the current common stock holders and holders of **In-the-Money** Options. The actual amount you would be entitled to receive will be determined based on the formula set forth in the Merger Agreement. **All payments made in respect of your In-the-Money Options in connection with the Merger shall be made without interest and net of applicable withholding taxes.**

2. <u>When the Cash Payments Will Be Made</u>.

Generally, the cash payment for your **In-the-Money** Options **described above** will be paid to you through the Company's regular payroll processes (**without interest and** less applicable withholding taxes, if any) on the next regular payroll date of the Company that occurs after the Effective Time~~,~~ **that is** at least three (3) Business Days after the date you deliver the documents required by <u>Section 3</u> below. However, the Merger Agreement also provides that a portion of ~~your cash will be held in an escrow account. The escrow account is expected to remain in place from the Effective Time~~**the Per Option Merger Consideration (i.e., your Escrow Contribution Amount and Representative Holdback Contribution Amount) will be withheld. Such withheld amount is expected to be held** until the Merger Consideration is adjusted pursuant to Section 2.12 of the Merger Agreement, and potentially longer in the event of a dispute regarding the determination of the Merger Consideration. ~~The escrow account may be utilized to offset a~~**This amount will be used to pay Parent for any positive Actual Adjustment (i.e., any** reduction in the Merger Consideration**) pursuant to the Merger Agreement and to pay certain costs and expenses of the Representative in performing its responsibilities under the Merger Agreement**. To the extent ~~that the amounts held in~~ such ~~escrow account are~~**amount is** not utilized ~~to offset a reduction in the Merger Consideration~~**accordingly**, you will receive your portion of ~~the cash~~

2

32335139.132335139.2

~~held in the escrow account~~any such remaining amount through the Company's regular payroll processes (less applicable withholding taxes, if any) when such ~~escrowed amounts are~~amount is released ~~from escrow~~ in accordance with the Merger Agreement and the ~~relevant~~ escrow agreement, as applicable. In addition, if the Actual Adjustment is negative (i.e., there is an increase in the Merger Consideration to be paid by Parent based on the calculation of the final amount of the Merger Consideration pursuant to the Merger Agreement), you will be entitled to a portion of that amount. The provisions of the Merger Agreement relating to ~~the escrow~~such withheld amount and disputes between Parent, on the one hand, and the ~~representative of the Company's stockholders~~Representative, on the other hand, may affect both the amount of cash you receive, as well as the timing of your payment. By signing this Agreement, you (i) acknowledge the provisions of the Merger Agreement relating to your Options, including the calculation of the Per Option Merger Consideration set forth in the Merger Agreement and any Escrow Contribution Amount and Representative Holdback Contribution Amount that will be withheld from the Per Option Merger Consideration in accordance with the Merger Agreement and (ii) agree to be bound by such provisions with respect to your Options.

3. What You Should Do Next.

    To receive ~~your cash payment~~the Per Option Merger Consideration for your In-the-Money Options pursuant to the Merger Agreement, please sign this Agreement and return the original signed copy to American Freight Group, Inc., c/o Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020, Attention: Miller Lulow on or prior to 5:00 PM on [●], 2019. While you may sign and return this Agreement at any time, the expected closing date of the Merger is on or about [●], 2019. Your payments will be paid to you through the Company's regular payroll processes on the next regular payroll date of the Company that occurs after the Effective Time, that is at least three (3) Business Days after the date you deliver the documents required by this Section 3. If you exercise any of your Options between now and the closing of the Merger, a revised Exhibit A will be provided to you, which will supersede the attached Exhibit A.

4. Release of Claims.

    By signing below, you consent to the cancellation of your Options and you irrevocably and unconditionally release and discharge the Company, its ~~affiliates~~Affiliates and financing sources and their respective equity holders, predecessors, successors and Agents (as defined below), together with each of their current and former financing sources, employees, consultants, officers, directors, ~~shareholders, affiliates~~equity holders, general partners, limited partners, Affiliates and agents, and the predecessors, successors and assigns of each of the foregoing (the "Released Parties") from any and all ~~claims~~Actions and Liabilities, known or unknown, which you or your successors or assigns have or may have, against the Released Parties relating to the ownership or cancellation of your Options in the Merger. This release is for any relief, no matter how denominated, including but not limited to injunctive relief,

3

732491779

32335139.132335139.2

compensatory damages and punitive damages. You further agree that you will not **directly or indirectly** file or **bring, or** permit **or encourage** to be filed **or brought** on your behalf **or otherwise,** any such ~~claim~~**Action**. However, this release shall not apply to any claims you may have against the Company as the surviving corporation in the Merger (and only against the Company~~)~~ **in such capacity) or the Representative** relating to your right to receive the ~~cash payment for your Options calculated~~**Per Option Merger Consideration** in accordance with the ~~formula~~**terms and conditions** contained in the Merger Agreement, nor does this release apply to any claims that may arise in connection with your employment **by the Company** generally. **Notwithstanding anything to the contrary, nothing herein or in any Company policy or agreement shall prevent you from filing a charge or complaint with, participating in an investigation or proceeding conducted by, or reporting possible violations of law or regulation to any government agency; provided, however, that you agree to forgo any monetary benefit from the filing of a charge or complaint with a government agency except pursuant to a whistleblower program or where your right to receive such a monetary benefit is otherwise not waivable by law. For the avoidance of doubt and without limiting the foregoing, this release is for any relief, no matter how denominated, including but not limited to injunctive relief, compensatory damages and punitive damages, whether on behalf of yourself individually or as a class member.** You hereby expressly waive any and all rights conferred upon you by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in his, her or its favor at the time of executing the release, which if known by him, her or it must have materially affected his, her or its settlement with the released party, including, without limitation, the following provisions of California Civil Code Section 1542: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS ~~WHICH~~**THAT** THE CREDITOR **OR RELEASING PARTY** DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE **AND THAT**, ~~WHICH~~ IF KNOWN BY HIM OR HER ~~MUST~~**, WOULD** HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR~~." This~~ **OR RELEASED PARTY." Notwithstanding anything to the contrary herein, (i) this** Section 4 is for the benefit of the Released Parties ~~and~~**, each of whom is an express third party beneficiary of this Agreement (ii) this Section 4** shall be enforceable by any of ~~them~~**the Released Parties** directly against you **and your Releasing Parties, (iii) you agree that the releases and waivers set forth in this Section 4 are given on behalf of yourself and your Releasing Parties and shall be effective against and binding upon you and such Releasing Parties and (iv) you agree to (x) cause your Releasing Parties to comply with the provisions of this Section 4 and (y) take such actions and execute and deliver such documents, instruments and agreements (and cause your Releasing Parties to take such actions and execute such documents, instruments and agreements) as may be necessary or appropriate to give effect to the provisions of this Section 4**. For the avoidance of doubt, this release is in addition to the releases contained in the Letter of Transmittal and the Stockholder Support Agreement. **"Releasing Parties" means your spouse or domestic partner and next of kin, your and their Affiliates and your and their respective successors and assigns.**

4

732491779

32335139.1~32335139.2

You acknowledge and agree that your receipt of the cash payment with respect to your **In-the-Money** Options (calculated in accordance with the formula contained in the Merger Agreement**, and** as described above) will constitute full satisfaction of your rights with respect to the canceled Options and that you will have no right to any other payments **or any other rights** with respect to your Options **or your Option agreement** after the Effective Time (other than any payments **of your the portion of your Escrow Contribution Amount and Representative Holdback Contribution Amount (if any)** to which you may be entitled ~~from the Escrow Agent in accordance with the Adjustment Escrow~~**pursuant to the Merger** Agreement).

**5.** **Representations and Warranties.**

**You represent, warrant and agree that (a) the information set forth on Exhibit A with respect to your Options is true, correct and complete and that you have no other Options and are not a party to any other agreement other than your applicable Option agreement with the Company in respect of your Options; (b) you have received a copy of and have reviewed the Merger Agreement and this Agreement and have had an opportunity to consult with and have relied solely upon the advice, if any, of your legal, financial, accounting and/or tax advisors with respect to such matters, in each case to the extent you have deemed necessary, and you have not been advised or directed by any Released Party (as defined below) with respect to such matters; (c) you are the record and beneficial owner of, and have good and marketable title to the Options reflected on Exhibit A, which Options are held by you free and clear of any Liens, and you have no ownership or equity interest, or any other phantom equity, profits interest or similar interest, in or with respect to the Company or any of its Subsidiaries, or any of their respective businesses (other than the Options); (d) upon receipt of the Per Option Merger Consideration (net of any applicable withholding taxes) in accordance with Section 1 and the Merger Agreement, you will have received all consideration due or payable to you pursuant to your Options and your Option agreement with the Company; (e) you have duly executed and delivered this Agreement and this Agreement constitutes your legal, valid and binding obligation, enforceable against you in accordance with its terms, except as limited by the Remedies Exception; and (f) you have the full legal capacity and authority to execute and deliver this Agreement and perform your obligations under this Agreement.**

5

732491779

**6.** ~~5.~~ If the Merger Does Not Close.

In the event the Merger Agreement terminates **in accordance with its terms** for any reason and the closing of the Merger does not occur, this Agreement will automatically terminate and be of no further force or effect, and your Options will remain in effect in accordance with their existing terms and conditions.

**7.** **The Representative.**

**Pursuant to Section 10.17 of the Merger Agreement, you hereby acknowledge and agree that you have appointed (and you hereby agree and consent to such appointment of) the Representative as your attorney-in-fact, agent and representative for and on your behalf, and consent to the taking by the Representative of any and all actions, executing all documents and the making of any decisions required or permitted to be taken by the Representative under or as contemplated by the Merger Agreement and the other documents contemplated thereby, including with respect to the Charges or other expenses of the Representative pursuant to Section 10.17(b) of the Merger Agreement, and acknowledge and agree to be bound by the provisions of Section 10.17 of the Merger Agreement, which provisions are incorporated by reference in this Agreement, *mutatis* mutandis.**

**8.** ~~6.~~ APPLICABLE LAW.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF ~~DELAWARE~~NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE OR PERMIT THE APPLICATION OF LAWS OF ANOTHER JURISDICTION.

**9.** ~~7.~~ JURISDICTION OF DISPUTES; WAIVER OF JURY TRIAL.

IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, WITH RESPECT TO ANY OF THE MATTERS DESCRIBED OR CONTEMPLATED HEREIN, THE PARTIES TO THIS AGREEMENT HEREBY AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO COMPLY WITH THE PROVISIONS SET FORTH IN SECTIONS 10.10 AND 10.11 OF THE MERGER AGREEMENT**, WHICH PROVISIONS SHALL APPLY AS IF FULLY SET FORTH HEREIN, *MUTATIS MUTANDIS*.**

6

32335139.132335139.2

**10. 8.** Severability.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

**11. 9.** Waivers.

The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**12. 10.** Third Party Beneficiaries.

Parent and its ~~subsidiaries~~**Affiliates (including, after the Effective Time, the Surviving Corporation)** are hereby made express third party beneficiaries of this Agreement.  In addition, the Released Parties are hereby made **express** third party beneficiaries of this Agreement for purposes of Section 4.

**13. 11.** Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A facsimile **or electronic** transmission of an executed counterpart signature page shall be deemed an original.

**14. Copy of Merger Agreement.**

**A copy of the Merger Agreement is attached hereto as Exhibit B.**

*[Signature page follows]*

7

732491779

32335139.132335139.2

   Please sign this Agreement below and return it to Miller Lulow at the address set forth above. You should keep a copy of this Agreement with your other important papers. This is an exciting time for the Company, and we are pleased that you will be able to share in the benefits of the Merger through the payments described above.

                              Sincerely,


                              AMERICAN FREIGHT GROUP, INC.


                              By: _____
                              Name:
                              Title:


ACCEPTED AND AGREED


_____
«FirstName» «LastName»

Dated: __

732491779

32335139.2

## Exhibit A

~~Your Options are exercisable for [●] shares of Common Stock of the Company.~~
**Options Held by «FirstName» «LastName»**

| Grant Date | Exercise Price | Shares Subject to Option (#) | In-the-Money (Y/N) |
|------------|----------------|------------------------------|--------------------|
|            |                |                              |                    |
|            |                |                              |                    |
|            |                |                              |                    |

732491779

**Exhibit B**

**Merger Agreement**

**See attached.**

| Summary report: Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on 12/7/2019 5:27:49 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://NYCDMS/NewYork/32335139/1 | |
| **Modified DMS:** iw://NYCDMS/NewYork/32335139/2 | |
| **Changes:** | |
| **Add** | 103 |
| ~~Delete~~ | 56 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 1 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 160 |

# EXHIBIT 15



***Jason H. Beehler, Esq.***
*Direct Dial: (614) 462-5452*
*jbeehler@keglerbrown.com*

Kegler Brown Hill **+** Ritter Co. LPA
65 East State Street, Suite 1800
Columbus, OH 43215
(614) 462-5400
www.keglerbrown.com

April 16, 2021

<u>*Via Email*</u>

Thomas Meloro, Esq.
Wilkie Farr & Gallagher
787 Seventh Ave.
New York, NY 10019-6099

    Re: Surplus Freight

Dear Mr. Meloro:

    We have been retained to represent Asaph Rink with respect to a demand letter from you relating to his employment with Surplus Freight.

    We have a copy of a Non-qualified Stock Option Agreement relating to a Stock Option grant on February 14, 2018 relating to Mr. Rink. I will address your April 8, 2021 letter regarding Mr. Rink based upon the terms of that Agreement.

    First, my understanding is that Mr. Rink's last day of employment with American Freight was in late May of 2019. The two year post employment restricted period set forth in the Agreement is therefore about to expire.

    Second, American Freight previously consented to Mr. Rink's work arrangement, both with respect to the Canadian Retail Company Exception referenced at Section 10 of the June 13, 2019 Agreement & Release, and with respect to Mr. Rink's work at the Surplus Freight facility in New York. In fact, the April 8, 2021 letter asserts that Surplus Freight has been in competition with American Freight for at least the last ten months. If in fact American Freight has been aware of this alleged competition since July of 2020, it will be very difficult to demonstrate that the company will suffer immediate and irreparable harm for purposes of a TRO or injunction.

    Third, you claim in the April 8, 2021 letter that Mr. Rink was involved with the solicitation of American Freight employees. I've spoken with our client, who assures me this is incorrect. While Surplus Freight has hired several former employees of American Freight, these individuals were hired after contacting Surplus Freight following the loss of their jobs with American Freight. Further, Mr. Rink instructed Messrs. Haris and Buljina not to hire or communicate with American Freight employees long before he ever received your letter.

    Certain aspects of the non-compete agreements are also unenforceable. "A non-compete provision must first meet the standard contract formalities, and is subject to the additional requirements that it (1) be <u>reasonable in geographic scope</u> and temporal duration, (2) advance a



legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable. Determining whether these elements are met is a fact-specific inquiry." *Walsh v. Riddle*, 2008 BL 289685, 3 (Del. Super. Ct. Nov. 25, 2008) (emphasis added).

Delaware Courts are skeptical of non-competes with a nationwide geographic scope.
*FP UC Holdings, LLC v. Hamilton*, No. C.A. No. 2019-1029-JRS, 2020 BL 114324, 2020 WL 1492783 *7 (Del. Ch. Mar. 27, 2020) (refusing to enforce nationwide geographic scope of non-compete). The court went on: "To be sure, this court has enforced non-competes with a nationwide scope, but only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry . . . anywhere . . . for a stated period of time after the sale." Id.

Under the Stock Option Agreement, the protected territory is defined as North America. And the provisions arose in the context of run-of-the-mill employment agreements and a stock option agreement for Mr. Rink that pre-dated the sale of the business by two years. They did not arise from the sale of a business with a resulting walk-away by competitors. We therefore do not believe that a court construing Delaware law will enforce a nationwide prohibition.

We further believe that the restriction on soliciting and hiring former employees of American Freight is overbroad. Although American Freight may have a legitimate business interest in preventing the solicitation of current employees, to maintain a stable workforce, it has no such interest in preventing the solicitation of terminated or former employees.

If American Freight chooses to take legal actions on largely unenforceable non-compete and non-solicitation provisions, just as they are about to expire, Mr. Rink will defend such claims vigorously.

Sincerely,

Robert G. Cohen

Jason H. Beeler

RGC/JHB/krb

# EXHIBIT 16

**Int. Cl.: 35**

**Prior U.S. Cls.: 100, 101 and 102**

**United States Patent and Trademark Office**

**Reg. No. 3,362,041**

Registered Jan. 1, 2008

### SERVICE MARK
### PRINCIPAL REGISTER

# AMERICAN FREIGHT

AMERICAN FREIGHT OF OHIO, INC. (OHIO CORPORATION)

2770 LEXINGTON AVENUE

LEXINGTON, OH 44904

FOR: RETAIL STORE SERVICES FEATURING MATTRESSES, FURNITURE, AND CARPETING, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-0-1994; IN COMMERCE 9-0-1994.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE AMERICAN, APART FROM THE MARK AS SHOWN.

SER. NO. 77-161,364, FILED 4-20-2007.

JOANNA DUKOVCIC, EXAMINING ATTORNEY

# EXHIBIT 17

Case: 2:21-cv-01922-MHW-EPD Doc #: 35-1 Filed: 06/01/21 Page: 184 of 222  PAGEID #: 754

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1                                              ETAS ID: TM446781
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ENTITY CONVERSION |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| American Freight of Ohio, Inc. | | 12/31/2014 | Corporation: OHIO |

## RECEIVING PARTY DATA

| | |
|---|---|
| **Name:** | American Freight of Ohio, LLC |
| **Street Address:** | 2770 Lexington Avenue |
| **City:** | Lexington |
| **State/Country:** | OHIO |
| **Postal Code:** | 44904 |
| **Entity Type:** | Limited Liability Company: DELAWARE |

## PROPERTY NUMBERS Total: 5

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |
| Registration Number: | 3908803 | ASSOCIATED BEDDING |
| Registration Number: | 3954456 | DR. MARVIN'S |
| Registration Number: | 3875531 | NORDICREST |
| Registration Number: | 2973591 | STEWART & HAMILTON |

## CORRESPONDENCE DATA

**Fax Number:**          6147480631

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

**Phone:**              6148470023
**Email:**              smueller@muelleriplaw.com
**Correspondent Name:**  Jerry K. Mueller, Jr.
**Address Line 1:**      3841B Attucks Drive
**Address Line 2:**      Wedgewood Office Park
**Address Line 4:**      Powell, OHIO 43065

| NAME OF SUBMITTER: | Jerry K. Mueller, Jr. |
|---|---|
| SIGNATURE: | /J.K. Mueller, Jr./ |
| DATE SIGNED: | 10/11/2017 |

**Total Attachments: 6**

OP  $140.00  3362041

source=AF of Ohio - DE Conversion Documents - FILED#page1.tif
source=AF of Ohio - DE Conversion Documents - FILED#page2.tif
source=AF of Ohio - DE Conversion Documents - FILED#page3.tif
source=AF of Ohio - DE Conversion Documents - FILED#page4.tif
source=AF of Ohio - DE Conversion Documents - FILED#page5.tif
source=AF of Ohio - DE Conversion Documents - FILED#page6.tif

**TRADEMARK**
**REEL: 006189 FRAME: 0183**

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF AN OHIO CORPORATION UNDER THE NAME OF "AMERICAN FREIGHT OF OHIO, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "AMERICAN FREIGHT OF OHIO, INC." TO "AMERICAN FREIGHT OF OHIO, LLC", FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2014, AT 7:05 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF CONVERSION IS THE FIRST DAY OF JANUARY, A.D. 2015, AT 12:01 O'CLOCK A.M.

5665650 8100V

141596472

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2001409

DATE: 12-31-14

**TRADEMARK
REEL: 006189 FRAME: 0184**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:28 PM 12/29/2014*
*FILED 07:05 PM 12/29/2014*
*SRV 141596472 - 5665650 FILE*

STATE OF DELAWARE
CERTIFICATE OF CONVERSION
OF AMERICAN FREIGHT OF OHIO, INC.
FROM AN OHIO CORPORATION TO A LIMITED LIABILITY COMPANY
PURSUANT TO
SECTION 18-214 OF THE DELAWARE LIMITED LIABILITY COMPANY ACT

December 24, 2014

Charles Jennings, being the duly elected Assistant Secretary of American Freight of Ohio, Inc., an Ohio corporation (the "Corporation"), does hereby certify as follows:

1. The jurisdiction where the Corporation first formed is Ohio.

2. The jurisdiction immediately prior to filing this Certificate of Conversion is Ohio.

3. The date the Corporation first formed is March 1, 1994.

4. The name of the Corporation immediately prior to filing this Certificate of Conversion is American Freight of Ohio, Inc.

5. The name of the Limited Liability Company into which the Corporation is herein being converted as set forth in the Certificate of Formation is American Freight of Ohio, LLC.

6. The conversion shall be effective as of 12:01 a.m. on January 1, 2015.

7. The conversion has been approved in accordance with the provisions of Section 18-214 of the Delaware Limited Liability Company Act.

*[Signature page follows]*

711980172

**TRADEMARK**
**REEL: 006189 FRAME: 0185**

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Conversion as of the date first above written.

By: _____

Name: Charles Jennings

Title: Authorized Person



*Delaware*

PAGE 2

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND
CORRECT COPY OF CERTIFICATE OF FORMATION OF "AMERICAN FREIGHT OF
OHIO, LLC" FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF
DECEMBER, A.D. 2014, AT 7:05 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF FORMATION IS THE FIRST DAY OF
JANUARY, A.D. 2015, AT 12:01 O'CLOCK A.M.

5665650  8100V

141596472

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2001409

DATE: 12-31-14

**TRADEMARK
REEL: 006189 FRAME: 0187**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:28 PM 12/29/2014*
*FILED 07:05 PM 12/29/2014*
*SRV 141596472 – 5665650 FILE*

# CERTIFICATE OF FORMATION
## OF
## AMERICAN FREIGHT OF OHIO, LLC

December 24, 2014

This Certificate of Formation of American Freight of Ohio, LLC (the "Company") is being executed by the undersigned for the purpose of forming a limited liability company under the Delaware Limited Liability Company Act, Del. Code, tit. 6, Section 18-101 et seq., as amended from time to time (the "Act").

1.  Name.  The name of the limited liability company formed hereby is "American Freight of Ohio, LLC".

2.  Registered Office.  The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

3.  Registered Agent.  The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

4.  Indemnification.  The Company shall indemnify, to the full extent permitted by the Act, as amended from time to time, all persons whom it is permitted to indemnify pursuant thereto.

5.  Effective Date.  The formation of the Company shall be effective as of 12:01 a.m. on January 1, 2015.

*[Signature Page Follows]*

711978756

IN WITNESS WHEREOF, the undersigned has caused this Certificate of Formation to be duly executed as of the date first above written.

**AUTHORIZED PERSON**

Name: Charles Jennings

Case: 2:21-cv-01922-MHW-EPD Doc #: 35-1 Filed: 06/01/21 Page: 192 of 222 PAGEID #: 762

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM452413

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | MERGER AND CHANGE OF NAME |
| EFFECTIVE DATE: | 08/16/2017 |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| American Freight of Ohio, LLC | | 08/16/2017 | Limited Liability Company: DELAWARE |

### NEWLY MERGED ENTITY DATA

| Name | Execution Date | Entity Type |
|---|---|---|
| American Freight, Inc. | 08/16/2017 | Corporation: DELAWARE |

### MERGED ENTITY'S NEW NAME (RECEIVING PARTY)

| | |
|---|---|
| Name: | American Freight, Inc. |
| Street Address: | 680 Sunbury Road |
| City: | Delaware |
| State/Country: | OHIO |
| Postal Code: | 43015 |
| Entity Type: | Corporation: DELAWARE |

### PROPERTY NUMBERS Total: 5

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |
| Registration Number: | 3908803 | ASSOCIATED BEDDING |
| Registration Number: | 3954456 | DR. MARVIN'S |
| Registration Number: | 3875531 | NORDICREST |
| Registration Number: | 2973591 | STEWART & HAMILTON |

OP $140.00 3362041

### CORRESPONDENCE DATA

**Fax Number:** 6147480631

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

| | |
|---|---|
| Phone: | 614-847-0023 |
| Email: | smueller@muelleriplaw.com |
| Correspondent Name: | Jerry K. Muellr, Jr. |
| Address Line 1: | 3841B Attucks Drive |
| Address Line 4: | Powell, OHIO 43065-6082 |

| NAME OF SUBMITTER: | Jerry K. Mueller, Jr. |
|---|---|
| SIGNATURE: | /J.K. MUELLER, JR./ |
| DATE SIGNED: | 11/29/2017 |

**Total Attachments: 3**
source=AF of Ohio merger#page1.tif
source=AF of Ohio merger#page2.tif
source=AF of Ohio merger#page3.tif

# AGREEMENT OF MERGER

## OF

## AMERICAN FREIGHT OF OHIO, LLC
### (a Delaware limited liability company)

## AND

## AMERICAN FREIGHT, INC.
### (a Delaware corporation)

Now on this 16th day of August, 2017, American Freight, Inc., a Delaware corporation (the "Corporation"), and American Freight of Ohio, LLC, a Delaware limited liability company (the "LLC" and, together with the Corporation, sometimes referred to herein as the "Constituent Entities"), have entered into the following Agreement of Merger (the "Agreement") pursuant to Section 264 of the General Corporation Law of the State of Delaware (the "DGCL") and pursuant to Section 18-209 of the Limited Liability Company Act of the State of Delaware (the "DLLCA").

WHEREAS, the Board of Directors of the Corporation and the sole member of the LLC declare it advisable and in the best interests of said Constituent Entities and their respective sole stockholder and sole member to merge the LLC with and into the Corporation pursuant to the provisions of the DLLCA and the DGCL upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and provisions hereinafter contained, the Constituent Entities do hereby prescribe the terms and conditions of the merger and of carrying the same into effect as follows:

1.       Pursuant to the provisions of the DGCL and the DLLCA, the LLC shall be merged with and into the Corporation, with the Corporation being the surviving entity (the "Merger"). The Merger is to become effective as at 11:59 p.m., Eastern Daylight Time, on October 1, 2017, upon the filing of a certificate of merger with the Secretary of State of the State of Delaware (the "Effective Time"). At the Effective Time, the Corporation shall continue its existence as a corporation formed under the laws of the State of Delaware (sometimes hereinafter referred to as the "Surviving Entity"). The separate existence of the LLC shall cease at the Effective Time.

2.       At the Effective Time, the Surviving Entity shall continue its existence as said surviving corporation pursuant to the provisions of the DGCL.

3.       At the Effective Time, the Certificate of Incorporation of the Corporation as in effect immediately prior to the Merger, shall continue in full force and effect as the Certificate of Incorporation of the Surviving Entity.

4.       At the Effective Time, the by-laws of the Corporation as in effect immediately prior to the Merger shall continue in full force and effect as the by-laws of the Surviving Entity.

724742443

**TRADEMARK**
**REEL: 006214 FRAME: 0828**

5. At the Effective Time, the board of directors of the Corporation immediately prior to the Effective Time shall be the board of directors of the Surviving Entity.

6. At the Effective Time, the officers of the Corporation immediately prior to the Effective Time shall be the officers of the Surviving Entity.

7. At the Effective Time, as the Corporation is the holder of all the issued and outstanding membership interests of the LLC, all the issued and outstanding membership interests of the LLC immediately prior to the Effective Time shall by virtue of the Merger and without any action on the part of the holder thereof cease to be outstanding, be canceled and retired without payment of any consideration. The shares of the Corporation shall not be converted, but each said share which is issued as of the Effective Time shall continue to represent one issued share of the Corporation.

*[Signature page follows]*

724742443

TRADEMARK
REEL: 006214 FRAME: 0829

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

AMERICAN FREIGHT, INC.

By: _____
Name: Chuck Jennings
Title: Assistant Secretary

AMERICAN FREIGHT OF OHIO, LLC

By: _____
Name: Chuck Jennings
Title: Assistant Secretary

724742443

RECORDED: 11/29/2017

TRADEMARK
REEL: 006214 FRAME: 0830

Case: 2:21-cv-01922-MHW-EPD Doc #: 35-1 Filed: 06/01/21 Page: 197 of 222 PAGEID #: 767

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1                                                                  ETAS ID: TM452334
Stylesheet Version v1.2

| SUBMISSION TYPE: | RESUBMISSION |
|---|---|
| NATURE OF CONVEYANCE: | MERGER AND CHANGE OF NAME |
| EFFECTIVE DATE: | 08/16/2017 |
| RESUBMIT DOCUMENT ID: | 900424623 |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| American Freight of Ohio, LLC | | 08/16/2017 | Corporation: DELAWARE |

**NEWLY MERGED ENTITY DATA**

| Name | Execution Date | Entity Type |
|---|---|---|
| American Freight, Inc. | 08/16/2017 | Corporation: DELAWARE |

**MERGED ENTITY'S NEW NAME (RECEIVING PARTY)**

| Name: | American Freight, Inc. |
|---|---|
| Street Address: | 2770 Lexington Avenue |
| City: | Lexington |
| State/Country: | OHIO |
| Postal Code: | 44904 |
| Entity Type: | Corporation: DELAWARE |

**PROPERTY NUMBERS Total: 5**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |
| Registration Number: | 3908803 | ASSOCIATED BEDDING |
| Registration Number: | 3954456 | DR. MARVIN'S |
| Registration Number: | 3875531 | NORDICREST |
| Registration Number: | 2973591 | STEWART & HAMILTON |

**CORRESPONDENCE DATA**

**Fax Number:**          6147480631
*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*
**Phone:**               6148470023
**Email:**               smueller@muelleriplaw.com
**Correspondent Name:**  Jerry K. Mueller, Jr.
**Address Line 1:**      3841B Attucks Drive
**Address Line 2:**      Wedgewood Office Park

| **Address Line 4:** | Powell, OHIO 43065 |
|---|---|

| **ATTORNEY DOCKET NUMBER:** | AMF 0-000 |
|---|---|
| **NAME OF SUBMITTER:** | JERRY K. MUELLER, JR. |
| **SIGNATURE:** | /J.K. MUELLER, JR./ |
| **DATE SIGNED:** | 11/28/2017 |

**Total Attachments: 6**
source=AF of Ohio - DE Conversion Documents - FILED#page1.tif
source=AF of Ohio - DE Conversion Documents - FILED#page2.tif
source=AF of Ohio - DE Conversion Documents - FILED#page3.tif
source=AF of Ohio - DE Conversion Documents - FILED#page4.tif
source=AF of Ohio - DE Conversion Documents - FILED#page5.tif
source=AF of Ohio - DE Conversion Documents - FILED#page6.tif

# Delaware

PAGE 1

### *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF AN OHIO CORPORATION UNDER THE NAME OF "AMERICAN FREIGHT OF OHIO, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "AMERICAN FREIGHT OF OHIO, INC." TO "AMERICAN FREIGHT OF OHIO, LLC", FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2014, AT 7:05 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF CONVERSION IS THE FIRST DAY OF JANUARY, A.D. 2015, AT 12:01 O'CLOCK A.M.

5665650  8100V

141596472

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2001409

DATE: 12-31-14

**TRADEMARK
REEL: 006199 FRAME: 0375**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:28 PM 12/29/2014*
*FILED 07:05 PM 12/29/2014*
*SRV 141596472 - 5665650 FILE*

STATE OF DELAWARE
CERTIFICATE OF CONVERSION
OF AMERICAN FREIGHT OF OHIO, INC.
FROM AN OHIO CORPORATION TO A LIMITED LIABILITY COMPANY
PURSUANT TO
SECTION 18-214 OF THE DELAWARE LIMITED LIABILITY COMPANY ACT

December 24, 2014

Charles Jennings, being the duly elected Assistant Secretary of American Freight of Ohio, Inc., an Ohio corporation (the "Corporation"), does hereby certify as follows:

1. The jurisdiction where the Corporation first formed is Ohio.

2. The jurisdiction immediately prior to filing this Certificate of Conversion is Ohio.

3. The date the Corporation first formed is March 1, 1994.

4. The name of the Corporation immediately prior to filing this Certificate of Conversion is American Freight of Ohio, Inc.

5. The name of the Limited Liability Company into which the Corporation is herein being converted as set forth in the Certificate of Formation is American Freight of Ohio, LLC.

6. The conversion shall be effective as of 12:01 a.m. on January 1, 2015.

7. The conversion has been approved in accordance with the provisions of Section 18-214 of the Delaware Limited Liability Company Act.

*[Signature page follows]*

**TRADEMARK**
**REEL: 006199 FRAME: 0376**

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Conversion as of the date first above written.

By:
Name:  Charles Jennings
Title:   Authorized Person



# Delaware

*The First State*

PAGE 2

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF CERTIFICATE OF FORMATION OF "AMERICAN FREIGHT OF OHIO, LLC" FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2014, AT 7:05 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF FORMATION IS THE FIRST DAY OF JANUARY, A.D. 2015, AT 12:01 O'CLOCK A.M.

5665650   8100V

141596472

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2001409

DATE: 12-31-14

**TRADEMARK**
**REEL: 006199 FRAME: 0378**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:28 PM 12/29/2014*
*FILED 07:05 PM 12/29/2014*
*SRV 141596472 – 5665650 FILE*

# CERTIFICATE OF FORMATION
## OF
## AMERICAN FREIGHT OF OHIO, LLC

December 24, 2014

This Certificate of Formation of American Freight of Ohio, LLC (the "Company") is being executed by the undersigned for the purpose of forming a limited liability company under the Delaware Limited Liability Company Act, Del. Code, tit. 6, Section 18-101 et seq., as amended from time to time (the "Act").

1. Name. The name of the limited liability company formed hereby is "American Freight of Ohio, LLC".

2. Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

3. Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

4. Indemnification. The Company shall indemnify, to the full extent permitted by the Act, as amended from time to time, all persons whom it is permitted to indemnify pursuant thereto.

5. Effective Date. The formation of the Company shall be effective as of 12:01 a.m. on January 1, 2015.

*[Signature Page Follows]*

**TRADEMARK**
**REEL: 006199 FRAME: 0379**

IN WITNESS WHEREOF, the undersigned has caused this Certificate of Formation to be duly executed as of the date first above written.

**AUTHORIZED PERSON**

Name: Charles Jennings

Case: 2:21-cv-01922-MHW-EPD Doc #: 35-1 Filed: 06/01/21 Page: 205 of 222  PAGEID #: 775

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1                                          ETAS ID: TM625227
Stylesheet Version v1.2

| SUBMISSION TYPE: | RESUBMISSION |
|---|---|
| NATURE OF CONVEYANCE: | MERGER |
| EFFECTIVE DATE: | 10/01/2017 |
| RESUBMIT DOCUMENT ID: | 900585137 |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| AMERICAN FREIGHT OF OHIO, LLC | | 09/20/2017 | Limited Liability Company: DELAWARE |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | American Freight, Inc |
| Street Address: | 680 Sunbury Road |
| City: | Delaware |
| State/Country: | OHIO |
| Postal Code: | 43015 |
| Entity Type: | Corporation: DELAWARE |

## PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |

## CORRESPONDENCE DATA

**Fax Number:**          6508385109

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

**Phone:**               650-838-3743
**Email:**               jlik@shearman.com
**Correspondent Name:**  MARIE-ALEXIS VALENTE
**Address Line 1:**      599 Lexington Avenue
**Address Line 2:**      Shearman & Sterling LLP
**Address Line 4:**      New York, NEW YORK 10022

| ATTORNEY DOCKET NUMBER: | 42218/3 |
|---|---|
| NAME OF SUBMITTER: | MARIE-ALEXIS VALENTE |
| SIGNATURE: | /MARIE-ALEXIS VALENTE/ |
| DATE SIGNED: | 02/08/2021 |

**Total Attachments: 6**

source=0 - American Freight Inc.-DE-Merger (Survivor)#page1.tif

source=0 - American Freight Inc.-DE-Merger (Survivor)#page2.tif
source=0 - American Freight Inc.-DE-Merger (Survivor)#page3.tif
source=0 - American Freight Inc.-DE-Merger (Survivor)#page4.tif
source=0 - American Freight Inc.-DE-Merger (Survivor)#page5.tif
source=0 - American Freight Inc.-DE-Merger (Survivor)#page6.tif

**TRADEMARK**
**REEL: 007182 FRAME: 0416**

# Delaware

#### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"AMERICAN FREIGHT OF SOUTHERN OHIO, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF WISCONSIN, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF ILLINOIS, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF MICHIGAN, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF MISSOURI, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF LOUISIANA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF SOUTH CAROLINA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

Jeffrey W. Bullock, Secretary of State

5602671  8100M
SR# 20176248898

Authentication: 203269663
Date: 09-21-17

You may verify this certificate online at corp.delaware.gov/authver.shtml



# Delaware

### The First State

Page 2

"AMERICAN FREIGHT OF TALLAHASSEE, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF FLORIDA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF VIRGINIA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF INDIANA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF CENTRAL FLORIDA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF SOUTH FLORIDA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF TENNESSEE, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF WEST VIRGINIA, LLC", A DELAWARE LIMITED LIABILITY COMPANY,

"AMERICAN FREIGHT OF OHIO, LLC", A DELAWARE LIMITED LIABILITY COMPANY,



Jeffrey W. Bullock, Secretary of State

5602671  8100M
SR# 20176248898

Authentication: 203269663
Date: 09-21-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

**TRADEMARK**
**REEL: 007182 FRAME: 0418**



# Delaware

### The First State

Page 3

*"AMERICAN FREIGHT OF WESTERN NEW YORK, LLC", A DELAWARE*

*LIMITED LIABILITY COMPANY,*

*"AMERICAN FREIGHT OF KENTUCKY, LLC", A DELAWARE LIMITED*

*LIABILITY COMPANY,*

*"AMERICAN FREIGHT OF MINNESOTA, LLC", A DELAWARE LIMITED*

*LIABILITY COMPANY,*

*"AMERICAN FREIGHT OF PENNSYLVANIA, LLC", A DELAWARE LIMITED*

*LIABILITY COMPANY,*

*WITH AND INTO "AMERICAN FREIGHT, INC." UNDER THE NAME OF*

*"AMERICAN FREIGHT, INC.", A CORPORATION ORGANIZED AND EXISTING*

*UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED*

*IN THIS OFFICE ON THE TWENTIETH DAY OF SEPTEMBER, A.D. 2017, AT*

*5:57 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF*

*THE AFORESAID CERTIFICATE OF MERGER IS THE FIRST DAY OF OCTOBER,*

*A.D. 2017 AT 11:59 O'CLOCK P.M.*

*A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE*

*NEW CASTLE COUNTY RECORDER OF DEEDS.*



Jeffrey W. Bullock, Secretary of State

5602671  8100M
SR# 20176248898

Authentication: 203269663
Date: 09-21-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

**TRADEMARK**
**REEL: 007182 FRAME: 0419**



# Delaware

### The First State

Page 4



5602671  8100M
SR# 20176248898

Authentication: 203269663
Date: 09-21-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

**TRADEMARK**
**REEL: 007182 FRAME: 0420**

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:57 PM 09/20/2017
FILED 05:57 PM 09/20/2017
SR 20176248898 - File Number 5602671

## STATE OF DELAWARE
## CERTIFICATE OF MERGER OF
## DOMESTIC LIMITED LIABILITY COMPANIES
## INTO A
## DOMESTIC CORPORATION

Pursuant to Title 8, Section 264(c) of the Delaware General Corporation Law and Title 6, Section 18-209 of the Delaware Limited Liability Company Act, the undersigned corporation executed the following Certificate of Merger:

FIRST: The name of the surviving corporation is American Freight, Inc., a Delaware corporation, and the name of the limited liability companies being merged into this surviving corporation are American Freight of Central Florida, LLC, American Freight of Florida, LLC, American Freight of Illinois, LLC, American Freight of Indiana, LLC, American Freight of Kentucky, LLC, American Freight of Louisiana, LLC, American Freight of Michigan, LLC, American Freight of Minnesota, LLC, American Freight of Missouri, LLC, American Freight of Ohio, LLC, American Freight of Pennsylvania, LLC, American Freight of South Carolina, LLC, American Freight of South Florida, LLC, American Freight of Southern Ohio, LLC, American Freight of Tallahassee, LLC, American Freight of Tennessee, LLC, American Freight of Virginia, LLC, American Freight of West Virginia, LLC, American Freight of Western New York, LLC and American Freight of Wisconsin, LLC.

SECOND: The Agreement of Merger has been approved, adopted, certified, executed and acknowledged by the surviving corporation and the merging limited liability company.

THIRD: The name of the surviving corporation is American Freight, Inc.

FOURTH: The merger is to become effective at 11:59 p.m. Eastern Daylight Time, on October 1, 2017.

FIFTH: The Agreement of Merger is on file at 680 Sunbury Road, Delaware, OH 43015, the place of business of the surviving corporation.

SIXTH: A copy of the Agreement of Merger will be furnished by the corporation on request, without cost, to any stockholder of any constituent corporation or member of any constituent limited liability company.

SEVENTH: The Certificate of Incorporation of the surviving corporation shall be its Certificate of Incorporation.

IN WITNESS WHEREOF, said Corporation has caused this certificate to be signed by an authorized officer of the Corporation on September 20, 2017.

[Signature Page Follows]

725342842

**TRADEMARK**
**REEL: 007182 FRAME: 0421**

AMERICAN FREIGHT, INC.

By: _____

Name: Ronald C. Allender
Title: Chief Financial Officer

725342842

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM614206

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ENTITY CONVERSION |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| AMERICAN FREIGHT, INC. | | 02/24/2020 | Corporation: DELAWARE |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | American Freight, LLC |
| Street Address: | 680 Sunbury Road |
| City: | Delaware |
| State/Country: | OHIO |
| Postal Code: | 43015 |
| Entity Type: | Limited Liability Company: DELAWARE |

**PROPERTY NUMBERS Total: 3**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |
| Serial Number: | 88820904 | AF AMERICAN FREIGHT APPLIANCE · FURNITUR |
| Serial Number: | 88820899 | AF AMERICAN FREIGHT FURNITURE · MATTRESS |

**CORRESPONDENCE DATA**

**Fax Number:** 6508385109

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 650-838-3743 |
| Email: | jlik@shearman.com |
| Correspondent Name: | MARIE-ALEXIS VALENTE |
| Address Line 1: | 599 Lexington Avenue |
| Address Line 2: | Shearman & Sterling LLP |
| Address Line 4: | New York, NEW YORK 10022 |

| ATTORNEY DOCKET NUMBER: | 42218/3 |
|---|---|
| NAME OF SUBMITTER: | MARIE-ALEXIS VALENTE |
| SIGNATURE: | /MARIE-ALEXIS VALENTE/ |
| DATE SIGNED: | 12/14/2020 |

**Total Attachments: 3**

source=0 - American Freight, Inc. - Certificate of Conversion (as filed in DE)#page1.tif

source=0 - American Freight, Inc. - Certificate of Conversion (as filed in DE)#page2.tif

source=0 - American Freight, Inc. - Certificate of Conversion (as filed in DE)#page3.tif



# Delaware

### The First State

Page 1

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "AMERICAN FREIGHT, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "AMERICAN FREIGHT, INC." TO "AMERICAN FREIGHT, LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF FEBRUARY, A.D. 2020, AT 3:43 O`CLOCK P.M.*

5602671  8100V
SR# 20201500739
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202459735
Date: 02-25-20

**TRADEMARK
REEL: 007133 FRAME: 0353**

**STATE OF DELAWARE**
**CERTIFICATE OF CONVERSION**
**FROM A CORPORATION TO A**
**LIMITED LIABILITY COMPANY PURSUANT TO**
**SECTION 18-214 OF THE LIMITED LIABILITY COMPANY ACT**

1.   The jurisdiction where the Corporation first formed is Delaware.

2.   The jurisdiction immediately prior to filing this Certificate is Delaware.

3.   The date the Corporation first formed is September 12, 2014.

4.   The name of the Corporation immediately prior to filing this Certificate is American Freight, Inc.

5.   The name of the Limited Liability Company as set forth in the Certificate of Formation is American Freight, LLC.

6.   All outstanding shares of capital stock of American Freight, Inc. shall be converted into membership interests in American Freight, LLC.

*[Signature page follows]*

40743619

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:43 PM 02/25/2020
FILED 03:43 PM 02/25/2020
SR 20201525041 - File Number 5602671

**TRADEMARK**
**REEL: 007133 FRAME: 0354**

IN WITNESS WHEREOF, the undersigned has executed this Certificate on the <u>24th</u> day of February, 2020.

By: _____

Name:   Andrew Kaminsky

Title:   Chief Administrative Officer and Executive Vice President

*[Signature Page to Certificate of Conversion – American Freight, Inc.]*

40743619

Case: 2:21-cv-01922-MHW-EPD Doc #: 35-1 Filed: 06/01/21 Page: 218 of 222  PAGEID #: 788

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM581694

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ENTITY CONVERSION |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| American Freight, Inc. | | 02/25/2020 | Corporation: DELAWARE |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | American Freight, LLC |
| Street Address: | 680 Sunbury Road |
| City: | Delaware |
| State/Country: | OHIO |
| Postal Code: | 43015 |
| Entity Type: | Limited Liability Company: DELAWARE |

## PROPERTY NUMBERS Total: 4

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 3362041 | AMERICAN FREIGHT |
| Registration Number: | 3954456 | DR. MARVIN'S |
| Registration Number: | 3875531 | NORDICREST |
| Registration Number: | 2973591 | STEWART & HAMILTON |

## CORRESPONDENCE DATA

**Fax Number:**        6147480631

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

| | |
|---|---|
| **Phone:** | 6148470023 |
| **Email:** | smueller@muelleriplaw.com |
| **Correspondent Name:** | Jerry K. Mueller, Jr. |
| **Address Line 1:** | 3841B Attucks Drive |
| **Address Line 2:** | Wedgewood Office Park |
| **Address Line 4:** | Powell, OHIO 43065 |

| NAME OF SUBMITTER: | Jerry K. Mueller, Jr. |
|---|---|
| SIGNATURE: | /J.K. Mueller, Jr./ |
| DATE SIGNED: | 06/17/2020 |

**Total Attachments: 3**
source=American Freight, Inc. - Certificate of Conversion (as filed in DE)#page1.tif
source=American Freight, Inc. - Certificate of Conversion (as filed in DE)#page2.tif

OP  $115.00  3362041

source=American Freight, Inc. - Certificate of Conversion (as filed in DE)#page3.tif

**TRADEMARK**
**REEL: 006972 FRAME: 0237**



# Delaware

### The First State

Page 1

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE CORPORATION UNDER THE NAME OF "AMERICAN FREIGHT, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM "AMERICAN FREIGHT, INC." TO "AMERICAN FREIGHT, LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF FEBRUARY, A.D. 2020, AT 3:43 O`CLOCK P.M.*

5602671  8100V
SR# 20201500739

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202459735
Date: 02-25-20

**TRADEMARK
REEL: 006972 FRAME: 0238**

**STATE OF DELAWARE**
**CERTIFICATE OF CONVERSION**
**FROM A CORPORATION TO A**
**LIMITED LIABILITY COMPANY PURSUANT TO**
**SECTION 18-214 OF THE LIMITED LIABILITY COMPANY ACT**

1. The jurisdiction where the Corporation first formed is Delaware.

2. The jurisdiction immediately prior to filing this Certificate is Delaware.

3. The date the Corporation first formed is September 12, 2014.

4. The name of the Corporation immediately prior to filing this Certificate is American Freight, Inc.

5. The name of the Limited Liability Company as set forth in the Certificate of Formation is American Freight, LLC.

6. All outstanding shares of capital stock of American Freight, Inc. shall be converted into membership interests in American Freight, LLC.

*[Signature page follows]*

40743619

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:43 PM 02/25/2020
FILED 03:43 PM 02/25/2020
SR 20201419624 - File Number 5602671

IN WITNESS WHEREOF, the undersigned has executed this Certificate on the <u>24th</u> day of February, 2020.

By: _____

Name:   Andrew Kaminsky

Title:   Chief Administrative Officer and Executive Vice President

*[Signature Page to Certificate of Conversion – American Freight, Inc.]*

40743619