## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
## OF OHIO EASTERN DIVISION

| | |
|---|---|
| AMERICAN FREIGHT LLC, | Civil Action No. 2:21-CV-01922 |
| *Plaintiff*, | Judge Michael H. Watson |
| v. | Magistrate Judge Elizabeth Preston Deavers |
| SURPLUS FREIGHT, LLC, SURPLUS FREIGHT INC., STAGE CAPITAL, LLC, ASAPH RINK, and DAVID BELFORD, | |
| *Defendants.* | |
| AMERICAN FREIGHT LLC, | Civil Action No. 2:21-CV-01922 (formerly 2:21-CV-02136) |
| *Plaintiff*, | Judge Michael H. Watson |
| v. | Magistrate Judge Elizabeth Preston Deavers |
| JOEL CADY and HARIS BULJINA, | |
| *Defendants.* | |

## PLAINTIFF AMERICAN FREIGHT, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DAVID BELFORD'S MOTION TO DISMISS

## PRELIMINARY STATEMENT[1]

In the Motion, Belford, a former member of the board of directors of plaintiff American Freight and the brother of the Company's founder, argues that even though American Freight granted him millions of dollars' worth of options in exchange for agreeing to be bound by certain restrictive covenants (including non-compete, confidentiality, and non-solicitation covenants) set forth in his Option Agreement, and even though he received almost $15 million from American Freight in full satisfaction of his right to receive those options, American Freight released him from all of his obligations for no consideration at all and waived all of its contractual rights as part of an Option Cancellation Agreement that terminated *Belford's* option rights—not American Freight's rights. Belford's argument is outrageous on its face. The restrictive covenants he claims were casually tossed aside were critically important to American Freight—as demonstrated by American Freight's insistence that Belford and his co-defendant, Asaph Rink, another high ranking American Freight executive, be subject to restrictive covenants in connection with their departures from the Company. Nevertheless, Belford argues that American Freight simply gave up its contractual protections prohibiting him from: (i) opening a competing discount furniture retailer in the same locations as American Freight, (ii) misappropriating American Freight's trade secrets and confidential information and using them to compete against it, and (iii) overseeing a secret campaign to poach American Freight's most experienced employees.

Belford's argument fails as a matter of law, contract, and common sense. The Option Cancellation Agreement, by its terms, terminated Belford's rights—including his right to receive options, under the Option Agreement—but it did *not* terminate or otherwise release Belford from his

---

[1] Although Plaintiff American Freight, LLC disagrees with Defendants' suggestion that it is not a correct plaintiff in this proceeding, Plaintiff has nevertheless amended its complaint to add its affiliate American Freight Group, LLC, as an additional plaintiff. American Freight Group, LLC is the successor entity of American Freight Group, Inc. Therefore, the point is now moot. Citations to the complaint herein are to the original complaint that Belford moved on (Dkt. No. 1), but the paragraph numbering is the same across both the original and amended complaints (Dkt. No. 35).

obligations to American Freight under that agreement, nor did it waive any of American Freight's rights. Nor would it have made sense for American Freight to have done so. The restrictive covenants to which Belford agreed were a critical part of the bargain struck between the parties. Having performed in full (by virtue of paying Belford almost $15 million for his options), American Freight never would have agreed to waive its rights to Belford's continued performance, thereby relinquishing all of its bargained-for protections, for no consideration at all. Nor did it do so. To grant Belford's Motion, the Court would not only have to overlook the well-pled allegations of the Complaint, but it would also have to find—without the benefit of any evidentiary record—that the Option Cancellation Agreement—the language of which even Belford argues is, at best, ambiguous—should be construed to waive all of American Freight's rights (and Belford's obligations) under the Option Agreement. This would require the Court to ignore accepted canons of contractual interpretation as well as common sense. The Court should reject Belford's arguments and deny the Motion.

Belford's other arguments in support of the Motion are similarly unavailing. *First*, the motion to dismiss Plaintiff's claim for tortious interference should be denied because the Complaint's well-pled allegations are plainly sufficient and because the "fair competition" affirmative defense that Belford invokes requires a fact-intensive inquiry that is wholly inappropriate to assert on a motion to dismiss, where all well-pled allegations must be taken as true. *Second*, although Belford argues that Plaintiff's unjust enrichment claim should be dismissed because it is duplicative of Plaintiff's breach of contract claim, pleading in the alternative is clearly permitted under Fed. R. Civ. P. 8, and there is no basis to dismiss the claim at this early stage in the proceedings. In any event, Belford also argues that the Option Agreement was terminated and is no longer of any legal effect, which is an additional reason not to dismiss Plaintiff's alternative unjust enrichment claim. *Third*, in a now familiar pattern, Belford's argument that Plaintiff has failed to plead claims under OUTSA and DTSA again ignores the well-pled allegations of the Complaint and relies on unsupported factual assertions that purport to

contradict those allegations, which is plainly improper on a motion to dismiss. Accordingly, the Court should deny the Motion in full.

Relatedly, it makes little sense for the Court to hold a separate hearing on Belford's Motion before the scheduled preliminary injunction hearing. The issues raised in the Motion are intertwined with the issues American Freight raised in its motion for injunctive relief, and the Court should have the benefit of a full record before addressing the merits of the claims. Further, it would be inefficient to hear the Motion separately because claims against all the other defendants would remain pending.

## STATEMENT OF FACTS

American Freight is a furniture and mattress retailer. (Compl. ¶ 26.) Defendant Belford served as a director on American Freight's board for about three years from 2014 through 2017. (Compl. ¶¶ 36-37, 58.) Belford's position on the board gave him access to the inner workings of American Freight: its strategies, business plans, personnel information, and various other types of confidential and commercially sensitive information. (*See, e.g.*, Compl. ¶ 37.)

American Freight granted Belford stock options in January 2015 pursuant to an option agreement (the "Option Agreement"). (Compl. ¶ 39.) The Option Agreement, which is governed by Delaware law, sets forth the rights and obligations of Belford and American Freight. (Compl. ¶¶ 39, 44.) As relevant to the Motion, the Option Agreement requires Belford to sell American Freight his options upon the sale of American Freight, and it imposes certain restrictive covenants on him that obligate him to, among other things, refrain from competing with Plaintiff or soliciting its customers or employees for the time period that he holds any stock options and for two years thereafter. (Compl. ¶¶ 40-43.) By accepting the options American Freight granted him, Belford expressly "agree[d] to be bound by the terms and conditions" of the Option Agreement, including the restrictive covenants. (Compl. Ex. 2 at 1.)

3

In late 2019, American Freight was acquired (the "Merger").  (Compl. ¶ 45; Mot. Ex. 1 at 1.) In connection with the Merger, American Freight repurchased all outstanding stock options.  (Compl. ¶ 45.)  To effect that repurchase, American Freight entered into the Option Cancellation Agreement (the "OCA") with Belford (as well as with other options holders) in early 2020.  (Compl. ¶ 45; Mot. Ex. 1 § 3.)  American Freight paid Belford over $15 million in full satisfaction of his right to receive options as set forth in the Option Agreement.  (Compl. ¶ 45.)  Thus, the purpose of the Option Cancellation Agreement, as reflected in all of its terms, was to terminate Belford's right to options and to settle and release, once and for all, his rights and/or claims under the Option Agreement for which he received almost $15 million.  (Mot. Ex. 1 at 1) ("The purpose of this Agreement is to explain how the Merger will affect your Options and to memorialize certain agreements and commitments *on your part* in connection with the Merger and *in consideration of the payments you will receive in respect of the Options pursuant to the Merger*.")) (emphasis added).  Section 1 of the OCA, which is titled "Treatment of the Options in the Merger" and has a first sentence that expressly limits Section 1 by indicating that "the Merger will have the following effect on the Options you hold," states in relevant part, that "[a]t the Effective Time, your In-the-Money Options, whether vested or unvested, will automatically be cancelled and converted into the right to receive the Per Option Merger Consideration and **your Option agreement shall be terminated, in full satisfaction of your rights as an Option holder**." (Mot. Ex. 1 § 1) (emphasis added).  In addition, pursuant to the OCA, Belford also broadly released any claims against American Freight related to or arising from the options or his employment generally.  (Mot. Ex. 1 § 4.)  Tellingly, however, the OCA contains no language waiving or releasing any of American Freight's rights under the Option Agreement, even though the termination language Belford relies on extensively is clearly and expressly limited by its language to the termination of Belford's rights as an Option holder.

4

Mere months after the Merger closed in February 2020, Belford—in coordination with American Freight's former CEO, Asaph Rink, and the other former American Freight employees named as defendants in this action—launched a massive campaign to open competing Surplus Freight discount furniture stores near American Freight stores and began poaching American Freight employees to run them in violation of Belford's (and other employees') non-competition and non-solicitation obligations to the Company.  (Compl. ¶¶ 5, 77.)  Prior to this, Surplus Freight operated as Surplus Furniture and Mattress Warehouse and only had 33 store locations in Canada and three more in New York.  (Compl. ¶ 27.)  But after American Freight paid Belford *millions* to buy his Options in the Merger, he reestablished Surplus Furniture and Mattress Warehouse as Surplus Freight, LLC and now serves as its president and CEO.  (Compl. ¶¶ 27, 45.)  Under his leadership, Surplus Freight has aggressively and rapidly expanded beyond Canada and New York.  Since May 2020, Belford has opened 19 new Surplus Freight stores in Virginia, Maryland, and North Carolina—all key markets for American Freight—in breach of his restrictive covenants, and he plans to open at least 20 more stores throughout the country in 2021.  (Compl. ¶ 74.)  As a former director of American Freight, Belford is well-aware that American Freight employees are similarly bound by non-competition and non-solicitation provisions.  (Compl. ¶ 5.)  Despite this, Belford hired co-defendants Rink, Buljina, and Cady to work at Surplus Freight and assist with its expansion outside Canada and New York.  (Compl. ¶¶ 4, 78, 80.)

At Belford's direction and control, these employees deliberately solicited numerous other American Freight employees to defect to Surplus Freight.  (Compl. ¶¶ 79, 81.)  Since at least March 2021, co-defendants Buljina and Cady contacted numerous Company employees to recruit them to join Surplus Freight.  (Compl. ¶¶ 5, 79, 81-87.)  Demonstrating that they were aware that the solicited employees had non-competition and non-solicitation agreements, Defendants (incorrectly) instructed these employees that they would need to get fired by American Freight in order to evade those

5

obligations.  (Compl. ¶¶ 79, 81, 86.)  These departures have caused significant harm to the Company, including business disruptions and decreased sales, among other things.  (Compl. ¶¶ 89-94.)

Belford's misconduct goes well beyond Surplus Freight's expansion and poaching campaign. He and his co-defendants have also misappropriated the Company's confidential information and trade secrets to gain an improper competitive advantage over it.  (Compl. ¶¶ 6, 106-07.)  American Freight takes commercially reasonable measures to protect such information, including the use of confidentiality agreements, password-protected security and restricted access to its computer servers, limiting access to sensitive information on a need-to-know basis, maintaining files in locked storage and shredding documents, and other measures.  (Compl. ¶ 103.)  After his departure, Belford wrongfully and knowingly received Company confidential information and trade secrets from Rink, such as market research, financial information, merchandise and supply chain information, advertising techniques and strategy, and has been using said information to build Surplus Freight.  (Compl. ¶¶ 100-01, 105-07.)

After learning of this misconduct, American Freight sent Belford a cease and desist letter on April 8, 2021 to remind him of his obligations and demand that he stop his wrongdoing immediately. (Compl. ¶ 96.)  On April 16, 2021, Belford responded and did not deny that he was engaging in the alleged conduct; rather, he claimed that the restrictive covenants had been terminated and were not enforceable against him.  (Compl. ¶¶ 97.)  Accordingly, and based on the information discovered in its ongoing investigation, American Freight initiated this lawsuit and sought injunctive relief against Belford (and the other defendants) to enforce the restrictive covenants, for misappropriating and infringing on American Freight's intellectual property, for tortiously interfering with American Freight's contracts with its employees, and for unjustly enriching himself.  (*See, e.g.*, Compl. ¶¶ 137-44, 154-61, 179-205, 228-38.)

## LEGAL STANDARD

Sixth Circuit precedent requires that courts deciding whether to grant a defendant's motion to dismiss must "construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of [its] claims that would entitle [it] to relief." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (reversing dismissal of plaintiff's claims under Rule 12(b)(6)). This standard is exacting: to prevail on his Motion, Belford must demonstrate "beyond doubt" that American Freight is not entitled to relief on its claims. *See, e.g.*, *Pension Ben. Guar. Corp. v. Ferfolia Funeral Homes Inc.*, 835 F. Supp. 2d 416, 418 (N.D. Ohio 2011). The Complaint need only assert "direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d at 1240. "A court evaluating a motion to dismiss is generally limited to consideration of the complaint and any exhibits attached to the complaint," *see Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 745 (S.D. Ohio 2020), and may not credit defendants' factual arguments at this stage. *See, e.g.*, *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012).

## ARGUMENT

## I.    THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

Delaware law governs Plaintiff's breach of contract claims under Belford's Option Agreement. (Compl. ¶ 44.) To state a claim for breach of contract under Delaware law, American Freight need only allege "[1] the existence of the contract, whether express or implied; [2] the breach of an obligation imposed by the contract; and [3] the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (denying motion to dismiss breach of contract claim). Plaintiff has unquestionably satisfied these pleading requirements: Plaintiff alleges that it entered into the Option Agreement with Belford (Compl. ¶ 39), that Belford breached the restrictive covenants thereunder (Compl. ¶¶ 75, 77), and that this

breach harmed American Freight. (Compl. ¶¶ 89-94.) This is more than sufficient to state a claim under Delaware law.

Belford's only argument for dismissing American Freight's breach of contract claims rests on his assertion of an affirmative defense: that a separate and later-in-time agreement, the OCA, terminated the Option Agreement in full and released Belford from all of his obligations to American Freight, including his non-competition and non-solicitation covenants. (Mot. at 5.) But, even assuming that it is proper to entertain such an argument on a motion to dismiss, the plain language of the OCA simply doesn't say what Belford claims it does. Rather, by the plain language of the OCA, Belford's *rights* under the Option Agreement were terminated, but not his obligations. Moreover, despite including a broad release by Belford of all of his rights and claims in connection with his options and his employment by American Freight, the OCA is silent as to American Freight's rights under the Option Agreement and includes no waiver or release by American Freight of any of its rights as against Belford. The unavoidable conclusion is that Belford's obligations under the Option Agreement, including his restrictive covenant obligations, remain intact and are still enforceable against him. Thus, the Motion must be denied.

### A. The OCA Did Not Terminate Belford's Obligations or American Freight's Rights Under the Option Agreement—The OCA Only Terminated Belford's Rights Under the Option Agreement

In the Motion, Belford acknowledges that contractual language must be read in the context of the agreement as a whole and without placing undue emphasis upon particular words or phrases. (*See* Mot. at 10.) Notwithstanding this, Belford's argument relies on part of one clause in the OCA that is taken out of the context and contradicts not only other language in the OCA, but also the intent and purpose of the transaction it was drafted to effectuate. The language at issue reads:

1. **Treatment of the Options[2] in the Merger**

Subject to the provisions of the Merger Agreement, *the Merger will have the following effect on the **Options** you hold:* . . .

- At the Effective Time [of the Merger], your In-the-Money Options, whether vested or unvested, will automatically be cancelled and converted into the right to receive the Per Option Merger Consideration and your Option agreement shall be terminated, *in full satisfaction of your rights as an Option holder.* . . .

(OCA, Section 1, emphasis added in the Motion.) Ignoring all of the language that surrounds it and modifies its meaning, Belford argues that the phrase "your Option agreement shall be terminated" simultaneously waived all of American Freight's rights under the Option Agreement and released Belford from all of his obligations to American Freight.

Belford's reading of this provision is wrong for several reasons. First, it ignores the rest of the words in the provision at issue, which provide that the termination is in full satisfaction of *Belford's rights*, and impermissibly renders those words mere surplusage. Second, it contravenes settled law requiring that one's contractual rights may only be waived via express and unambiguous language. Finally, it disregards the commercial context of the transaction and would lead to an absurd and grossly unfair result.

*First*, Belford's proposed reading of that clause impermissibly ignores the rest of the provision, which continues: "your Option agreement shall be terminated, ***in full satisfaction of your rights as an Option holder***." The "in full satisfaction of your rights as an Option holder" language modifies and limits the clause, "your Option agreement shall be terminated," making clear that the termination is being effected for a specific purpose—the satisfaction of Belford's rights under the Option Agreement—and not for all purposes. Belford's proposed reading also ignores the title of Section 1 and the introductory sentence that make clear that the provision relates only to the treatment of

---

[2] "Options" is defined in the OCA's second paragraph as "one or more options to purchase shares of common stock of the Company [] granted to you under the 2015 Non-Qualified Stock Option Plan of the Company (the 'Plan')."

9

Belford's option rights upon the Merger being consummated.  Belford's argument would require the Court to disregard this language, effectively rendering it meaningless in contravention of long settled rules of contractual interpretation requiring that every word be given meaning.[3]  *See, e.g.*, *Palombo Grp. v. Poughkeepsie City Sch. Dist.,* 3 N.Y.S.3d 390, 392 (App. Div. 2015) ("When interpreting a contract, the construction arrived at should give fair meaning to all of the language employed by the parties . . . .").  "[T]he [C]ourt may not read [an] agreement to make any of its terms meaningless, or construe its language to render particular provisions mere surplusage." *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009); s*ee also In re John E. Andrus Mem'l Home v. De Buono*, 688 N.Y.S.2d 687, 688 (App. Div. 1999) ("A contract should not be interpreted in such a way as would leave one of its provisions substantially without force or effect.").  Tellingly, Belford offers no explanation of why this clear constraining language should be ignored.

Belford claims that American Freight "asks the Court to read the [so-called] residual clause . . . to mean that the restrictive covenants survive the OCA." (Mot. at 10-11.)  But that puts the cart before the horse.  The plain reading of the provision is that the Option Agreement was terminated only in satisfaction of Belford's rights, not his obligations.[4]  Consequently, Belford's obligations were never terminated.

<u>Second</u>, Belford's proposed reading would require the Court to add language addressing Belford's *obligations* under the Option Agreement that is absent from the OCA.  Had the parties intended for the OCA to cancel Belford's obligations under the Option Agreement as Belford claims,

---

[3] Delaware law governs the Option Agreement (Compl. Ex. 2 § 21(e)), and New York law governs the OCA (Mot. Ex. 1 § 8.).
[4] Belford's argument that the OCA lacks a "survival clause" preserving the restrictive covenants also fails because it is based on comparing language in the OCA with language in a completely different agreement that Belford entered into years earlier—the Agreement and General Release—and that the OCA does not even mention.  (Mot. at 8-9.)  On a motion to dismiss, a court cannot look to extrinsic evidence, such as other contracts, to interpret the plain meaning of provisions in the OCA.  *See, e.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").

the parties would have expressly stated that the restrictive covenants were terminated or, at a minimum, the language at issue would either (i) omit the qualifier "*in full satisfaction of [his] rights as an Option holder*" from the provision, as noted above, or (ii) expressly provide that the OCA terminates Belford's Option agreement "in full satisfaction of [his] *rights as an Option holder **and his obligations.**" The provision does neither. New York law provides that "[a] court may not rewrite into a contract conditions the parties did not insert by adding or excising terms under the guise of construction." *Slamow v. Del Col*, 571 N.Y.S.2d 335, 336 (App. Div. 1991), *aff'd*, 594 N.E.2d 918 (N.Y. 1992). Because the OCA expressly terminates only Belford's option rights under the prior Option Agreement and is silent as to his obligations, the Court should reject Belford's claim that the OCA terminates Belford's obligations as well.

*Third*, courts should strive to "harmonize" all the provisions in contracts when interpreting them. *See Guar. Tr. Co. of N.Y. v. Mexican Petroleum Co*., 245 F. 901, 903 (S.D.N.Y. 1917) ("It is, of course, an[] elementary principle of the construction of written instruments that their various clauses should be harmonized, if possible, and the courts seek to avoid a construction which will nullify or render inconsistent one clause or provision with or as against another."); *see also HTRF Ventures, LLC v. Permasteelisa N. Am. Corp.*, 141 N.Y.S.3d 17, 26 (App. Div. 2021) ("[C]ourts are not to interpret any clause as being superfluous."). Belford's reading of the OCA fails to harmonize all of its provisions and renders certain provisions of the OCA superfluous. For example, Section 4 of the OCA states, in relevant part, that:

> "[Belford] acknowledge[s] and agree[s] that [his] receipt of the cash payment with respect to [his] In the-Money Options . . . will constitute *full satisfaction of [his] rights* with respect to the canceled Options and that [he] will have no right to any other payments *or any other rights* with respect to [his] Options or [his] Option agreement after the Effective Time . . . ."

(Mot. Ex. 1 at § 4, emphasis added.) The inclusion of this language underscores that the OCA only terminated Belford's rights under the Option Agreement, and did not terminate his obligations.

Moreover, it shows that Belford's proposed expansive reading of the provision does not make sense when read in context with the rest of the OCA. The release in Section 4 only extends one way: from Belford to American Freight. That the OCA does not include a corresponding release of American Freight's rights and claims against Belford, or Belford's obligations to American Freight, further illustrates that the OCA was not intended to waive or release American Freight's rights (or Belford's obligations) under the Option Agreement. If the parties had intended and agreed upon a mutual release, they could have easily drafted language to effect that result. Under Belford's reading, however, the language in the OCA specifying that his rights under the Option Agreement were terminated cannot be harmonized with his argument that not only his rights but also his obligations and American Freight's rights were terminated.

_Fourth_, in order for American Freight to waive its rights under the Option Agreement, the OCA would have had to include language expressly doing so. *See, e.g.*, *DLJ Mortg. Cap. Corp. v. Fairmont Funding, Ltd.*, 920 N.Y.S.2d 1, 2 (App. Div. 2011) (holding that defendant failed to establish that plaintiff waived right where no "express waiver in writing" existed). There is no such language in the OCA. Moreover, in order to terminate and supersede the Option Agreement, the OCA would need to have explicit language that it meant to do so, and it has no such language. "[A] subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *CreditSights, Inc. v. Ciasullo*, No. 05 CV 9345 (DAB), 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007); *see also Globe Food Servs. Corp. v. Consol. Edison Co. of N.Y., Inc.*, 584 N.Y.S.2d 820, 821 (App. Div. 1992) (agreement purportedly cancelling all prior agreements did not supersede the prior agreements "in the absence of more definitive language such as that contained in contracts held to have such an effect as a matter of law").[5] Indeed, a case cited by Belford, *Penguin*

---

[5] To the extent Belford claims that American Freight somehow waived its rights, a similar analysis would apply. *See Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 516 (S.D.N.Y. 2009) (holding that waiver requires a

*Group (USA) Inc. v. Steinbeck*, also shows that the language in the OCA does not supersede the Option Agreement. *See* 537 F.3d 193 (2d Cir. 2008). Unlike the OCA at issue here, the 1994 agreement at issue in *Steinbeck* expressly provided that, "when signed by Author and Publisher, [it] will cancel and supersede the previous agreements, as amended, for the [works] covered hereunder." *Id*. at 196 (applying New York law). The OCA does not contain any such provision expressly superseding the Option Agreement, which further supports an argument that the Option Agreement's provisions not addressed in the OCA are still in full force and effect.

<u>Finally</u>, Belford's proposed reading of the provision is inconsistent with the transaction that the OCA was drafted to effect. Although Belford argues that American Freight's reading of Section 4 leads to an "absurd result," he offers no explanation as to how or why American Freight's interpretation is "absurd." (Mot. at 11.) In fact, the converse is true. Adopting Belford's reading of the OCA would require the Court to find that American Freight paid him almost $15 million dollars for stock options that he was granted in exchange for agreeing to restrictive covenants, and at the same time, terminated those same restrictive covenants *for no consideration whatsoever*. Such a reading is nonsensical on its face. Belford also argues that "American Freight failed to bargain for the survival of those restrictive covenants when it negotiated the OCA with Belford." (Mot. at 7-8.) But American Freight was not required to bargain for the survival of the restrictive covenants because, by their plain terms, they continued to apply for two years after Belford no longer held options unless the parties expressly agreed otherwise. Consequently, *Belford would have had to bargain for his restrictive covenant obligations to be terminated*. He did not, and instead, according to his argument, he received a $15 million windfall in connection with the purported termination of those obligations. The Court should reject this patently absurd result.[6]

---

clean manifestation of intent to relinquish a right). Whether a party had the intent to waive is typically a matter of fact, and would not be appropriately determined on a motion to dismiss. *Id.*

[6] *See, e.g.*, *Reape v. N.Y. News, Inc.*, 504 N.Y.S.2d 469, 470 (App. Div. 1986) ("[W]here a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord with the

### B. Any Ambiguity in the Language of the OCA Would Preclude Dismissal

Belford incorrectly argues that if the Court deems the OCA ambiguous, then the Court must construe it against American Freight. (Mot. at 11-12.) But the case law is clear that "[o]n a motion to dismiss, all ambiguities must be resolved in Plaintiffs' favor." *Serdarevic v. Centex Homes, LLC,* 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010) (denying motion to dismiss where plaintiff's interpretation of ambiguous phrase was not implausible). In any event, even if the Court were to agree with Belford that the relevant language in the OCA is ambiguous (it is not), then the meaning of the provision would be a question of fact that would preclude the dismissal of the breach of contract claims against Belford. *See, e.g.*, *Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14-CV-9839 JMF, 2015 WL 1809001, at *3 (S.D.N.Y. Apr. 20, 2015) ("'[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal' on a Rule 12(b)(6) motion.").

## II. THE COMPLAINT STATES A CLAIM FOR TORTIOUS INTERFERENCE

Belford argues that American Freight's tortious interference claim must be dismissed for two reasons. First, Belford claims that American Freight fails to plead "any facts" to support its claim. (Mot. at 13.) This is plainly incorrect. Second, Belford insists that any "alleged interference was not 'improper'" under a fact intensive seven-part balancing test. But Belford badly misconstrues the law governing claims for tortious interference with contracts, and the Court should reject his arguments.

To state a claim for tortious interference, a plaintiff needs to allege "(1) the existence of a contract, (2) the wrongdoers' knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). The Complaint satisfies each element. *First*, Plaintiff alleges that the former American Freight employees are bound by contracts containing non-

---

reasonable expectations of the parties."); *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (App. Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd [and] commercially unreasonable . . .").

compete and non-solicitation provisions, among other restrictive covenants. (*See, e.g.*, Compl. ¶¶ 37, 81–88, 233–36.) *Second*, Plaintiff alleges that Belford, *who served as a director at American Freight*, "know[s] of the existence and terms of these contractual obligations." (Compl. ¶¶ 37, 235.) Belford's position on the board of directors and his own, similar agreements with American Freight also permit the Court to infer that he knew about the restrictive covenants in the employees' contracts. *See, e.g.*, *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 931 (S.D. Ohio 2012) (court must "indulge all reasonable inferences that might be drawn from the pleading" in plaintiff's favor on a motion to dismiss). *Third*, the Complaint alleges that Belford knowingly induced and caused former American Freight employees to breach their contracts with Plaintiff when he recruited them work at a direct competitor. (*See, e.g.*, Compl. ¶¶ 5, 79, 81, 95, 236). Belford protests that the Complaint fails to offer details about Plaintiff's allegation that Belford was aware of or involved in the coordinated poaching campaign, but he is incorrect here too. "[T]he focus [on a motion to dismiss] is whether the plaintiff is entitled to offer evidence to support [its] claim," but the "complaint need not set down in detail all the particularities." *Miami Valley*, 852 F. Supp. 2d at 930-31. This is particularly true here, where the misconduct was secretive and there was no way for American Freight to obtain more detailed evidence before discovery. The Complaint's allegation that Belford directed and coordinated the poaching campaign, and thereby caused numerous former American Freight employees to breach their contracts with the company (*See, e.g.*, Compl. ¶¶ 5, 79, 81, 95, 236), is sufficient to plead a tortious interference claim as a matter of law. *Miami Valley*, 852 F. Supp. 2d at 942-43. Belford does not dispute that Plaintiff sufficiently pled the fifth element of its tortious interference claim, damages. (Mot. at 12-15; *see also* Compl. ¶¶ 89-94.)

Belford's other argument to dismiss the tortious interference claim addresses the fourth element, lack of justification, which goes to whether Belford's alleged interference with the former employees' contracts was "improper." *See Paramount Farms Int'l, L.L.C. v. Ventilex B.V.*, 61 N.E.3d

702, 707 (Ohio Ct. App. 2016). Belford argues in the Motion that his alleged interference could not be improper because it constituted "otherwise lawful economic competition." (Mot. at 14.) But the question of whether Belford's interference was justified as a matter of lawful competition, under the law of this Circuit, requires the application of a fact-intensive seven-part test. *See, e.g.*, *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999). It is inappropriate at the pleading stage to seek dismissal of the claim on this basis. Indeed, all the cases Belford cites on this point are rulings on summary judgment, not on motions to dismiss. (Mot. at 14-15 (citing *Baseball at Trotwood, LLC v. Dayton Pro. Baseball Club*, No. C-3-98-260, 2003 WL 25566103 (S.D. Ohio Sept. 2, 2003); *Fred Siegel Co., L.P.A.*, 707 N.E.2d 853; *Miller v. Pennitech Indus. Tools, Inc.*, Case No. 2356-M, 1995 WL 230894, at *1 (Ohio Ct. App. Apr. 19, 1995))).[7]

## III. PLAINTIFF'S UNJUST ENRICHMENT CLAIM SHOULD NOT BE DISMISSED

Belford argues that the Court should dismiss American Freight's unjust enrichment claim because it is duplicative of its breach of contract claim under the Option Agreement. (Mot. at 15-16.) Belford misstates the law. Fed. R. Civ. P. 8(d)(3) expressly permits Plaintiff to plead "as many claims as it has, regardless of consistency." *Miami Valley*, 852 F. Supp. 2d at 939. Courts only dismiss unjust enrichment claims when a contract undisputedly governs the parties' relationship, rendering the claims duplicative. *See, e.g.*, *Smith v. Fifth Third Bank*, Case No. 1:18-CV-464, 2019 WL 1746367, at *13 (S.D. Ohio Apr. 18, 2019), *report and recommendation*

---

[7] Regardless, the "economic competition" privilege Belford invokes here does not justify his tortious interference, as the *Ginn v. Stonecreek Dental Care* case shows. *See* 30 N.E.3d 1034 (Ohio Ct. App. 2015). In *Stonecreek Dental*, a dentist named Dr. Ginn sued a competing dental practice for tortiously interfering with a contract that Dr. Ginn had entered into with another dentist, Dr. Martin. *Id.* When Dr. Ginn acquired Dr. Martin's dental practice, they entered into a sales contract that specifically restricted Dr. Martin from competing with Dr. Ginn for five years. *Id.* at 1037. Another dental practice, Stonecreek Dental, knew about their non-compete agreement but nevertheless hired Dr. Martin about one year after he sold his practice. *Id.* at 1041, 1046. As *Stonecreek Dental* explains, the seven-factor balancing test "establish[es] a privilege of fair competition that will defeat a claim of tortious interference with a contract when the contract is terminable *at will.*" *Id.* at 1045 (emphasis added). However, "[r]estrictive clauses utilized in a covenant not to compete are *not terminable at will by definition* as there is a specific time period stated during which a party may not compete." *Id.* at 1046 (reversing directed verdict entered for Stonecreek Dental on the basis of competitor's privilege). Like the restrictive covenants at issue in *Stonecreek Dental*, the former employees' restrictive covenants bind them for a specified time period of two years (or more in the event that the covenant is tolled due to a breach). Therefore, Belford cannot invoke the "fair competition" privilege to justify his misconduct.

*adopted*, No. 1:18-CV-464, 2019 WL 4050946 (S.D. Ohio Aug. 28, 2019). However, Belford has argued that the OCA terminated the Option Agreement and that it is therefore unenforceable against him; indeed, that argument is the entire basis for his motion to dismiss Plaintiff's contract claims. (Mot. at 5-12.) Courts do not dismiss unjust enrichment claims as duplicative when the parties dispute whether the contract at issue is valid and enforceable. *See Miami Valley*, 852 F. Supp. 2d at 939 (denying motion to dismiss unjust enrichment claim where "it [was] not clear at this point whether Defendant concedes [that the contract was valid and enforceable]"). Belford cannot have it both ways. Plaintiff's unjust enrichment claim is not duplicative unless and until Belford concedes (or this Court finds) that the Option Agreement governs this issue and is enforceable against him. Accordingly, the Court should not dismiss the unjust enrichment claims. *See id.*

## IV. THE COMPLAINT STATES A CLAIM FOR VIOLATION OF THE OUTSA AND DTSA AND THESE CLAIMS SHOULD NOT BE DISMISSED

Belford argues that Plaintiff's claims for misappropriation of trade secrets should be dismissed because: (1) American Freight's business information described in the Complaint is not protectable as trade secrets; and (2) American Freight failed to take adequate precautions to guard the confidentiality of its alleged trade secrets. These arguments fail.

### A. American Freight's Business Information Is Protectable as a Trade Secret

Under Ohio law, "[w]hether information qualifies as a trade secret is ordinarily 'a question of fact to be determined by the trier of fact upon the greater weight of the evidence.'" *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002) (quoting *Fred Siegel Co., L.P.A*, 707 N.E.2d 853). Likewise, as the Sixth Circuit recently noted, district courts in this circuit have also found that the "trade secret" element of trade secret misappropriation claims under the DTSA "raise ***fact questions*** reviewed under the clear-error standard." *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020) (emphasis added); *see also, e.g.*, *PSC Indus., Inc. v. Johnson*,

No. 3:19-CV-00362, 2021 WL 1663574, at *14 (M.D. Tenn. Apr. 28, 2021) (denying motion for summary judgment because dispute over whether certain information was "confidential" under DTSA and state law presented genuine dispute of material fact); *Prudential Def. Sols., Inc. v. Graham*, 498 F. Supp. 3d 928, 937-38 (E.D. Mich. 2020) (finding that Plaintiff stated valid claim under DTSA because existence of trade secret is a fact-specific inquiry); *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *13 (E.D. Ky. Mar. 26, 2019) ("the determination of whether certain information constitutes a trade secret [under the DTSA] is a fact-based inquiry").

In any event, Ohio courts consistently recognize that information similar to that which American Freight identified as trade secrets is protectable as such. American Freight adequately identifies its trade secrets, which are defined as its Confidential Information and Trade Secrets in the Complaint. (Compl. ¶¶ 100-01, 107.) Ohio courts have recognized that pricing, sales, and marketing strategies, financial plans, marketing plans, the strengths and weaknesses of products, customer needs and preferences, customer retention programs, and compensation structures for sales people all can be protected as trade secrets. *See, e.g.*, *FirstEnergy Sols. Corp. v. Flerick*, No. 5:12-cv-2948, 2012 WL 6649201, at *3 (N.D. Ohio Dec. 20, 2012); *Dayton Superior Corp. v. Yan*, No. 3:12-cv-380, 2012 WL 5497804, at *7 (S.D. Ohio Nov. 13, 2012); *Litig. Mgmt., Inc. v. Bourgeois*, No. 95730, 2011 WL 2270553, at *3 (Ohio Ct. App. June 9, 2011); *Kemper Mortg., Inc. v. Russell*, No. 3:06-cv-042, 2006 WL 4968120, at *5 (S.D. Ohio May 4, 2006). The Sixth Circuit applying the DTSA has similarly recognized that a company's confidential business information, such as its strategic future planning, customer service levels, recruitment strategy, business development strategy, regional pricing strategy, and margins, is protectable as trade secrets. *RGIS, LLC*, 817 F. App'x at 162. Therefore, American Freight's Confidential Information and Trade Secrets are protectable.

Belford seeks to support his incorrect assertion that American Freight trade secrets are not protectable by citing to *A&P Tech., Inc. v. Lariviere*, Case No. 1:17-cv-534, 2017 WL 6606961 (S.D.

Ohio Dec. 27, 2017). (Mot. 17.) But Belford fails to provide adequate context for *A&P Technology*. First, Belford notes that a list of categories of business information in *A&P Tech.* similar to American Freight's was not a list of actual trade secrets in that case. *Id.* However, the trade secrets in *A&P Tech.* were considered in the context of the defendant's motion for identification of the plaintiff's trade secrets before allowing any discovery. *Id.* at \*7-9. This Court rightly indicated that in prior cases favoring pre-discovery identification of trade secrets, "identification was required before the discovery of any of the *defendants' trade secrets*, but was *not* required before *any* discovery could occur." *Id.* at \*9 (emphasis added). Therefore, the plaintiff's identification of its trade secrets was not required to adequately plead its trade secret misappropriation claim. Here, to survive a motion to dismiss, American Freight has sufficiently identified what is defined as its Confidential Information and Trade Secrets. *See, e.g.*, *RGIS, LLC*, 817 F. App'x at 162.

Second, Belford argues that "[t]erms such as 'engineering,' 'research and development procedures and materials,' and 'marketing materials' . . . do not in any way allow [d]efendants to properly craft a defense around the alleged misappropriation of trade secrets." *A&P Tech., Inc.*, 2017 WL 6606961, at \*10. Belford relies on *Water Management, Inc. v. Stayanchi*, 472 N.E.2d 715 (Ohio 1984) as an example where the plaintiff's engineering and marketing techniques were not granted trade secret protection. (Mot. 17.) But Belford fails to provide any context as to *why* such information was not protectable as trade secrets there. The Supreme Court of Ohio noted that the information at issue was typically known to those in the waste water treatment field, and that these findings were made at the trial level based on evidence. *Water Mgmt., Inc.*, 472 N.E.2d at 718. Here, there is no indication that its trade secrets are typically known by those in the retail furniture industry. To the contrary, American Freight alleges that its Confidential Information and Trade Secrets are *not* typically known by those in the retail industry due to the competitive value they provide American

Freight and the measures American Freight takes to protect their confidentiality.  (Compl. ¶¶ 102-03.)  To the extent this is disputed, it is a question of fact that cannot be resolved on a motion to dismiss.

**B.  American Freight Took Adequate Precautions to Protect Its Trade Secrets**

American Freight has sufficiently pled that it took reasonable measures to maintain the secrecy of its trade secrets.  American Freight indicated that its employees are required to agree to non-competition and confidentiality agreements, which prohibit the disclosure of American Freight's Confidential Information and Trade Secrets and provide that all such information must be returned to American Freight upon termination of the agreement.  (Compl. ¶ 103.)  In addition, American Freight protects its Confidential Information and Trade Secrets by storing it on a secure server, limiting access to such information to a limited number of authorized personnel on a need-to-know basis, requiring user IDs and passwords to access American Freight's computer system, locking up confidential document or shredding confidential documents upon disposal, requiring key or key card access to American Freight's facilities, and limiting visitors' access to American Freight's offices.  (*Id.*)  Accordingly, American Freight has sufficiently alleged this element of the claim.

Belford's sole argument that American Freight failed to take adequate steps to maintain the secrecy of its alleged trade secrets is that the OCA terminated the restrictive covenants.  (Mot. 19.)  However, as discussed above, American Freight did not terminate the restrictive covenants, and they are still in effect.  To the extent that there is any ambiguity as to whether the restrictive covenants are in effect, that is a question of fact that is not appropriately addressed in a motion to dismiss.  *See, e.g.*, *Dolansky v. Frisillo*, 939 N.Y.S.2d 210, 212 (App. Div. 2012).  ("[W]hether a contract has been terminated or cancelled by mutual agreement is generally a question of fact for the jury where the evidence is conflicting.").

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Belford's Motion to dismiss in its entirety.

20

Respectfully submitted,

By: */s/ David J. Butler*

TAFT STETTINIUS & HOLLISTER LLP

David J. Butler (0068455) (Trial Attorney)
David C. Roper (0099782)
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
dbutler@taftlaw.com
droper@taftlaw.com

*Attorneys for Plaintiffs American Freight, LLC*

WILLKIE FARR & GALLAGHER LLP

Tariq Mundiya
Thomas J. Meloro
James C. Dugan
Tara L. Thieme
Vanessa C. Richardson
Brittany M. Wagonheim
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000
tmundiya@willkie.com
tmeloro@willkie.com
jdugan@willkie.com
tthieme@willkie.com
vrichardson@willkie.com
bwagonheim@willkie.com

*Attorneys for Plaintiff American Freight, LLC*

21

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing *Plaintiff American Freight, LLC's Memorandum of Law in Opposition to Defendant David Belford's Motion to Dismiss* was filed via the Clerk of this Court's CM/ECF system and served upon all counsel of record this first day of June 2021.

*/s/ David J. Butler*
David J. Butler